# EXHIBIT A

# HEALTH SERVICES AND DEVELOPMENT AGENCY MEETING
## JUNE 26, 2013
## APPLICATION SUMMARY

| | |
|---|---|
| NAME OF PROJECT: | Tri-Cities Holdings, LLC d/b/a Trex Treatment Center |
| PROJECT NUMBER: | CN1302-005 |
| ADDRESS: | 4 Wesley Court<br>Johnson City (Washington County), Tennessee 37601 |
| LEGAL OWNER: | Tri-Cities Holdings, LLC<br>6555 Sugarloaf Parkway, Suite 307-137<br>Duluth (Gwinnett County), Georgia 30097 |
| OPERATING ENTITY: | Not Applicable |
| CONTACT PERSON: | Steven W. Kester<br>(404) 664-2616 |
| DATE FILED: | March 8, 2013 |
| PROJECT COST: | $670,000.00 |
| FINANCING: | Cash Reserves of Kester L.P. |
| PURPOSE OF REVIEW: | Establishment of a nonresidential substitution-based treatment center for opiate addiction and the initiation of opiate addiction treatment |

### DESCRIPTION:

Trex Treatment Center is seeking approval to establish a nonresidential substitution-based treatment center that provides opiate addiction treatment (referred to as OTP for opiate treatment program throughout the remainder of the report). The OTP will provide individual counseling and group therapy and will offer methadone and buprenorphine to prevent symptoms of withdrawal. The service area includes Carter, Cocke, Greene, Hamblen, Hawkins, Johnson, Sullivan, Unicoi and Washington counties. The OTP will operate as a private, for-profit clinic under all applicable licensure requirements of the Tennessee

Department of Mental Health and Substance Abuse Services (TDMHSAS). No state, federal, or local funding will be sought.

## SERVICE SPECIFIC CRITERIA AND STANDARD REVIEW:
## NON-RESIDENTIAL METHADONE TREATMENT FACILITES (NRMTF)*

A non-residential narcotic treatment facility should provide adequate medical, counseling, vocational, educational, mental health assessment, and social services to patients enrolled in the opioid treatment program with the goal of the individual becoming free of opioid dependency.

> *The applicant reports that patients will receive continuous and intensive counseling, services, and mental health assessments aimed at helping the patient become free of opioid dependency. This includes educational services delivered through counseling staff and referrals to vocational services. Patients will be supervised by a Board-Certified physician experienced in opioid dependency per TDMHSAS Rules. The applicant projects 530 patients in Year 1 while employing twelve (12) substance abuse counselors. The applicant indicates the industry standards dictate a client-to-counselor ratio of 50 to 1.*

> *The TDMHSAS Report (page 17) indicates the application does not have enough information to determine whether staffing requirements will be met and if staff will have the appropriate certifications.*

> *It is <u>unknown whether this criterion has been met.</u>*

### Need

The need for non-residential narcotic treatment facilities should be based on information prepared by the applicant for a certificate of need, which acknowledges the importance of considering the demand for services along with need and addressing and analyzing service problems as well.

The assessment should cover the proposed service area and include the utilization of existing service providers, scope of services provided, patient origin, and patient mix.

The assessment should consider that the users of opiate drugs are the clients at non-residential narcotic treatment facilities, and because of the illegal nature of opiate drug use, data will be based on estimates, actual counts, arrests for drug use, and hospital admittance for drug abuse.

Tri-Cities Holdings, Inc.<br>
CN1302-005<br>
June 26, 2013<br>
PAGE 2

The assessment should also include:

1. **A description of the geographic area to be served by the program;**

   *The applicant proposes to serve eligible individuals residing in a nine county service area, which includes Carter, Cocke, Greene, Hamblen, Hawkins, Johnson, Sullivan, Unicoi, and Washington counties. The applicant further defined the service area by using a 2002 report\*\* that included Methadone Service Areas (MSA). This information is included on pages 118-121 of the 1st (March 25, 2013) supplemental application.*

   *It appears that this criterion has been <u>met.</u>*

2. **Population of area to be served;**

   *The population of the proposed service area in 2013 was 600,895.*

   **The estimated number of persons, in the described area, addicted to heroin or other opioid drugs and an explanation of the basis of the estimate;**

   *The applicant estimates there are between 12,000 and 24,000 adults who are addicted to opiates (heroin and prescription pain pills) in the proposed nine (9) county service area. The applicant calculated the estimates from SAMSHA (Substance Abuse and Mental Health Services Administration) and TDMHSAS reports.*

   *The TDMHSAS Report questions the applicant's need methodology and indicates it has resulted in a misrepresentation.*

   *It appears that this criterion <u>has not been met.</u>*

3. **The estimated number of persons, in the described area, addicted to heroin or other opioid drugs presently under treatment in methadone and other treatment programs;**

   *TDMHSAS Central Registry data related to opioid treatment is no longer available to the Health Services and Development Agency. According to a representative of the TDMHSAS, the sole function of a central registry is to prevent multiple enrollments of individuals receiving methadone treatment. Further, any information disclosed to a central registry may not be used for any other purpose than the prevention of multiple enrollments, unless directed by a court order. TDMHSAS concluded that this language prevents the contents of the Central Registry being used to obtain utilization data.*

   *Since current data is not available, the applicant based its estimates on*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 3

*previously released 2008 Central Registry data, and a telephone survey.*

*The 2008 Central Registry data indicated 175 patients in the nine county service area received treatment from a Tennessee-based methadone maintenance provider. The applicant calculated that 866 patients in the proposed service area now need treatment by applying 2008 Central Registry data to population data (see page 19 of the 1st supplemental).*

*The applicant estimated 950-1,500 people receive treatment for opioid dependency from clinics in Knoxville, Tennessee and Asheville and Boone, North Carolina. The methodology for the estimate is based on telephone interviews and the Applicant's "own data and extrapolation." The methodology is detailed on pages 19 and 20 of the March 25, 2013 supplemental application.*

*The TDMHSAS Report questions the applicant's need methodology.*

*Since current data is not available, staff contacted the Virginia and North Carolina Methadone Authorities in early June 2013. Virginia estimated as many as 50 Tennessee residents were crossing the state line into Virginia for treatment. North Carolina has indicated it will respond prior to the June 26 Agency meeting.*

*While this criterion does require the applicant to "estimate the number of persons addicted to heroin or other opioid drugs presently under treatment...." this estimate relies on 2008 Tennessee Department of Mental Health Registry data and on secondary sources which have not been verified.*

*It is <u>unknown whether this criterion has been met</u>.*

**4. Projected rate of intake and factors controlling intake;**

*The applicant projects the rate of intake will be 50 patients per week.*

**5. Compare estimated need to existing capacity.**

*There are 77 SAMSHA certified buprenorphine (suboxone) outpatient providers in the proposed service area. There are no existing OTPs in the service area.*

**Also, consideration should be given to the reality that existing facilities can expand or reduce their capacity to maintain or treat patients without large changes in overhead.**

*There are no existing OTPs in the service area. Migration data of patients who travel outside of the proposed service area is not available.*

*It appears that this criterion is <u>not</u> applicable.*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 4

Service Area

The geographic service area should be reasonable and based on an optimal balance between population density and service proximity.

> *There are no OTPs in the applicant's proposed service area.*

> *It appears that this criterion has been met.*

The relationship of the socio-demographics of the service area and the projected population to receive services should be considered. The proposal's sensitivity to and the responsiveness to the special needs of the service area should be considered including accessibility to consumers, particularly women, racial and ethnic minorities, and low-income groups.

> *The applicant states a U.S. Center for Disease Control (CDC) report states opioid abuse and overdose cuts across all genders, age groups, race, and economics. The TDMHSAS report (page 9) indicates the cited CDC reference cannot be confirmed.*

> *The applicant references the Appalachian Commission Report of 2008. The TDMHSAS Report (page 11) questions whether this study can be appropriately applied to the proposed service area.*

> *The program will be accessible to a few people in the low-income group. Charity care will be provided at the rate of approximately 2.0% of total gross revenue in Years 1 and 2 ($35,643 or approximately 11 patients and $78,074 or 21 patients, respectively).*

> *Since a small percentage of charity care will be provided, it appears that the program may be accessible to a few people in the low-income group. It appears that this criterion may be partially met.*

Relationship to Existing Applicable Plans

The proposals' estimate of the number of patients to be treated, anticipated revenue from the proposed project, and the program funding source with description of the organizational structure of the program delineating the person(s) responsible for the program, should be considered.

> *The applicant proposes to provide services to 530 patients in 2014 generating gross operating revenues of $1,782,144. Treatment is self-funded by the patient. The applicant has provided an organizational structure of the*

*program and person responsible for the program.*

*According to the SAMSHA Alcohol and Drug Services Study (ADSS) titled "The National Treatment System: Outpatient Methadone Facilities", March 2004, Private for-profit outpatient methadone facilities were much less dependent on public revenue than other facilities. Seventy-nine percent of private for-profit facilities received less than half of their revenue from public sources.*

*It appears that this criterion has been met.*

**The proposals' relationship to policy as formulated in local and national plans, including need methodologies, should be considered.**

*There appears to be no local or national plans that include needs methodologies.*

*It appears that this criterion is not applicable.*

**The proposals' relationship to underserved geographic areas and underserved population groups, as identified in local plans and other documents, should be a significant consideration.**

*In June 1999, the Washington County Health Council developed plans to address priority health concerns. Adult Alcohol/Drug Abuse was ranked as the 3rd highest area of concern for Washington County as based on the following: (a) the size of population impacted, (b) the seriousness of health concern both present and future, and (c) the effectiveness of potential interventions. Source: The Washington County Health Council Report 1999.*

*The report did not specifically address nonresidential substitution-based opioid treatment programs.*

*It appears this criterion is not applicable.*

**The impact of the proposal on similar services supported by state appropriations should be assessed and considered.**

*The applicant plans to utilize self-pay programs and does not plan to participate in State and Federal programs such as TennCare or Medicare.*

*It appears that this criterion is not applicable*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 6

The degree of projected financial participation in the Medicare and TennCare programs should be considered.

*The applicant plans to utilize self-pay programs and does not plan to participate in State and Federal programs such as TennCare or Medicare.*

*It appears that this criterion is not applicable*

* Note to Agency Members: The criteria and standards for certificate of need have not been updated to reflect the change in nomenclature to nonresidential substitution-based treatment center for opiate addiction. The Non-Residential Methadone Treatment Facilities (NRMTF) standards were included in the 2000 Edition of the Guidelines for Growth. The Division of Health Planning has had preliminary discussions with TDMHSAS regarding the development of new standards and criteria.

**The applicant is referring to a report generated in response to Public Chapter 363 of the Acts of the 2001. The legislation directed the Commissioner of Health to study issues relating to the need for and location of non-residential methadone treatment facilities in the Certificate of Need process. The legislation directed the Commissioner to consult with the Health Facilities Commission and the Board for Licensing Health Care Facilities to design precise guidelines concerning the location of new non-residential methadone treatment facilities and the need for any additional regulation of non-residential methadone treatment facilities. The legislation also directed the Commissioner to report recommendations to the house health and human resources committee and the senate general welfare, health and human resources committee on or before January 1, 2002. The Commissioner assembled a task force, which proposed recommendations for changes to the rules of the Board for Licensing Health Care Facilities that govern methadone treatment facilities as well as modifications to the Guidelines for Growth. The goal was to provide assistance in making decisions about the need for and location of methadone facilities in the state. Information from the state's Central Registry of methadone patients in treatment was compiled, analyzed, and studied by the task force.

The report designated 23 distinct Methadone Service Areas (MSA) within the state to assure reasonable patient access to a methadone program. MSA was defined as a county or constellation of contiguous counties in the state that comprise a sufficient general population making it likely that a minimum number of opiate dependent persons reside in the MSA who seek treatment could support a program. The minimum population foundation was balanced with the need to establish geographic boundaries such that patients living within the MSA would reside within an hour drive one-way to a treatment program if the program were established in the heart of the MSA.

A copy of the Report is attached to this summary.

Staff could find no evidence that the General Assembly or any state agency adopted any of the findings. TDH did revise rules related Non-Residential Narcotic

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 7

*Treatment Facilities, effective May 4, 2003. There were no changes to the Guidelines for Growth. Executive Order 44, dated February 23, 2007, transferred the regulation of all Alcohol & Drug facilities back to the Department of Mental Health.*

SUMMARY:

Tri-Cities Holdings, LLC d/b/a Trex Treatment Center is an active limited liability company registered with the Tennessee Secretary of State. It was formed on January 11, 2013 with two members holding 50% membership each: Steve Kester and Leigh B. Dunlap. Steve Kester serves as the Chief Executive Officer.

A brief summary of the management biographies of the owners (March 25, 2013 supplemental/page 49) follows: Steve Kester is the co-founder of Treatment Centers HoldCo d/b/a Crossroads Treatment Centers. He is currently a minority shareholder of Treatment Centers HoldCo and is not active in the management of the company. Treatment Centers HoldCo operates 3 methadone treatment centers in North Carolina, 3 in South Carolina, 2 in Georgia and 1 in Virginia. Leigh B. Dunlap has no healthcare experience. She is identified as a "unit holder" and has no management position in the company.

The proposed facility will be located on 1.66 acres in an 8,260 square feet facility at 4 Wesley Court, Johnson City (Washington County). This location is an industrial area zoned for medical services. The applicant holds an Option to Lease agreement with an initial term of 5 years with an option to renew for two additional 5-year terms (for a total of 10 additional years). The monthly lease is $5,440. The applicant indicates the size of the facility and accompanying parking can accommodate 1,000 patients with a one-shift operation.

The applicant provided a copy of the Johnson City Zoning Regulations specific to methadone clinics in the March 25, 2013 (page 109) supplemental response. The applicant does not comply with zoning regulation 6.13.3.4, items E. and F. (below), has requested a zoning variance, and has challenged the denial by Johnson City in Federal Court (such litigation is ongoing).

6.13.3.4 Methadone Treatment Clinic provided:

E. The hours of operation shall be between 7:00 am and 8:00 p.m.

*The applicant plans to operate from 5:00 A.M. until noon seven days a week. The applicant states a majority of the traffic at the proposed facility is expected between 5:00 A.M. and 7:00 A.M. so patients can get to work and school.*

**Tri-Cities Holdings, Inc.**
**CN1302-005**
**June 26, 2013**
**PAGE 8**

*Note to Agency Members: The TDMHSAS Map of the 12 existing Tennessee Statewide Opioid Treatment Centers indicate 5 centers open at 5:00 A.M., 5 at 5:30 A.M., 1 at 5:45 A.M., and 1 at 6:00 A.M.*

F. The facility shall be located on and the primary access shall be from an arterial street.

*The applicant states the facility is located on a cul-de-sac with industrial and commercial customers nearby (construction supply company, a construction company, and an empty lot).*

The total population of the nine county primary service area (PSA) is estimated at 600,895 residents in calendar year (CY) 2013 increasing by approximately 1.7% to 610,962 residents in CY 2017. The applicant states the proposed service area represents Washington, Carter, Johnson and Unicoi counties in Methadone Service Area #1, Sullivan and Hawkins counties in MSA #2, and Greene, Cocke and Hamblen counties in MSA #3.

There are currently no other licensed facilities in the proposed service area. If approved, Tri-Cities Holdings, Inc. will be the 13th OTP in the state (note: a map of all licensed and proposed OTPs is provided with this summary). The closest treatment facilities in the state are located in Knoxville (Knox County), TN.

Behavioral Health Group (BHG) based in Dallas, Texas currently owns a majority of the existing methadone clinics (nine of the twelve) in Tennessee. BHG owns clinics in Knoxville (2), Nashville (1), Memphis (3), Jackson (1), Paris (1), and Columbia (1). BHG also owns 29 other facilities in Colorado, Kansas, Kentucky, Louisiana, and Texas.

Since TDMHSAS Central Registry Opioid Treatment data is no longer available, staff has attempted to pull together historical information for Agency members.

Paris Professional Associates, CN0903-014A, reviewed in 2009, was the last methadone application that included methadone registry data. The applicant provided a copy of the 2008 Methadone Registry that indicates consumers by county of residence and clinic. A copy of the 2008 registry is located on the March 25, 2013 supplemental pages 110B-110G. This registry captured only the Tennessee facilities where methadone patients receive services. The methadone registries of adjoining states were not available.

The following table displays the 2008 service area out-migration for the nine-county service area to Tennessee OTPs:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 9

2008 Methadone Registry
Proposed Service Area Out-Migration

| County | Treatment Facility | | | | Total |
|--------|-----------------------------------|-------------------------------|------------------------------------|------------------------------------|-------|
|        | Davidson County-MidSouth TX Ctr. | Hamilton County-Volunteer TX Ctr. | Knox DRD Knoxville-Location #1 | Knox DRD Knoxville,-Location #2 |       |
| Carter |  | 4 | 2 | 1 | 7 |
| Cocke |  | 1 | 10 | 12 | 23 |
| Greene |  |  | 2 | 8 | 10 |
| Hamblen |  | 14 | 38 | 31 | 83 |
| Hawkins | 1 | 2 | 5 | 15 | 23 |
| Johnson | 1 |  | 1 |  | 2 |
| Sullivan | 1 |  | 10 | 8 | 19 |
| Unicoi |  | 1 |  | 1 | 2 |
| Washington |  |  | 4 | 2 | 6 |
| Total | 3 | 22 | 72 | 78 | 175 |

*Source: CN1302-005*

According to the TDMHSAS Tennessee Opioid Treatment Clinics Map, the hours of operation of Knoxville clinics are Mon-Sat, 5:30 A.M.-2:30 P.M. with dosing hours between 5:30 A.M.-11:00 A.M. and Saturday between 6:00 A.M. to 9:00 A.M.
*Source: http://www.tennessee.gov/mental/A&D/A_D_docs/methadonelabeledclinics.pdf*

The applicant states patients must attend every day (seven days a week) for the first 45 days of treatment before being permitted to take the drugs off-site.

The 2001 Methadone Task Report indicated the number of people seeking treatment for opiate addiction was directly proportional to the distance traveled to receive treatment. The Task Force report also noted the number of patients diminish greatly when the distance lived from the clinic exceeds 60 miles. The following is a table of driving distances and driving time for methadone services from larger cities in the proposed service area to the proposed clinic in Johnson City, TN and the nearest existing clinics located in Knoxville, TN and Weaverville, NC.

The closest Tennessee OTP is located in Knoxville (Knox County), Tennessee which is located over 100 miles away or approximately 1 hour and 45 minute drive time from the cities of Johnson City, Bristol, and Kingsport in the proposed service area. The closest out of state OTP is located in Weaverville, NC with a traveling distance of 52 miles/56 minutes for residents of Johnson City, TN.

| Methadone Provider | Johnson City, TN (Washington Co.) | Kingsport, TN (Sullivan Co.) | Bristol, TN (Sullivan Co.) |
|---|---|---|---|
| Proposed Tri-Cities Holdings, Inc., Johnson City, TN | 0 | 21 miles/28 min. | 22 miles/36 min. |
| Crossroads of Weaverville, Weaverville, NC | 52 miles/56 min. | 74 miles/1 hr. 23 min. min. | 76 miles/1hr.32 min. |
| DRD Knoxville Medical Clinic-2 locations, Knoxville, TN | 106.5 miles/1 hr. 43 min. | 102 miles/1 hr. 42 min. | 112 miles/1 hr. 47 min. |

Source: MapQuest

The applicant proposes to serve 530 clients in Year 1 increasing to 1,056 clients in Year 2. Of the 530 patients served during the first year, the applicant projects to serve 387 methadone patients or 73%, 133 buprenorphine-based treatment patients or 25%, and 10 or 2% abstinence-based treatment patients.

The fee schedule is on page 37 of the March 25, 2013 supplemental information. A failed drug screen results in a charge of $25.00. The applicant indicates the buprenorphine daily dosage fee for TennCare members would be adjusted if TennCare pays for the prescription.

The applicant reports methadone maintenance treatment (MMT) was developed in 1964 and is the most common and established form of opioid addiction treatment. In October 2002, the applicant notes the Food and Drug Administration (FDA) approved buprenorphine, subutex, and suboxone for use in opioid addiction treatment. The applicant states the greatest difference between the two is that buprenorphine is a partial opiate agonist but methadone is a full opiate agonist. The applicant indicates private physicians rarely offer counseling in conjunction to buprenorphine treatment and states getting buprenorphine from a physician's office is termed "dose and dash" because of the lack of counseling, drug testing, diversion monitoring and care planning. The applicant notes the following differences between buprenorphine and methadone:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 11

- Buprenorphine is harder to abuse so patients are allowed to take it home. Methadone can be more easily abused, when patients first start treatment they need to travel to a clinic each day to take their dosage. At later stages of treatment, patients are allowed take-home doses of methadone.
- For people with heavy opiate habits and serious addiction, buprenorphine cannot provide effective relief from withdrawal symptoms. Methadone works better for such individuals.
- Buprenorphine is generally less addictive than methadone.
- Withdrawal symptoms of a buprenorphine detox are generally less severe than methadone detox, and
- The risk of fatal overdose on buprenorphine is less than the methadone.

The applicant states the OTP plans to utilize self-pay programs and does not plan to participate in Medicare or TennCare. Effective August 1, 2005 TennCare no longer provided coverage for methadone maintenance services for adult TennCare enrollees. According to the TennCare Quick Guide dated May 2013, Methadone Maintenance Treatment is covered as medically necessary for children under age 21. TennCare also covers generic buprenorphine, Subutex and Suboxone for opiate addiction. The applicant reports conducting a telephonic survey on March 25, 2013 of all 12 OTPs and finding that none accepted TennCare. The applicant indicated TennCare participants (ages 21 and under) may submit claims to TennCare for reimbursement for services received from out-of-network methadone maintenance providers.

*Note to Agency Members: The Addiction Treatment Act of 2000 allows qualifying physicians to receive a waiver from the special registration requirements in the Controlled Substances Act for the provision of medication-assisted opioid therapy. This waiver allows qualifying physicians to practice medication-assisted opioid addiction therapy with Schedule III, IV, or V narcotic medications specifically approved by the Food and Drug Administration (FDA). On October 8, 2002 Subutex® (buprenorphine hydrochloride) and Suboxone® tablets (buprenorphine hydrochloride and naloxone hydrochloride) received FDA approval for the treatment of opioid addiction. The physician has the capacity to refer addiction therapy patients for appropriate counseling and other non-pharmacologic therapies, and that the physician will not have more than 30 patients on addiction therapy at any one time for the first year. (Note: the number of a physician's practice locations does not affect the 30-patient limit. One year after the date on which the physician submitted the initial notification, the physician will be able to submit a second notification stating the need and intent to treat up to 100 patients.) Source: http://buprenorphine.samhsa.gov/waiver_qualifications.html*

The following chart reflects the TennCare top five (5) drugs by payment amount for the first quarters of 2011 and 2012. Buprenorphine/Naloxone was ranked number #4 in payment amount ($3,668,218 ) in the 1st quarter of 2011 and #5 in

2012 ($2,211,589). There appears to be a 65.8% decrease in the dollar amount of Buprenorophine/Naloxone reimbursed by TennCare from the 1st quarter of 2011 to the 1st quarter of 2012. If the 2012 first quarter amount of $2,211,589 were annualized, the amount for 2012 reimbursed by TennCare statewide for Buprenorphine/Naloxone would be $8,846,356.

### TennCare
### Top 5 Drugs by Payment Amount for Adults
### First Qtr.2011 & 2012

| Rank | Drug 1st Qtr. 2012 | Payment 1 Qtr. 12 | Rank 2011 | Payment 1 Qtr. 2011 |
|---|---|---|---|---|
| 1 | Aripiprazale | $4,765,688 | 2 | $4,147,591 |
| 2 | Dexlansoprazole | $3,483,676 | 5 | $2,878,886 |
| 3 | Olanzapine | $2,877,449 | 3 | $3,973,118 |
| 4 | Teleprevir | $2,574,011 | - | $382,965 |
| 5 | **Buprenorphine/Naloxone** | $2,211,589 | 4 | $3,668,218 |

*Source: TenniCare Drug Utilization Review Advisory board, September 11, 2012*
*https://tnm.providerportal.sxc.com/rxclaim/TNM/DUR%20Presentation%2009112012.pdf*

The SAMSHA (Substance Abuse and Mental Health Services Administration) physician and treatment locator for physicians certified for Buprenorphine Treatment indicates there are 77 certified physicians and one (1) facility (Indian Path Medical Center) in the proposed 9 county service area. According SAMSHA, there are 17 physician providers certified for Buprenorphine Treatment in Bristol, 2 in Blountville, 16 in Kingsport, 29 in Johnson City, 2 in Gray, 3 in Mountain Home, 4 in Morristown, 3 in Elizabethton and 1 in Unicoi.

HSDA staff analysis of the current SAMSHA buprenorphine certified providers practicing in the State of Tennessee revealed the following:

- There are 298 unduplicated SAMSHA buprenorphine certified providers statewide
- The proposed nine county service area has 77 unduplicated SAMSHA certified buprenorphine providers
- The proposed service area represents 600,895, or **9.4%** of the State of Tennessee 2013 population of 6,414,297, but has **25.8%** of the statewide buprenorphine certified providers
  *Source: http://buprenorphine.samhsa.gov/bwns_locator/*

The applicant's proposed direct patient care staffing includes 1 contract Medical Director, 1 FTE Program Director, 1 FTE Charge Counselor, 1 FTE Charge Nurse,

Case 2:13-cv-00305-JRG-MCLC   Document 1-2   Filed 07/08/13   Page 14 of 63   PageID #: 91

2 FTE LPN Dosing Nurse and 12 FTE Substance Abuse Counselors. The applicant notes the clinical staff will satisfy State Minimum Staffing Qualification Program Requirements for an OTP. The applicant states the industry guidelines are 50 patients per counselor. The applicant does not have current plans to hire a security guard but will do so if the need arises.

The applicant projects $1,782,144 in total gross revenue on 530 clients during the first year of operation increasing to $3,903,715 on 1,056 clients in Year 2 (approximately $3,362 to $3,697 per client, respectively). Net Operating Income less Capital Expenditures will equal $7,638 in Year 1 increasing to $565,578 in Year 2.

The applicant will provide charity care at the rate of approximately 2.0% of total gross revenue in Years 1 and 2 ($35,643 or approximately 11 clients increasing to approximately $78,074 or 21 clients). For comparative purposes, in June 2009 the Agency reviewed Upper Cumberland Private Clinic (CN0903-013D) which was proposed to be located in Spencer, Tennessee. Charity Care was proposed at the rate of approximately 10% of total gross revenue in Year 1 increasing to approximately $393,357.00 or 13.3% of total gross revenue in Year 2 of operations.

The applicant states the facility will require no structural modifications and has sufficient parking. The interior structure will require renovation. The renovated cost is $160,000 or $20.00 per square foot. The renovation will include:

- Partitioning large rooms to create offices for counselors, doctors and the Executive director
- Partitioning large rooms and adding plumbing to build examination and lab rooms
- Constructing dosing rooms and associated dosing windows
- Constructing a room for the pharmacy and associated medicine vault
- Constructing a check-in booth
- The addition of electrical, cabling, video and communications.

After completion, the interior structure will include 1 large waiting area, 1 exam room, 1 pharmacy (dosing equipment and vault), 13 counseling rooms, 2 dosing rooms, 1 group room, American with Disabilities (ADA) compliant restrooms, an unfinished small storage area, and 1 employee break room. The applicant states the lobby area will accommodate 153 people at one time.

The total estimated project cost is $670,000.00 which includes $25,000.00 for Architectural and Engineering Fees, $30,000.00 for Legal, Administrative, and Consultant Costs, $160,000.00 for Site Preparation Costs, $23,500 for Moveable

Equipment, $20,000 for Office Equipment, $320,000 for Lease Expense, $8,500 for Patient Software, $80,000 for Operating Loss Costs, and $3,000 for CON filing fees.

The project will be financed by cash reserves of Kester L.P. A March 27, 2013 letter from Mike Fenton, Senior Vice President of Maxim Group, which is investment banking, securities and investment management firm, attests to the availability of cash in the amount of $762,888.60 to finance the proposed project.

The applicant indicates the Commission on Accreditation of Rehabilitation Facilities (CARF) will accredit the facility.

The applicant provided documentation of its required statutory notices to state, county and local area government officials, including State Senator Rusty Crowe, State Representative James (Micah) Van Huss, Washington County Mayor Dan Eldridge, and City of Johnson City Mayor Jeff Banyas.

Public Hearing

*Tennessee Health Services and Planning Act*, 68-11-1608 (b), states "upon request by interested parties or at the direction of the executive director, the staff of the agency shall conduct a fact-finding public hearing on the application in the area in which the project is to be located". A public hearing was requested for this application. The hearing was held on May 28, 2013 in the Jones Meeting Center, Johnson City Public Library, 100 W. Millard Street, Johnson City (Washington County), Tennessee. A copy of the minutes and transcript are attached behind the application.

*The applicant has submitted the required corporate and real estate lease documentation. HSDA staff reviewed these documents. A copy will be available for member reference at the meeting. Copies are also available for review at the Health Services and Development Agency office.*

Should the Agency vote to approve this project, the CON would expire in **two** years.

## CERTIFICATE OF NEED INFORMATION FOR THE APPLICANT:

There are no other Letters of Intent, pending applications, denied applications, or outstanding Certificates of Need for this applicant.

## CERTIFICATE OF NEED INFORMATION FOR OTHER PROVIDERS IN THE SERVICE AREA:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 15

There are no letters of intent, denied or pending applications, or outstanding Certificates of Need for other health care organizations in the service area proposing this type of service.

**PLEASE REFER TO THE REPORT BY THE DEPARTMENT OF MENTAL HEALTH AND SUBSTANCES ABUSE SERVICES FOR A DETAILED ANALYSIS OF THE STATUTORY CRITERIA OF NEED, ECONOMIC FEASIBILITY, AND CONTRIBUTION TO THE ORDERLY DEVELOPMENT OF HEALTH CARE IN THE AREA FOR THIS PROJECT. THAT REPORT IS ATTACHED TO THIS SUMMARY IMMEDIATELY FOLLOWING THE COLOR DIVIDER PAGE.**

PME
06/19/2013

# LETTER OF INTENT



## LETTER OF INTENT
# TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

The Publication of Intent is to be published in the **Johnson City Press** which is a newspaper
(Name of Newspaper)
of general circulation in **Washington** , Tennessee, on or before **March 7** , 20**13**
(County) (Month / day) (Year)
for one day.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is to provide official notice to the Health Services and Development Agency and all interested parties, in accordance with T.C.A. § 68-11-1601 *et seq.,* and the Rules of the Health Services and Development Agency,

**Tri-Cities Holdings LLC d/b/a Trex Treatment Center**         **NA**
(Name of Applicant)                                                        (Facility Type-Existing)

owned by: **Tri-Cities Holdings LLC**         with an ownership type of **Limited Liability Company**

and to be managed by: **Manager Steve Kester**         intends to file an application for a Certificate of Need

for [PROJECT DESCRIPTION BEGINS HERE]:

Establishment of a nonresidential substitution-based treatment center for opiate addiction offering methadone and buprenorphine which is designed to treat opiate addiction by preventing symptoms of withdrawal. In addition, we will offer individual counseling services and group therapy to help break the cycle of addiction and provide patients the life skills and resources to serve as productive members of their communities, families and employers.. The location of the proposed project is 5 Wesley Court, Johnson City, Tennessee 37601. The project cost is estimated to be $670,000.

The anticipated date of filing the application is: **March 7**         20 **13**

The contact person for this project is **Steve Kester**         **Manager**
(Contact Name)                                              (Title)

who may be reached at: **Tri-Cities Holdings LLC**         **6555 Sugarloaf Parkway Suite 307-137**
(Company Name)                                     (Address)

**Duluth**         **Georgia**         **30097**         **404-664-2616**
(City)             (State)             (Zip Code)       (Area Code / Phone Number)

*SF W. IC*         **March 1, 2013**         **swkester@gmail.com**
(Signature)                 (Date)                 (E-mail Address)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**The Letter of Intent must be filed in triplicate and received between the first and the tenth day of the month. If the last day for filing is a Saturday, Sunday or State Holiday, filing must occur on the preceding business day. File this form at the following address:**

Health Services and Development Agency
The Frost Building, Third Floor
161 Rosa L. Parks Boulevard
Nashville, Tennessee 37243

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The published Letter of Intent must contain the following statement pursuant to T.C.A. § 68-11-1607(c)(1). (A) Any health care institution wishing to oppose a Certificate of Need application must file a written notice with the Health Services and Development Agency no later than fifteen (15) days before the regularly scheduled Health Services and Development Agency meeting at which the application is originally scheduled; and (B) Any other person wishing to oppose the application must file written objection with the Health Services and Development Agency at or prior to the consideration of the application by the Agency.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HF51 (Revised 01/09/2013 – all forms prior to this date are obsolete)

# Copy

## Supplemental #1

# Tri-Cities Holdings, LLC

# CN1302-005

2013 MAR 25 PM 12 05

COPY

## Application for

# CERTIFICATE OF NEED

### Filed with the

# Tennessee Health Services and Development Agency

## CN1303-005

Filed by:
**Tri-Cities Holdings LLC**
d/b/a Trex Treatment Center
6555 Sugarloaf Parkway Suite 307-137
Duluth, GA 30097

**March 22, 2013**

# Table of Contents

SECTION A.  APPLICANT PROFILE                              1

SECTION B: PROJECT DESCRIPTION

    I.     Executive Summary                              4

    II.    Project Narrative                              6

    III. A. Plot Plan                                     10

    III. B. Transportation                            14

    IV. Floor Plan                                     15

SECTION C.  GENERAL CRITERIA FOR CERTIFICATE OF NEED

    Need                                              17

    Economic Feasibility                          29

    Orderly Development                          42

    Proof of Publication                          46

    Development Schedule                      49

**1.** _**Name of Facility, Agency, or Institution**_

Tri-Cities Holdings LLC dba Trex Treatment Center

| | |
|---|---|
| Name | |
| 4 Wesley Court | Washington |
| Street or Route | County |
| Johnson City | TN |
| City | State |

37601 Zip Code

**2.** _**Contact Person Available for Responses to Questions**_

Steven W. Kester — Managing Member

Name / Title

Tri Cities Holdings LLC — swkester@gmail.com

Company Name / Email address

6555 Sugarloaf Parkway, Suite 307-137    Duluth    GA    30097

Street or Route    City    State    Zip Code

Same    404-664-2616    404-537-3780

Association with Owner    Phone Number    Fax Number

**3.** _**Owner of the Facility, Agency or Institution**_

Tri-Cities Holdings LLC    404-664-2616

Name    Phone Number

6555 Sugarloaf Parkway, Suite 307-137    Gwinnett

Street or Route    County

Duluth    GA    30097

City    State    Zip Code

**4.** _**Type of Ownership of Control (Check One)**_

A. Sole Proprietorship
B. Partnership
C. Limited Partnership
D. Corporation (For Profit)
E. Corporation (Not-for-Profit)

F. Government (State of TN or Political Subdivision)
G. Joint Venture
H. Limited Liability Company ✓
I. Other (Specify)_____

PUT ALL ATTACHMENTS AT THE BACK OF THE APPLICATION IN ORDER AND REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

5. **_Name of Management/Operating Entity (If Applicable)_**

N/A (see added Attachment A-5 for bios and affiliatiations)
Name

Street or Route                                                        County

City                                           State                    Zip Code

PUT ALL ATTACHMENTS AT THE END OF THE APPLICATION IN ORDER AND
REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

6. **_Legal Interest in the Site of the Institution (Check One)_**

A. Ownership                            D. Option to Lease        ✓
B. Option to Purchase                   E. Other (Specify) _____
C. Lease of _____ Years

PUT ALL ATTACHMENTS AT THE BACK OF THE APPLICATION IN ORDER AND
REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

7. **_Type of Institution_** _(Check as appropriate--more than one response may apply)_

A. Hospital (Specify)_____         I. Nursing Home
B. Ambulatory Surgical Treatment     J. Outpatient Diagnostic Center
   Center (ASTC), Multi–Specialty    K. Recuperation Center
C. ASTC, Single Specialty            L. Rehabilitation Facility
D. Home Health Agency                M. Residential Hospice
E. Hospice                           N. Non-Residential Methadone
F. Mental Health Hospital               Facility                   ✓
G. Mental Health Residential         O. Birthing Center
   Treatment Facility                P. Other Outpatient Facility
H. Mental Retardation Institutional     (Specify)_____
   Habilitation Facility (ICF/MR)    Q. Other (Specify)_

8. **_Purpose of Review_** _(Check) as appropriate--more than one response may apply)_

A. New Institution          ✓        G. Change in Bed Complement
B. Replacement/Existing Facility        [Please note the type of change
C. Modification/Existing Facility       by underlining the appropriate
D. Initiation of Health Care            response: Increase, Decrease,
   Service as defined in TCA §          Designation, Distribution,
   68-11-1607(4)                        Conversion, Relocation]
   (Specify)_____              H. Change of Location
E. Discontinuance of OB Services    I. Other (Specify)_____
F. Acquisition of Equipment

## 9. Bed Complement Data

*Please indicate current and proposed distribution and certification of facility beds.*

| | | Current Beds Licensed | *CON | Staffed Beds | Beds Proposed | TOTAL Beds at Completion |
|---|---|---|---|---|---|---|
| A. | Medical | | | | | |
| B. | Surgical | | | | | |
| C. | Long-Term Care Hospital | | | | | |
| D. | Obstetrical | | | | | |
| E. | ICU/CCU | | | | | |
| F. | Neonatal | | | | | |
| G. | Pediatric | | | | | |
| H. | Adult Psychiatric | | | | | |
| I. | Geriatric Psychiatric | | | | | |
| J. | Child/Adolescent Psychiatric | | | | | |
| K. | Rehabilitation | | | | | |
| L. | Nursing Facility (non-Medicaid Certified) | | | | | |
| M. | Nursing Facility Level 1 (Medicaid only) | | | | | |
| N. | Nursing Facility Level 2 (Medicare only) | | | | | |
| O. | Nursing Facility Level 2 (dually certified Medicaid/Medicare) | | | | | |
| P. | ICF/MR | | | | | |
| Q. | Adult Chemical Dependency | | | | | |
| R. | Child and Adolescent Chemical Dependency | | | | | |
| S. | Swing Beds | | | | | |
| T. | Mental Health Residential Treatment | | | | | |
| U. | Residential Hospice | | | | | |
| | **TOTAL** | 0 | 0 | 0 | 0 | 0 |

*CON-Beds approved but not yet in service

---

| 10. | **Medicare Provider Number** | N/A |
|---|---|---|
| | **Certification Type** | |

| 11. | **Medicaid Provider Number** | N/A |
|---|---|---|
| | **Certification Type** | |

**12.** If this is a new facility, will certification be sought for Medicare and/or Medicaid? No

**13.** *Identify all TennCare Managed Care Organizations/Behavioral Health Organizations (MCOs/BHOs) operating in the proposed service area.* **Will this project involve the treatment of TennCare participants?** No *If the response to this item is yes, please identify all MCOs/BHOs with which the applicant has contracted or plans to contract.*

*Discuss any out-of-network relationships in place with MCOs/BHOs in the area.*

**SUPPLEMENTAL- # 1**

March 25, 2013
2:15pm

I. **Provide a brief executive summary of the project not to exceed two pages. Topics to be included in the executive summary are a brief description of proposed services and equipment, ownership structure, service area, need, existing resources, project cost, funding, financial feasibility and staffing.**

Proposed Services -- We seek to establish an outpatient opiate treatment program ("OTP") in Johnson City, Tennessee. We anticipate using buprenorphine, methadone and abstinence-based treatment for those suffering from opiate addiction. We will offer individual counseling services and group therapy to help break the cycle of addiction and provide patients the life skills and resources to serve as productive members of their communities, families and employers. We understand the concern of trading one addiction for another in perpetuity. Our commitment will be to give patients their independence back as soon as medically, morally and ethically possible.

Equipment--The only equipment used in treatment are the dispensing devices used to correctly administer medication doses.

Ownership Structure--The ownership of the facilities management and administration will be Tri-Cities Holdings LLC, a Duluth, Georgia-based company.

Service Area--The proposed service area will be the nine most northeastern counties of Tennessee that have convenient access from and to Interstate 81: Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson. This covers 100% of the population of Tennessee's Methadone Service Area #1, 97% of #2, and 70% of #3.

Need and Existing Resources -- The applicant can demonstrate the need for a non-residential treatment program for the Northeast Tennessee area. First and foremost, the abuse of prescription pain medication is an epidemic in the United States.[1] The rate of abuse is higher in the region we intend to serve.[2] Methadone maintenance treatment is the most effective treatment for opiate addiction according to the Center for Disease Control,[3] the U.S. National Institute on Drug Abuse,[4] the Center for Substance Abuse Treatment, the Institute of Medicine,[5] the National Institute of Health,[6] and the World Health Organization. There are no existing SAMHSA-designated methadone maintenance treatment programs in our proposed service area.

1. The nearest clinics are far away yet still get numerous patients from the proposed service area. No local option exists for the comprehensive medication management and counseling services that we will offer. A SAMHSA list of buprenorphine providers and in-patient treatment program in the proposed service area and it is included as Attachment B1.

   a. The applicant's manager is the co-founder and part owner of nine treatment programs, including two in the Asheville area, 49 and 70 miles from the proposed location respectively (Crossroads Treatment Centers of Weaverville, NC and Asheville). Approximately 600 patients make the commune from Northeast Tennessee areas to the applicant's Asheville facilities.

   b. There are three other OTPs in Asheville and two other OTP's in Boone, NC that report between 20-40% of patients being from northeast Tennessee (Western Carolina, CRC and Mountain Area Recovery Center in Asheville and Stepping Stone and McLeod in Boone).

   c. Nearest Tennessee OTPs are in Knoxville, 104 miles away, owned by Behavioral Health Group ("BHG"). An admissions counselor on 2/25/2013 indicated BHG had nearly 400 patients from Northeast Tennessee area in their

[1] http://www.cdc.gov/homeandrecreationalsafety/rxbrief/.

[2] An Analysis of Mental Health and Substance Abuse Disparities & Access to Treatment Services in the Appalachian Region, 2008, ARC.

[3] http://www.cdc.gov/idu/facts/methadonefin.pdf.

[4] http://international.drugabuse.gov.

[5] Institute of Medicine, 1995. "Development of Medications for the Treatment of Opiate and Cocaine Addictions."

[6] NIH Consensus Conference. Effective Medical Treatment of Opiate Addiction. JAMA 1998: 280:1936–1943.

programs.

2. Several other providers have tried to site clinics in the Northeast Tennessee area in 2012, 2010 and twice in 2003. The only company to go through the CON process had their application approved, only to be overturned on a technicality. The other companies stopped the application process because of zoning issues, for which our company has a plan to address. Since opiate addiction is significantly higher in 2013 than it was in 2003[7], when a Johnson City CON was approved, the need is greater now.

3. The patients from Northeast Tennessee who travel many miles to the nearest OTP will also highlight the need in other ways. If a Johnson City patient travels 200 miles round trip to Knoxville, he or she will also consume approximately $30 in gas and over three hours of drive time. That is a real hardship for patients, especially new patients who must come seven days per week. Under current rules, new patients from the Northeast Tennessee area driving to Knoxville (the closest clinic in TN) must drive up to 9,000 extra miles in the first 45 days of treatment. Of the barriers to access to healthcare, geographic distance is the top of the list, even higher than access to healthcare insurance[8]. For every patient that makes the commute, several are most likely foregoing treatment because they can't afford the time, money or energy.

4. In 2003, a CON was granted for a OTP in Johnson City, but was overturned on a technicality.[9] Since this time, the CDC has declared prescription medication abuse an epidemic, and SAMHSA has noted a 300% increase in emergency room visits for opiate-related cases.[10]

5. The Tennessee Depart of Health clearly recognizes this problem. The Safety Subcabinet Working Group issued a report in 2012 titled "Prescription Drug Abuse in Tennessee"[11] that has significant data to highlight the problem (drug overdoses going up by 250% over 10 years overtaking motor vehicle deaths, suicides and homicides, a quarter million Tennesseans abusing opiates, the high cost associated with those who abuse to the State, etc.). The Report listed 3 recommendations, one of which was more treatment options. The last CON approved for a treatment center was in 2009.

**Financial Feasibility**--Tri-Cities Holdings (TCH) has all of the necessary resources to execute this project. Steve Kester is the leader of TCH and has successfully opened 9 OTPs in four states in five years. Each facility has received full accreditation and the facilities' need have been well-justified and financially feasible. In addition to leadership and experience, the company has the financial resources to see this project through fruition. We are planning to be supported through self-payment from patients and not seek revenue through programs such as TennCare or Medicare.

This center is projected to have more than 500 patients when fully operational. Mr. Kester is co-founder and part owner of 9 OTP clinics, which serve approximately 4,000 patients and knows first-hand that clinics of this size are financially healthy. The financial pro forma and various scenarios show a financially healthy firm.

**Project Cost**--The project's costs are expected to be approximately $670,000 including lease costs, construction build-out/renovation, operating carry loss and other project-related costs.

**Funding**--This project will be funded personally by Steve Kester, Managing Member of TCH. Mr. Kester has the monies in reserve and committed to more than cover the project costs and start-up operating loss.

**Staffing**--Staffing of the center would include: Center Executive Director, Medical Director, Nurses, Counselors, Intake Specialist, Administrator/Receptionist, Accounting, Human Resources, and Legal Support Staff.

[Note: responses to supplemental questions related to this section are included in Attachment B1 – Supplemental Questions in order to keep the length in compliance.]

---

[7] SAMHSA (2009), see Office of National Drug Control Policy,: http://www.whitehouse.gov/ondcp/prescription-drug-abuse.

[8] Veterans Affairs on Rural Health, (2011).

[9] http://www.mapinc.org/drugnews/v03/n702/a01.html

[10] http://www.samhsa.gov/data/DAWN.aspx

[11] http://tn.gov/mental/policy/presc_drug_abuse.shtml

**SUPPLEMENTAL- # 1**

March 25, 2013
12:15pm

II.   Provide a detailed narrative of the project by addressing the following items as they relate to the proposal.

    A.   Describe the construction, modification and/or renovation of the facility (exclusive of major medical equipment covered by T.C.A. § 68-11-1601 et seq.) including square footage, major operational areas, room configuration, etc. Applicants with hospital projects (construction cost in excess of $5 million) and other facility projects (construction cost in excess of $2 million) should complete the Square Footage and Cost per Square Footage Chart. Utilizing the attached Chart, applicants with hospital projects should complete Parts A.-E. by identifying as applicable nursing units, ancillary areas, and support areas affected by this project. Provide the location of the unit/service within the existing facility along with current square footage, where, if any, the unit/service will relocate temporarily during construction and renovation, and then the location of the unit/service with proposed square footage. The total cost per square foot should provide a breakout between new construction and renovation cost per square foot. Other facility projects need only complete Parts B.-E. Please also discuss and justify the cost per square foot for this project. If the project involves none of the above, describe the development of the proposal.

We have chosen a facility that will require no structural modifications and has ample parking. The current structure includes a large lobby (which will be re-purposed as a waiting area), several large conference rooms, ample ADA bathrooms for men and women, and an unfinished storage area.

The renovation construction involved will include:

- Partitioning large rooms to create offices for counselors, doctors and the Executive Director
- Partitioning large rooms and adding plumbing to build examination and lab rooms
- Constructing dosing rooms and associated dosing windows
- Constructing a room for the pharmacy and associated medicine vault
- Constructing a check-in booth
- Adding the electrical, cabling, video and telephony for the above rooms

# SQUARE FOOTAGE AND COST PER SQUARE FOOTAGE CHART

| A. Unit / Department | Existing Location | Existing SF | Temporary Location | Proposed Final Location | Proposed Final Square Footage | | | Proposed Final Cost/ SF | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Renovated | New | Total | Renovated | New | Total |
| Lobby | | | | | 1,230 | | 1,230 | $10 | | |
| Counselors offices | | | | | 3,200 | | 3,200 | $24.30 | | |
| Medical/Lab | | | | | 300 | | 300 | $24.30 | | |
| Dosing | | | | | 400 | | 400 | $24.30 | | |
| Administration | | | | | 250 | | 250 | $24.30 | | |
| Meeting | | | | | 420 | | 420 | $10 | | |
| Common | | | | | 1,408 | | 1,408 | $10 | | |
| Pharmacy | | | | | 300 | | 300 | $30 | | |
| Maint./storage | | | | | 150 | | 150 | $10 | | |
| Bathrooms | | | | | 300 | | 300 | $40 | | |
| Breakroom | | | | | 250 | | 250 | $24.30 | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| B. Unit/Depart. GSF Sub-Total | | | | | 8,208 | | 8,208 | $20 | | |
| | | | | | | | | | | |
| C. Mechanical/ Electrical GSF | | | | | | | | | | |
| D. Circulation /Structure GSF | | | | | | | | | | |
| E. Total GSF | | | | | 8,208 | | 8,208 | $20 | | |

B.     Identify the number and type of beds increased, decreased, converted, relocated, designated, and/or redistributed by this application. Describe the reasons for change in bed allocations and describe the impact the bed change will have on the existing services.

This is strictly an outpatient facility and will require no beds.

C.     As the applicant, describe your need to provide the following health care services (if applicable to this application):

1. Adult Psychiatric Services

2. Alcohol and Drug Treatment for Adolescents (exceeding 28 days)

3. Birthing Center

4. Burn Units

5. Cardiac Catheterization Services

6. Child and Adolescent Psychiatric Services

7. Extracorporeal Lithotripsy

8. Home Health Services

9. Hospice Services

10. Residential Hospice

11. ICF/MR Services

12. Long-term Care Services

13. Magnetic Resonance Imaging (MRI)

14. Mental Health Residential Treatment

15. Neonatal Intensive Care Unit

16. Non-Residential Methadone Treatment Centers

17. Open Heart Surgery

18. Positron Emission Tomography

19. Radiation Therapy/Linear Accelerator

20. Rehabilitation Services

21. Swing Beds.

This is a proposed non-residential methadone treatment facility and intends to serve the Northeast Tennessee area, which includes Johnson City, Kingsport, Bristol and the surrounding communities. According to the 2011 US Census, the 9 most northeastern counties of Tennessee had a population of 600,084, a growth of over 2,431 from 2010.

The Tennessee Health Services and Development Agency has recognized the need for a NRMTC 10 years ago when it granted a CON for a Johnson-City based program. Since that time, the population has grown and, according to the CDC, the prescription-pain medication abuse has

reached "epidemic levels" in the country. Further, in 2008 the Appalachian Regional Commission, a Federal-State partnership, concluded that the prescription medication abuse was higher in the southern Appalachian region, which includes northeastern Tennessee, than the rest of the U.S. and part of the problem is lack of available treatment programs[12]. In fact, this 228-page report's academic partner was East Tennessee State University, located in Johnson City, Tennessee.

In summary, the abuse of prescription pain medication is an epidemic in the U.S.; it's higher in the region we intend to site; there are no NRMTF treatment programs; and lack of treatment programs is part of the problem. We have much work to do.

We are not the first provider to recognize this need. At least four others have formally tried through the CON or local permitting process, and TCH believe nearly every major provider has informally researched the idea.

D.     Describe the need to change location or replace an existing facility.

Not Applicable (NA). This will be a new facility.

E.     Describe the acquisition of any item of major medical equipment (as defined by the Agency Rules and the Statute) which exceeds a cost of $1.5 million; and/or is a magnetic resonance imaging (MRI) scanner, positron emission tomography (PET) scanner, extracorporeal lithotripter and/or linear accelerator by responding to the following:

1. For fixed-site major medical equipment (not replacing existing equipment):

a. Describe the new equipment, including:

1. Total cost ;(As defined by Agency Rule).

2. Expected useful life;

3. List of clinical applications to be provided; and

4. Documentation of FDA approval.

b. Provide current and proposed schedules of operations.

2. For mobile major medical equipment:

a. List all sites that will be served;

b. Provide current and/or proposed schedule of operations;

c. Provide the lease or contract cost.

d. Provide the fair market value of the equipment; and

e. List the owner for the equipment.

3. Indicate applicant's legal interest in equipment (i.e., purchase, lease, etc.) In the case of equipment purchase include a quote and/or proposal from an equipment vendor, or in the case of an equipment lease provide a draft lease or contract that at least includes the term of

---

[12] An Analysis of Mental Health and Substance Abuse Disparities & Access to Treatment Services in the Appalachian Region, 2008, ARC

**SUPPLEMENTAL- # 1**

**the lease and the anticipated lease payments.**

Not Applicable (NA). The most expensive equipment in the facility will be a methadone dispensing system and a vault for safe storage of medicine. Both items cost less than $10,000.

III. (A) **Attach a copy of the plot plan of the site on an 8 1/2" x 11" sheet of white paper which must include:**

1. **Size of site (in acres);**

2. **Location of structure on the site; and**

3. **Location of the proposed construction.**

4. **Names of streets, roads or highway that cross or border the site.**

Our proposed location is at 4 Wesley Court, in Johnson City, Tennessee. This location is a freestanding building in an industrial area, and is zoned for medical services by Johnson City. The location is 0.2 mile from Quillen Rehabilitation Hospital.

The location is situated on 1.66 acres, and the square footage of the facility is 8,260 square feet. The facility has parking on all four sides plus an adjacent side lot. Street parking is permitted. The capacity of the facility and street parking is 1,00 spaces. This size of a facility and accompanying parking can accommodate 1,000 patients with a one-shift operation and more if afternoon and evening programs are offered. 2,000 patients in treatment requires approximately 100 parking spaces because of take-home policies (where patients do not have to come every day), carpooling, public transportation, multiple shifts, and staggering of arrival times.

The facility is on a cul-de-sac with industrial and commercial customers as neighbors: a construction supply company, a construction company, and an empty lot. Most of the traffic at our facility is expected between 5AM and 7 AM so patients can get to work or school. This traffic will occur before the neighboring businesses are open. The traffic on the street is very light given the limited number, hours of operation and nature of the businesses.

Johnson City has strict zoning regulations regarding locations of NRMTFs. The applicant has spent significant time finding a location that best meets the City's zoning requirements. The site is well outside all limits that the city has schools, daycare, parks or locations that sell alcoholic beverages:

| Place | Minimum Requirements | Closest Location | Actual distance[13] | Site Reference on map below |
|-------|---------------------|------------------|---------------------|------------------------------|
| Our proposed site | | | | A |
| School | 200 feet | Fairmont Elementary School 1405 Lester Harris Rd<br><br>Johnson City, TN | 6,135 feet | B |
| Day care | 200 feet | Princeton Prep, 504 Princeton Rd, Johnson City, TN 37601 | 1,336 feet | C |
| Park | 200 feet | Massengill Memorial. 2801 State Highway 36. Johnson City, TN | 3,199 feet | D |
| Alcohol | 200 feet | Cootie Brown's<br><br>2715 N Roan St, Johnson City, TN | 3,183 feet | E |

Map of Above Locations

---

[13] Shortest distance between property lines, "as the crow flies", using Google maps and freemaptools.com.



(B)1. Describe the relationship of the site to public transportation routes, if any, and to any highway or major road developments in the area. Describe the accessibility of the proposed site to patients/clients.

Our proposed site is less than a quarter mile to transit stops on Johnson City's Transit System Blue Route. Drop offs and pickups are on the hour, starting at 6:26 in the morning.

**Nearby access to public transportation**



The proposed location is less than one mile to I26, a major interstate and a 20-minute drive from Kingsport. The other major city is Bristol, which is 22 miles away. Both of these distances represent a major improvement of the driving distances patients currently go for treatment, as shown below:

| Patient's Domiciled City | Closest treatment center: Weaverville, NC (miles) | Closest treatment center in Knoxville, Tennessee (miles) | Distance to our proposed center (miles) | Round-trip savings (miles) |
|---|---|---|---|---|
| **Johnson City** | 45 | 104 | 0 | 90 - 208 |
| **Kingsport** | 67 | 99 | 22 | 90 - 154 |
| **Bristol** | 70 | 113 | 22 | 96 - 182 |

Since close to 1,000 patients from the Northeast Tennessee area make this commute to clinics in Knoxville and North Carolina[14]--often in dangerous winter conditions--the accessibilities of the proposed facility is a major improvement over the nearest alternatives.

---

[14] TCH estimate based on clinics owned by TCH principal in North Carolina and discussion with Knoxville clinics.

IV. Attach a floor plan drawing for the facility which includes legible labeling of patient care rooms (noting private or semi-private), ancillary areas, equipment areas, etc. on an 8 1/2" x 11" sheet of white paper.

**NOTE: DO NOT SUBMIT BLUEPRINTS.** Simple line drawings should be submitted and need not be drawn to scale.

The lobby area could accommodate 153 seats, more than enough for the maximum number of patients at one time plus guests they may bring. Overflow seating, should we need it, would be in the common area on the left side of the building, shown on the diagram. The inside of the facility will be non-smoking. Smoking for patients will be accommodated in the grassy area in front of the building; there is an awning during inclement weather. Smoking for staff will be accommodated outside the rear exit of the building.



All counseling and exam rooms are private

Our proposed services will also include comprehensive referral services to patients in order to equip them with the resources for independence outside of our treatment. A list of these services and referrals is provided in Attachment B4 – Referral Sources.

V. For a Home Health Agency or Hospice, identify:

    1. Existing service area by County;

    2. Proposed service area by County;

    3. A parent or primary service provider;

    4. Existing branches; and

    5. Proposed branches.

Not Applicable (NA).

QUESTIONS

NEED

**1. Describe the relationship of this proposal toward the implementation of the State Health Plan and Tennessee's Health: Guidelines for Growth.**

**a. Please provide a response to each criterion and standard in Certificate of Need Categories that are applicable to the proposed project. Do not provide responses to General Criteria and Standards (pages 6-9) here.**

[Note: The criterion wording from Tennessee's Health: Guidelines for Growth for NON-RESIDENTIAL METHADONE TREATMENT FACILITIES (NRMTF) are stated below in **bold italics**. Our response follows in normal font.]

### *NEED*

*A non-residential narcotic treatment facility should provide adequate medical, counseling, vocational, educational, mental health assessment, and social services to patients enrolled in the opioid treatment program with the goal of the individual becoming free of opioid dependency.*

Applicant will comply with TDMHDD rules for qualifications and training of all staff. As required by State rules, Applicant will be medically supervised by a Board-certified physician who has expertise in opioid dependency. Applicant will provide continuous and intensive counseling, services, and mental health assessments aimed at helping the patient become free of opioid dependency as soon as possible, and to manage life successfully on methadone maintenance, until that time. This will include educational services delivered through the counseling staff and referral to vocational services.

*The need for non-residential narcotic treatment facilities should be based on information prepared by the applicant for a certificate of need which acknowledges the importance of considering the demand for services along with need and addressing and analyzing service problems as well.*

*The assessment should cover the proposed service area and include the utilization of existing service providers, scope of services provided, patient origin, and patient mix.*

*The assessment should consider that the users of opiate drugs are the clients at non-residential narcotic treatment facilities, and because of the illegal nature of opiate drug use, data will be based on estimates, actual counts, arrests for drug use, and hospital admittance for drug abuse.*

The Applicant acknowledges this and is in compliance. The need is summarized below:

| Area | Prescription Drug Addiction Problem | Source And Statistics/Quote | Opiate Treatment Programs (Otps) | OTP's Per 1,000,000 Residents |
|---|---|---|---|---|
| United States | "Epidemic" | **Centers For Disease Control**[15] <br><br> • Just under 10 percent of the US population abuses opiates at some point in their lifetime <br><br> • Drug overdose death rates in the United States have more than tripled since 1990 and have never been higher. | 1,077 | 3.42 |
| Tennessee | Worst than above | **Tennessee Safety Subcabinet Working Group**[16] <br><br> • In 2008, Tennessee's drug overdose rate was 25% high than the overall U.S. Tennessee's rate climbed 11% two years later; 242% from 2000 – 2010 <br><br> • Drug overdose has become the leading cause of accidental death in Tennessee | 12 | 1.86 |
| Proposed Service Area | Worse than above | **Appalachian Regional Commission**[17] <br><br> • The opiate addiction rate of the southern Appalachian Region (included proposed service area) is 8% higher than non-Appalachian areas <br><br> • A Johnson City Professor wrote a 2010 report titled *"Prescription Drug Abuse and the Pill Pipeline in Appalachia"*[18] | 0 | 0 |

*[The assessment should also include:] A description of the geographic area to be served by the program;*

---

[15] *"Policy Impact: Prescription Painkiller Overdoses"*,

http://www.cdc.gov/homeandrecreationalsafety/rxbrief/

[16] *"Prescription Drug Abuse in Tennessee"*,
http://tn.gov/mental/policy/persc_drug_docs/Prescription%20Drug%20Use%20in%20TN_2%203%202012_R2.pdf

[17] *"Disproportionately High Rates of Substance Abuse in Appalachia"*,
http://www.arc.gov/news/article.asp?ARTICLE_ID=113

[18] http://www.etsu.edu/cph/NewsEventsDocuments/Alarmingly_High_by_Robert_P._Pack.pdf

Complies. The proposed service area for this facility would be the nine most northeastern counties of Tennessee. These counties include (in order of size): Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson.

### [The assessment should also include:] Population of area to be served;

Complies. Based on the 2011 US Census, the population of the proposed serve area was 600,084, or just under 10% of Tennessee's population. The largest city in this service area is also the proposed site of our project: Johnson City, population 63,800.

### [The assessment should also include:] The estimated number of persons, in the described area, addicted to heroin or other opioid drugs and an explanation of the basis of the estimate;

Complies. We estimate that there are approximately between 12,000 and 24,000 adults who are addicted to opiates (heroin and prescription pain pills) in the proposed service area. This range is derived using the following methods:

- SAMHSA (Substance Abuse and Mental Health Services Administration - U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES) reports that heroin use was 0.3% in 2011 and prescription pain medication abuse was 1.7%[19]. Combined, this would yield 12,000 opiate abusers or opiate dependents from the proposed service area.

- In Tennessee's Department of Mental Health and Substance Abuse Services report, "Prescription Drug Abuse In Tennessee" by the Safety Subcabinet Working Group, reported that almost 250,000 Tennesseans older than 12 reported abusing prescription opioids in 2009. Tennessee's population was approximately 6.3 million in 2009, yielding an incidence rate of 3.9%. This alone would yield approximately 23,800 opiate abusers or opiate dependents from the proposed service area.

### [The assessment should also include:] The estimated number of persons, in the described area, addicted to heroin or other opioid drugs presently under treatment in methadone and other treatment programs;

Complies. We estimate that the number of individuals in methadone treatment from the proposed service area is between 950 and 1,500.

- Applicant attempted to get Registry Data of NRMTF enrollment by county from the Tennessee Department of Mental Health and Substance Abuse Services, but the Department does not release this data publically. This is a policy change from prior NRMTF CONs where the data was provided. However, the most recent release of Registry Data was for CY2008 (Attachment C, Need, 1a.), which showed that 8,889 Tennessee-domiciled patients were enrolled in Tennessee opiate treatment programs (not including Tennessee residents in out-of-state programs) and the State's population was 6,156,719, or a rate of 144.4 patients per 100,000 residents. Applying this rate to Applicant's proposed service area, would yield 866 patients, which is low because of a) the epidemic growth of opiate abuse since 2008, and b) the number of residents going to out-of-state programs, such as in Applicant's proposed service area.

- We instead relied on data from the closest NRMTFs in the Asheville area, Knoxville, and Boone, NC. The applicant's manager is a co-founder and partial owner of two Asheville-area

---

[19] http://www.samhsa.gov/data/nsduh/2k11results/nsduhresults2011.htm#Ch2

clinics and was able to get actual data of patients attending treatment at these clinics who also live in the proposed service area. Some other clinics participated in a telephone survey about patients attending those clinics who lived in the proposed service area. Finally, for non-participating clinics, extrapolations were done, based on the other clinics' responses. Based on the methodology described above, the we estimate that the number of patients from the proposed service area attend clinics in the following locations:

- o Knoxville:  300 – 400,  based on telephone interviews
- o Asheville:  600 – 900,  based on Applicant's owned data and extrapolation
- o Boone:  50 – 100,  based on telephone interviews
- o Total:  950 – 1,500

Also important is the consideration of the number of addicts that forego treatment because of distance. The U.S. Department of Veteran affairs did a study of this, and their findings were sobering. Substance abuse patients who traveled 10 miles or less were 2.6 times more likely to obtain aftercare than those who traveled more than 50 miles[20]. This says that there may be 2,470 – 3,900 opiate addicts in the area that would seek treatment if it were closer.

The economic and social costs of untreated patients who would seek treatment if it were closer are significant. Medicaid-paid medical, mental health, and long-term care costs are significantly lower for persons addicted to opiates who participate in methadone treatment, compared to opiate addicts who remain untreated[21]. The study, based out of the Washington state, concurs with what Tennessee has found. In the 2010 report "Prescription Drug Abuse In Tennessee" the State found that, "Abuse of prescription opioids is the number one drug problem for Tennesseans receiving state-funded treatment services."

The Applicant estimates the economic savings to the State to be $765 per patient per month based on the Washington and Tennessee studies. When applied to the estimated untreated population that would seek treatment in the proposed service are equates to $22.7 - $35.8 million State-funded savings per year. Further, the study found that patients that stay in methadone treatment for more than a year are 61% less likely to be re-arrested and 83% less likely to commit a felony than those left untreated.

*[The assessment should also include:] Projected rate of intake and factors controlling intake;*

Complies. Applicant projects that the rate of intake will be 50 patients per week or less. The factors controlling intake will include the mix of transfers patients versus new patients (new patients

---

[20] Center for Health Care Evaluation and Health Economics Resource Center, Veterans Affairs, Palo Alto Health Care System, Palo Alto, CA, USA. *"The influence of distance on utilization of outpatient mental health aftercare following inpatient substance abuse treatment."*

[21] Washington State Department of Social & Health Services, *"Methadone Treatment For Opiate Addiction Lowers Health Care Costs And Reduces Arrests And Convictions"*

require more time to admit), the number of staffing hours we can secure from our medical doctor(s), and the rate at which new patients will learn of our clinic.

*[The assessment should also include:] Compare estimated need to existing capacity.*

*Also, consideration should be given to the reality that existing facilities can expand or reduce their capacity to maintain or treat patients without large changes in overhead*

Complies. Currently there are no NRMTFs in this service area. We expect that the overwhelming percentage of patients who will use our proposed location would live in the proposed service area. According to phone screens and Applicant's knowledge of data at owned clinics, patient census has grown significantly in recent years with the growing problem of opiate addiction in the U.S., Tennessee, and surrounding areas.

Applicant contacted the Tennessee Department of Mental Health and Substance Abuse Services to obtain central registry data to accurately quantify the number of patients enrolled in Tennessee NRMTFs from the proposed service area. This data has been supplied by the Department of Mental Health for prior CONs. However, Applicant was informed that the Department changed its policy regarding releasing the data for such requests, and Applicants request was denied.

To estimate the number of patients from the proposed service area enrolled in opiate treatment programs, the Applicant relied on data from the clinics he has a partial ownership interest in (Asheville and Weaverville, NC), and telephone surveyed clinics in non-owned clinics in Knoxville, Asheville, and Boone, NC.

[Note: The Applicant also reviewed the Five Principles for Achieving Better Health that are contained in Tennessee's full State Health Plan. The Five Principles are listed below in **bold italics**, followed immediate by Applicant response in normal font.]

1. *The purpose of the State Health Plan is to improve the health of Tennesseans;*

    Complies. The Centers For Disease controls describes methadone treatment as *"needed, life-saving services"*. The benefits cited include reduced or stopped use of injection drugs; reduce risk of acquiring or transmitting HIV, hepatitis B or C or bacterial infections; reduce mortality; reduced criminal activity; improved family stability; and improved pregnancy outcomes[22].

2. *Every citizen should have reasonable access to health care;*

    Complies. This proposed facility provides needed access where a demonstrated need exists. The proposed service area is consistent with the State's Methadone Service Areas that balance population and access.

3. *The state's health care resources should be developed to address the needs of Tennesseans while encouraging competitive markets, economic efficiencies, and the continued development of the state's health care system;*

    Complies. This project seeks no public funding, would compete in an open market, and provides treatment consistent with the State's Methadone Service Areas.

---

[22] http://www.cdc.gov/idu/facts/methadonefin.pdf

**4. Every citizen should have confidence that the quality of health care is continually monitored and standards are adhered to by health care providers; and**

Complies. The Applicant recognizes and accepts the critical role that State and Federal regulating and licensing agencies play to ensure quality care.

**5. The state should support the development, recruitment, and retention of a sufficient and quality health care workforce.**

Complies. The Applicant looks forward to working with State and local officials to create, recruit and retain 20-40 highly-paid and trained healthcare jobs.

### Service Area

**The geographic service area should be reasonable and based on an optimal balance between population density and service proximity.**

Complies. The Applicant's proposed service area is comprised of 100% of the "Methadone Service Area #1" defined by the State in 2002; 97% of "Methadone Service Area #2" and 70% of "Methadone Service Area #3". These Methadone Service Areas, or MSA were specifically addressed to balance population with proximity to care. Attachment C 3, "Tennessee Methadone Service Areas", details the areas. Basically, where the State said there should be three facilities in 2002, there are none today, and the need has become materially more pronounced since that time.

**The relationship of the socio-demographics of the service area and the projected population to receive services should be considered. The proposal's sensitivity to and the responsiveness to the special needs of the service area should be considered including accessibility to consumers, particularly women, racial and ethnic minorities, and low-income groups.**

Complies. Opioid dependency is prevalent in every adult age group and race in the United States. The CDC notes that opioid overdoses have increased over 400% in the decade from 1999 - 2009[23]. This report also clearly shows that opioid abuse and overdose cuts across genders, age groups, race, metropolitan status and economics. Further, the report shows that Tennessee is among the 12 states with the highest per-capita overdose rates in the nation.

**b. Applications that include a Change of Site for a health care institution, provide a response to General Criterion and Standards (4)(a-c).**

Not applicable

---

[23] http://www.fda.gov/downloads/Drugs/NewsEvents/UCM300859.pdf

**2. Describe the relationship of this project to the applicant facility's long-range development plans, if any.**

We estimate that the facility would eventually serve approximately 1,100 – 1,200 patients at a given time. The biggest demands on a NRMTF are parking spaces and counselors' offices. 1,200 patients would require 24 counselors (50 patients per counselor per industry guidelines) and approximately 120 peak parking spaces in a one-shift operation. After the facility treated 800 patients, we would anticipate running a morning and an afternoon program, where the morning would take approximately 60% of the demand and the afternoon would take approximately 40% of the demand. In this scenario, we would need 15 counselor offices for the morning program and 72 parking spaces. The proposed facility can meet the peak needs of the anticipated patient population.

**3. Identify the proposed service area and justify the reasonableness of that proposed area. Submit a county level map including the State of Tennessee clearly marked to reflect the service area. Please submit the map on 8 1/2" x 11" sheet of white paper marked only with ink detectable by a standard photocopier (i.e., no highlighters, pencils, etc.).**

Our proposed service area is shown in the darkened areas of the map below and also more *clearly* in Attachment C-3 Proposed Service Area. The nine counties comprising our proposed serve area are: Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi, and Johnson. The map below and in Attachment C-3 shows the nine most northeastern counties of Tennessee. Currently, there are no NRMTFs in this service area.

# Proposed Service Area



Proposed Service Area includes the counties that are those boxed above, including Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson. Washington, Carter, Johnson and Unicoi counties form Methadone Service Area #1, Sullivan and Hawkins county are in MSA #2, and Green, Cocke and Hamblen counties are in MSA #3.

Distance is a long-recognized barrier to treatment.[24] Studies show that treatments rates fall

---

[24] K. Beardsley, E. D. Wish, D. B. Fitzelle, K. O'Grady, and A. M. Arria, "Distance traveled to outpatient drug treatment and client retention," Journal of Substance Abuse Treatment, vol. 25, no. 4, pp. 279–285, 2003, cited in "Distance Traveled and Cross-State Commuting to Opioid Treatment Programs in the United States," *Journal of Environmental and Public Health*, Volume 2011, Article ID 948789 (additional citations therein).

substantially as commute distances increase beyond 25 miles.[25]  The U.S. Department of Veteran affairs did a study of this, and their findings were sobering.  Substance abuse patients who traveled 10 miles or less were 2.6 times more likely to obtain aftercare than those who traveled more than 50 miles[26].  Tennessee Department of Health produced similar results in 2001 a report concluded "[t]*he closer one lives to a treatment program, the greater likelihood of participation. The current rate of participation is nearly twice as high for persons living in or close to one of the five counties (Shelby, Davidson, Knox, Hamilton and Madison) that house programs, 59.0/100,000 than the rate for those that live 60 miles or more from a program, 32.2/100,000."[27]*

The proposed location is located in the largest city in this service area (Johnson City).  It is within 25 minutes or less of the next two largest cities in this area: Kingsport, and Bristol.  Today, people from this area suffering from opiate addiction drive hundreds of miles round trip for treatment.  Patients are most vulnerable to relapse when they first enter treatment.  Patients must attend every day (seven days a week) for the first 45 days of treatment.  This places an undue hardship on those seeking treatment.  Moreover, for every patient that does travel the distance, several may forego treatment.

The effects of untreated heroin abuse are well documented.  According to the New York Academy of Medicine, the lifetime Medicaid cost for each injecting drug user with AIDS is about $109,000. In contrast, one year of methadone treatment costs about $5,000 per patient, and is private pay with no drain on public coffers.  According to the Tennessee Department of Health, nearly 1,000 new HIV cases are reported each year in the State[28].

Untreated addicts commit more crime, are more susceptible to HIV, abandon their families, have higher unemployment and absenteeism, and neglect their overall health significantly more than addicts in treatment.  Between 2004 and 2010, opioid- and heroin-related emergency room visits went up three-fold[29].

Every dollar invested in opioid dependence treatment may yield a return of between $4 and $7 in reduced drug related crime, criminal justice costs, and theft alone. When savings related to health care costs are included, the ratio can equal 12:1 for every dollar invested[30].  Further, since our program will rely on self-payment, the State will receive the benefits without having to make any financial investment.

Our proposed site removes this barrier to treatment for patients who do not seek treatment and makes it easier for patients in treatment to stay in treatment.  This will greatly benefit the Northeast Tennessee Area and the State of Tennessee.

---

[25] Id.

[26] Center for Health Care Evaluation and Health Economics Resource Center, Veterans Affairs, Palo Alto Health Care System, Palo Alto, CA, USA. *"The influence of distance on utilization of outpatient mental health aftercare following inpatient substance abuse treatment."*

[27] http://health.state.tn.us/Downloads/g6022004.pdf

[28] http://health.state.tn.us/statistics/std.htm

[29] SAMHSA

[30] Institute of Addiction Medicine.

## 4. A. Describe the demographics of the population to be served by this proposal.

The nine-county demographic summary:

| Demographic | Johnson | Carter | Sullivan | Washington | Unicoi | Hawkins | Greene | Hamblen | Cocke | Total for service area | Tennessee |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Population, 2011 estimate | 18,231 | 57,135 | 157,419 | 124,353 | 18,280 | 56,871 | 69,339 | 63,082 | 35,544 | 600,084 | 6,399,787 |
| Population, 2010 (April 1) estimates base | 18,244 | 57,424 | 156,823 | 122,979 | 18,313 | 56,833 | 68,831 | 62,544 | 35,662 | 597,653 | 6,346,113 |
| Population, percent change, April 1, 2010 to July 1, 2011 | -0.1% | -0.4% | 0.4% | 1.1% | -0.2% | -0.3% | 0.7% | 0.8% | -0.3% | 0.4% | 0.8% |
| Persons under 5 years, percent, 2011 | 4.7% | 5.2% | 6.1% | 6.4% | 4.8% | 5.3% | 5.3% | 6.3% | 5.5% | 5.3% | 6.3% |
| Persons under 18 years, percent, 2011 | 18.1% | 19.5% | 20.3% | 19.0% | 20.0% | 21.0% | 21.0% | 23.5% | 21.1% | 20.7% | 23.3% |
| Persons 65 years and over, percent, 2011 | 18.8% | 17.4% | 19.0% | 15.7% | 19.8% | 17.1% | 18.0% | 16.2% | 17.4% | 17.5% | 13.7% |
| Female persons, percent, 2011 | 46.3% | 51.1% | 51.6% | 51.1% | 51.1% | 51.0% | 51.0% | 51.2% | 51.6% | 51.1% | 51.3% |
| | | | | | | | | | | | |
| White persons, percent, 2011 (a) | 96.4% | 96.7% | 95.4% | 92.6% | 98.1% | 96.6% | 95.0% | 91.6% | 95.4% | 94.6% | 79.5% |
| Black persons, percent, 2011 (a) | 2.2% | 1.6% | 2.4% | 4.2% | 0.4% | 1.6% | 2.2% | 4.8% | 2.2% | 2.8% | 16.9% |
| American Indian and Alaska Native persons, percent, 2011 (a) | 0.2% | 0.2% | 0.3% | 0.4% | 0.4% | 0.3% | 0.3% | 0.7% | 0.5% | 0.4% | 0.4% |
| Asian persons, percent, 2011 (a) | 0.2% | 0.3% | 0.6% | 1.2% | 0.2% | 0.5% | 0.4% | 0.8% | 0.3% | 0.6% | 1.5% |
| Native Hawaiian and Other Pacific Islander persons, percent, 2011 (a) | z | z | z | z | z | z | 0.1% | 0.1% | 0.1% | z | 0.1% |
| Persons reporting two or more races, percent, 2011 | 0.9% | 1.2% | 1.2% | 1.5% | 1.0% | 1.0% | 1.0% | 1.7% | 1.5% | 1.3% | 1.6% |
| Persons of Hispanic or Latino Origin, percent, 2011 (b) | 1.6% | 1.5% | 1.6% | 3.0% | 4.1% | 1.3% | 2.6% | 11.0% | 1.9% | 3.1% | 4.7% |
| White persons not Hispanic, percent, 2011 | 95.0% | 95.2% | 94.1% | 90.0% | 94.2% | 95.5% | 93.6% | 82.4% | 93.8% | 92.2% | 75.4% |
| | | | | | | | | | | | |
| Living in same house 1 year & over, percent, 2007-2011 | 89.5% | 88.3% | 85.8% | 82.9% | 88.0% | 86.1% | 86.9% | 84.6% | 88.6% | 85.5% | 84.1% |
| Foreign born persons, percent, 2007-2011 | 0.7% | 0.9% | 1.6% | 3.4% | 3.0% | 1.1% | 2.1% | 7.3% | 1.6% | 2.5% | 4.5% |
| Language other than English spoken at home, percent age 5+, 2007-2011 | 1.5% | 1.8% | 2.6% | 4.6% | 5.2% | 2.4% | 3.9% | 10.4% | 2.8% | 4.0% | 6.4% |
| High school graduate or higher, percent of persons age 25+, 2007-2011 | 70.1% | 78.6% | 82.7% | 85.1% | 75.3% | 79.0% | 79.2% | 78.5% | 72.6% | 80.4% | 83.2% |
| Bachelor's degree or higher, percent of persons age 25+, 2007-2011 | 10.7% | 15.7% | 20.4% | 28.2% | 11.7% | 12.4% | 14.8% | 15.7% | 8.1% | 18.4% | 23.0% |
| Veterans, 2007-2011 | 1614 | 5470 | 15315 | 11873 | 1738 | 5211 | 6114 | 5622 | 3544 | 56,499 | 501,665 |
| Mean travel time to work (minutes), workers age 16+, 2007-2011 | 26.7 | 22 | 20.9 | 19.6 | 24.7 | 24.3 | 23 | 21.2 | 27.6 | 22.1 | 24 |
| | | | | | | | | | | | |
| Per capita money income in the past 12 months (2011 dollars), 2007-2011 | $15,957 | $18,269 | $23,638 | $24,742 | $20,753 | $20,293 | $19,036 | $21,331 | $17,014 | $ 21,555 | $24,197 |
| Median household income, 2007-2011 | $32,159 | $32,148 | $40,672 | $42,104 | $35,265 | $38,795 | $38,310 | $39,604 | $28,563 | $ 36,007 | $43,989 |
| Persons below poverty level, percent, 2007-2011 | 23.4% | 22.0% | 16.5% | 17.3% | 20.7% | 18.9% | 21.6% | 17.7% | 26.9% | 18.9% | 16.9% |
| | | | | | | | | | | | |
| Land area in square miles, 2010 | 298 | 341 | 413 | 326 | 186 | 487 | 622 | 161 | 435 | 3,271 | 41,234.90 |
| Persons per square mile, 2010 | 61.1 | 168.3 | 379.4 | 376.7 | 98.4 | 116.7 | 110.6 | 388 | 82.1 | 287.9 | 153.9 |

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.
FN. Footnote on this item for this area in place of data
NA: Not available
D: Suppressed to avoid disclosure of confidential information
X: Not applicable
S: Suppressed; does not meet publication standards
Z: Value greater than zero but less than half unit of measure shown
F: Fewer than 100 firms
Source: US Census Bureau State & County QuickFacts

This service area represents approximately 10% of Tennessee's population. Compared to the State, this service area has:

- A higher percentage of Caucasians
- Lower average income

Both of these demographic statistics indicate a higher opiate addiction rates:

- Using opioid-related emergency room visits as a marker, Caucasians are 43% more likely that African-Americans to abuse opiates on a per-capita basis.[31]
- The link between poverty and substance abuse is well established, particularly in the

---

[31] Center for Behavioral Health Statistics and Quality, SAMHSA

Appalachian region.[32]

b. Describe the special needs of the service area population, including health disparities, the accessibility to consumers, particularly the elderly, women, racial and ethnic minorities, and low-income groups. Document how the business plans of the facility will take into consideration the special needs of the service area population.

The most apparent disparity for our proposed service area is the lack of treatment, as the table below shows. There are 6 Combined Metropolitan Statistical Areas (CMSA) in Tennessee. CMSAs are combinations of Metropolitan and Micropolitan Statistical Areas.

| CMSA | POPULATION | Number of NRMTF's |
|---|---|---|
| Nashville-Davidson-Murfreesboro-Columbia, TN | 1,533,406 | 2 |
| Memphis | 1,274,704 | 3 |
| Knoxville-Sevierville-La Follette, TN | 1,010,978 | 2 |
| Chattanooga-Cleveland-Athens, TN-GA | 658,201 | 5[33] |
| JOHNSON CITY-KINGSPORT-BRISTOL (TRI-CITIES), TN-VA | 493,587 | 0 |
| Jackson-Humboldt, TN | 160,398 | 1 |
| Dyersburg (not a CMSA) | 37,886 | 1 |
| Paris (not a CMSA) | 31,837 | 1 |
| Savannah, TN (not a CMSA) | 6,917 | 1 |
| | Total | 16 |

It is impossible to talk about disparities in accessibilities when there are no service providers. For the patients that travel hundreds of miles for treatment, this challenge is exacerbated with poverty, and for the elderly and women who must stay home to take care of a family.

In providing a local treatment option, our proposed facility will remove the most significant barrier to treatment for everyone affected – geographic distance - a barrier that is even greater for the poor, women and elderly.

---

[32] Appalachian Regional Commission Report, 2008

[33] This figure includes one Tennessee NRMTF plus 4 "border play" facilities in Georgia

**5. Describe the existing or certified services, including approved but unimplemented CONs, of similar institutions in the service area. Include utilization and/or occupancy trends for each of the most recent three years of data available for this type of project. Be certain to list each institution and its utilization and/or occupancy individually. Inpatient bed projects must include the following data: admissions or discharges, patient days, and occupancy. Other projects should use the most appropriate measures, e.g., cases, procedures, visits, admissions, etc.**

There are no NRMTF service providers in our proposed service area. Applicant requested Central Registry data to calculate utilization rates of existing NRMTF's in Tennessee and to learn how many current patients from the proposed service area are using other clinics. Tennessee Department of Mental and Substance Abuse Services informed applicant that it would no longer provide such data because of policy change. The need for the proposed service area has been documented in Sections B1, Section C General Criteria, Need, and in Question 1 of this Section. Our projected utilization is in our response to No. 6 below.

**6. Provide applicable utilization and/or occupancy statistics for your institution for each of the past three (3) years and the projected annual utilization for each of the two (2) years following completion of the project. Additionally, provide the details regarding the methodology used to project utilization. The methodology must include detailed calculations or documentation from referral sources, and identification of all assumptions.**

Since our facility would be new, we have no history. We took two approaches to project our utilization. The first was to examine the number of patients from the Northeast Tennessee /service area were in treatment in the nearest clinics (North Carolina and Tennessee), and make estimates on how many would transfer to a center that was 100-200 miles closer round-trip. The second way was to apply per capita statistics on patients in treatment from Tennessee and apply them to our projected service area. Both approaches yield a similar number of projected patients. We averaged the results. Our projected utilization, and associated calculations, assumptions and sources are shown in the table below.

- **Method One: Transfer Method**

| End of Year | End of Year Patients | End of Year Facility Utilization | Methodology | Patient assumptions | Utilization assumptions | Source |
|---|---|---|---|---|---|---|
| 1 | 918 | 51% | 50% of the Tri-Cities patients currently traveling to Asheville (1,400) and 80% traveling to Knoxville would transfer; 10% taper off/release | 1 shift operation; admissions 3 days per week; variance granted for operating hours | 1 counselor for 50 patients; 200 sq. feet of space plus overhead per counselor; 7,000 feet of office space | Ownership of Asheville area clinics; interview with Knoxville Program Directors; CARF, Federal and State regulations |
| 2 | 1208 | 69% | 25% of Year 1 patients taper off/released; admit 10 new patients per week | | | Experience owning 9 other clinics |

- **Method Two: Tennessee Per-Capita Method**

SUPPLEMENTAL- # 1

March 25, 2013
12:15pm

| End of Year | End of Year Patients | End of Year Facility Utilization | Methodology | Patient assumptions | Utilization assumptions | Source |
|---|---|---|---|---|---|---|
| 1 | 850 | 49% | Use the per-capita rate of admissions (189 per 100,000) from the 2009 Tn State Registry (with projected growth) and apply it to the service area population. Assume 75% of these patients are admitted In the first year. | 1 shift operation; admissions 3 days per week; variance granted for operating hours | 1 counselor per 50 patients; 200 sq. feet of space plus overhead per counselor; 7,000 feet of office space | Ownership of Asheville area clinics; TN Dept. of Mental Health; interview with Knoxville Program Directors; CARF, Federal and State regulations |
| 2 | 1134 | 63% | Remaining 25% of per-capita patients are admitted. | | | Experience owning 9 other clinics |

ECONOMIC FEASABILITY

1.    Provide the cost of the project by completing the Project Costs Chart on the following page. Justify the cost of the project.

- All projects should have a project cost of at least $3,000 on Line F. (Minimum CON Filing Fee). CON filing fee should be calculated from Line D. (See Application Instructions for Filing Fee)

- The cost of any lease (building, land, and/or equipment) should be based on fair market value or the total amount of the lease payments over the initial term of the lease, whichever is greater. Note: This applies to all equipment leases including by procedure or "per click" arrangements. The methodology used to determine the total lease cost for a "per click" arrangement must include, at a minimum, the projected procedures, the "per click" rate and the term of the lease.

- The cost for fixed and moveable equipment includes, but is not necessarily limited to, maintenance agreements covering the expected useful life of the equipment; federal, state, and local taxes and other government assessments; and installation charges, excluding capital expenditures for physical plant renovation or in-wall shielding, which should be included under construction costs or incorporated in a facility lease.

- For projects that include new construction, modification, and/or renovation; documentation must be provided from a contractor and/or architect that support the estimated construction costs.

See pages that follow.

Applicant provides the following footnotes to accompany the Project Cost Chart:

Line A.2. Legal, administrative and consultant fees include CARF accreditation and materials

Line B1. Facility costs include the monthly leasing and common area maintenance fees for a five year lease at an average of $5,333 per month

Line C4. Includes the operating losses that must be financed during the time between when the facility opens until it becomes cashflow positive.

A. Construction and equipment acquired by purchase:

| | | |
|---|---|---|
| 1. | Architectural and Engineering Fees | $25,000 |
| 2. | Legal, Administrative (Excluding CON Filing Fee), Consultant Fees | 30,000 |
| 3. | Acquisition of Site | |
| 4. | Preparation of Site | 160,000 |
| 5. | Construction Costs | |
| 6. | Contingency Fund | |
| 7. | Fixed Equipment (Not included in Construction Contract) | |
| 8. | Moveable Equipment (List all equipment over $50,000) | 23,500 |
| 9. | Other (Specify) Office furniture, computers, etc. | 20,000 |

B. Acquisition by gift, donation, or lease:

| | | |
|---|---|---|
| 1. | Facility (inclusive of building and land) | $320,000 |
| 2. | Building only | |
| 3. | Land only | |
| 4. | Equipment (Specify)_____ | |
| 5. | Other (Specify) Patient software | 8,500 |

C. Financing Costs and Fees:

| | | |
|---|---|---|
| 1. | Interim Financing | |
| 2. | Underwriting Costs | |
| 3. | Reserve for One Year's Debt Service | |
| 4. | Other (Specify) Operating loss carry | $80,000 |

D. Estimated Project Cost
   (A+B+C) — $667,000

E. CON Filing Fee — $3,000

F. Total Estimated Project Cost
   (D+E)

TOTAL — $670,000

Z-9A

## PROJECTED DATA CHART
2013 MAR 28   AM 10 19

Give information for the two (2) years following the completion of this proposal. The fiscal year begins in _January__ (Month).

| | | Year 2014_ | Year_2015_ |
|---|---|---|---|
| A. | Utilization Data (Specify unit of measure) | 530 avg. pts._ | 1,056 avg. pts. |
| B. | Revenue from Services to Patients | | |
| | 1.   Inpatient Services | | |
| | 2.   Outpatient Services | $1,782,14__ | $3,903,715 |
| | 3.   Emergency Services | | |
| | 4.   Other Operating Revenue (Specify)_____ | | |
| | **Gross Operating Revenue** | $1,782,144 | $3,903,715 |
| C. | Deductions from Gross Operating Revenue | | |
| | 1.   Contractual Adjustments | $_____ | $_____ |
| | 2.   Provision for Charity Care | __35,643 | _78,074_ |
| | 3.   Provisions for Bad Debt | __17,821__ | _39,037___ |
| | **Total Deductions** | $_53,464_ | $_117,111_ |
| **NET OPERATING REVENUE** | | $1,728,680 | $3,786,604_ |
| D. | Operating Expenses | | |
| | 1.   Salaries and Wages | $780,000 | $1,573,135 |
| | 2.   Physician's Salaries and Wages | _144,000_ | _144,000_ |
| | 3.   Supplies | _579,750_ | _767,972_ |
| | 4.   Taxes | ___5,092_ | _435,719_ |
| | 5.   Depreciation | __25,000_ | __25,000__ |
| | 6.   Rent | __67,200_ | __67,200__ |
| | 7.   Interest, other than Capital | | |

8.  Management Fees:                                    2013 MAR 28  AM 10 20

    a.  Fees to Affiliates                             _____     _____

    b.  Fees to Non-Affiliates                         _____     _____

9.  Other Expenses – Specify on Page 32               _120,000       _120,000_

    **Total Operating Expenses**                      $1,721,042_    $3,133,026_

E.  Other Revenue (Expenses) -- Net (Specify)_____  $_____     $_____

**NET OPERATING INCOME (LOSS)**                        $7,638____     $653,578__

F.  Capital Expenditures

1.  Retirement of Principal                            $_____     $80,000_

2.  Interest                                           _____     __8,000__

    **Total Capital Expenditures**                     $_____     $88,000_

**NET OPERATING INCOME (LOSS)**

**LESS CAPITAL EXPENDITURES**                          $7,638____     $565,578__

**HISTORICAL DATA CHART-OTHER EXPENSES**

2013 MAR 28  AM 10 20

| OTHER EXPENSES CATEGORIES | Year_NA_ | Year_NA_ | Year_NA_ |
|---|---|---|---|
| 1. | $ | $ | $ |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| **Total Other Expenses** | $ | $ | $ |

**PROJECTED DATA CHART-OTHER EXPENSES**

| OTHER EXPENSES CATEGORIES | Year_2014_ | Year_2015 |
|---|---|---|
| 1. Utilities | $24,000_ | $24,000_ |
| 2. Insurance | _54,000__ | _54,000 |
| 3. Travel and other | _42,000_ | _42,000_ |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| **Total Other Expenses** | $120,000__ | $120,000_ |

32

SUPPLEMENTAL - # 1

March 25, 2013
12:15pm

2. Identify the funding sources for this project.

2013 MAR 25  PM 12 07

Please check the applicable item(s) below and briefly summarize how the project will be financed. *(Documentation for the type of funding MUST be inserted at the end of the application, in the correct alpha/numeric order and identified as Attachment C, Economic Feasibility-2.)*

☐ A. Commercial loan—Letter from lending institution or guarantor stating favorable initial contact, proposed loan amount, expected interest rates, anticipated term of the loan, and any restrictions or conditions;

☐ B. Tax-exempt bonds--Copy of preliminary resolution or a letter from the issuing authority stating favorable initial contact and a conditional agreement from an underwriter or investment banker to proceed with the issuance;

☐ C. General obligation bonds—Copy of resolution from issuing authority or minutes from the appropriate meeting.

☐ D. Grants—Notification of intent form for grant application or notice of grant award; or

☑ E. Cash Reserves—Appropriate documentation from Chief Financial Officer.

☐ F. Other—Identify and document funding from all other sources.

Cash Reserves of the Applicant. See Attachment C, Economic Feasibility-2.

**3. Discuss and document the reasonableness of the proposed project costs. If applicable, compare the cost per square foot of construction to similar projects recently approved by the Health Services and Development Agency.**

These costs were developed with the Applicant's experience of having opened 9 NRMTFs in 4 states. In every case, the projects involve standard work elements:

- Adding and modifying offices, including wall construction and moving, adding electrical, phones, cable and security, reconfiguring heating and air conditioning systems, etc.
- Adding workrooms unique to NRMTFs such as dosing windows, pharmacy, and payment/check-in areas
- Outfitting the offices with desks, computers, phones, etc.
- Installing patient and accounting software systems unique to NRMTFs

**4. Complete Historical and Projected Data Charts on the following two pages--Do not modify the Charts provided or submit Chart substitutions! Historical Data Chart represents revenue and expense information for the last three (3) years for which complete data is available for the institution. Projected Data Chart requests information for the two (2) years following the completion of this proposal. Projected Data Chart should reflect revenue**

and expense projections for the Proposal Only (i.e., if the application is for additional beds, include anticipated revenue from the proposed beds only, not from all beds in the facility).

See page that follows

Notes to Project Data Chart:

- CARF accreditation and material costs are included in Other Expenses
- Of the 530 patients during the first year, Applicant's assumptions for initial treatment are:
  o Methadone:                          73%, or 387
  o Buprenorphine-based treatment:      25%, or 133
  o Abstinence-based treatment:         2%, or 10
- Applicant was asked to provide Historical Data Chart for the last three years for a center in Asheville, NC. Applicant is a currently a shareholder of the company and not an officer or member of management, and as such does not have access to this information.

## HISTORICAL DATA CHART

2013 MAR 25  PM 12 07

Give information for the last *three (3)* years for which complete data are available for the facility or agency. The fiscal year begins in _____ (Month).

|  |  | Year | Year | Year |
|---|---|---|---|---|
|  |  | N/A | N/A | N/A |
| A. | Utilization Data (Specify unit of measure) |  |  |  |
| B. | Revenue from Services to Patients |  |  |  |
|  | 1.  Inpatient Services | $ | $ | $ |
|  | 2.  Outpatient Services |  |  |  |
|  | 3.  Emergency Services |  |  |  |
|  | 4.  Other Operating Revenue (Specify)_____ |  |  |  |
|  | **Gross Operating Revenue** | $ | $ | $ |
| C. | Deductions from Gross Operating Revenue |  |  |  |
|  | 1.  Contractual Adjustments | $ | $ | $ |
|  | 2.  Provision for Charity Care |  |  |  |
|  | 3.  Provisions for Bad Debt |  |  |  |
|  | **Total Deductions** | $ | $ | $ |
| **NET OPERATING REVENUE** |  | $ | $ | $ |
| D. | Operating Expenses |  |  |  |
|  | 1.  Salaries and Wages | $ | $ | $ |
|  | 2.  Physician's Salaries and Wages |  |  |  |
|  | 3.  Supplies |  |  |  |
|  | 4.  Taxes |  |  |  |
|  | 5.  Depreciation |  |  |  |
|  | 6.  Rent |  |  |  |
|  | 7.  Interest, other than Capital |  |  |  |
|  | 8.  Other Expenses (Specify)_____ |  |  |  |
|  | **Total Operating Expenses** | $ | $ | $ |
| E. | Other Revenue (Expenses) – Net (Specify) | $ | $ | $ |
| **NET OPERATING INCOME (LOSS)** |  | $ | $ | $ |
| F. | Capital Expenditures |  |  |  |
|  | 1.  Retirement of Principal | $ | $ | $ |
|  | 2.  Interest |  |  |  |
|  | **Total Capital Expenditures** | $ | $ | $ |
| **NET OPERATING INCOME (LOSS) LESS CAPITAL EXPENDITURES** |  | $ | $ | $ |

5.    Please identify the project's average gross charge, average deduction from operating revenue, and average net charge.

| | | |
|---|---|---|
| Patients (average during year) | 530 | 1,056 |
| Average gross charge (revenue per year) | $3,363 | $3,697 |
| Average deduction from operating revenue | $101 | $111 |
| Average net charge | $3,262 | $3,586 |

6. A. Please provide the current and proposed charge schedules for the proposal. Discuss any adjustment to current charges that will result from the implementation of the proposal. Additionally, describe the anticipated revenue from the proposed project and the impact on existing patient charges.

Since this is a new operation, Applicant submits planned charges.

| Service | Proposed Charge |
|---|---|
| Intake assessment | $50 |
| Methadone Fee | $10 per day |
| Buprenorphine/Suboxone Fee | $200 per month plus medication cost |
| Guest dosing | $20 per day |
| Drug screens, passed | $0, included in medication |
| Drug screens, failed | $25 |
| Counseling | $0, included in fees above |
| Annual Health & Physical | $0, included in fees above |

6.    B. Compare the proposed charges to those of similar facilities in the service area/adjoining service areas, or to proposed charges of projects recently approved by the Health Services and Development Agency. If applicable, compare the proposed charges of the project to the current Medicare allowable fee schedule by common procedure terminology (CPT) code(s).

The comparative charge schedule is shown below:

| Service | Charge | Phone survey results, if available |
|---|---|---|
| Intake assessment | $50 | Waived at Asheville area clinics, $50 at Knoxville clinics and Galax, VA; $25 at Stepping Stone in Boone, NC |
| Methadone Fee | $10 per day | $16.14 at 2 clinics in Knoxville; $11 – $13 per day at Asheville clinics and Boone, NC; Galax, VA is $25 per day according to a 3/22 phone inquiry |
| Buprenorphine/Suboxone Fee | $200 per month plus medication cost | Asheville area clinics were full and not accepting new patients; Stepping Stone is $13-$21 per day depending on dosage; Galax, VA is $30 per day.<br><br>$400 per month plus medication cost at buprenorphine-private physician offices, without counseling, drug testing, STD/HIV/TB testing, diversion control, etc. |
| Guest dosing | $20 per day | $15 - $25 per day plus a one-time charge of $25 |

| Drug screens, passed | $0, included in medication | $0, included in medication |
|---|---|---|
| Drug screens, failed | $25 | $0 - $25 |
| Counseling | $0, included in fees above | $0, included in fees above at other NRMTFs

Either not available or on a referral basis at buprenorphine-approved private physician offices |
| Annual Health & Physical | $0, included in fees above | $0, included in fees above |

This is a new project, so there is no impact to previous charge schedules.

Based upon telephone surveys in February 2013, the proposed gross charge is approximately 20%-33% less than those charged by the nearest clinics in North Carolina and Tennessee (Crossroads in Weaverville, NC and DRD in Knoxville, TN). Based on phone interviews during March, 2013, the clinics in Knoxville charged approximately $16.30 per day and the clinics in Weaverville and Asheville, NC charge between $12 and $13 per day.

Since TennCare does not cover Methadone Clinic Services[34] for patients over 21 years of age and Medicare does not pay for methadone maintenance treatment, there is not a relevant comparable charge base.

7.      Discuss how projected utilization rates will be sufficient to maintain cost-effectiveness.

This project is scheduled to be cash flow positive within 180 days of opening. Any negative variances to this will be covered by Tri-Cities Holdings, LLC.

8.      Discuss how financial viability will be ensured within two years; and demonstrate the availability of sufficient cash flow until financial viability is achieved.

As shown in the Projected Data Chart, this project is projected to be cash flow positive in Year 1, and ongoing thereafter. The management of Tri-Cities Holdings, LLC has opened 9 similar NRMTFs in four states and has significant experience and an excellent track record of ensuring cash flow positive, viable and compliance NRMTFs. In the supporting document, a personal financial

---

[34] www.tn.gov/tenncare/forms/phar20050912.pdf

statement is included in Attachment C Economic Feasibility-10 for Steve Kester, Tri-Cities Holding's CEO, who will personally guarantee this project through fruition. All funds required to open and outfit this facility, and cover the operating loss during the first year, plus contingency, are secured.

**9.     Discuss the project's participation in state and federal revenue programs including a description of the extent to which Medicare, TennCare/Medicaid, and medically indigent patients will be served by the project. In addition, report the estimated dollar amount of revenue and percentage of total project revenue anticipated from each of TennCare, Medicare, or other state and federal sources for the proposal's first year of operation.**

The Applicant plans to utilize self-pay programs and does not plan to participate in State and federal programs such as TennCare or Medicare. If the healthcare environment shifts, such as universal coverage of NRMTFs services for qualified patients, the Applicant may revisit this decision. Because buprenorphine patients will comprise an estimated 25% of applicant's patient mix, the applicant cannot justify the investment of resources required to maintain compliance with TennCare. However, a call to TennCare Solutions (888-816-1680) indicated that TennCare patients can be reimbursed for approved medication and services upon individual submission of receipts.

**10. Provide copies of the balance sheet and income statement from the most recent reporting period of the institution and the most recent audited financial statements with accompanying notes, if applicable. For new projects, provide financial information for the corporation, partnership, or principal parties involved with the project. Copies must be inserted at the end of the application, in the correct alpha-numeric order and labeled as Attachment C, Economic Feasibility-10.**

The proposed facility and the company are new, so no historical data is available. Personal financial statements are included in Attachment C Economic Feasibility-10 for Tri-Cities Holding's CEO who is personally funding and guaranteeing this project.

**11. Describe all alternatives to this project which were considered and discuss the advantages and disadvantages of each alternative including but not limited to:**

**a. A discussion regarding the availability of less costly, more effective, and/or more efficient alternative methods of providing the benefits intended by the proposal. If development of such alternatives is not practicable, the applicant should justify why not; including reasons as to why they were rejected.**

There is no treatment in the proposed service area currently. Our proposal may appear to be more expenses than the status quo, i.e. no service. However, the State of Tennessee and many organizations have documented the cost of untreated persons significantly outweigh the cost of treatment, as measured by crime, broken families, loss or diminishment of employment, related health costs, and fatalities[35].

---

[35] tn.gov/mental/policy/presc_drug_abuse.shtml



Date Created: 3/18/2013

1. Parcel size: 1.66 acres
2. Building size: 8,208 square feet
3. All construction will be inside the four
   exterior walls of the building.
4. Names of streets, roads or highway that
   cross or border the site: Wesley Court

As for effectiveness of treatment, methadone maintenance treatment has proven the most effective treatment for opiate addiction, as studied by numerous agencies, including the Centers For Disease Control and the National Institute on Drug Abuse[36]. However, our proposed services also include buprenorphine-based treatment and abstinence-based services. The patient, together with his or her care team of doctors, nurses and counselors will decide the best treatment plan. In addition, we anticipate that patients will migrate between treatment services. For example, a patient may be stabilized with methadone, tapered down and switched to Suboxone, then transition to abstinence-based treatment, and finally be discharged after successful demonstrating the ability to lived independently without relapse.

Our estimate is that *initial* treatments will breakdown as follows:

- Methadone maintenance: 73%
- Buprenorphine-based treatment: 25%
- Abstinence treatment: 2%

Comparison of applicant's proposed services and inpatient treatment:

- Frontier Health/Magnolia Ridge Alcohol & Drug Residential Treatment
  900 Buffalo Street
  Johnson City, TN 37604
  www.frontierhealth.org
  COST: $6,000 per month (compared to applicant's $400/month outpatient)
  NOTE: 9-12 week waiting list.

- Comprehensive Community Services
  6145 Temple Star Road
  Kingsport, TN 37660
  ccstreatment.com
  COST: $5,600 per month (compared to applicant's $400/month outpatient)
  NOTE: 100+ patients on waiting list/Minimum four weeks until available.

**b. The applicant should document that consideration has been given to alternatives to new construction, e.g., modernization or sharing arrangements. It should be documented that superior alternatives have been implemented to the maximum extent practicable.**

The applicant reviewed more than 50 locations in the Tri-Cities area before selecting its proposed location. Beyond best meeting zoning requirements, the proposed facility was chosen because it was located in the biggest city of the proposed service area and therefore close to the maximum number of anticipated patients; it had ready highway access to all points within the proposed service area; and it required no new construction, only upfitting and modifications to an existing structure. Tri-Cities Holdings has balanced cost control with providing patients quality care and a healing environment.

---

[36] www.cdc.gov/idu/facts/methadonefin.pdf