# EXHIBIT K

# CITY OF JOHNSON CITY, TENNESSEE

## BOARD OF COMMISSIONERS

Jeff Banyas, Mayor
Phil Carriger, Vice Mayor
Jane Myron
Clayton Stout
Ralph Van Brocklin

## PLANNING COMMISSION

| | |
|---|---|
| Jim Woods, Chairman | Brenda Clarke |
| Kevin Cole, Vice-Chairman | Greg Cox, Secretary |
| Thomas M. Hord | John Hunter, Assistant Secretary |
| Dan Rutledge | Robert Thomas |
| Clayton Stout | Joe Wise |

## BOARD OF ZONING APPEALS

Dwight Harrell, Chairman
Steve Meroney, Vice-Chairman
Jeff Benedict
Tim O'Neil
Jamie Povlich

## ADMINISTRATIVE STAFF

M. Denis Peterson, City Manager
Angie Carrier, Development Services Director

# TABLE OF CONTENTS

**ARTICLE I**  **Title, Purpose, and Enactment**
1.1    Title
1.2    Short Title
1.3    Purpose and Enactment

**ARTICLE II**  **Definition of Terms Used in the Code**

**ARTICLE III**  **Nonconforming Provisions**
3.1    Purpose
3.2    Applicability
3.3    Nonconforming Uses
3.4    Termination of Nonconforming Uses
3.5    Nonconforming Lots
3.6    Special Exceptions

**ARTICLE IV**  **Application of Regulations**
4.1    Conformity to Subdivision Regulations
4.2    Zoning District Boundaries
4.3    Use
4.4    Street Frontage
4.5    Reduction of Lot Size
4.6    One Principal Building Per Lot
4.7    Yards and Setbacks
4.8    Height and Density
4.9    Exceptions on Height Limits
4.10   Exceptions on Setbacks
4.11   Vision Clearance
4.12   Site Plan Requirements

**ARTICLE V**  **Site Plan Approval Procedure**
5.1    Application and Approval Procedure
5.2    Development Standards

**ARTICLE VI**    <u>**Use Requirements by District**</u>

6.1    R-1 Low Density Residential District
6.2    R-2 Low Density Residential District
6.3    R-2A Low Density Residential District
6.4    R-2B Low Density Residential District
6.5    R-2C Low Density Residential District
6.6    R-3 Medium Density Residential District
6.7    R-4 Medium Density Residential District
6.8    R-5 High Density Residential District
6.9    R-6 High Density Residential-University District
6.10    RP-2, RP-3, RP-4, and RP-5 Planned Residential Districts
6.11    RM-3, RM-4, and RM-5 Manufactured Home Park Districts
6.12    RO-1 High Density Residential-Professional Office District
6.13    MS-1 Medical Services District
6.14    B-1 Neighborhood Business District
6.15    B-2 Central Business District
6.16    B-3 Supporting Central Business District
6.17    B-4 Planned Arterial Business District
6.18    B-5 Planned Community Business District
6.19    I-1 Light Industrial District
6.20    I-2 Heavy Industrial District
6.21    A-1 Agricultural District
6.22    BP Business Park District
6.23    RTP Research/Technology Park District
6.24    MX Mixed Use District
6.25    MX-1 Mixed Use Neighborhood
6.26    HCZO Historic/Conservation Overlay District
6.27    PB Planned Business District
6.28    CO Corridor Overlay District
6.29    HVO Highway Vista Overlay District
6.30    DO Design Overlay District
6.31    UPO University Parkway Overlay
6.32    RO-2 Medium Density Residential-Professional Office District
6.33    UCO- Urban Commercial Overlay


**ARTICLE VII**    <u>**Sign Regulations**</u>

7.1    General Provisions
7.2    Exempt and Prohibited Signs
7.3    Regulations by Zoning District
7.4    Animated Signs
7.5    Electronic Message Boards

**ARTICLE VIII**    **Floodplain Regulations**
    8.1    Purpose and Objectives
    8.2    General Provisions
    8.3    Administrative Procedures for the Floodplain Regulations
    8.4    Administrative Procedures for the Sinkhole Regulations


**ARTICLE IX**    **Sidewalk Regulations**
    9.1    Purpose
    9.2    Requirements
    9.3    Sidewalk Construction and Design
    9.4    Variance Procedure


**ARTICLE X**    **Transmission Tower Regulations**
    10.1    Purpose
    10.2    General Provisions
    10.3    Submittal and Review


**ARTICLE XI**    **Parking Regulations**
    11.1    Purpose
    11.2    General Provisions
    11.3    Required Parking Spaces
    11.4    Off-Premise Parking
    11.5    Joint Use of Parking Spaces
    11.6    Handicap Parking
    11.7    Motorcycle Parking
    11.8    Loading Areas
    11.9    Stacking Lanes for Drive-Up Windows


**ARTICLE XII**    **Landscape Regulations**
    12.1    General Provisions
    12.2    Landscape Yards
    12.3    Parking Area Landscaping
    12.4    Buffer Yards
    12.5    Protective Screening


**ARTICLE XIII**    **Lighting Regulations**
    13.1    Purpose
    13.2    Applicability
    13.3    Temporary Exemptions

|  | 13.4 | General Standards |
|  | 13.5 | Site Plan Review |
|  | 13.6 | Compliance |

**ARTICLE XIV**  **Amendments**
| | 14.1 | Procedure |
| | 14.2 | Initiation of Amendments |
| | 14.3 | Concept Plan |
| | 14.4 | Neighborhood Meeting and Notification |
| | 14.5 | Approval Process |
| | 14.6 | Reapplication |

**ARTICLE XV**  **Board of Zoning Appeals**
| | 15.1 | Creation and Appointments |
| | 15.2 | Procedure |
| | 15.3 | Appeals:  How Taken |
| | 15.4 | Powers |

**ARTICLE XVI**  **Legal Provisions**
| | 16.1 | Establishment of Administrative Officer |
| | 16.2 | Duties and Limitations of the Chief Building Official |
| | 16.3 | Zoning Compliance Permit Required |
| | 16.4 | Fees |
| | 16.5 | Certificate of Occupancy |
| | 16.6 | Penalties |
| | 16.7 | Remedies |
| | 16.8 | Conflicts with other Ordinances |
| | 16.9 | Validity |
| | 16.10 | Effective Date |

(cover.doc)

# ARTICLE I
## TITLE, PURPOSE, AND ENACTMENT

## 1.1 - TITLE

A CODE, IN PURSUANCE OF THE AUTHORITY GRANTED BY THE TENNESSEE CODE ANNOTATED, AND FOR THE PURPOSE OF PROMOTING THE PUBLIC HEALTH, SAFETY, MORALS, CONVENIENCE, ORDER, PROSPERITY, AND GENERAL WELFARE; TO PROVIDE FOR THE ESTABLISHMENT OF DISTRICTS WITHIN THE CORPORATE LIMITS; TO REGULATE, WITHIN SUCH DISTRICTS, THE LOCATION, HEIGHT, BULK, NUMBER OF STORIES AND SIZE OF BUILDINGS AND OTHER STRUCTURES, THE PERCENTAGE OF LOT OCCUPANCY, THE REQUIRED OPEN SPACE, THE DENSITY OF POPULATION AND THE USES OF LAND, BUILDINGS AND OTHER STRUCTURES; TO PROVIDE METHODS OF ADMINISTRATION OF THIS CODE AND TO PRESCRIBE PENALTIES FOR THE VIOLATION THEREOF.

BE IT ORDAINED by the City of Johnson City, Tennessee, as follows:

## 1.2 - SHORT TITLE

This Code shall be known as the "Zoning Code of the City of Johnson City, Tennessee." The map herein referred to which is identified by the title "Zoning Map of Johnson City, Tennessee," dated January 11, 1972 and explanatory matter thereon are hereby adopted and made a part of this Code.

## 1.3 - PURPOSE AND ENACTMENT

For the purpose of promoting the public health, safety, morals, convenience, order, prosperity, or general welfare of Johnson City; and to lessen congestion in the streets, to secure safety from fire, panic and other dangers, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to facilitate the adequate provisions of transportation, water, sewerage, schools, parks, and other public requirements; to promote desirable living conditions and the sustained stability of neighborhoods, protecting property against blight and depreciation, securing economy in governmental expenditure, conserving the value of buildings and encouraging the most appropriate use of lands, buildings, and other structures throughout the municipality, all in accordance with a comprehensive plan, the City Commission of Johnson City, Tennessee, does hereby ordain and enact into law the following articles and sections:

zonecode/articles/ART1.doc

# ARTICLE II
## DEFINITION OF TERMS USED IN THE CODE

Except as specifically defined herein, all words used in the Code have their customary dictionary definition to give this Ordinance it"s most reasonable application given its stated purpose and objectives. For the purpose of this Code, certain words or terms used herein shall be defined as follows: words used in the present tense include the future tense; words used in the singular number include the plural, and words used in the plural include the singular; the word "person" includes a firm, co-partnership, company, organization, trust, association, corporation, as well as an individual; the word "lot" includes the word "plot" or "parcel", and the word "building" includes the word "structure".

The word "shall" is always mandatory; the word "may" is permissive. The word "used" or "occupied" as applied to any land or building shall be construed to include the word "intended", arranged, or designed to be used or occupied.

ACCESSORY BUILDING, HEIGHT OF: The vertical distance measured from the average ground elevation to the highest point of the roof.

ACCESSORY STRUCTURE: (This definition is for the exclusive purpose of Article VIII, Floodplain Regulations). Any structure shall represent a subordinate structure to the principal structure and, for the purpose of this section, shall conform to the following: accessory structures shall not be used for human habitation; accessory structures shall be designed to have low flood damage potential; accessory structures shall be constructed and placed on the building site so as to offer the minimum resistance to the flow of flood waters; accessory structures shall be firmly anchored to prevent flotation which may result in damage to other structures; and service facilities such as electrical and heating equipment shall be elevated or flood-proofed.

ACCESSORY STRUCTURE OR USE: A structure or use customarily incidental and subordinate to the principal use or building and located on the same lot with such principal use or building.

ACT: The statutes authorizing the National Flood Insurance Program that are incorporated in 42 U.S.C. 4001-4128.

ADDITION (TO AN EXISTING BUILDING): Any walled and roofed expansion to the perimeter of a building in which the addition is connected by a common load-bearing wall other than a firewall. Any walled and roofed addition, which is connected by a firewall or is separated by an independent perimeter load-bearing wall, shall be considered "New Construction".

ADULT DAY-CARE CENTER:  A place operated by a person, society, agency, corporation, institution, or other group that receives payment for the care of persons over eighteen (18) years of age for less than twenty-four (24) hours per day in an approved community-based facility.  The adult day-care center shall provide a structured program of personalized care for adults who are not capable of full independent living as a result of physical disability, developmental disabilities, emotional impairment, or frailty resulting from advanced age.

ADULT-ORIENTED BUSINESSES SHALL INCLUDE:

A.   "Adult arcade" means an establishment where, for any form of consideration, one or more motion picture projectors, slide projectors or similar machines, for viewing by five or fewer persons each are used to show films, motion pictures, video cassettes, slide or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

B.   "Adult bookstore" means an establishment that restricts or purports to restrict admission to adults or to any class of adults and which has as a substantial portion of its stock-in-trade and offers for sale for any form of consideration any one or more of the following:

   1)   Books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes, slides or other visual representations which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas", or

   2)   Instruments, devices or paraphernalia which are designed for use in connection with "specified sexual activities."

C.   "Adult cabaret" means a nightclub, bar, restaurant or similar establishment which regularly features live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities," or films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

D.   "Adult motel" means a motel or similar establishment offering public accommodations for any form of consideration which provides patrons with closed-circuit television transmissions, films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

E. "Adult motion picture theater" means an establishment where, for any form of consideration, films, motion pictures, video cassettes, slides or similar photographic reproductions are shown, and in which a substantial portion of the total presentation time is devoted to the showing of material which is characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

F. "Adult theater" means a theater, concert hall, auditorium or similar establishment which, for any form of consideration, regularly features live performances which are characterized by an emphasis upon the exposure of "specified anatomical areas" or by "specified sexual activities."

G. "Characterized by an emphasis upon" means the dominant or principal theme of the object referenced. For instance, when the phrase refers to films "which are characterized by emphasis upon the depiction or description of „specified sexual activities" or „specified anatomical areas," the films so described are those whose dominant or principal character and theme are the exhibition or display of "specified anatomical areas" or "specified sexual activities."

H. "Massage parlor" means an establishment where, for any form of consideration, massage, alcohol rub fomentation, electric or magnetic treatment, or similar treatment or manipulation of the human body is administered, unless such treatment or manipulation is administered by a medical practitioner, chiropractor, acupuncturist, physical therapist or similar professional person licensed by the state. This definition does not include an athletic club, health club, school, gymnasium, reducing salon, spa or similar establishment where massage or similar manipulation of the human body is offered as in incidental or accessory service.

I. "Semi-nude" means the female breast below a horizontal line across the top of the areola at its highest point or the showing of the male or female buttocks. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast, exhibited by a dress, blouse, skirt, leotard, bathing suit, or other wearing apparel, provided the areola is not exposed in whole or in part.

J. "Semi-nude Model Studio" means an establishment which regularly features a person (or persons) who appears semi-nude and is provided to be observed, sketched, drawn, painted, sculptured, or photographed by other persons who pay money or any form of consideration, but shall not include a proprietary school licensed by the State of Tennessee or a college, junior college, community college, or university supported entirely or partly by public taxation; a private college or university which maintains and operates educational programs in which credits are transferable to a college, junior college, or university supported entirely or partly by taxation.

K. <u>"Sexual encounter establishment"</u> means an establishment, other than a hotel, motel or similar establishment offering public accommodations, which, for any form of consideration, provides a place where two or more persons may congregate, associate or consort in connection with "specified sexual activities" or the exposure of "specified anatomical areas." This definition does not include an establishment where a medical practitioner, psychologist, psychiatrist or similar professional person licensed by the state engages in sexual therapy.

L. <u>"Specified Anatomical Areas"</u> means any of the following:

   1. Less than completely and opaquely covered human genitals, pubic region, buttocks, anus or female breasts below a point immediately above the top of the areolae; or
   2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

M. <u>"Specified Sexual Activity"</u> means any of the following:

   1. Human genitals in a state of sexual stimulation or arousal;
   2. Acts of human masturbation, sexual intercourse, or sodomy;
   3. Fondling or other erotic touching of human genitals, pubic regions, buttocks, or female breasts;
   4. Flagellation or torture in the context of a sexual relationship;
   5. Masochism, erotic, or sexually-oriented torture, beating or the infliction of pain;
   6. Erotic touching, fondling, or other such contact with an animal by a human being; or
   7. Human excretion, urination, menstruation, vaginal or anal irrigation as part of or in connection with any of the activities set forth in "1" through "6" above.

N. <u>"Substantial portion"</u> means over twenty percent (20%) of floor area, or over twenty percent (20%) of inventory by units or value, or over twenty percent (20%) of revenues, or an inventory of two hundred (200) or more units of the items set forth and enumerated in the definition of "adult book store" above, specifically being the books, magazines, periodicals, or other printed matter, or photographs, films, motion pictures, video cassettes, slides, or other visual representations which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas" or the instruments, devices or paraphernalia which are designed for use in connection with "specified sexual activities".

ALLEY:  A minor right-of-way, dedicated to public use, which affords a secondary means of vehicular access to the back or side of properties otherwise abutting a street, and which may be used for public utility purposes.

ALTERNATIVE TOWER STRUCTURE: A type of monopole tower structure camouflaged to appear as a tree, clock tower, light pole, flag pole, farm silo, or similar man-made structure to conceal the presence of antennas or towers.

ANGLE OF INCIDENCE:  The angle at which a light ray strikes the surface, measured between the ray and a line perpendicular to the surface.

ANTENNA ARRAY:  Devices such as poles, rods, panels, reflecting dishes, and whip antennas used for the transmission or reception of radio frequency signals.

APPEAL:  A request for a review of the local enforcement officer"s interpretation of any provision of this Ordinance or a request for a variance.

AREA OF SHALLOW FLOODING: A designated AO or AH Zone on the Flood Insurance Rate Map (FIRM) with one percent or greater annual chance of flooding to an average depth of one (1) to three (3) feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and indeterminate; and where flood water velocity may or may not be evident.  Such flooding is characterized by ponding or sheet flow.

AREA OF SPECIAL FLOOD-RELATED EROSION HAZARD: The land within a community which is most likely to be subject to severe flood-related erosion losses. The area may be designated as Zone E on the Flood Hazard Boundary Map (FHBM). After the detailed evaluation of the special flood-related erosion hazard area in preparation for publication of the FIRM, Zone E may be further refined.

AREA OF SPECIAL FLOOD HAZARD: (ALSO REFERRED TO AS A SPECIAL FLOOD HAZARD AREA - SFHA): The land in the floodplain within a community subject to a one (1) percent or greater chance of flooding in any given year.  The area may be designated as Zone A on the FHBM.  After detailed rate making has been completed in preparation for publication of the FIRM, Zone A is usually refined into:

>    ZONE A: The special flood hazard area that is subject to being inundated by the water of the base flood.  No detailed hydraulic analyses have been performed, so base flood elevations or depths are not shown on the FHBM or the FIRM.

>    ZONES AE AND A1-30: The special flood hazard area that is subject to inundation by the base flood.  Detailed hydraulic analyses have been performed, and base flood elevations are shown on the FIRM.  Zone AE is used on new and revised maps in place of Zone A1-30.

ZONE AH: The special flood hazard area that is subject to inundation by the base flood, but with shallow flooding (usually areas of ponding). Average flood water depths are between one and three feet. Base flood elevations derived from detailed hydraulic analysis are shown in this zone.

ZONE AO: The special flood hazard area that is subject to inundation by the base flood, but with shallow flooding (usually sheet flow on sloping terrain). Average flood water depths are between one (1) and three (3) feet. Average flood depths derived from detailed hydraulic analysis are shown in this zone. For areas of alluvial fan flooding, velocities are also determined.

ZONE A99: The special flood hazard area that is subject to inundation by the base flood, and which will be protected by a federal flood protection system when construction has reached specified statutory progress toward completion. No detailed hydraulic analyses have been performed, so no base flood elevations are shown.

ZONES B, C, AND X: The special flood hazard areas which have been identified as areas of moderate or minimal hazard from the principal source of flood in the area. Specifically, the area inundated by a flood with a 0.2 percent or greater chance of being equaled or exceeded in any given year (500 YR. Flood); the area inundated by the base flood with average depths of less than one foot or with drainage basin areas of less than one square mile; and areas protected by levees from the waters of the base flood. Zone X is used on new and revised maps in place of Zones B and C.

ZONE D: The unstudied areas where flood hazards are possible but undetermined.

ARTERIAL STREET:  A roadway that provides for traffic movement between areas and across portions of the city and secondarily for direct access for abutting land, as indicated on the Zoning Map of the City of Johnson City.

AUCTION HOUSE:  A facility principally devoted to the temporary storage and sale of new and used goods which are sold to the highest bidder.

BAFFLE:  An opaque or translucent element used to shield a light source from direct view at certain angles, to absorb or block obtrusive light, or to reflect and redirect light.

BARE LAMP:  A light source with no shielding. The bare lamp of a luminaire is assumed to be the arc tube or filament in a clear lamp or the first sight of a lamp in the case of frosted lamps.

BASE FLOOD: The flood having a one (1) percent chance of being equaled or exceeded in any given year.

BASEMENT: That portion of a building having its floor below ground level on at least two (2) sides.

BEAM ANGLE: The angle between the two directions for which the intensity is 50% of the maximum intensity as measured in a plane through the nominal beam centerline. For beams that do not have rotational symmetry, the beam angle is generally given for two planes at 90°, typically the maximum and minimum angles.

BED-AND-BREAKFAST HOME: A residential unit in which between one (1) and three (3) guest rooms are available for overnight accommodations and breakfast for the registered guests is provided. The owner shall have primary residence on the premises and the use shall be subordinate and incidental to the main residential use of the building.

BED-AND-BREAKFAST INN: A residential unit in which between one (1) and six (6) guest rooms are available for overnight accommodations and breakfast for the registered guests is provided.

BEER SERVING/SALES ESTABLISHMENTS: Any business authorized to sell beer with an alcoholic content of not more than five (5) percent by weight, and any beverage of like alcohol content.

BICYCLE LOCKER: A totally enclosed lockable storage area for bicycles located within one-hundred (100) feet of the entrance to a building.

BICYCLE RACK: A ribbon rack able to contain a minimum of four (4) bicycles located within one hundred (100) feet of the entrance to a building.

BREAKAWAY WALL: A wall not part of the structural support of the building and which is intended through its design and construction to collapse under specific lateral loading forces, without causing damage to the elevated portion of the building or supporting foundation system.

BUFFER TREE: Any tree which will achieve adequate height, width, and density to provide screening between incompatible land uses. A list of acceptable buffer trees is maintained by the Johnson City Planning Department.

BUFFER YARD: A landscaped area composed of planted vegetation, including walls, fencing, bikeways, or walkways affording visual privacy and noise relief between uses of differing impact.

BUILDING: Any structure built for support having a roof supported by columns or by walls and intended for the shelter, housing, storage, or enclosure of persons, animals, or chattel (see STRUCTURE).

BUSINESS SERVICES: An establishment providing services to places of business including, but not limited to: repair and maintenance of equipment, temporary personnel services, printing and copying, cleaning, rental and leasing, credit reporting and collection, mailing and advertising and other similar services not specifically allowed as a permitted use or special exception and where the primary purpose does not involve retail trade.

CENTER LINE OF THE STREET: That line surveyed and monumented by the governing body shall be the center line of the street; or if such center line has not been surveyed, it shall be that line running midway between the outside curbs or ditches of such street.

CHIEF BUILDING OFFICIAL: The administrator appointed to implement the provisions of this ordinance, see Article XVI, Subsection 16.1.

CITY-OWNED UTILITY TOWER: A tower structure which is accessory to the public utility use. The purpose is to provide communications to remote public utilities such as electric power substations or water/sewer pump stations. It is not for the purpose of providing cellular telephone service.

CLINIC: A building or portion of a building, other than a hospital, as herein defined, containing facilities providing outpatient medical, dental, chiropractic, optical, osteopathic diagnostic, and similar services, for humans, by physicians, dentists, and other health care specialists. The term clinic includes offices as a separate use for the above, but does not include Substance Abuse Treatment Facility, or Methadone Treatment Clinic.

COLLECTOR STREET: A street providing for traffic movement within such areas of the city and between major streets and local streets for direct access to abutting property, as indicated on the Zoning Map of the City of Johnson City.

COMMUNITY RECREATIONAL FACILITY: A recreational area (swimming pool, tennis courts, playground, or golf course) designed to serve several neighborhoods or subdivisions. No set service area is defined.

COSINE LAW: The law that the illuminance on any surface varies as the cosine of the angle of incidence (see HORIZONTAL ILLUMINANCE).

CUT-OFF ANGLE: The angle, measured up from nadir, between the vertical axis and the first line of sight at which the bare source is not visible.

DAY-CARE CENTER:  A place operated by a person, society, agency, corporation, institution, or other group that receives pay for the care of five (5) or more children under seventeen (17) years of age for less than twenty-four (24) hours per day, without transfer of custody.

DBH:  Diameter Breast Height.  The diameter of a tree measured four and one-half (4 1/2) feet above ground level.

DECK:  An uncovered structure which exceeds thirty (30) inches in height.

DESIGN DEVIATION:  Any adjustment, change, or modification to the standards for sidewalk construction contained in General Requirements & Standards of Design resulting from unusual  or exceptional topographic, physical, or natural conditions of the site.

DEVELOPMENT: Any man-made change to improved or unimproved real estate, including, but not limited to, buildings or other structures, mining, dredging, drilling operations, excavation, filling, grading, paving, the removal of healthy trees over six (6) inches dbh, or permanent storage of equipment or materials.

DIRECT LIGHTING:  Lighting by luminaires distributing 90% - 100% of the emitted light in the general direction of the surface to be illuminated.

DRIP LINE:  A vertical line extending from the outer edge of the canopy of a tree to the ground.

DWELLING, MULTI-FAMILY:  A building designed, constructed, or reconstructed and used for more than two (2) dwelling units, with each dwelling unit having a common structural or load-bearing wall of at least ten (10) lineal feet with any other dwelling unit on the same floor or building level.

DWELLING, SINGLE-FAMILY:  A building designed, constructed, and used for one dwelling unit.

A.     DETACHED:  A one-family dwelling which is completely surrounded by open spaces.

B.     SEMI-DETACHED:  A one-family dwelling that is connected on one side by means of a common dividing structural or load-bearing wall of at least ten (10) lineal feet to another one-family dwelling, each dwelling on its own individual lot.

C.     ATTACHED:  A one-family dwelling that is connected on two sides by means of a common dividing structural or load bearing wall of at least ten (10) lineal

feet of two or more other one-family dwellings, or the end dwelling of a series of such dwellings, each dwelling unit on its own individual lot.

D.      DWELLING GROUP, ONE-FAMILY ATTACHED:   A line of one-family attached dwellings, joined at the sides by means of common structural or load bearing walls, comprising an architectural whole.

DWELLING, TWO-FAMILY OR DUPLEX:  A building designed, constructed, or reconstructed and used for two dwelling units that are connected by a common structural or load-bearing wall of at least ten (10) lineal feet.

DWELLING UNIT:  One room, or rooms, connected together, constituting a separate, independent housekeeping establishment for owner occupancy, or rental, or lease on a weekly, monthly, or longer basis, and physically separated from any other rooms or dwelling units which may be in the same structure, and containing independent cooking and sleeping facilities for permanent residential occupancy by one family.

ELEVATED BUILDING: A non-basement building: 1) built to have the bottom of the lowest horizontal structure member of the elevated floor elevated above the ground level by means of pilings, columns (posts and piers), or shear walls and 2) adequately anchored so as not to impair the structural integrity of the building during a flood of up to the magnitude of the base flood.  In the case of Flood Zones A1-30, AE, A, A99, AO, AH, B, C, X, or D, elevated building also includes a building elevated by means of fill or solid foundation perimeter walls with openings sufficient to facilitate the unimpeded movement of flood waters.

EMERGENCY FLOOD INSURANCE PROGRAM or EMERGENCY PROGRAM: The program as implemented on an emergency basis in accordance with Section 1336 of the National Flood Insurance Program.  It is intended as a program to provide a first layer amount of insurance on all insurable structures before the effective date of the initial FIRM.

EMERGENCY OR TEMPORARY SHELTER:  A residential facility which offers emergency shelter to persons on a temporary basis.

EROSION:  The process of the gradual wearing away of landmasses.  This peril is not per se covered under the Program.

EXCEPTION:  A waiver from the provisions of this Ordinance which relieves the applicant from the requirements of a rule, regulation, order or other determination made or issued pursuant to this Ordinance.

EXISTING CONSTRUCTION: Any structure for which the start of construction commenced before the effective date of the first floodplain management code or

ordinance adopted by the community as a basis for that community"s participation in the National Flood Insurance Program (NFIP).

EXISTING MANUFACTURED HOME PARK OR SUBDIVISION: A manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the first floodplain management code or ordinance adopted by the community as a basis for that community"s participation in the National Flood Insurance Program (NFIP).

EXISTING STRUCTURES: see EXISTING CONSTRUCTION.

EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION: The preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

EXTERIOR LIGHTING FIXTURE: An electrically-powered illuminating device containing a light source in excess of 50 watts per fixture (except for incandescent light sources in excess of 160 watts per fixture), which is temporarily or permanently installed outdoors, including, but not limited to, search, spot, flood, and area lighting.

FAMILY: One or more related persons or a group of not more than three (3) persons who are mutually unrelated by blood, marriage, legal adoption, or legal guardianship. In multi-family dwellings in the R-6 district, the number of unrelated persons may increase to four (4) persons provided that the allowable density is reduced to 18.75 units per acre. Domestic workers employed on the premises are not counted as part of the family.

FIELD ANGLE: The angle between the two directions for which the intensity is 10% of the maximum intensity measured in a plane through the nominal beam centerline. For beams without rotational symmetry, the field angle is generally given for two planes at 90°, typically the maximum and minimum angles.

500 - YEAR FLOOD: The term 500-Year Flood does not refer to a flood that occurs once every five hundred (500) years, but refers to a flood level with a 0.20 percent or greater chance of being equaled or exceeded in any given year.

FLOOD or FLOODING: A general and temporary condition of partial or complete inundation of normally dry land areas from the overflow of inland or tidal waters and/or the unusual and rapid accumulation or runoff of surface waters from any source.

FLOOD ELEVATION DETERMINATION: A determination by the FEMA Administrator or consultant work approved by the Administrator of the water surface elevations of the base flood, that is, the flood level that has a one (1) percent or greater chance of occurrence in any given year.

FLOOD ELEVATION STUDY: An examination, evaluation, and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation, and determination of mudslide (i.e., mudflow) and/or flood-related erosion hazards.

FLOOD HAZARD BOUNDARY MAP (FHBM): An official map of a community, issued by the FEMA, where the boundaries of areas of special flood hazard have been designated as Zone A.

FLOOD INSURANCE RATE MAP (FIRM): An official map of a community, on which the FEMA has delineated both the areas of special flood hazard and the risk premium flood zones applicable to the community.

FLOOD INSURANCE STUDY: The official report provided by the FEMA, evaluating flood hazards and containing flood profiles the water surface elevation of the base flood.

FLOODPLAIN or FLOOD-PRONE AREA: Any land area susceptible to being inundated by water from any source.

FLOOD PROTECTION SYSTEM: Physical structural works which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the area within a community subject to a special flood hazard and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees, or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

FLOOD-PROOFING: Any combination of structural and nonstructural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures, and their contents.

FLOOD-RELATED EROSION: The collapse or subsidence of land along the shore of a lake or other body of water as a result of undermining caused by waves or currents of water exceeding anticipated cyclical levels or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as a flash flood or an abnormal tidal surge, or by some similarly unusual and unforeseeable event which results in flooding.

FLOOD-RELATED EROSION AREA or FLOOD-RELATED EROSION PRONE AREA: A land area adjoining the shore of a lake or other body of water, which due to the composition of the shoreline or bank and high water levels or wind-driven currents, is likely to suffer flood-related erosion damage.

FLOOD-RELATED EROSION AREA MANAGEMENT: The operation of an overall program of corrective and preventive measures for reducing flood-related erosion damage, including but not limited to emergency preparedness plans, flood-related erosion control works, and flood plain management regulations.

FLOODPLAIN MANAGEMENT:  The operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works, and floodplain management regulations.

FLOODWAY: The channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one (1) foot above the Base Flood Elevation.

FLOOR: The top of the lowest interior surface of an enclosed area in a building (including basement), i.e., top of slab in concrete slab construction or top of wood flooring in wood frame construction.  Except for the purposes of the Flood Regulations, the term does not include the floor of a garage used solely for parking vehicles.

FLUSH-MOUNTED OR RECESSED LUMINAIRE:  A luminaire, which is mounted above the ceiling (or behind a wall or other surface) with the opening of the luminaire level with the surface.

FOOTCANDLE:  A unit of illuminance, equal to 1 lumen/ft$^2$, abbreviated as fc.

FRATERNITY OR SORORITY HOUSE:  A building rented, occupied, or owned by a general or social chapter of some regularly organized college fraternity or sorority, or by or on its behalf by a building corporation or association composed of members of alumni thereof, and occupied by members of the local chapter of such fraternity or sorority, as a place of residence.

FREEBOARD: A factor of safety usually expressed in feet above a flood level for purposes of  floodplain management.  Freeboard tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and  floodway conditions, such as wave action, bridge openings, and the hydrological effect of urbanization of the watershed.

FULL CUT-OFF FIXTURE: A luminaire that allows no direct light from the luminaire above a horizontal plane through the luminaire"s lowest light-emitting part in its mounted form. Also known as a fully-shielded fixture.

FUNCTIONALLY DEPENDENT USE: A use which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities, and port facilities that are necessary for the loading and unloading of cargo or passengers and ship building and ship repair facilities, but does not include long-term storage or related manufacturing facilities.

GASOLINE SERVICE STATION: Buildings and premises where gasoline, oil, grease, batteries, tires, and automobile accessories may be supplied and dispensed at retail. However, uses permissible at a gasoline service station do not include major mechanical and body work, straightening of body parts, painting, welding, storage of automobiles not in operating condition, or other work involving noise, glare, fumes, smoke, or other characteristics to an extent greater than normally found in service stations. A gasoline service station is not a repair garage nor a body shop.

GLARE: The sensation produced by luminance within the visual field that is sufficiently greater than the luminance to which the eyes are adapted to, causing annoyance, discomfort, or loss in visual performance and visibility.

GROUP HOME: A residential facility which offers a home-like environment for mentally retarded, mentally handicapped, or physically handicapped residents, on either a permanent or temporary basis.

HIGHEST ADJACENT GRADE: The highest natural elevation of the ground surface, prior to construction, next to the proposed walls of a structure.

HISTORIC STRUCTURE: Any structure that is: 1) listed individually in the National Register of Historic Places or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register; 2) certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district; 3) individually listed on a state inventory of historic places; or 4) individually listed on a local inventory of historic places and determined as eligible by communities with historic preservation programs that have been certified either: A) by an approved state program as determined by the Secretary of the Interior; or B) Directly by the Secretary of the Interior.

HOME OCCUPATION: Any business, occupation, or activity undertaken for profit within a residential structure that is incidental and secondary to the use of that structure as a dwelling unit. Home occupation as defined does not include telecommuting.

HORIZONTAL ILLUMINANCE:   The measurement of brightness from a light source, measured in footcandles, which is taken through a light meter's sensor at a horizontal position at the surface being lighted.   Horizontal illuminance measurements incorporate the inverse square law and cosine law into their readings, and can be calculated as $E=(I)(\cos \text{ angle of incidence})/d^2$.   See INVERSE SQUARE LAW definition.


HOSPITAL: An institution licensed by the state health department providing primary health services and medical or surgical services to persons, primarily in-patients suffering from illness, disease, injury, and other abnormal physical or mental conditions, and including as an integral part of the institution related facilities and services such as laboratories, surgical care, testing, and outpatient and emergency services.

ILLUMINANCE:   The quantity of light, or luminous flux, arriving at a surface divided by the area of the illuminated surface, measured in footcandles.

IMPERVIOUS SURFACE:   An area covered by any material or compacted in a way so that it is highly resistant to infiltration by water.

INITIAL FOOTCANDLES:   the calculated or measured illumination level when a luminaire is new and is void of light-reducing elements.   The difference between initial footcandle and measured footcandle levels constitutes the light loss factor.

INVERSE SQUARE LAW:   The law stating that the illuminance (E) at a point on a surface varies directly with the intensity (I) of a point source, and inversely as the square of the distance (d) between the source and the point, expressed as $E=I/d^2$ if the surface at the point is perpendicular to the direction of the incident light.

ISOFOOTCANDLE LINE OR DIAGRAM:   A line plotted on any appropriate set of coordinates to show all points on a surface where the illuminance is the same.   A series of such lines is called an isofootcandle diagram.   For the purposes of the site plan requirements of this Code, point calculations (or measurements) of footcandle levels at intervals of thirty (30) feet or less are considered comparable.

JUNK YARDS:   Any open or uncovered land on which dilapidated automobiles, machines or machine parts, scrap metal, rags, plastics, boxes, barrels, old papers, or tires, and the like are assembled for purposes of trade.

KARST SYSTEM:   Irregular terrain characterized by a subsurface drainage system and consisting of solution channels, closed depressions, subterranean drainage through sinkholes, and caves.

LANDSCAPE YARD:  A landscaped area located at the perimeter of the lot along all abutting streets.

LANDSCAPED AREA:  An area of landscaping planted with growing plant materials (trees, vines, shrubs, grass, flowers, and/or growing ground cover) with up to twenty-five (25) percent mulch.

LEVEE: A manmade structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water to provide protection from temporary flooding.

LEVEE SYSTEM: A flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

LIGHT LOSS FACTORS:  The ratio of measured illuminance to the value that would occur if lamps operated at their (initial) rated lumen output and if no system variation or depreciation had occurred.

LIGHT TRESPASS:  Light emitted by a lighting installation that falls outside the boundaries of the property on which the installation is sited.

LIQUOR STORE:  The building or part of a building where a licensee conducts any of the business authorized by the license from the State of Tennessee to sell for off-premises consumption alcohol, spirits, liquor, wine and every other liquid containing alcohol, spirits and wine, and capable of being consumed by a human being, other than patented medicine or beer, where the latter contains an alcoholic content of five (5) percent weight or less.

LOT:  A parcel of land which fronts on and has ingress and egress by means of a public right-of way and which is occupied or intended to be occupied by a building or groups of buildings as provided herein with the customary accessories and open spaces.

LOT AREA:  The total horizontal area included within lot lines.

LOT, CORNER:  A lot of which at least two (2) adjoining sides abut for their full lengths on a street, provided that the interior angle at the intersection of two such sides is less than one-hundred thirty-five (135) degrees.

LOT DEPTH:  The average distance from the street line of the lot to its rear line, measured in the general direction of the side lines of the lot.

LOT, DOUBLE FRONTAGE:  A lot which runs through a block from street to street or which has two non-intersecting sides abutting on two or more streets.

LOT FRONTAGE:  That dimension of a lot or portion of a lot abutting on a street, excluding the side dimension of a corner lot.

LOT, INTERIOR:  A lot other than a corner lot.

LOT LINES:  The lines bounding a lot as defined herein.

A.      LOT LINE, FRONT:  In the case of an interior lot, the line separating said lot from the street.  In the case of a corner or double frontage lot, the line separating said lot from that street which is designated as the front street.

B.      LOT LINE, REAR:  The lot boundary opposite and most distance from the front lot line.  In the case of a pointed or irregular lot, it shall be an imaginary line parallel to and farthest from the front lot line, not less than thirty (30) feet long and wholly within the lot.

C.      LOT LINE, SIDE:  A side lot line is any lot boundary line not a front lot line or rear lot line.

LOT OF RECORD:  A lot which is part of a subdivision recorded in the office of the appropriate county registrar, or a lot legally created prior to the adoption of this Code, the description of which has been recorded.

LOT WIDTH:  The width of a lot at the required building setback line measured at right angles to its depth.

LOWEST FLOOR:  The lowest floor of the lowest enclosed area, including basement and crawl space.  An unfinished or flood resistant enclosure, including a crawl space and areas usable solely for parking of vehicles, building access, or storage is also considered a building's lowest floor; provided, that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirements of the Floodplain Regulations.

LUMEN:  A unit of light energy used to specify the light output of sources, calculated as the rate at which light falls on one (1) square foot of surface area one (1) foot from a source of one (1) candela.

LUMINAIRE:  A complete lighting fixture including one or more lamps and ballasting (when applicable) together with the parts designed to distribute the light, to position and protect the lamps and to connect the lamps to the power supply.

MANUFACTURED HOME:  A detached residential dwelling unit designed for transportation, after fabrication, on streets or highways on its own wheels or on a flatbed or other trailer, and arriving at the site where it is to be occupied as a dwelling

complete and ready for occupancy except for minor and incidental unpacking and assembly operations, location on jacks or other temporary or permanent foundations, connections to utilities, and the like. The following shall not be included in this definition:

A.    Travel trailers, pickup campers, motor homes, camping trailers, or other recreational vehicles.

B.    Manufactured modular housing which is designed to be set on a permanent foundation, and which meets the Standard Building Code Congress International.


MANUFACTURED HOME PARK:  A parcel or tract of land under single ownership which has been planned and improved for the placement of manufactured homes for dwelling purposes; provided that all manufactured home parks existing at the time of passage of this Code not meeting the minimum requirements established in Article VI, Section 6.11, shall be considered a nonconforming use, and further provided that one manufactured home on a separate lot, shall not be considered a nonconforming manufactured home park.

MAP:  The Flood Hazard Boundary Map (FHBM) or the Flood Insurance Rate Map (FIRM) for a community issued by the Agency.

MEAN SEA LEVEL: The average height of the sea for all stages of the tide.  It is used as a reference for establishing various elevations within the floodplain.  For purposes of the Floodplain Regulations, the term is synonymous with National Geodetic Vertical Datum (NGVD) or other datum, to which base flood elevations shown on the Flood Insurance Rate Map are referenced.

MEDICAL CLINIC:  Medical services for out-patients only.

METHADONE TREATMENT CLINIC:   A licensed facility for the counseling of patients and the distribution of methadone for outpatient, non-residential purposes only.

MOUNTING HEIGHT:  The vertical distance between the surface to be lighted and the center of the apparent light source of a luminaire.

NATIONAL GEODETIC VERTICAL DATUM (NGVD): As corrected in 1929, is a vertical control used as a reference for establishing varying elevations within the floodplain.

NEIGHBORHOOD CONVENIENCE CENTER: A retail store selling a limited variety of food, beverages, and sundry items; with or without motor fuel facilities; and catering primarily to motorists making quick stops, and/or neighborhood customers.

NEIGHBORHOOD RECREATIONAL FACILITY: A recreational facility (such as a swimming pool, tennis courts, or playgrounds) designed to serve a designated neighborhood or subdivision. Membership shall be limited to 200 families.

NEW CONSTRUCTION: Any structure for which the start of construction commenced on or after the effective date of the Floodplain Regulations. The term also includes any subsequent improvements to such structure.

NEW MANUFACTURED HOME PARK OR SUBDIVISION: A manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the adopted date of the Floodplain Regulations and includes any subsequent improvements to such structure.

NO-BUILD LINE: A flood elevation line that delineates an area within which no development shall be allowed to occur.

NORMAL FLOW ELEVATION: The elevation of the surface of water flowing in a stream, measured when the surface of the water flowing in a stream is not elevated due to a recent rainfall or lowered by drought conditions.

NORTH AMERICAN VERTICAL DATUM (NAVD): As corrected in 1988 is a vertical control used as a reference for establishing varying elevations within the floodplain.

OBTRUSIVE LIGHT: Light trespass which, because of quantitative, directional, or spectral context, gives rise to annoyance, discomfort, distraction, or a reduction in the ability to see essential information.

100 YEAR FLOOD see BASE FLOOD: The term 100 Year Flood does not refer to a flood that occurs once every one hundred (100) years, but refers to a flood level with a one (1) percent or greater chance of being equaled or exceeded in any given year.

PERSONAL SERVICES: An establishment providing services to individuals such as barber and beauty shops, shoe repair, dressmaking, tailoring, and laundry and other similar services not specifically allowed as a permitted use or special exception and where the primary purpose of the business does not involve retail trade.

PERVIOUS (PERMEABLE) SURFACE:  Surface which allows for the infiltration of stormwater through the surface into the ground.  Such surfaces may include, but are not limited to, porous concrete, porous asphalt, and concrete pavers.

PHOTOMETER:  An instrument for measuring photometric quantities such as illuminance or luminance.

POINT METHOD:  A lighting design procedure for predetermining the illuminance at various locations in lighting installations, by the use of luminaire photometric data.  The point method utilizes the angle of incidence and inverse square law in its calculations.

PRINCIPAL BUILDING, HEIGHT OF:  The vertical distance measured from the average ground elevation to the highest point of the roof for flat roofs, to the deck line of mansard roofs, and to the mean height between eaves and ridge for gable, hip, and gambrel roofs.

PRINCIPAL USE:  The primary purpose or function that a lot serves or is intended to serve.

PROFESSIONAL SERVICES: An establishment providing a service by established professions such as legal services, engineering and architectural services, accounting services, and other similar services not specifically allowed as a permitted use or special exception and where the primary purpose does not involve retail trade.

PROTECTIVE SCREENING:  A continuous screen composed of planted vegetation, fencing, or walls affording visual relief from areas producing adverse visual effects.

PUBLIC UTILITY FACILITIES:  Public utility facilities include any public or private building or structure used for the production, storage, transmission, distribution, and recovery of communications, water, sewage, gas, energy, and other similar utilities.

RECREATIONAL VEHICLE: A vehicle which is: built on a single chassis; four hundred (400) square feet or less when measured at the largest horizontal projections; designed to be self-propelled or permanently towable by a light duty truck; and designed primarily not for use as a permanent dwelling but as temporary living quarters for recreation, camping, travel, or seasonal use.

REGULATORY FLOODWAY: The channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot above the Base Flood Elevation.

RESIDENTIAL HOMES FOR THE AGED:  A home represented and held out to the general public as a home which accepts aged persons for relatively permanent,

domiciliary care. A home for the aged provides room, board, and personal services to one (1) or more unrelated persons.  A Residential Home for the Aged is not a nursing home.

RIVERINE:  Relating to, formed by, or resembling a river (including tributaries), stream, brook, etc.

ROOMING OR BOARDING HOUSE:  A building containing a single dwelling unit and not more than five (5) guest rooms where lodging is provided for not more than five (5) guests with or without meals for compensation.

SHADE TREE:  Any tree whose mature height is expected to exceed thirty (30) feet with an expected crown spread of thirty (30) feet or more, with a trunk that can be maintained in a clear condition (no branches) at least five (5) feet above ground level, and is considered a shade tree in accordance with the American Standards of Nursery Stock, set forth by the American Association of Nurserymen.  A list of acceptable shade trees is maintained by the Johnson City Planning Department.

SHIELDED LIGHT FIXTURE:  Outdoor lighting fixtures constructed so that no light rays are emitted at an angle above the horizontal plane, excluding architectural or sign floodlighting where the bare lamp is fully hidden from public view.

SINKHOLES:  Shallow, bowl-like depressions found in karst terrain systems, that occur with the development of effective, underground conduit drainage.

SORORITY HOUSES:  See Fraternity Houses.

SPECIAL EXCEPTION:  A special exception is a use that would not be appropriate generally or without restriction throughout the zoning division or district but which, if controlled as to number, area, location, or relation to the neighborhood, would promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity, or general welfare. Such uses may be permitted in such zoning division or district as special exceptions, if specific provision for such special exceptions is made in this Zoning Code and only after approval has been granted by the Board of Zoning Appeals.

SPECIAL HAZARD AREA: An area having special flood, mudslide (i.e., mudflow) and/or flood-related erosion hazards, and shown on an FHBM or FIRM as Flood Zone A, AO, A1-30, AE, A99, or AH.

SPECIMEN TREE:  Any healthy tree with a diameter of eighteen (18) inches dbh or greater.

START OF CONSTRUCTION: includes substantial improvement, and means the date the building permit was issued, provided the actual start of construction, repair,

reconstruction, rehabilitation, addition, placement, or other improvement was within one hundred eighty (180) days of the permit date. The actual start means either the first placement of permanent construction of a structure (including a manufactured home) on a site, such as the pouring of slabs or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for a basement, footings, piers, or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

STATE COORDINATING AGENCY: The Tennessee Department of Economic and Community Development, Local Planning Assistance Office as designated by the Governor of the State of Tennessee at the request of the Administrator to assist in the implementation of the National Flood Insurance Program for the state.

STORY: That part of a building or structure above ground level between a floor and the floor or roof next above. A mezzanine shall be considered a story if it exceeds one-third of the area of the floor immediately below. A penthouse shall be considered a story if it exceeds one-third of the area of the roof. A basement shall be considered a story when more than one-half of its height is above the average ground elevation.

STREET: A public right-of-way set aside for public travel not less than thirty (30) feet in width which: (a) has been accepted for maintenance by the city of Johnson City; (b) has been established as a public street prior to the date of adoption of this Code; or (c) has been dedicated to the city of Johnson City for public travel by the recording of a plat of a subdivision which has been approved by the Johnson City Regional Planning Commission.

STRUCTURE: Anything constructed or erected, the use of which requires location on the ground, or attachment to something having location on the ground, which includes a manufactured home, a gas or liquid storage tank, or other manmade facilities or infrastructures.

STUDENT ORIENTED HOUSING: Apartments designed for students, oriented so that each bedroom can be rented out individually with one shared living area.

SUBDIVISION SITE PLAN: A site plan required for commercial subdivisions within the B-4, B-5, and PB districts.

SUBSTANCE ABUSE TREATMENT FACILITY: A building or portion of a building, other than a clinic containing offices, facilities or designated space with the predominant, substantial, or significant purpose of providing outpatient treatment, counseling or similar services to individuals who are dependent on legal and illegal drugs, opiates, alcohol or other similar substances. Staffing by physicians who have received a waiver or have been certified or should have received a waiver or be certified by the Substance Abuse Treatment Act of 2000 and subsequent amendments or enactments shall create a presumption that the building or portion of a building should be designated a substance abuse treatment facility.

SUBSTANTIAL DAMAGE: Damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed fifty (50) percent of the market value of the structure before the damage occurred.

SUBSTANTIAL IMPROVEMENT: Any repairs, reconstructions, rehabilitations, additions, alterations or other improvements to a structure taking place during a 5-year period in which the cumulative costs equals or exceeds fifty (50) percent of the market value of the structure before the start of construction of the improvement. The market value of the structure should be: (1) the appraised value of the structure prior to the start of the initial repair or improvement; or (2) in the case of damage, the value of the structure prior to the damage occurring. This term includes structures which have incurred substantial damage, regardless of the actual repair work performed.

For the purpose of this definition, "Substantial Improvement" is considered to occur when the first alteration of any wall, ceiling, floor or other structural part of the building commences, whether or not that alteration affects the external dimensions of the building. The term does not, however, include either: (1) any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been pre-identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions and not solely triggered by an improvement or repair project or; (2) any alteration of a historic structure, provided that the alteration will not preclude the structure's continued designation as a historic structure.

SUBSTANTIALLY IMPROVED EXISTING MANUFACTURED HOME PARKS OR SUBDIVISIONS: The repair, reconstruction, rehabilitation, or improvement of the streets, utilities, and pads equals or exceeds fifty (50) percent of the value of the streets, utilities, and pads before the repair, reconstruction, or improvement commenced.

TEAROOM: A small limited service restaurant with no more than 500 square feet of dining area in a residential structure. An area for outside dining may be added with seating limited to 16 patrons. Carry-out service is permitted, but not including drive-thru facilities.

TEMPORARY RECREATIONAL VEHICLE: A trailer, tent, modular unit, or other moveable prefabricated structure. No temporary recreational vehicle shall be occupied for residential purposes anywhere in the city of Johnson City and location in an RV campground site shall not exceed 90 cumulative days within a calendar year.

TOWER STRUCTURE: A wireless transmission facility constructed as a lattice tower with or without guy wires, as an alternative tower structure, or as a monopole tower; primarily for the purpose of supporting an antenna array; and support buildings and equipment; excluding equipment under thirty (30) feet in height used for amateur radio communication.

UNIFORMITY RATIO: Describes the maximum level of illumination in relation to the minimum level for a given area, expressed as a ratio.

VALUE-ORIENTED HOUSING: The maximum value of a single-family house shall be derived by using the Department of Housing and Urban Development"s latest Low and Moderate Income Table for a family of 4 and multiplying it by 2.5.

VARIANCE: A variance is a relaxation of the terms of the Zoning Code where such variance will not be contrary to the public interest and where, owing to conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the Code would result in unnecessary and undue hardship. As used in this Code, a variance is authorized only for height, area, and size of structure or size of yards and open spaces; establishment or expansion of a use otherwise prohibited shall not be allowed by variance, nor shall a variance be granted because of the presence of non-conformities in the zoning district or uses in an adjoining zoning district.

VERTICAL ILLUMINANCE: The measurement of brightness from a light source, measured in foot candles, which is taken through a light meter"s sensor at a vertical position at a five (5) foot height for the area being lighted, used in this Code primarily for measurements of light trespass at the property line. The use of vertical illuminance measurements tend to ignore the influence of off-site sources such as street lighting.

VIOLATION: The failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without the elevation certificate, other certification, or other evidence of compliance required in this Ordinance is presumed to be in violation until such time as that documentation is provided.

WATER SURFACE ELEVATION: The height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929, (or other datum, where specified) of floods of various magnitudes and frequencies in the floodplains of coastal or riverine areas.

WATERWAY:  Any portion of land of a natural stream carrying surface water having a bed and defined banks or side elevations which contain said surface water.

YARD:  A required open space that lies between the principal or accessory structure or use and the nearest lot line which is unoccupied and unobstructed from thirty (30) inches above ground level upward except as herein permitted:

A.     YARD, FRONT:  The yard fronting a street extending along the front of the lot between the side lot lines.

B.     YARD, REAR:  The yard extending along the rear of the lot, opposite of the front yard and between the side lot lines, excluding double frontage lots which have no rear yard.

C      YARD, SIDE:  The yard extending along the side lot lines from the front lot line to the rear lot line. A lot line not a front lot line or rear lot line shall be deemed a side lot line.



articles/ART2.doc

**ARTICLE III**
**NONCONFORMING PROVISIONS**

## 3.1 - PURPOSE

Within the districts established by this Code or amendments that may later be adopted there exist lots, structures, uses of land and structures, and characteristics of use which were lawful before this Code was passed or amended, but which would be prohibited or restricted under the terms of this Code or future amendment. It is the purpose of this Code to permit these nonconformities to continue until they are removed, discontinued, or abandoned. It is further the purpose of this Code that nonconformities shall not be enlarged upon, expanded or extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district, except as permitted by the Code of Tennessee.

## 3.2 – APPLICABLILITY

A use, otherwise in accordance with the provisions of this Code, shall not be deemed a nonconforming use for a failure to comply with the provisions of this Code relating to any of the following:

3.2.1   Changes in review procedures or setback requirements applicable to the establishment of the use;

3.2.2   Permitted signs;

3.2.3   Off-street parking requirements; or

3.2.4   A lawfully permitted use shall not become a nonconforming use solely because it subsequently violates any use limitation or distance requirement, whether through changes to this Code or because new uses are established closer than what is lawfully permitted under this Code.

## 3.3 - NONCONFORMING USES

A nonconforming use is declared by this Code to be a use which is not permitted in the district in which it is located and which is in continuous operation after the effective date of such ordinance even though it does not comply with the use regulations applicable to the zoning district in which it is located.   A nonconforming use of a structure, a nonconforming use of land, or a nonconforming use of a structure and land in combination shall not be extended or enlarged after passage of this Code by the addition of other uses of a nature which would be prohibited in the district involved.

3.3.1   CONSTRUCTION INITIATED

To avoid undue hardship, nothing in this Code shall be deemed to require a change in the plans, construction, or designated use of any building on which actual construction was lawfully begun prior to the effective date of adoption or amendment of this Code and upon which actual building construction has been carried on diligently.   Actual construction is hereby defined to include the erection of construction materials in a permanent position and fastened in a permanent manner.   Where excavation, demolition, or removal of an existing building has been substantially begun prior to rebuilding, such excavation, demolition or removal shall be deemed to be actual construction, provided that work shall be carried on diligently and complies with all applicable city requirements.

3.3.2   LIMITATION ON EXPANSION

Provided it continues to comply with all provisions of the city's Zoning Ordinance, any nonconforming use may continue to operate and expand on the same land area/parcel containing the nonconforming use on the date the use first became nonconforming.   A nonconforming use shall not expand upon any land area/parcel that was not part of the original property at the time the use first became nonconforming.

3.3.2.1   STRUCTURAL ALTERATIONS

A.   Any nonconforming use of a structure or structure and land in combination may as special exception be changed to another nonconforming use, provided the Board of Zoning Appeals finds that the proposed use is equally appropriate or more appropriate to the district than the existing nonconforming use.   In permitting such change, the Board of Zoning Appeals may require appropriate conditions and safeguards in accord with the provisions of this Code.

B.   All off-street parking operated by, in conjunction with, or accessory to a nonconforming use shall be maintained in accordance with all specifications for maintenance of off-street parking spaces as established by the Code.   Required off-street parking space for a nonconforming use shall not be reduced in any manner or used for storage or display of materials or goods.

C.   Multifamily residential establishments (whether used as owner-occupied property or rental property) which were permitted to operate under zoning regulations or exceptions thereto immediately preceding a change in zoning shall be allowed to reconstruct new facilities necessary to the conduct of such multifamily residential establishment subsequent to the zoning change, in the event of damage (whether partial or complete) by involuntary fire or wind damage or other natural disaster.

D.  The provisions of this section shall not apply to a legally established nonconforming manufactured home provided:

   1. That written notification of intent to replace the manufactured home and the proposed date of replacement of is filed with the Chief Building Official within ninety (90) days of the manufactured home's removal;

   2. That the manufactured home is replaced within one-hundred and eighty (180) days of the removal of the previous manufactured home;

   3. That the replacement manufactured home is of structural quality at the date of filing of the notice with the Chief Building Official, equal to or exceeding that of the previous manufactured home, in the opinion of the Chief Building Official; and

   4. That the replacement manufactured home meets the area and yard requirements of the district in which it is located.

## 3.4 – TERMINATION OF NONCONFORMING USES

3.4.1  Should a nonconforming structure or a nonconforming portion of a structure be removed or destroyed by any means to an extent of more than fifty (50) percent of its replacement cost at time of damage, it shall not be reconstructed except in conformity with the provisions of this Code, provided, however, that the right to maintain a nonconforming detached single-family residence in a residential or nonresidential district shall not be terminated regardless of the amount of damage.

3.4.2  Subject to all other regulations of this Code, a building damaged by fire, explosion or other casualty, act of God, or government action to the extent of not more than fifty (50) percent of its replacement cost at time of damage, may be restored and the occupancy or use of such building or part thereof which existed at the time of such destruction may be continued, providing restoration shall begin within one-hundred and eighty (180) days of the date of damage.

3.4.3  When a nonconforming use of a structure, or structure and land in combination, is discontinued or abandoned for twelve (12) consecutive months, the structure, or structures and premises in combination, shall not thereafter be used except in conformity with the regulations of the district in which it is located.  This provision shall not apply when government action impedes access to the premises or when the owner can demonstrate that an attempt has been made to continue the nonconforming status through continuous advertisement for sale, rent, or lease, or through alteration or remodeling, provided a building permit has been obtained.

3.4.4  Changing any nonconforming use to a conforming use shall terminate the nonconforming use and the nonconforming use shall not be reestablished.

3.4.5    Any one of the following violations of this Code shall terminate immediately the right to operate a nonconforming use:

3.4.5.1    Failure to make a nonconforming use comply with local, state, or federal regulations which results in negative health or safety impacts;

3.4.5.2    Increasing the number of dwelling units in the nonconforming use; or

3.4.5.3    Changing a nonconforming use to another nonconforming use without approval from the Board of Zoning Appeals.

3.4.6    The right to operate and maintain any nonconforming use shall terminate and shall cease to exist whenever the structure containing said use deteriorates to the point it becomes obsolete or substandard under the Code of Ordinances for Johnson City and the cost of placing such structure in compliance exceeds fifty (50) percent of the replacement cost of the structure as determined by the Chief Building Official; provided that in determining the replacement cost, the cost of the land shall not be included.

3.4.7    The reconstruction or reestablishment of all or any part of a nonconforming use shall not be permitted whenever the structure in which the nonconforming use is operated and maintained has been intentionally demolished, damaged, or destroyed.

## 3.5 - NONCONFORMING LOTS

A nonconforming lot shall be any lot, the dimensions or location of which were lawful prior to the adoption or amendment of this Code, but which fails by reason of such adoption or amendment to conform to the present requirements of this Code.  Such lot is classified as a "legal lot of record".

3.5.1    A nonconforming lot shall be used only for a permitted use or special exception in the zoning district in which the lot is located.

3.5.2    Development or establishment of such use shall comply with all applicable standards for that zoning district, except compliance with existing minimum lot area standards is not required.

3.5.3    A nonconforming lot shall not be used, conveyed, transferred, subdivided, nor have its boundaries altered in any manner, except for government purpose, that would compound or further increase the nonconforming characteristics of the lot.

3.5.4 In any district in which single-family dwellings are permitted, a single-family dwelling and customary accessory buildings may be erected on any single lot of record at the effective date of adoption or amendment of this Code, notwithstanding limitations imposed by other provisions of this Code. Such lot shall be in separate ownership and not of continuous frontage with other lots in the same ownership.

3.5.5 If two or more lots or combination of lots and portions of lots with continuous frontage in single ownership are of record at the time of passage or amendment of this Code, and if the lots do not meet the requirements of a fifty (50) foot lot width at the building line and six-thousand (6,000) square feet of land area, the lands involved shall be considered to be an undivided parcel for the purpose of this Code and shall be platted together to create lots with a minimum of six-thousand (6,000) square feet with a minimum lot width of fifty (50) feet regardless of the zoning prior to a building permit being issued. During the platting process, no lot remnants will be created or remain which have a lot area of less than six-thousand (6,000) square feet and a lot width of less than fifty (50) feet.

## 3.6 - SPECIAL EXCEPTIONS

Any use which is permitted as a special exception in a district under the terms of this Code (other than a change through the Board of Zoning Appeals from one nonconforming use to another nonconforming use not permitted in the district) shall not be classified as a nonconforming use in such district, but shall without further action be considered a conforming use.

# ARTICLE IV
## APPLICATION OF REGULATIONS

## 4.1 - CONFORMITY TO SUBDIVISION REGULATIONS

No building permit shall be issued or no building shall be erected on any lot or parcel unless the street giving access to the lot or parcel has been accepted and improved, to the minimum specifications of the City Engineer, as a public street or unless said street corresponds in its location and lines with a street shown on a subdivision plat approved by the Johnson City Regional Planning Commission and such approval is entered in writing on the plat by the Secretary of the Planning Commission, and further that a performance bond or other security has been posted with the Planning Commission or the City Recorder in an amount sufficient to insure the improvement of said street within a period of one year.

## 4.2 - ZONING DISTRICT BOUNDARIES

Unless specifically indicated on the Zoning Map, the boundaries of zoning districts are lot lines, centerlines of streets or alleys or such lines extended, the corporate limit lines, a line midway between the main track of a railroad, or the centerlines of streams or other water bodies. When a zoning district boundary is clearly intended to split a lot-i.e., does not follow the lot line-the rear yard setback shall be measured from the zoning district boundary if the adjoining zone is more restrictive.

## 4.3 - USE

No building, structure, or land shall be used and no building or part thereof shall be erected, moved, or altered unless for a use expressly permitted by and in conformity with the regulations specified for the district in which it is located.

## 4.4 - STREET FRONTAGE

No dwelling shall be erected on a lot which does not abut at least one street for at least fifty (50) feet, excluding lots fronting on cul-de-sacs which may have a minimum road frontage of forty (40) feet.

## 4.5 - REDUCTION OF LOT SIZE

No lot shall be reduced in area so that required yards, lot area per family, lot width, building area, or other provisions of this Code shall not be maintained.

## 4.6 - ONE PRINCIPAL BUILDING PER LOT

Only one (1) principal building and its customary accessory buildings may be erected on any lot, unless otherwise provided in this Code.

## 4.7 - YARDS AND SETBACKS

4.7.1    REQUIRED YARD:
No part of a yard or other open space required about any building for the purpose of complying with the provisions of this Code shall be included as a part of a yard or other open space required under this Code for another building or structure.

4.7.2    CORNER LOTS:
Except in B-2, B-3, B-4, B-5, and PB districts, the minimum width of a side yard along an intersecting street shall be fifty (50) percent greater than the minimum side yard requirements of the district in which the lot is located, or one-half of the minimum required front yard setback along the side street, whichever is greater.

4.7.3    PRINCIPAL USES WITHOUT BUILDINGS:
Where a permitted use of land involves no structures, such use, excluding agricultural uses, shall nonetheless comply with all yards and minimum lot area requirements applicable to the district in which it is located, as well as obtaining any other license or permit applicable to the particular use.

4.7.4    FRONT YARD SETBACK:
The minimum front yard setback for any structure or use located on a lot where the average front yard setback of existing structures within one hundred (100) feet on the same side of the street is ten (10) feet more or less than what is required by this Code, the required setback shall be the average setback of said structures.

4.7.5    MEASUREMENT OF SETBACKS:
Where the dedicated right-of-way is less than forty (40) feet for a lane or fifty (50) feet for all other streets, the front yard setback and, for corner lots, the side yard setback, shall be measured starting at a point twenty (20) feet from the centerline of the pavement for a lane or twenty-five (25) feet from the centerline of the pavement for all other streets.

4.7.6    OUTDOOR DISPLAY OF MERCHANDISE:
Where permitted, merchandise displayed outdoors which exceeds the height of six (6) feet, including new and used mobile homes, trucks, or other motor vehicles, shall set back from street right-of-way lines not less than one-half (1/2) of the required building setback.

4.7.7    DOUBLE FRONTAGE LOTS:
         The required front yard setback shall be observed on both frontages of such lot.

4.7.8    LOT SPLIT:
         When a zone line is clearly intended to split a lot--i.e., does not follow the lot line--
         the rear yard setback must be measured from the zone line if the adjoining zone is
         more restrictive.

4.7.9    FRONT-FACING GARAGES
         Front-facing garages shall have a minimum front yard setback of twenty-five (25)
         feet or the required front yard setback of the zone in which it is located, whichever is
         greater.


## 4.8  -  HEIGHT AND DENSITY

No building or structure shall be erected or altered that exceeds the height limit, accommodates
or houses a greater number of families, or creates narrower or smaller front yards or side yards
than are permitted in the regulations for the district in which it is located.


## 4.9  -  EXCEPTION ON HEIGHT LIMITS

The height limitations in this Code shall not apply to church spires, belfries, cupolas, and domes
not intended for human occupancy;  monuments, water towers, observation towers, windmills,
chimneys, smokestacks, derrick conveyors, flagpoles, radio towers, masts, and aerials.


## 4.10  - EXCEPTIONS ON SETBACKS

The following structures subject to the provisions of section 4.10, shall be permitted to encroach
into the minimum yard setbacks of the specific district regulations set forth in Article VI.

4.10.1    Awnings, canopies, and marquees, not to exceed three (3) feet within all zoning
          districts except the B-2 Central Business District. Within the B-2 Central Business
          District metal marquees or awnings shall be permitted to extend into the public right-
          of-way up to eighteen (18) inches from the street curb.

4.10.2    Parking spaces, driveways, curbs, sidewalks, and steps, provided, however, steps or
          stairs to a dwelling, non-enclosed, not to exceed six (6) feet.

4.10.3    Fences, walls, and landscaping.

4.10.4    Flagpoles.

4.10.5    Garbage disposal equipment, non-permanent.

4.10.6    On buildings over thirty-five (35) feet in height, overhanging of roof, eave, gutter, cornice, or other architectural feature, not to exceed three (3) feet.

4.10.7    Open fire escapes on any building may extend into any required yard not more than six (6) feet.

4.10.8    Signs, subject to the regulations set forth in Article VII.

4.10.9    Decks, not located closer than 7.5 feet from the side or rear property line except in the R-1 and R-2 districts in which case they shall meet the principal building setback.


## 4.11 - VISION CLEARANCE

To maintain a safe line of sight for drivers of vehicles in all districts except the B-2 Central Business district, no fence, wall, shrubbery, or other obstruction to vision between the height of three (3) feet and fifteen (15) feet shall be permitted within a sight distance triangle located at the intersection of the rights-of-way lines of streets or of streets and railroads. No sight distance triangle will be required in the case of intersecting streets or railroads not located on the same grade (overpasses, underpasses, etc.). The sight distance triangle required shall be the area enclosed by straight lines connecting three (3) points. The first point shall be the intersection of the two street right-of-way lines, and the second and third points shall be located on each street's right-of-way line a specified distance from the first point.  In the case of minor intersecting streets, two of these points shall be located on each street's right-of-way line a distance of twenty (20) feet from the point of intersection of the two street rights-of-way. In the case of a minor street intersection with an arterial or collector street, the required sight distance triangle shall measure twelve (12) feet by forty (40) feet along the street rights-of-way similar to the above method, with the forty (40) foot measurement being taken along the arterial or collector street. In the case of intersecting arterial or collector streets, as designated on the zoning map, dual twelve (12) foot by forty (40) foot sight triangles shall be required.  In the case of rounded property corners, the point of intersection of the two streets shall be assumed to be the point of intersection of the two streets where the two right-of-way lines would have met without such rounding.  All measurements shall be made horizontally from the point of intersection of the two street right-of-way lines.  The following diagrams illustrate the required sight triangles.

MINOR STREET



MINOR STREET

20'

20'

PROPERTY LINE

10' SIGN SETBACK LINE

14.14'

ARTERIAL OR COLLECTOR

MINOR STREET

40'

12'

PROPERTY LINE

10' SIGN SETBACK LINE

12.4'

ARTERIAL OR COLLECTOR

ARTERIAL OR
COLLECTOR

40'

40'

PROPERTY LINE

10' SIGN SETBACK LINE

12.4'

## 4.12 – SITE PLAN REQUIREMENTS

4.12.1   Pedestrian walks:
To promote pedestrian connection within and between commercial developments, provision for internal pedestrian facilities shall be required where needed to accommodate existing or potential pedestrian use. Such facilities may include concrete, asphalt, stone, brick, or gravel sidewalks, painted lanes or crosswalks, appropriate signage, and similar improvements.

4.12.2   Drainage and erosion control:
The following standards are intended to minimize onsite erosion and sedimentation flow into streets and streams, to improve the general appearance of sites under development, and to ensure that stormwater is handled in a way which will not threaten or injure the health, safety, and welfare of citizens, property, or motorists.

    A.   All developments shall meet the drainage and erosion control requirements of the Johnson City Public Works Department's standards of latest issue.

    B.   Reseeding or sodding any cleared or graded site shall be required where no building activity has occurred within a three (3) month period.

4.12.3   Water and Sewer:
All water and sewer improvements shall comply with the "Standards of Design for Water and Sewer Lines" as adopted by the Board of Commissioners.

zonecode/articles/ART4.doc

# ARTICLE V
# SITE PLAN APPROVAL PROCEDURE

**5.1**      **APPLICATION AND APPROVAL PROCEDURE**

With the exception of single-family and two-family dwellings, the following site plan approval procedure shall govern all development:

5.1.1.      Two (2) sets of complete site plan drawings and an electronic copy of the site plan shall be submitted to the Code Enforcement Division, along with the appropriate review fee, if required.

5.1.2      The site plan shall be drawn to scale and include:

A. Boundary of the tract, including dimensions and location of any new or revised lots or easements within the tract;

B. The location and dimensions of all existing and proposed roads, driveways, entrances and exits, lanes, easements, and parking areas, including the number of parking spaces;

C. Proposed building locations and dimensions including the height of buildings and building entrances both pedestrian and vehicular;

D. Location and extent of existing and proposed landscaping, buffer yards, fences, lighting, pedestrian walkways, and signage;

E. Proposed use of land and buildings;

F. The relation of the project to the adjoining street system and surrounding area, including the zoning and land use of surrounding properties;

G. The complete grading plan, erosion prevention and sediment control plan in compliance with ordinance number 4064-04, water quality plan in compliance with ordinance number 4293-07, floodplain regulations information in compliance with Article VIII of the Zoning Ordinance, and stormwater runoff calculations supporting the stormwater collection and detention plan, shall also be submitted;

H. Location and profiles of proposed sanitary sewers and stormwater sewers with grades, sizes, and elevations indicated;

I. Proposed water distribution system showing pipe location, sizes, and the location of all pumps, meters, valves, and fire hydrants; and

J.  The location and extent of other utility facilities, including electric, telephone, and TV cable lines, natural gas lines, and poles for power or telephone.

5.1.3    Review procedure:
Staff review procedure - Upon receipt of a site plan, the Code Enforcement Division shall:

A.    Notify the Planning Department, Engineering Division, Water and Sewer Department, and any other department as appropriate of submitted plans;

B.    Each department shall promptly review the site plan for conformity with the requirements in Subsection 5.1.2 and convey its findings to the Code Enforcement Division, which shall compile a consolidated staff report on the site plan;

C.    If any deficiency is found in the plan, the applicant and property owner shall be contacted and the deficiency or deficiencies explained. If the applicant and owner agree to amend the plan to correct all deficiencies, then a corrected site plan shall be submitted for review; and

D.    Finding of compliance - Upon finding that the site plan is in full compliance with the requirements of Subsection 5.1.2, the Chief Building Official shall issue the appropriate grading or building permits.

5.1.4    Appeal procedure:
A.    If the applicant disagrees with the findings of the city staff, an appeal may be made to the Planning Commission. Such appeal shall be made in writing to the Planning Department and shall state the reasons why in the applicant's opinion, that feels the site plan is in compliance. The appeal shall be filed no later than ten (10) full working days prior to the next Planning Commission meeting and shall be accompanied by ten (10) additional copies of the site plan.

B.    The Planning Commission at its regular meeting shall review the disputed site plan and hear evidence from the applicant, the staff, and from any other interested persons. After hearing evidence, the Planning Commission shall approve the site plan as submitted, approve with amendments, or disapprove the plan. In determining its findings, the Planning Commission shall take into consideration the character of the surrounding area to: (1) protect adjoining residentially-zoned lots and residential uses; (2) to provide for the public safety; and (3) to prevent traffic congestion.

C. The applicant may appeal the Planning Commission's finding to the City Commission. After receiving the findings of the Planning Commission, the City Commission shall review the site plan and the evidence presented by the staff, the applicant, and any other concerned persons. The appeal shall be filed no later than fourteen (14) full working days prior to the next City Commission meeting and shall be accompanied by seven (7) additional copies of the site plan. After such review, the City Commission shall approve, disapprove, or approve with amendment the site plan. In determining its action, the City Commission may also make additional reasonable requirements.

5.1.6 Subdivision and replatting procedure:

A. In order to promote interconnectivity, reduce the number of curb cuts, and the development of comprehensive stormwater management, a Subdivision Site Plan shall be required for all subdivisions in the B-4, B-5, and PB districts. A Subdivision Site Plan shall include the following:

1. Location and number of proposed curb cuts;

2. Proposed interconnectivity between proposed lots; and

3. Preliminary stormwater detention location.

B. In the B-4, B-5, and PB districts, lots may be created which gain access from a private drive, private street, or easement. Any creation of lots or easements or any replatting of or within the original tract shall be reviewed according to the provisions of the Subdivision Regulations of the Johnson City Regional Planning Commission. The original subdivision of land within the tract or the establishment of permanent easements for access shall be reviewed by the Planning Commission; thereafter, replats or further subdivisions may be reviewed administratively subject to the provisions of the Subdivision Regulations.

## 5.2 DEVELOPMENT STANDARDS:

Each proposed site plan shall be evaluated according to the following standards:

5.2.2 Internal circulation and curb-cut location:

To promote and protect the safety and function of city streets, the internal circulation and the location and number of curb cuts of each project shall be carefully regulated. The City Engineer may request that information from the developer be provided concerning future development plans. In addition, developments having off-street parking facilities shall

interconnect on-site vehicular access with adjoining property where practical.

5.2.3    Private streets and permanent easements:

A.    Private streets designed to serve as internal streets within a commercial development shall be built to the public street standards of Article IV of the Subdivision Regulations. So long as such streets and utilities remain private, their maintenance shall be the responsibility of the property owner. Upon verification by the Planning Commission, City Engineer, and the Water and Sewer Engineer that private streets and utilities have been constructed according to Subdivision Regulations standards for public streets and the utilities have been constructed according to TDEC and Water and Sewer Department Standards, they may be accepted by the city upon dedication by the owner.

B.    Permanent private easements for transportation access may be established within a commercial development across parking lots or driveways where appropriate, based on traffic volumes, site conditions, and building location. The minimum width of such easement shall be twelve (12) feet for one-way traffic and twenty (20) feet for two-way traffic. The minimum pavement depths of such easements shall be 6 inches of mineral aggregate base and 3 inches of asphalt. The maintenance of such easements shall be the permanent responsibility of the owner. In no case shall the city accept such easements as public nor maintain them.

5.2.4    Sidewalk Requirement:
Sidewalks shall be required for all multi-family, commercial, and office developments along their public street frontages, and for all industrial developments along their collector and arterial street frontages, in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

zonecode/articles/ART5.doc

# ARTICLE VI
## USE REQUIREMENTS BY DISTRICT

## 6.1 - R-1 LOW DENSITY RESIDENTIAL DISTRICT

6.1.1    PERMITTED USES:
Within the R-1 Low Density Residential District the following uses are permitted:

6.1.1.1    Single-family residences;

6.1.1.2    Customary general farming, but not the raising of farm animals or poultry;

6.1.1.3    Public utility stations, provided all lot area requirements of the district in which they are located are met;

6.1.1.4    Municipal, county, state, or federal buildings or land uses;

6.1.1.5    Accessory structures and uses, provided:
A.    Maximum size of buildings shall be limited to eight hundred fifty (850) square feet; and

B.    Structures and uses shall be located in the rear yard and a minimum of seven and one-half (7 ½) feet from all lot lines; excluding swimming pools, detached carports, and detached garages which may be located in the side yard or rear yard provided they meet the minimum setback requirement for the district in which it is located or seven and one-half (7 ½) feet, whichever is greater.

6.1.1.6    Group homes for eight (8) or fewer unrelated mentally retarded, mentally handicapped, or physically handicapped residents, which may include two (2) additional persons, approved by the licensing agency to act as houseparents or guardians, and who need not be related, provided that:
A.    Prior to admission to the facility, all resident applicants are screened by the appropriate sponsoring agency, such as Watauga Mental Health Center or Dawn of Hope, in order to exclude violence-prone or other potentially dangerous persons;

B.    The facility is fully licensed/certified by the appropriate overseeing state agency (e.g. the State Department of Mental Health and Mental Retardation);

C.    The facility is operated as a residential home only and does not include teaching or training activities for non-residents; and

D.   The facility is located not closer than one thousand three hundred and twenty (1,320) feet to any other group home or temporary shelter.

6.1.1.7   Customary, incidental, home occupations, provided:
A. Permitted Home Occupations:
1.  Offices for such professionals as but not limited to architects, counselors, contractors, clergy, draftspersons and cartographers, engineers, financial planners, insurance agents, lawyers, real estate agents, accountants, psychologists, psychiatrists, surveyors, cleaning services, salespersons and manufacturer's representatives;

2.  Personal services including barber and beauty shops (limited to one chair), tattooing, therapeutic massage, manicure and pedicure shops, pet grooming/sitting, catering, tailors and dressmakers, and typing and word processing services;

3.  Instructional services including but not limited to dance, music, arts and crafts, and tutoring;

4.  Studios for artists, sculptors, musicians, and photographers and similar activities;

5.  Repair services for jewelry, watches and clocks, small appliances, computers, electronic devices, guns, lawnmowers, and small engines, and similar activities; and

It is recognized that this list is not totally inclusive. The Planning Department shall make the determination of whether an unlisted business is similar to a permitted use. An appeal of the Planning Department's determination may be made to the Board of Zoning Appeals.

B. Prohibited Home Occupations:
1.  Kennels and veterinarian clinics or hospitals;
2.  Medical and dentist offices involving patient visitation;
3.  Motor vehicle repair;
4.  Retail sales of goods not made or used on the premises; and
5.  Barber and beauty shops exceeding one chair.
6.  Substance Abuse Treatment Facility involving client visitation.

C. Operational Standards:

1. The home occupation shall be clearly incidental to the residential use of the dwelling and shall not change the essential residential character and appearance of the dwelling. No internal or external alterations inconsistent with the residential use shall be permitted.

2. Use of the dwelling for this purpose shall be limited to twenty-five (25) percent of one floor of the principal building and fifty (50) percent of the floor area of one (1) accessory building. No outside storage shall be used in connection with the home occupation. Refuse generated in the conduct of the home occupation shall be stored and or disposed of in accordance with city policy.

3. The equipment used by the business and the operation of the business shall not create any vibrations, heat, glare, dust, odors, or smoke discernable at the property lines. The business and the operation of the business shall not generate noise exceeding 75 decibels at the property lines from 7:00 A.M. to 11:00 P.M. or generate any noise exceeding 55 decibels at the property lines from 11:00 P.M. to 7:00 A.M. The business and the operation of the business shall not create any electrical, magnetic or other interference off the premises, consume utility quantities that negatively impact the delivery of those utilities to surrounding properties, or use and/or store hazardous/explosive materials in excess of quantities normally found in residential structures.

4. The home occupation shall have no more than one nonresident employee on the premises at any one time. The number of nonresident employees working at locations other than the home occupation is not limited.

5. Customer or client visits to the home occupation are limited to the hours from 9:00 A.M. to 8:00 P.M., and no more than two customers or clients shall be present at any one time.

6. Delivery vehicles used to deliver goods to the home occupation are limited to passenger vehicles, mail carriers, and express carriers such as UPS. Deliveries shall be permitted between 8:00 A.M. and 6:00 P.M. The home occupation shall be limited to the parking or storage of one commercial vehicle on the premises, not exceeding a one-ton capacity. Off-site employees shall not park vehicles at the location of the home occupation.

7. Signage for home occupations shall be limited to one (1) nameplate attached to the building, not to exceed two (2) square

feet in area. No freestanding signs in the yard used in conjunction with the home occupation shall be permitted.

6.1.2    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTIONS:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.1.2.1    Schools offering general education, churches with parish houses, and Sunday school buildings, provided:
A.    They are located on an arterial or collector street; and

B.    The buildings are placed not less than thirty (30) feet from side property lines.

6.1.2.2    Day-care centers established to offer instruction to persons of pre-school, elementary, and secondary school age, provided:
A.    The facility meets all requirements imposed by the state licensing board, including, but not limited to, maximum allowable enrollment, adequate play and work space, and noise and safety controls;

B.    Excessive noise shall be controlled by such means as enclosure, screening, and/or play yard supervision to not unduly interfere with the use and enjoyment of surrounding properties;

C.    The facility shall be located on an arterial or collector street;

D.    A paved driveway for the off-street loading and unloading of children provides a separate entrance and exit to and from the property from an arterial or collector street, without backing into the street;

E.    The property shall contain a minimum of one and one-half (1.5) acres; and

F.    Parking shall not be permitted in the required front yard.

6.1.2.3    Alternative tower structures

6.1.3    AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.1.3.1    Minimum Lot Size:
A.    Minimum lot size shall be 21,780 square feet.

B. Minimum lot width shall be one hundred (100) feet at the front building line.

6.1.3.2 Yard Area:
A. Front Yard:
Minimum front yard setback shall be as follows:

| Type Street | Setback |
|---|---|
| Arterial | 70 feet |
| Collector | 60 feet |
| All other | 50 feet |

B. Side Yards:
Minimum side yard setback shall be fifteen (15) feet for a one-story building, twenty (20) feet for a two-story building, and twenty-five (25) feet for a three-story building.

C. Rear Yard:
Minimum rear yard setback shall be thirty (30) feet.

6.1.4 MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty (30) percent of the total lot area.

6.1.5 HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.

6.1.6 SIDEWALK REQUIREMENT:
Sidewalks shall be required along the public street frontages of churches, day-care centers, government buildings, public utility stations, and schools in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

zonecode/articles/R1.doc

## 6.2 - R-2 LOW DENSITY RESIDENTIAL DISTRICT

6.2.1     PERMITTED USES:
          Within the R-2 Low Density Residential District the following uses are permitted:

      6.2.1.1     All uses permitted in the R-1 Low Density Residential District provided all other R-2 requirements are observed;

      6.2.1.2     Publicly owned recreational facilities and grounds;

      6.2.1.3     Cemeteries; and

      6.2.1.4     Local or counsel headquarters of national, nonprofit organizations providing for the education, attainment of high morals, good citizenship, and character of young men and women from the ages of nine (9) to sixteen (16) years inclusive provided:
          A.     The buildings are placed no less than fifty (50) feet from the side property lines;

          B.     The lot area contains no less than fifty thousand (50,000) square feet; and

          C.     No external evidence of such use of the property other than a sign attached to the principal building, not more than two (2) square feet in area.

6.2.2     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
          The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

      6.2.2.1     All special exceptions permitted in the R-1 Low Density Residential District.

      6.2.2.2     Swimming clubs, tennis clubs, and similar recreational facilities, provided:
          A.     They are owned and operated by private clubs organized as nonprofit associations, whether incorporated or not, conducting noncommercial recreational activities for the exclusive use of club members and their guests;

          B.     Community recreational facilities must be located on an arterial or collector street as designated on the city's Zoning Map and have a minimum lot size of ten (10) acres. A neighborhood recreational facility may be located on a minor street and must have a minimum lot size of one-half (0.5) acre. Membership to the neighborhood

facility will be limited to families residing in the subdivision or a designated neighborhood and shall not exceed two hundred (200) memberships;

C.   All buildings, machinery, and equipment shall meet the minimum setback requirements of the district in which the facility is located;

D.   The sale of merchandise, excluding refreshments to be consumed on the premises by members and their guests, shall be prohibited;

E.   One (1) identification sign, with an area not to exceed twelve (12) square feet, shall be permitted;

F.   Noise and glare shall be minimized. Outdoor loud speakers, juke boxes, public address systems, electric amplifiers, and similar electronic devices shall not be permitted; and

G.   Neighborhood recreational facilities shall have no parking requirements.

6.2.2.3   Golf courses provided:

A.   Minimum size for a par-3 golf course shall be twenty (20) acres; for an executive golf course, fifty (50) acres; and for a regulation golf course, one hundred twenty (120) acres;

B.   Location shall be on a collector or arterial street with direct access provided by such street unless waived by the Board of Zoning Appeals as a result of conditions unique to the site;

C.   A generalized site plan drawn to a scale of not less than one (1) inch equals one hundred (100) feet shall be submitted depicting the following: the identification of existing and/or planned uses surrounding the site; the location and size of all holes (including tees and greens); proposed driveways; off-street parking areas; accessory uses including clubhouse, pro-shop, snack bar, maintenance and storage buildings or similar uses; putting greens; driving ranges; walkways; landscaping; screening; fencing; and buffering;

D.   Orientation of driving tees shall direct golf balls away from any abutting streets and residences, or suitable screens or netting shall be required;

E.   Driving ranges and night lighting shall not be permitted on par-3 golf courses and allowed only at the discretion of the BZA on executive and regulation golf courses; and

F.   Any additional requirements to ensure the protection of the surrounding neighborhood.


6.2.3   AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.2.3.1   Minimum Lot Size:
A.   Minimum lot size shall be 15,000 square feet.

B.   Minimum lot width shall be ninety (90) feet at the front building line.

6.2.3.2   Yard Area:
A.   Front Yard:
Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and twenty (20) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B.   Side Yard:
Minimum side yard setback shall be ten (10) feet.

C.   Rear Yard:
Minimum rear yard setback shall be thirty (30) feet.


6.2.4   MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty (30) percent of the total lot area.


6.2.5   HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.


6.2.6   SIDEWALK REQUIREMENT:
Sidewalks shall be required for all uses required in R-1, Subsection 6.1.6, and for headquarters of non-profit organizations (youth), recreational clubs, and public owned recreation facilities and grounds along their public street frontages in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

zonecode/articles/R2.doc

**6.3 - R-2A LOW DENSITY RESIDENTIAL DISTRICT**

6.3.1    PERMITTED USES:
         Within the R-2A Low Density Residential District the following uses are permitted:

         6.3.1.1    All uses permitted in the R-2 Low Density Residential District provided
                    all other R-2A requirements are observed.

6.3.2    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
         The following uses are permitted when approved by the Board of Zoning Appeals as
         Special Exceptions as provided by Section 15.4:

         6.3.2.1    All Special Exceptions permitted in the R-2 Low Density Residential
                    District.

6.3.3    AREA REGULATIONS:
         All buildings and uses, unless otherwise specified in this Code, shall comply with the
         following setback, coverage, and area requirements:

         6.3.3.1    Minimum Lot Size:
                    A.    Minimum lot size shall be 12,000 square feet.

                    B.    Minimum lot width shall be eighty (80) feet at the front building
                          line.

         6.3.3.2    Yard Area:
                    A.    Front Yard:
                          Minimum front yard setback shall be twenty-five (25) feet on an
                          arterial or collector street and twenty (20) feet on all other streets.
                          Front-facing garages shall have a minimum setback of twenty-five
                          (25) feet on all streets.

                    B.    Side Yard:
                          Minimum side yard setback shall be ten (10) feet.

                    C.    Rear Yard:
                          Minimum rear yard setback shall be thirty (30) feet.

6.3.4    MAXIMUM LOT COVERAGE:
         The principal building and all accessory buildings shall cover not more than thirty
         (30) percent of the total lot area.

6.3.5    HEIGHT REGULATIONS:

Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.

6.3.6    SIDEWALK REQUIREMENT:
Sidewalks shall be required for all uses required in R-2, Subsection 6.2.6, along their public street frontages in accordance with Article IX, Sidewalk Regulations, and <u>The Standards of Design for Streets and Drainage.</u>

zonecode/articles/R2A.doc

**6.4 - R-2B LOW DENSITY RESIDENTIAL DISTRICT**

6.4.1    PERMITTED USES:
         Within the R-2B Low Density Residential District the following uses are permitted:

         6.4.1.1    All uses permitted in the R-2A Low Density Residential District provided
                    all other R-2B requirements are observed.

6.4.2    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
         The following uses are permitted when approved by the Board of Zoning Appeals as
         Special Exceptions as provided by Section 15.4:

         6.4.2.1    All Special Exceptions permitted in R-2A Low Density Residential
                    Districts.

6.4.3    AREA REGULATIONS:
         All buildings and uses, unless otherwise specified in this Code, shall comply with the
         following setback, coverage, and area requirements:

         6.4.3.1    Minimum Lot Size:
                    A.    Minimum lot size shall be 9,000 square feet.

                    B.    Minimum lot width shall be seventy-five (75) feet at the front
                          building line.

         6.4.3.2    Yard Area:
                    A.    Front Yard:
                          Minimum front yard setback shall be twenty-five (25) feet on an
                          arterial or collector street and twenty (20) feet on all other streets.
                          Front-facing garages shall have a minimum setback of twenty-five
                          (25) feet on all streets.

                    B.    Side Yard:
                          Minimum side yard setback shall be eight (8) feet.

                    C.    Rear Yard:
                          Minimum rear yard setback shall be thirty (30) feet.

6.4.4    MAXIMUM LOT COVERAGE:
         The principal building and all accessory buildings shall cover not more than
         thirty-five (35) percent of the total lot area.

6.4.5    HEIGHT REGULATIONS:

Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.


6.4.6      SIDEWALK REQUIREMENT:
           Sidewalks shall be required for all uses required in R-2, Subsection 6.2.6, along their public street frontages in accordance with Article IX, Sidewalk Regulations, and <u>The Standards of Design for Streets and Drainage.</u>


zonecode/articles/R2B.doc

## 6.5 - R-2C LOW DENSITY RESIDENTIAL DISTRICT

6.5.1     PERMITTED USES:
           Within the R-2C Low Density Residential District the following uses are permitted:

           6.5.1.1     All uses permitted in the R-2B Low Density Residential District provided
                        all other R-2C requirements are observed.


6.5.2     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
           The following uses are permitted when approved by the Board of Zoning Appeals as
           Special Exceptions as provided by Section 15.4:

           6.5.2.1     All Special Exceptions permitted in the R-2B Low Density Residential
                        District.


6.5.3     AREA REGULATIONS:
           All buildings and uses, unless otherwise specified in this Code, shall comply with the
           following setback, coverage, and area requirements:

           6.5.3.1     Minimum Lot Size:
                        A.     Minimum lot size shall be 6,000 square feet.

                        B.     Minimum lot width shall be sixty (60) feet at the front building
                               line.

           6.5.3.2     Yard Area:
                        A.     Front Yard:
                               Minimum front yard setback shall be twenty-five (25) feet on an
                               arterial or collector street and twenty (20) feet on all other streets.
                               Front-facing garages shall have a minimum setback of twenty-five
                               (25) feet on all streets.

                        B.     Side Yard:
                               Minimum side yard setback shall be eight (8) feet.

                        C.     Rear Yard:
                               Minimum rear yard setback shall be twenty-five (25) feet.


6.5.4     MAXIMUM LOT COVERAGE:
           The principal building and all accessory buildings shall cover not more than forty
           (40) percent of the total lot area.

6.5.5     HEIGHT REGULATIONS:
          Principal buildings shall not exceed the height of thirty-five (35) feet and accessory
          buildings shall not exceed the height of fifteen (15) feet.


6.5.6     SIDEWALK REQUIREMENT:
          Sidewalks shall be required for all uses required in R-2, Subsection 6.2.6, along their
          public street frontages in accordance with Article IX, Sidewalk Regulations, and <u>The
          Standards of Design for Streets and Drainage.</u>



zonecode/articles/R2C.doc

## 6.6 - R-3 MEDIUM DENSITY RESIDENTIAL DISTRICT

6.6.1       PERMITTED USES:
Within the R-3 Medium Density Residential District the following uses are permitted:

6.6.1.1     All uses permitted in the R-2C, Low Density Residential District, provided all other R-3 requirements are observed;

6.6.1.2     Two-family and multi-family dwellings;

6.6.1.3     Boarding or rooming houses;

6.6.1.4     Churches with parish houses and Sunday school buildings, provided all buildings have a minimum side yard setback of twenty-five (25) feet;

6.6.1.5     Group homes for ten (10) or fewer unrelated mentally retarded, mentally handicapped, or physically handicapped residents, which may include two (2) additional persons, approved by the licensing agency to act as houseparents or guardians, and who need not be related, provided:

     A.     Prior to admission to the facility, all resident applicants are screened by the appropriate sponsoring agency, such as Watauga Mental Health Center or Dawn of Hope, in order to exclude violence-prone or other potentially dangerous persons;

     B.     The facility is fully licensed/certified by the appropriate overseeing state agency (e.g. the State Department of Mental Health and Mental Retardation);

     C.     The facility is operated as a residential home only and does not include teaching or training activities for non-residents; and

     D.     The facility is located not closer than 1,320 feet to any other group home or temporary shelter.

6.6.1.6     Residential homes for the aged, provided:

     A.     Such a home shall be licensed and shall meet all requirements of the minimum standards and regulations of nursing homes except nursing services by a professional nurse;

     B.     Such a home shall meet all building and fire safety codes as required by the State of Tennessee Department of Public Health; and

     C.     Density shall be based on bedrooms per acre and shall be calculated as two (2) times the number of dwelling units allowed in

the zoning district. In the R-3 district, maximum allowable density shall be fourteen (14) bedrooms per acre.

6.6.1.7  Emergency or temporary shelters, provided:

A.  The shelter houses no more than eight (8) persons for no more than thirty (30) days per person. Length of stay may be extended when extenuating circumstances can be shown to the Shelter Director;

B.  Prior to admission to the facility, all shelter applicants are screened by the appropriate sponsoring agency, in order to exclude violence-prone or other potentially dangerous persons;

C.  The facility meets the "Shelter Service and Performance Standards" as recognized by the State Department of Human Services; and

D.  The facility is located no closer than 1,320 feet to any other temporary shelter or group home as defined in Article II.

6.6.1.8  Adult day-care centers, provided:

A.  The facility has a maximum allowable enrollment of thirty (30) people and adequate work space (25 sq. ft. per person);

B.  Parking shall not be permitted in the required front yard;

C.  For emergency purposes, including ambulances, emergency vehicles, and fire vehicles, the facility shall be located on an arterial or collector street, or a minor street provided it is not a cul-de-sac and the street has a minimum right-of-way width of fifty (50) feet with a minimum paved width of twenty-nine (29) feet, including curbs; and

D.  A paved driveway for the off-street loading and unloading of handicapped persons provides a separate entrance and exit to and from the property from an arterial or collector street without backing into the street.

6.6.1.9  Bed-and-breakfast homes, provided:

A.  There shall be no more than six (6) registered guests at one time and a current guest register shall be kept by the owner;

B.  Parking shall be located at the rear or side of the building;

C.  There shall be no more than one (1) bed-and-breakfast home located within 1,500 feet (determined by a straight line and not street distance) of the establishment;

D. All necessary state and city permits, certifications, or requirements shall be obtained as a condition of approval of a bed-and-breakfast home service; and

E. No exterior alterations, other than those necessary to assure safety of the structure, shall be made to any building for the purpose of providing bed-and-breakfast.

6.6.1.10   Mortuary Establishments provided:

A. Primary access shall be from a collector or arterial street;

B. Minimum lot size shall be three (3) acres;

C. A Type 2 buffer shall be required along all property lines that abut R-1 through R-6 zoning districts;

D. A ground-mounted sign with a maximum of 32 square feet shall be allowed for each street granting access.  If two or more individual signs are allowed due to multiple street frontage, they may be substituted for one ground-mounted sign with a maximum size of 64 square feet; and

E. A site plan shall be approved by the Planning Commission;  said plan shall contain the following:

1. Location, size, and height of all proposed structures;

2. A traffic circulation plan including the location of all parking areas, driveways, and points of ingress and egress;

3. Location, extent, and composition of all proposed buffering; and

4. Other information as required by the Planning Commission.

F. Minimum front yard setback shall be twenty-five (25) feet, side yard setback shall be twenty-five (25) feet except where said side yard abuts a residential district in which case said side yard shall be fifty (50) feet; and rear yard setback shall be fifty (50) feet.

6.6.2   USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.6.2.1     All Special Exceptions permitted in the R-2C Low Density Residential District;

6.6.2.2     Libraries, museums, art galleries and other cultural facilities, offices and facilities of non-profit and civic organizations, and social service organizations provided:

A.     The use shall be located in a discontinued school or similar public building;

B.     Pick-up and delivery of goods shall be restricted to access only from a collector or arterial street and only between the hours of 7:00 a.m. and 7:00 p.m.;

C.     Parking and loading docks shall be located at the rear or side of the building and not be visible from any public right-of-way (excluding alleys) or residential property;

D.     No exterior alterations, other than those necessary to assure the safety of the structure, shall be made to any building; and

E.     No exterior storage shall be permitted.

6.6.2.3     Alternative tower structures.


6.6.3     AREA REGULATIONS:

All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.6.3.1     Minimum Lot Size:

A.     Minimum lot size shall be 9,000 square feet.

B.     Minimum lot width shall be seventy-five (75) feet at the front building line.

6.6.3.2     Density:

Maximum density shall be seven (7) dwelling units per acre.


6.6.3.3     Yard Area:

A.     Front Yard:

Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and twenty (20) feet on all other streets.

Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B.   Side Yard:
Minimum side yard setback shall be eight (8) feet.

C.   Rear Yard:
Minimum rear yard setback shall be thirty (30) feet.

6.6.4   MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty-five (35) percent of the total lot area.

6.6.5   HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.

6.6.6   SIDEWALK REQUIREMENT:
Sidewalks shall be required for all uses required in R-2, Subsection 6.2.6, and for adult day-care centers and multi-family developments along their public street frontages in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

6.6.7   CONCEPT PLAN REQUIRED:
Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/r3.doc

**6.7 - R-4 MEDIUM DENSITY RESIDENTIAL DISTRICT**

6.7.1     PERMITTED USES:
          Within the R-4 Medium Density Residential District the following uses are permitted:

      6.7.1.1     All uses permitted in the R-3 Medium Density Residential District provided all other R-4 requirements are observed.

6.7.2     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
          The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

      6.7.2.1     All Special Exceptions permitted in the R-3 Medium Density Residential District;

      6.7.2.2     Day-care centers and private dancing schools that are established to offer instructions to persons of pre-school, elementary, and secondary school age, provided:
            A.     No more than 100 children are cared for in day-care centers and no more than 20 students are given instruction at one time in dancing schools;

            B.     These uses are not permitted to be located on cul-de-sacs;

            C.     If access is gained from an arterial or collector street, a paved driveway connected to the arterial or collector street must be provided. This driveway must include an exit and an entrance to facilitate safe, off-street loading and unloading which does not require backing into the street; and

            D.     The maximum permitted floor area of the principal building shall be five thousand (5,000) square feet.

      6.7.2.3     Golf Courses provided:
            A.     The golf course consists of a minimum of ten (10) acres open space;

            B.     The property was previously used for a golf course within the last five years, and such use was found then to be a satisfactory and compatible use, and is considered to still be satisfactory and compatible by review by the Board of Zoning Appeals;

C.    The golf course is located on an arterial or collector street, and all access to the golf course, including its parking areas, club house, etc. is gained from the designated arterial or collector;

D.    The clubhouse, parking, and any accessory buildings are no closer than fifty (50) feet to any property line;

E.    The sale of merchandise is limited to an enclosed area no larger than four hundred (400) square feet, and this use shall be clearly incidental to the golf course use;

F.    The sale of food is restricted to the club house, is limited to no more than four hundred (400) square feet, and is clearly incidental to the golf course function;

G.    One sign shall be permitted and shall be oriented to the street giving access to the property. The size, setbacks, and any lighting restrictions shall be the same as for other nonresidential uses permitted within the applicable zone; and

H.    Noise and glare are to be minimized as follows: loud speakers, juke boxes, public address systems, electric amplifiers, and similar electronic devices shall not be permitted.

6.7.2.4    Restaurants, museums, or art galleries provided:
A.    The structure was constructed prior to 1864;

B.    The use shall be allowed only in structures that are recognized as architecturally, historically, or culturally significant and that, through renovation and use as a restaurant, museum, or art gallery, will contribute significantly to the ambiance, character, or economic revitalization of the neighborhood. In demonstrating compliance with this condition, the petitioner shall provide a brief history of the residence that illustrates its architectural, historical, or cultural significance;

C.    The structure shall be located on an arterial or collector street;

D.    The structure shall be adjacent to a nonresidential zoning district;

E.    No exterior alterations, other than those necessary to assure safety of the structure or are consistent with the architectural, historical, or cultural significance of the structure shall be permitted;

F. Parking shall be located at the rear or side of the building and not be visible from any public right-of-way (excluding alleys) or adjacent residential property; and

G. Noise is to be minimized. Outdoor loudspeakers, public address systems, and similar electronic devices shall not be permitted.

6.7.2.5 Bed-and-breakfast inns, provided:
A. There shall be no more than twelve (12) registered adult guests at one time and a current guest register must be kept by the owner (or manager);

B. The owner (or manager) must reside on the premises;

C. Parking shall not be visible from any public right-of-way (excluding alleys) or adjacent property;

D. All necessary state and city permits, certifications, or requirements be obtained as a condition of a bed-and-breakfast inn service;

E. No exterior alterations, other than those necessary to assure safety of the structure, shall be made to any building for the purpose of providing bed-and-breakfast;

F. No bed-and-breakfast inn may be located within fifteen hundred (1,500) feet (determined by a straight line and not street distance) of another;

G. The structure shall be located on an arterial or collector street; and

H. The property shall be a minimum lot size of one (1) acre.

6.7.3 AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.7.3.1 Minimum Lot Size:
A. Minimum lot size shall be seven thousand (7,000) square feet; and

B. Minimum lot width shall be fifty (50) feet.

6.7.3.2 Density:
Maximum density shall be fourteen (14) dwelling units per acre.

6.7.3.3 Yard Area:

A. Front Yard:
   Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and twenty (20) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B. Side Yard:
   Minimum side yard setback shall be eight (8) feet.

C. Rear Yard:
   Minimum rear yard setback shall be thirty (30) feet.

6.7.4   MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty-five (35) percent of the total lot area.

6.7.5   HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.

6.7.6   SIDEWALK REQUIREMENT:
Sidewalks shall be required for all uses required in R-3, Subsection 6.6.6, and for dance schools, golf courses, and multi-family developments along their public street frontages in accordance with Article XI, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

6.7.7   CONCEPT PLAN REQUIRED:
Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode\articles\r4.doc

## 6.8 - R-5 HIGH DENSITY RESIDENTIAL DISTRICT

6.8.1   PERMITTED USES:
Within the R-5 High Density Residential District the following uses are permitted:

6.8.1.1   All uses permitted in the R-4 Medium Density Residential District provided all other R-5 requirements are observed;

6.8.1.2   Schools, public and private, offering general education, provided:
A.   They are located on an arterial or collector street; and

B.   The buildings are placed not less than fifty (50) feet from the side property lines.

6.8.1.3   Swimming clubs, provided:
A.   They are owned and operated by private clubs organized as non-profit associations, whether incorporated or not, conducting noncommercial recreational swimming activities and other related recreational activities for the exclusive use of club members and their guests;

B.   The minimum lot area is two (2) acres with the total lot area to be calculated on the basis of one (1) acre for each one hundred (100) families in the membership of the club or organization;

C.   They are located on arterial or collector streets as the same are designated on the Official Zoning Map of the city of Johnson City;

D.   No recreational activity takes place nor any building, machinery, or equipment is located within fifty (50) feet of any side, front, or rear property lines;

E.   The sale of merchandise, excluding refreshments to be consumed on the premises by members and their guests, shall be prohibited;

F.   One (1) identification sign, with an area not to exceed twelve (12) square feet, erected flat against a fence or the front or side of the building shall be permitted. Lighting of such sign shall be prohibited; and

G.   Noise and glare are to be minimized. Outdoor loud speakers, juke boxes, public address systems, electric amplifiers, and similar electronic devices shall not be permitted.

6.8.1.4    Day-care centers and dance schools which are established to offer instructions to persons of preschool and elementary and secondary school age, provided:

A.    No more than one hundred (100) children are cared for in day-care centers and no more than twenty (20) students are given instructions at one time in dancing schools;

B.    These uses are not permitted to be located on cul-de-sacs;

C.    If access is gained from an arterial or collector street, a paved driveway connected to the arterial or collector street must be provided. This driveway must include an exit and an entrance to facilitate safe, off-street loading and unloading which does not require backing into the street; and

D.    The maximum permitted floor area of the principal building shall be five thousand (5,000) square feet.

6.8.1.5    Emergency or temporary shelters, provided:

A.    The shelter houses no more than fifteen (15) persons for no more than thirty (30) days per person. Length of stay may be extended when extenuating circumstances can be shown by the Shelter Director; and

B.    All applicable conditions for approval listed in Subsection 6.6.1.7 are met.

6.8.2    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.8.2.1    Nursing homes, provided:

A.    They are located on an arterial or collector street; and

B.    The buildings are placed not less than fifty (50) feet from side property lines.

6.8.2.2    Golf courses, subject to the provisions of Subsection 6.7.2.3.

6.8.2.3    Group homes for eleven (11) to fifteen (15) unrelated mentally retarded, mentally handicapped, or physically handicapped residents, provided:

A.    Supervisor(s) or houseparents(s), certified by the appropriate overseeing agency (e.g. the State Department of Mental Health and Mental Retardation), be on-premise at all times;

B. Prior to admission to the facility, all resident applications are screened by the appropriate sponsoring agency, such as Watauga Mental Health Center or Dawn of Hope, in order to exclude violence-prone or other potentially dangerous persons;

C. The facility is fully licensed by the appropriate overseeing state agency; and

D. The facility is located not closer than 1,320 feet to any group home or temporary shelter.

6.8.2.4 Alternative tower structures.


6.8.3 AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.8.3.1 Minimum Lot Size:
A. Minimum lot size shall be 6,000 square feet.

B. Minimum lot width shall be fifty (50) feet at the front building line.

6.8.3.2 Density:
Maximum density shall be twenty-two (22) dwelling units per acre.

6.8.3.3 Yard Area:
A. Front Yard:
Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and twenty (20) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B. Side Yard:
Minimum side yard setback shall be eight (8) feet.

C. Rear Yard:
Minimum rear yard setback shall be thirty (30) feet.


6.8.4 MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty-five (35) percent of the total lot area.

6.8.5        HEIGHT REGULATIONS:
             Principal buildings shall not exceed the height of sixty-five (65) feet.


6.8.6        SIDEWALK REQUIREMENT:
             Sidewalks shall be required for all uses required in R-4, Subsection 6.7.6, and for
             swimming clubs and multi-family developments along their public street
             frontages in accordance with Article XI, Sidewalk Regulations, and The
             Standards of Design for Streets and Drainage.


6.8.7        CONCEPT PLAN REQUIRED:
             Each application for a rezoning request shall be accompanied by five sets of a
             concept plan as described in Article XIV, Subsection 14.2.2.1. The review and
             approval process for such concept plan shall be as described in Subsection
             14.2.2.2.


zonecode/articles/R5.doc

## 6.9 - R-6 HIGH DENSITY RESIDENTIAL-UNIVERSITY DISTRICT

6.9.1     PERMITTED USES:
Within the R-6 High Density Residential-University District the following uses are permitted:

     6.9.1.1     All uses permitted in the R-5 High Density Residential District provided all other R-6 requirements are observed; and

     6.9.1.2     Fraternity and sorority houses.

6.9.2     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4.

     6.9.2.1     All Special Exceptions permitted in the R-5 High Density Residential District; and

     6.9.2.2     Student activity centers, provided:
         A.     Minimum side yard setbacks shall be fifty (50) feet;  and

         B.     No living quarters are provided, except for not more than two (2) persons employed as custodians.

6.9.3     AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage and area requirements:

     6.9.3.1     Minimum Lot Size:
         A.     Minimum lot size shall be 6,000 square feet.

         B.     Minimum lot width shall be fifty (50) feet at the front building line.

     6.9.3.2     Density:
Maximum allowable density for residential uses shall be twenty-five (25) dwelling units per acre. For multi-family units consisting of four (4) or more bedrooms, maximum density shall be 18.75 dwelling units per acre. (See also Article II (Family) and Subsection 11.3.3.7).

6.9.3.3    Yard Area:

    A.    Front Yard:
        Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and twenty (20) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

    B.    Side Yard:
        Minimum side yard setback shall be eight (8) feet.

    C.    Rear Yard:
        Minimum rear yard setback shall be thirty (30) feet.

## 6.9.4    MAXIMUM LOT COVERAGE:

The principal building and all accessory buildings shall cover not more than thirty-five (35) percent of the total lot area.

## 6.9.5    HEIGHT REGULATIONS:

Principal buildings shall not exceed the height of sixty-five (65) feet.

## 6.9.6    SIDEWALK REQUIREMENT:

Sidewalks shall be required for all uses required in R-5, Subsection 6.8.6, student activity centers, and multi-family residential developments along their public street frontages in accordance with Article XI, Sidewalk Regulations, and <u>The Standards of Design for Streets and Drainage</u>.

## 6.9.7    CONCEPT PLAN REQUIRED:

Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/R6.doc

**6.10 - RP-2, RP-3, RP-4, AND RP-5 PLANNED RESIDENTIAL DISTRICTS**

6.10.1    GENERAL DESCRIPTION:

6.10.1.1    The regulations established in this Section are intended to provide optional methods of land development which encourage more imaginative solutions to environmental design problems. Residential areas thus established would be characterized by a unified building and site development program, open space for recreation, and provision for commercial, religious, education, and cultural facilities which are integrated with the total project by unified architectural and open space treatment.

6.10.1.2    District regulations shall be as outlined in the following paragraphs and shall be the same for RP-2, RP-3, RP-4, and RP-5 districts except for the density permitted in each district.

6.10.1.3    Each planned residential development shall be compatible with the surrounding or adjacent districts. Such compatibility shall be determined by the Planning Commission and Board of Commissioners by review of a Concept Plan.

6.10.1.3.1    Any substantial deviation from the approved Concept Plan shall require approval by the Planning Commission and City Commission as an amended plan. A substantial deviation includes but is not limited to: (1) increase in the number of dwelling units; (2) change in the type and location of dwelling units that would impact adjoining property; (3) change in access to the proposed development that would negatively impact adjoining property; and (4) an increase, exceeding ten (10) percent, in the amount of projected traffic resulting from the proposed development.

6.10.2    USES PERMITTED ON REVIEW:
All uses listed below shall be approved as part of the Concept Plan. Any change of use shall require approval of an amended Concept Plan.

6.10.2.1    Single-family, two-family, and multi-family dwellings;

6.10.2.2    Recreation uses including a community center, a golf course, a swimming pool, or parks, playground or other public or private recreational uses, and non-profit clubs such as country clubs, swimming and/or tennis clubs;

6.10.2.3    Public and semi-public uses which are designed to primarily serve the RP district.

6.10.2.4    Home occupations as defined in Subsection 6.1.1.7;

6.10.2.5    Private day nurseries and kindergartens, as regulated in Subsection 6.8.1.4;

6.10.2.6    Alternative tower structures;

6.10.2.7    Accessory structures and uses; and

6.10.2.8    Commercial Uses:
In planned residential developments of twenty (20) acres or more, commercial uses may be permitted which conform with permitted uses in the B-1 Neighborhood Business District - Article 6.14. Commercial uses shall further be governed by the following:

A.   No commercial facilities shall be permitted in developments of less than two hundred (200) dwelling units;

B.   One (1) acre of land may be set aside for commercial development for each two hundred (200) dwelling units in the development plan. Commercial uses shall not be constructed until a minimum of 200 residential units have been constructed; and

C.   Commercial development shall be compatible, in scale with surrounding residential development as determined by the Planning Commission and Board of Commissioners.

6.10.3   AREA REGULATIONS:
All structures and uses shall meet the following requirements:

6.10.3.1    Minimum Lot Size:
A.   Minimum lot size for a detached single-family unit shall be four thousand (4,000) square feet and;

B.   Minimum lot width shall be forty (40) feet.

6.10.3.2    Yard Area:
A.   Front Yard:
No front yard setback shall be required except for detached single-family residential structures. Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and ten (10) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B.   Side Yard:

No side yard setback shall be required except for drainage and utility easements where necessary.

C. Rear Yard:
The rear yard setback on exterior lots shall be equal to the required setback in the adjacent non-RP zoning district.

6.10.3.3 Height Regulations:
Principal buildings located in an RP-2 or RP-3 district shall not exceed the height of thirty-five (35) feet. Principal buildings located in the RP-4 and RP-5 district shall not exceed the height of thirty-five (35) feet on local streets and sixty-five (65) feet on collector and arterial streets.

6.10.3.4 Open Space and Recreational Areas
Fifteen (15) percent of the overall RP-zoned area shall be set aside and developed for common open space or recreational uses not including building setbacks and stormwater detention facilities. Said open space shall be designated as common area.

6.10.3.5 Sidewalk Requirement:
Sidewalks shall be required for all residential uses, churches, schools, recreational facilities and grounds, libraries, museums, and historic monuments and sites, private day nurseries and kindergartens, and multi-family developments along their public street frontages in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

6.10.4 UNIT DENSITY:

A. For attached dwelling units i.e. duplexes, apartments, townhouses, and condominiums, the maximum density shall be as follows:

6.10.4.1 RP-2 DISTRICT: Maximum density shall be 3.4 dwelling units per acre.

6.10.4.2 RP-3 DISTRICT: Maximum density shall be 8.5 dwelling units per acre.

6.10.4.3 RP-4 DISTRICT: Maximum density shall be 15.3 dwelling units per acre.

6.10.4.4 RP-5 DISTRICT: Maximum density shall be 27.2 dwelling units per acre.

B. For detached single-family units, the maximum density shall be dictated by the minimum lot size of not less than 4,000 square feet per lot.

6.10.5 ADMINISTRATIVE PROCEDURE FOR A PLANNED RESIDENTIAL DEVELOPMENT:

6.10.5.1    Application shall be made to the Planning Commission for rezoning to RP-2, RP-3, RP-4, or RP-5 in accordance with the regulations set forth in Article XIV of this Code. The application shall be accompanied by a Concept Plan including the following information:

1. Use(s) including the number and type of dwelling units;
2. Buffers and/or screening;
3. Approximate building location, size and height, with setbacks;
4. Parking and driveway areas;
5. Entrance and exit locations;
6. Internal vehicular circulation pattern (if appropriate);
7. Private streets must be indentified, if proposed;
8. The location of the required 15 percent of open space; and

6.10.5.2    The Planning Commission shall review the proposed development and forward its recommendation to the Board of Commissioners which shall review and give final approval or reject the proposed plan.

6.10.5.3

A.    The Planning Commission shall review the conformity of the proposed development recognizing the objectives of the Comprehensive Plan and neighborhood compatibility;

B.    The Planning Commission and the Board of Commissioners may impose conditions regarding layout, circulation, and performance of the proposed development and may require that appropriate deed restrictions be filed;

C.    The proposed development must be designed to produce an environment of compatible and desirable character not out of harmony with its surrounding neighborhood and must provide standards of recreation and open space, transportation, and areas for parking adequate for the occupancy proposed; and

D.    A final plat of the development shall be recorded in the office of the appropriate county Registrar of Deeds and shall show property lines, common land, streets, easements, and other applicable features required by the Subdivision Regulations. Building permits may be issued prior to final subdivision approval. However, no certificate of occupancy will be issued prior to the recording of the final plat.

zonecode/articles/RP.doc

## 6.11 - RM-3, RM-4, AND RM-5 MANUFACTURED HOME PARK DISTRICTS

6.11.1    GENERAL DESCRIPTION:

6.11.1.1    The regulations established in this subsection are intended to provide optional methods of land development which encourage more imaginative solutions to environmental design problems. Manufactured home parks thus established would be characterized by a unified building and site development program.

6.11.1.2    District regulations shall be as outlined in the following paragraphs and shall be the same for RM-3, RM-4, and RM-5 districts except for the dwelling unit density permitted in each district.

6.11.1.3    Each manufactured home park shall be compatible with the surrounding or adjacent districts. Such compatibility shall be determined by the Planning Commission by review of development plans for the district. Any use considered on review shall be judged by the Planning Commission to be an integral and necessary function in the design of the manufactured home park.

6.11.2    GENERAL PROVISIONS:

6.11.2.1    The manufactured home park shall be located on a well-drained site, properly graded to insure rapid drainage and freedom from stagnant pools of water.

6.11.2.2    No building or structure erected or stationed in the park shall have a height greater than one (1) story or fifteen (15) feet.

6.11.2.3    A manufactured home park shall be entirely enclosed, exclusive of driveways, at its external boundaries by an opaque wall not less than seven (7) feet in height or an opaque buffer yard, as described in Section 12.4 in this code.

6.11.2.4    Each Manufactured Home Park shall be permitted a sign as described in Article VII, Sign Regulations.

6.11.2.5    Each manufactured home space shall be of sufficient size that, in addition to the manufactured home, the following areas shall be provided:
A.    Each manufactured home space shall be at least thirty (30) feet wide and such space shall be clearly defined by permanent markers;

B.      There shall be a front yard setback of ten (10) feet from all access roads within the manufactured home park;

C.      Manufactured homes shall be so harbored on each space so that there shall be at least a twenty (20) foot clearance between manufactured homes, provided, however, with respect to manufactured homes parked end-to-end, the end-to-end clearance shall be not less than twelve (12) feet. No manufactured home shall be located closer than twenty (20) feet from any building within the manufactured home park;

D.      Parking spaces may be located in the rear or side yard of said manufactured home space; and

E.      Each manufactured home space shall be provided with a paved patio of at least two hundred (200) square feet and having a storage locker of at least one hundred (100) cubic feet. Storage lockers may be located in locker compounds.

6.11.2.6   Common Parking, Access Points, Access Roads, Trailer Spaces, and Walkways:

A.      Access roads within a manufactured home park shall be paved to a width of not less than twenty-four (24) feet. Where access roads are paved to a width of thirty-two (32) feet or more, the required guest parking area shall be waived;

B.      Manufactured home spaces may abut upon a driveway of not less than twenty (20) feet in width, which shall have unobstructed access to the access road within the manufactured home park. The sole vehicular access shall not be by the alley, and all dead-end driveways shall include adequate vehicular turning space or a cul-de-sac;

C.      All access roads and driveways shall be constructed with a 6-inch stone base and a 2-inch layer of asphalt. Extruded concrete roll curbs, the face of which shall not be less than 5½ inches high, shall be installed along the entire length of all such access roads;

D.      A minimum of six (6) inches of compacted gravel or other suitable pavement material shall be installed for each manufactured home space. Size of pads shall be as follows:

1.    5% - 10' x 40' or larger
2.    90% - 10' x 50' or larger
3.    5% - 10' x 60' or larger

E.     Walkways not less than two (2) feet wide shall be provided from the manufactured home spaces to service buildings.

6.11.2.7   Each manufactured home space shall be provided with a connection to a sanitary sewer line.

6.11.2.8   A park and recreation area with a minimum of one hundred fifty (150) square feet for each manufactured home space shall be provided. Areas shall be consolidated into usable areas with minimum dimensions of not less than thirty (30) feet.

6.11.2.9   Each manufactured home park shall be provided with a management office and service buildings as necessary to provide facilities for mail distribution, storage space for suppliers, maintenance materials and equipment, and laundry facilities. Outside laundry drying yards shall be enclosed with a six (6) foot high solid fence.

6.11.2.9.1   Trailers, with or without toilet facilities, that cannot be connected to a sanitary sewer line shall not be permitted in a manufactured home park.

6.11.2.10   Prohibited Uses:
A.     Cabanas and other similar enclosed structures are prohibited; and

B.     Manufactured homes shall not be used for commercial, industrial, or other non-residential uses within the manufactured home park.

6.11.2.11   Each manufactured home shall have a non-combustible, corrosive resistant skirt extending from the bottom of the manufactured home to the pad pavement. Said skirt shall be provided with an access way with a door measuring at least eighteen (18) inches by twenty-four (24) inches; and the skirt shall be constructed to prohibit insect and rodent infestation.

6.11.3   AREA REGULATIONS:
All buildings and manufactured homes shall be set back from street right-of-way lines and the periphery of the project to comply with the following requirements:

6.11.3.1   No manufactured home park shall be established to occupy less than five (5) acres nor contain less than twenty-five (25) manufactured home spaces at the time of first occupancy. However, the park, upon completion, must be designed for a minimum of fifty (50) manufactured home units.

6.11.3.2   The manufactured home park shall be subject to the density provisions of the district in which it is located, provided, however, there shall be not less than three thousand (3,000) square feet of lot area for each space provided

on the site. This space ratio shall include access roads, automobile parking, accessory building space, and recreational area.

6.11.4   DENSITY:
With net area being calculated on the basis of total area less all access roads and driveways, common parking space and accessory building space.

   6.11.4.1   RM-3 DISTRICT:   Maximum density shall be four (4) manufactured homes per net acre.

   6.11.4.2   RM-4 DISTRICT:   Maximum density shall be eight (8) manufactured homes per net acre.

   6.11.4.3   RM-5 DISTRICT:   Maximum density shall be ten (10) manufactured homes per net acre.


6.11.5   ADMINISTRATIVE PROCEDURE FOR MANUFACTURED HOME PARK DEVELOPMENT:

   6.11.5.1   Application shall be made to the Planning Commission for rezoning to RM-3, RM-4, or RM-5 in accordance with the regulations set forth in Article XIV of this Code.  Any application shall be accompanied by:
   A.      A general site plan showing tentative street plans, public facilities, building arrangements, and manufactured home space locations.

   B.      Preliminary sketches and specifications showing the proposed architectural design and type of construction.

   6.11.5.2   Within one year after an area is rezoned RM-3, RM-4, or RM-5 there shall have been filed with the Planning Commission a written application for review and approval.  Said application shall be accompanied by the following information:
   A.      The application shall be accompanied by an overall development plan showing the use or uses, dimensions and locations of proposed streets, parks, playgrounds, school sites, and other open spaces, with such other pertinent information as may be necessary to determine the contemplated arrangement or use which makes it acceptable to develop a manufactured home park as proposed;

   B.      Where several buildings are to be constructed, architectural sketches and data should be provided to insure an aesthetically-acceptable design for all buildings;

   C.      At least the following construction plans must be submitted: profiles of proposed streets, sanitary sewers and storm water

sewers with grading sizes and elevations indicated, proposed water distribution system showing pipe sizes, location of valves and fire hydrants, and complete grading plan; and

D.  The proposed development plan and all construction plans shall be prepared by and have the seal of an architect or engineer duly registered to practice in the State of Tennessee.

6.11.5.3  The Planning Commission shall review the proposed development and forward its recommendation to the Board of Commissioners which shall review and may, by resolution, give final approval or reject the proposed development:

A.  The Planning Commission shall review the conformity of the proposed development recognizing principles of civic design, land-use planning and landscape architecture. The final design must conform with the original application to the satisfaction of the Planning Commission.

B.  The Planning Commission and the Board of Commissioners may impose conditions regarding layout, circulation, and performance of the proposed development and may require that appropriate deed restrictions be filed.

C.  No building permit or zoning compliance permit shall be issued until a final plat of the proposed development is approved by the Board of Commissioners and recorded. No occupancy permit shall be issued until the Chief Building Official has determined that the project, as constructed, meets all the requirements of the approved plan. The tract or parcel of land involved must be either in one ownership or the subject of an application filed jointly by the owners of all the property.

D.  The proposed development must be designed to produce an environment of stable and desirable character not out of harmony with its surrounding neighborhood and must provide standards of open space and areas for parking adequate for the occupancy proposed. It must include provisions for recreation areas to meet the anticipated population.

E.  A plat of the development shall be recorded in the office of the appropriate county Registrar of Deeds and shall show building lines, common land, streets, easements, and other applicable features required by the Johnson City Regional Planning Commission's Subdivision Regulations for final subdivision plats, provided, however, that the approval of said plat does not

constitute the approval of a subdivision within the meaning of the Subdivision Regulations.

6.11.5.4   Upon abandonment of a particular project authorized by this Section or upon the expiration of three (3) years from the authorization hereunder of a manufactured home park which has not by then been completed (or commenced and an extension of time for completion granted), the authorization shall expire and the Planning Commission shall consider whether to extend the RM zoning, to rezone the property to the zoning district that existed prior to the current zoning, or to apply a different and more appropriate zoning classification.  Should the Planning Commission extend the RM zoning, such extension shall be reviewed after one (1) year.

6.11.5.5   Failure to file an application for review and approval of the Manufactured Home Park within one (1) year of the RM-3, RM-4, and RM-5 zoning shall require review of the zoning by the Planning Commission as stipulated in Subsection 6.11.5.4.

6.11.6   MANUFACTURED HOME PARKS WHICH PROVIDE FOR THE SALE OF INDIVIDUAL LOTS:
Manufactured home park developments which are intended to provide for the sale of individual lots are authorized within the RM-3, RM-4, and RM-5 Zoning Districts provided the following regulations are satisfied:

6.11.6.1   General Requirements:
The proposed development must satisfy the requirements set forth in Subsection 6.11.1 of this Zoning Code.

6.11.6.2   Preliminary Plan Requirements:
Application for rezoning to RM-3, RM-4, or RM-5 shall include a Concept Plan which meets the requirements of the Subdivision Regulations, provided all manufactured home developments shall be served by a sanitary sewer system and all streets shall be public streets constructed in conformance with the Subdivision Regulations.

6.11.6.3   Final Plat Requirements:
Within one (1) year from the date of preliminary approval, unless an extension of time is applied for and approved by the Planning Commission, the developer shall submit to the Planning Commission a final plat which shall:
A.       Conform to the requirements of the Subdivision Regulations; and

B.       Contain certified copies of all deed restrictions, covenants, owner association agreements (if any), etc. which provide for the maintenance of any common use recreation or service facilities.

Upon final approval by the Planning Commission and all necessary certifications, the original copy of the final plat shall be maintained by the Planning Commission with other subdivision plats. A copy of the approved final plat shall be provided to the developer for recording in the office of the County Registrar.

6.11.6.4   Area Requirements:

A.   A manufactured home park development which provides for the sale of individual lots shall occupy a site not less than five (5) acres in area;

B.   The maximum density of the development shall conform to the requirements of Subsection 6.11.4. In no case shall a lot contain less than 3,000 square feet of area;

C.   Each manufactured home lot shall have a minimum of thirty (30) feet frontage on a public street and a minimum lot width of thirty (30) feet; and

D.   Each manufactured home lot shall contain a paved pad which is no smaller in width or length than the manufactured home to be placed on said pad. Each pad shall be no closer than ten (10) feet to each side lot line and no closer than thirty (30) feet to any public right-of-way. Rear yard setback shall be no less than six (6) feet, except that all setbacks from the periphery of the manufactured home development shall be at least thirty (30) feet.

6.11.7   SIDEWALK REQUIREMENT:

Sidewalks shall be required for all multi-family developments along their public street frontages in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

zonecode/articles/RM.doc

## 6.12 - RO-1 HIGH DENSITY RESIDENTIAL-PROFESSIONAL OFFICE DISTRICT

6.12.1    PERMITTED USES:
Within the RO-1 High Density Residential- Professional Office District the following uses are permitted:

6.12.1.1    Single-family, two-family, and multi-family dwellings;

6.12.1.2    Day-care centers, adult day-care centers, and dance schools;

6.12.1.3    Churches, including parish houses and Sunday school buildings;

6.12.1.4    Fraternal organizations and clubs not operated for profit;

6.12.1.5    Student activity centers;

6.12.1.6    Public utility stations;

6.12.1.7    Municipal, county, state, or federal buildings or land uses;

6.12.1.8    Elementary and secondary schools, colleges, universities, and similar institutions, public or private with or without students in residence;

6.12.1.9    Fraternity or Sorority houses;

6.12.1.10    Libraries, museums, and art galleries;

6.12.1.11    Clinics;

6.12.1.12    Office Buildings: government and private office buildings, including professional offices.  For the purposes of this Section, a permitted office building is defined as a building having not less than fifty (50) percent of its total floor area occupied by medical, dental, governmental, private, or professional office uses;

6.12.1.13    Drug stores, located within a permitted office building as defined in Subsection 6.12.1.12;

6.12.1.14    Barber and beauty shops, located within a permitted office building as defined in Subsection 6.12.1.12;

6.12.1.15    Branch banks, located within a permitted office building as defined in Subsection 6.12.1.12;

6.12.1.16 Accessory structures and uses, provided they are located in the rear yard and setback a minimum of seven and one-half (7 ½) feet from all property lines;

6.12.1.17 Bed-and-breakfast inns, provided:
A.    There shall be no more than twelve (12) registered adult guests at one time and a current guest register must be kept by the owner (or manager);

B.    The owner (or manager) must reside on the premises;

C.    Parking shall be located at the rear or side of the building and not be visible from any public right-of-way (excluding alleys) or adjacent property;

D.    All necessary state and city permits, certifications, or requirements be obtained as a condition of a bed-and-breakfast inn service; and

E.    No exterior alterations, other than those necessary to assure safety of the structure, shall be made to any building for the purpose of providing bed-and-breakfast.

6.12.1.18 Group homes, subject to the requirements of Subsection 6.6.1.5;

6.12.1.19 Residential homes for the aged, subject to the requirements of Subsection 6.6.1.6;

6.12.1.20 Emergency or temporary shelters, provided:
A.    The shelter houses no more than twenty-five (25) persons for no more than thirty (30) days per person. Length of stay may be extended when extenuating circumstances can be shown to the Shelter Director; and

B.    All other applicable conditions for approval listed in Subsection 6.6.1.7 are met.

6.12.1.21 Portrait studio, provided:
A.    The use shall be located on an arterial or collector street; and
B.    Off-street parking shall be provided in either the side or rear yard at one (1) space per three hundred (300) square feet of floor area used in conjunction with the business; and

6.12.1.22 Professional Services.

6.12.2     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:

The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.12.2.1    Restaurants, provided:

         A.    Food is prepared to be consumed within the principal building only; and

         B.    The restaurant is located within a permitted office building as defined in Subsection 6.12.1.12.

6.12.2.2    Mortuary establishments, provided such establishments will not cause undue traffic congestion or create a traffic hazard;

6.12.2.3    Hospitals for the treatment of human ailments, provided they are located on an arterial or collector street, on a street constructed to industrial or commercial standards, or where a portion of the property lies within five hundred (500) feet of an arterial or collector street;

6.12.2.4    Gasoline service stations, provided:

         A.    Service stations principal and accessory buildings shall not be constructed closer than forty (40) feet to any side or rear lot line nor closer than forty-five (45) feet to any street right-of-way;

         B.    Gasoline pump islands shall not be located closer than thirty (30) feet to any street right-of-way line nor closer than forty (40) feet to any side or rear lot line which abuts an RO-1 or more restrictive zone but which does not abut a street right-of-way; and

         C.    Canopies shall not be constructed closer than thirty (30) feet from any street right-of-way (Since the code states that variances may only be given when special conditions prevent the beneficial use of land, if a gasoline station may be constructed on a lot, the land has resulted in beneficial use; and, therefore, no waiver may be given permitting the canopy to extend closer than thirty (30) feet to the street right-of-way).

6.12.2.5    Golf courses, subject to the provisions of Subsection 6.7.2.3;

6.12.2.6    Group homes, subject to the requirements of Subsection 6.8.2.3;

6.12.2.7    Antique sales and home decorating service;

6.12.2.8    Alternative tower structures; and

6.12.2.9    Tearoom provided:

         A.    The structure shall be located on an arterial street;

B.      The use shall be located either in a residential structure or bed-and-breakfast inn with the owner residing on the premises of the residential structure of the bed-and-breakfast inn. Tearooms not part of a bed-and breakfast inn shall provide a minimum of five (5) off-street parking spaces located in the side or rear yard;

C.      No exterior alterations designed to increase seating capacity shall be permitted;

D.      Kitchen facilities shall meet applicable code requirements;

E.      Outside dining shall be screened from adjacent residential uses by a six-foot opaque wooden fence, Type 1 buffer, or other acceptable screening approved by the BZA;

F.      Operation shall be limited to the hours of 11:00 AM to 7:00 PM, seven days a week; and

G.      Any other conditions deemed appropriate by the BZA to ensure protection of surrounding residential uses.

6.12.3    AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.12.3.1   Minimum Lot Size:
A.      Minimum lot size shall be 6,000 square feet.

B.      Minimum lot width shall be fifty (50) feet at the front building line.

6.12.3.2   Density:
Maximum density shall be thirty-five (35) dwelling units per acre.

6.12.3.3   Yard Area:
A.      Front Yard:
Minimum front yard setback shall be twenty-five (25) feet on an arterial or collector street and ten (10) feet on all other streets. Front-facing garages shall have a minimum setback of twenty-five (25) feet on all streets.

B.    Side Yard:
      Minimum side yard setback shall be eight (8) feet.

C.    Rear Yard:
      Minimum rear yard setback shall be thirty (30) feet.


6.12.4    MAXIMUM LOT COVERAGE:
          The principal building and all accessory buildings shall cover not more than thirty-five (35) percent of the total lot area.


6.12.5    HEIGHT REGULATIONS:
          Unlimited.


6.12.6    SIDEWALK REQUIREMENT:
          Sidewalks shall be required for all adult day care centers, churches, dance schools, day-care centers, fraternal organizations, government buildings, hospitals, libraries/museums/art galleries, public utility stations, schools, student activity centers, bed-and-breakfast inns, golf courses, multi-family residential, office, and commercial developments along their public street frontages in accordance with the Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.


6.12.7    CONCEPT PLAN REQUIRED:
          Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.


zonecode/articles/RO1.doc

## 6.13 - MS-1 MEDICAL SERVICES DISTRICT

6.13.1    INTENT:
This district is intended to provide space for the harmonious development of medical facilities, services, and related support uses. The Medical Services District is intended to be protected from encroachment by land uses adverse to the location, operation, and expansion of medical use development.

6.13.2    PERMITTED USES:
Within the MS-1 Medical Services District the following uses are permitted:

6.13.2.1    Apothecaries, drug stores, and pharmacies;

6.13.2.2    Artificial limb and brace, therapeutic establishments, including the manufacturing, wholesale, and retail sales of products;

6.13.2.3    Banks;

6.13.2.4    Barber and beauty shops;

6.13.2.5    Bookstores including card and gift shops;

6.13.2.6    Churches, including parish houses;

6.13.2.7    Clinics;

6.13.2.8    Day-care centers and adult day-care centers;

6.13.2.9    Florist shops;

6.13.2.10    General office uses and office buildings, including professional and governmental;

6.13.2.11    Group homes, subject to the requirements of Subsection 6.8.2.3;

6.13.2.12    Hospitals for the treatment of human ailments, including psychiatric hospitals;

6.13.2.13    Laboratories - medical, dental, optical, pharmaceutical and related;

6.13.2.14    Medical, surgical, and dental supply businesses, both wholesale and retail;

6.13.2.15    Municipal, county, state or federal buildings or land uses;

6.13.2.16   Motels and hotels;

6.13.2.17   Nursing homes, rest homes, and convalescent homes;

6.13.2.18   Parking garages;

6.13.2.19   Public utility stations;

6.13.2.20   Residential homes for the aged, subject to the requirements of Subsection 6.6.1.5;

6.13.2.21   Restaurants, including drive-in services;

6.13.2.22   Retail sales and service establishments pertaining to any medically oriented product or service;

6.13.2.23   Schools;

6.13.2.24   Single-family residences;

6.13.2.25   Accessory structures and uses, provided they are located in the rear yard and set back a minimum of seven and one-half (7 ½) feet from all property lines;

6.13.2.26   Alternative tower structures; and

6.13.2.27   Heliports subject to compliance with the most recent edition of Federal Aviation Administration Circular 150/5390-2A.

6.13.2.28   Beer serving/sales establishments

6.13.3   USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.13.3.1   Mortuary establishments, provided such establishments will not cause undue traffic congestion or create a traffic hazard;

6.13.3.2   Gasoline service stations, provided:
A.     Service stations' principal and accessory buildings shall not be constructed closer than forty (40) feet to any side or rear lot line nor closer than forty-five (45) feet to any street right-of-way;

B.      Gasoline pump islands shall not be located closer than thirty (30) feet to any street right-of-way line nor closer than forty (40) feet to any side or rear lot line which abuts an RO-1 or more restrictive zone but which does not abut a street right-of-way; and

C.      Canopies shall not be constructed closer than thirty (30) feet from any street right-of-way. (Since the Code states that variances may only be given when special conditions prevent the beneficial use of land, if a gasoline station may be constructed on a lot, the land has resulted in beneficial use; and, therefore, no waiver may be given permitting the canopy to extend closer than thirty (30) feet to the street right-of-way.)

6.13.3.3    Tower Structures.

6.13.3.4    Methadone Treatment Clinic provided:

A.      The facility shall be fully licensed/certified by the appropriate regulating state agency;

B.      A certificate of need shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.      The facility shall not be located within two hundred (200) feet of a school, day-care facility, or park as measured from property line to property line;

D.      The facility shall not be located within two hundred (200) feet of any establishment that sells either on-premise or off-premise alcoholic beverages as measured from property line to property line;

E.      The hours of operation shall be between 7:00 a.m. and 8:00 p.m.; and

F.      The facility shall be located on and primary access shall be from an arterial street.

6.13.3.5    Substance Abuse Treatment Facility provided:

A.      The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

B.  A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.  The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-6, RO-1, and RO-2 districts;

D.  The facilty shall not operate before 7:00 a.m. or after 8:00 p.m.;

E.  The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F.  The petitioner shall provide the Board of zoning Appeals with information regarding the number of staff to be employed; and

G.  The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3.

6.13.4  SIDEWALK REQUIREMENT:
Sidewalks shall be required for all developments along their public street frontages, in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

6.13.5  AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements:

6.13.5.1  Minimum Lot Size:
Not restricted.

6.13.5.2  Yard Area:
A.  Front Yard:
Minimum front yard setback shall be forty-five (45) feet on an arterial street , thirty-five (35) feet on a collector street, and twenty-five (25) feet on all other streets.

B.  Side Yards:
The minimum total depth of the two side yards shall be twelve (12) feet for the first story; eight (8) additional feet for each of the next two stories, and four (4) additional feet for each of the next five

stories, and zero (0) additional feet for each additional story. At least one-third (1/3) of the total depth shall be provided on the smaller side, provided that neither side yard shall be less than six (6) feet in depth.

C.     Rear Yard:
       The minimum depth of the rear yard shall be thirty (30) feet.

6.13.6     MAXIMUM LOT COVERAGE:
           The principal building and all accessory buildings shall cover not more than fifty (50) percent of the total lot area.

6.13.7     HEIGHT REGULATIONS:
           Unlimited.

6.13.8     CONCEPT PLAN REQUIRED:
           Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/MS1.doc

**6.14 - B-1 NEIGHBORHOOD BUSINESS DISTRICT**

INTENT:

6.14.1      The B-1, Neighborhood Business District is located to provide limited commercial and personal service facilities of a convenience nature, servicing persons residing in adjacent residential areas without adversely impacting the residential character of the area.  Commercial uses should be in scale and character with the adjacent residential uses and do not encourage the generation of additional traffic from outside the area. Pedestrian uses are encouraged and districts are typically located on collector/arterial streets. Residential uses on the upper floors of buildings are encouraged.

6.14.2      PERMITTED USES:

Within the B-1 Neighborhood Business District the following uses are permitted:

6.14.2.1   Accessory structures and uses, provided they are not located in the required front or side yard nor within seven and one-half (7.5) feet of the rear property line.

6.14.2.2   Alternative tower structures;

6.14.2.3   Bakery;

6.14.2.4   Beer serving/sales establishments;

6.14.2.5   Financial institutions;

6.14.2.6   Home occupations (Subject to Section 6.1.1.7);

6.14.2.7   Laundromats, dry-cleaning and laundry establishments not exceeding one thousand five hundred (1500) square feet;

6.14.2.8   Municipal, county, state, or federal buildings, or land uses;

6.14.2.9   Neighborhood convenience center, provided:

A.      Auto servicing operations such as oil changes shall be permitted, however, no vehicle repair shall be permitted;

B.      A one-bay drive-thru car wash shall be permitted only in conjunction with the neighborhood convenience center; and

C.      Canopies shall not be constructed closer than fifteen (15) feet to any street right-of-way.  Since the Code states that variances may only be given when special conditions prevent the beneficial use of land, if a neighborhood convenience center can be constructed on a lot, the land has resulted in beneficial use.  Therefore, no waiver

shall be given permitting a pump island or canopy to be constructed closer than fifteen (15) feet to any right-of-way. ~~and~~

6.14.2.10  Personal and professional services limited to one thousand five hundred (1500) square feet of gross floor area for each use;

6.14.2.11  Pharmacies, limited to four thousand (4000) square feet;

6.14.2.12  Public utility stations;

6.14.2.13  Residential uses, on upper stories of multi-story buildings;

6.14.2.14  Restaurants and eating places which are established to serve neighborhood residents, provided:
   A.  Total floor area does not exceed two thousand (2,000) gross square feet;

   B.  Total patron seating does not exceed forty (40);

   C.  Noise and glare are minimized; public address systems, electric amplifiers, video games, amusements, loud speakers, and similar devices shall be prohibited; and

   D.  Drive through windows are permitted provided there is indoor seating.

6.14.2.15  Temporary uses not to exceed ninety (90) days; and

6.14.2.16  Video movie rental stores.

6.14.3  USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided for in Section 15.4:

6.14.3.1  Day-care centers and schools established to offer instructions to persons of pre-school, elementary, and secondary school age, subject to the conditions of Subsection 6.7.2.2.

6.14.4     AREA REGULATIONS:

        6.14.4.1    Yard Area:
                A.      Front Yard:
                       The minimum depth of the front yard shall be as follows:

| Type Street | Setback |
|-------------|---------|
| Arterial | 45 feet |
| Collector | 35 feet |
| All Other | 25 feet |

                B.      Side Yards:
                       No side yard is required; unless it abuts a single-family district in which instance, it shall be a minimum of ten (10) feet.

                C.      Rear Yard:  The minimum depth of the rear yard shall be twenty-five (25) feet.

6.14.5     MAXIMUM LOT COVERAGE:  No restrictions.

6.14.6     HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet.

## 6.15 - B-2 CENTRAL BUSINESS DISTRICT

6.15.1     INTENT:
The intent of the B-2, Central Business District is to promote a compact urban core with a mixture of commercial, office, institutional, and residential uses which facilitate pedestrian accessibility.

6.15.2     PERMITTED USES:
Within the B-2 Central Business District the following uses are permitted:

6.15.2.1     Accessory structures and uses;

6.15.2.2     Alternative tower structures;

6.15.2.3     Amusements, and recreation, including theaters;

6.15.2.4     Auction houses;

6.15.2.5     Bakeries;

6.15.2.6     Beer serving/sales establishments;

6.15.2.7     Churches, parish houses, Sunday school buildings, cemeteries, and other church related activities;

6.15.2.8     Clinics;

6.15.2.9     Cultural, civic, and institutional uses;

6.15.2.10     Financial institutions;

6.15.2.11     Fraternal organizations and clubs, not operated for profit;

6.15.2.12     Graphics, printing, and newspaper publishing facilities;

6.15.2.13     Home occupations (Subject to Section 6.1.1.7);

6.15.2.14     Hotels;

6.15.2.15     Liquor Stores;

6.15.2.16     Micro breweries and distilleries;

6.15.2.17     Municipal, county, state, or federal buildings and uses;

6.15.2.18    Offices, both private and governmental;

6.15.2.19    Parking lots and garages with first floor retail encouraged;

6.15.2.20    Personal, business, and professional services;

6.15.2.21    Pharmacies;

6.15.2.22    Public utility stations;

6.15.2.23    Radio and television stations;

6.15.2.24    Residential dwellings on the upper floors of buildings;

6.15.2.25    Restaurants (without drive-thru facilities);

6.15.2.26    Schools, public and private;

6.15.2.27    Stores and shops conducting retail trade;

6.15.2.28    Taxi facilities, train stations, and bus stations;

6.15.2.29    Temporary uses not to exceed ninety (90) days; and

6.15.2.30    Warehousing, not including self-service storage facilities.


6.15.3     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
           The following uses are permitted when approved by the Board of Zoning Appeals as
           a Special Exception as provided by Section 15.4:

6.15.3.1   Production and assembly of hand crafted items and custom designed
           products provided:

           A.      Such uses shall not produce exterior smoke, dust, noise, odor,
                   unusual lighting, vibrations, fumes, hazards, or other objectionable,
                   noxious or injurious conditions and shall and shall conform to
                   applicable building and fire codes;

           B.      The front of the building at street level shall remain open and
                   visible from the sidewalk with a view of the activities inside and

           C.      A showroom or display area, or a sales area shall be provided.

6.15.3.2    Sidewalk dining provided:

A.    No sidewalk dining shall be permitted except for a restaurant. Restaurant shall be defined as any place kept, used, maintained, advertised and held out to the public as a place where food is prepared and served;

B.    Sidewalk dining includes the serving and consumption of both food and beverages within the permitted sidewalk dining area. The serving or consumption of food shall occur within the hours of operation, not to exceed 11:00 p.m. The serving of alcohol shall be limited to the hours of 11:00 a.m. through 11:00 p.m. No serving or consumption of food or beverage shall occur within the permitted sidewalk dining area after 11:00 p.m. No cooking or food preparation shall be conducted on the sidewalk at any time;

C.    Sidewalk dining shall be permitted only along that length of sidewalk and/or public property immediately adjoining the building containing the restaurant;

D.    A four-foot unobstructed pedestrian way shall be maintained on all sidewalks at all times. The unobstructed pedestrian way shall be measured and maintained from the back of the curb toward the building along a line perpendicular to the building;

E.    All outer boundaries of the permitted sidewalk dining area shall be clearly delineated. A scaled drawing of the proposed permitted sidewalk dining area shall be submitted with the special exception request;

F.    The restaurant shall keep in full force and effect a minimum of $1,000,000.00 commercial general liability insurance policy naming the City of Johnson City, Tennessee, as additional insured and, at the time of renewal of the special exception, shall provide proof thereof to the Risk Management Department of the City of Johnson City, Tennessee;

G.    Outside furniture shall be suitable for outdoor use and able to withstand the elements. Furniture shall not be attached, chained, or permanently placed within the right-of-way or on the sidewalk. No alterations or modifications of any kind, including but not limited to penetration of the sidewalk, shall be made to any part of the sidewalk or public right-of-way;

H.     No table umbrellas shall be permitted that encroach into the four-foot unobstructed pedestrian way, and all umbrellas shall be fastened to a secure base properly weighted to prevent the umbrella's movement; umbrellas shall not contain messages, symbols, or advertising, in any form;

I.     Any trash receptacles provided by the restaurant shall have the recommendation of the Johnson City Development Authority;

J.     When granted a special exception, the restaurant may serve, and its patrons may display and consume, any alcoholic beverages for which the restaurant has a license, within the permitted sidewalk dining area at permitted times. No alcoholic beverages shall be served, displayed, or consumed outside of the permitted sidewalk dining area at any time or within the permitted sidewalk dining area beyond the permitted time;

K.     The restaurant shall comply with all state and local regulations regarding the sale, possession, and/or consumption of alcoholic beverages;

L.     The special exception granted herein shall be reviewed by the Board of Zoning Appeals at any time to assure continued compliance with the criteria set forth above. No special exception shall be considered to be permanent, and no special exception shall be considered as attached to, appurtenant to, or a part of the property to which it applies. The special exception shall, instead, be considered applicable only to the restaurant to which it is granted and only for so long as the restaurant is operating and in compliance with the criteria set forth above. A restaurant's failure to comply with any of the criteria set forth above or its failure to maintain furniture, umbrellas, and the premises in good condition and free of trash shall be cause for the Board of Zoning Appeals to revoke the special exception. Notwithstanding the date that a special exception is granted by the Board of Zoning Appeals, all permits are valid for three years and shall expire on June 30th of the third year;

M.     The restaurant shall provide any additional information required by the Board of Zoning Appeals to ensure compliance with these regulations.

N.  Outdoor dining on public property, in addition to the right-of-way adjoining the restaurant, may be permitted by special exception if the following terms and conditions are met and satisfied and the Board of Zoning Appeals approves such requests:

1. Approval for outdoor dining use requires a yes/no recommendation from the City Manager with a yes/no recommendation from the appropriate city department responsible for maintenance and use of the public property;

2. Dining space shall not exceed 25 percent or 250 square feet whichever is less of the public property in question and shall adjoin the restaurant with an impervious surface;

3. The area of dining space shall be determined in a manner that does not impede, restrict, or otherwise diminish the use of the remaining public property, as determined by the appropriate city department; and

4. Special Exception approval shall require compliance with all applicable conditions for sidewalk dining.

6.15.4   AREA REGULATIONS:
To create an interesting and visually stimulating environment, all buildings, excluding civic and institutional uses, should be located at the sidewalk edge. Civic and institutional uses, such as churches, museums, and publicly-owned buildings, are encouraged to be set back from the street with a plaza or lawn. Blank or monotonous facades create a hostile and uninviting environment and are to be avoided on all buildings by using doors, windows, display areas, sculptures, columns, and other architectural features.

6.15.4.1   Building Placement:
All buildings, excluding cultural, civic, and institutional uses, shall be set back no further than five (5) feet from the front lot line for at least ninety (90) percent of the front facade, unless an outdoor eating area is provided which extends from the front building line to within five (5) feet of the front lot line. Corner lots shall be considered to have front lot lines for all sides of the lot adjoining a public right-of-way, excluding alleys.

6.15.4.2   Exterior Building Treatment:
   A.      Cultural, civic, and Institutional Uses:
           A minimum of twenty-five (25) percent of the street level facade
           of all buildings shall be windows, doors, display areas, or similar
           architectural features.

   B.      All Other Buildings:
           A minimum of sixty-five (65) percent of the street level facade of
           all buildings, shall be windows, doors, display areas, or similar
           architectural features.

6.15.4.3   Building Height:
           All buildings will be a minimum of two stories in height.

## 6.17 - B-4 PLANNED ARTERIAL BUSINESS DISTRICT

6.17.1    INTENT:
The B-4, Planned Arterial Business District is designed to encourage a unified development approach along the major highway corridors. The principal uses of land are devoted to commercial establishments which cater specifically to motor-vehicle-oriented trades and services. It is further intended to provide appropriate space and sufficient depth from the street to provide for the orderly development and concentration of appropriate highway and arterial commercial uses at suitable locations, and to encourage the clustered development of such uses to minimize traffic hazards and interference with other uses in the vicinity, rather than to encourage the spread of strip commercial development. The introduction of residential uses in buildings with two or more stories with residential uses permitted on the upper floors may be appropriate in certain instances.

6.17.2    PERMITTED USES:
Within the B-4 Planned Arterial Business District the following uses are permitted:

6.17.2.1    Accessory structures and uses, provided they are not located in the front or side yard nor within seven and one-half (7.5) feet of the rear property line;

6.17.2.2    Alternative tower structures;

6.17.2.3    Amusements, and recreation, including theaters;

6.17.2.4    Beer serving/sales establishments;

6.17.2.5    Bus terminals and taxi facilities;

6.17.2.6    Churches; parish houses, Sunday school buildings, cemeteries, and other related church activities;

6.17.2.7    Clinics;

6.17.2.8    Cultural, civic, and institutional uses;

6.17.2.9    Day-care centers, provided:

A.    If access is gained from an arterial or collector street, a paved driveway connected to the arterial or collector street must be provided. This driveway must include an exit and an entrance to facilitate safe, off-street loading and unloading which does not require backing into the street; and

B.    Must meet all state licensing requirements.

6.17.2.10    Financial institutions;

6.17.2.11    Fraternal organization and clubs, not operated for profit;

6.17.2.12    Funeral Homes and mortuary establishments;

6.17.2.13    Golf driving range;

6.17.2.14    Home occupations (Subject to Section 6.1.1.7);

6.17.2.15    Hospitals;

6.17.2.16    Hotels, motels, and extended stay facilities;

6.17.2.17    Liquor stores;

6.17.2.18    Manufactured homes, boats, and recreational vehicle sales;

6.17.2.19    Micro breweries and distilleries;

6.17.2.20    Multi-bay car washes;

6.17.2.21    Municipal, county, state, or federal buildings or land uses;

6.17.2.22    Neighborhood convenience centers, provided:
A.    Service stations, principal accessory buildings, and gasoline pumps shall not be constructed closer than forty (40) feet to any residential district;

B.    Gasoline pump islands shall not be located closer than twenty (20) feet to any street right-of-way line; however, where pump islands are constructed perpendicular to the pavement edge, the pump island shall be located not less than thirty (30) feet back of the right-of-way line;

C.    Canopies shall not be constructed closer than fifteen (15) feet from any street right-of-way. (Since code states that variances may only be given when special conditions prevent the beneficial use of land, if a gasoline station may be constructed on a lot, the land has resulted in beneficial use; and, therefore, no waiver may be given permitting the canopy to extend closer than fifteen (15) feet to the street right-of-way); and

D.    Any vehicle repair shall be conducted within an enclosed building.

6.17.2.23    Offices, both governmental and private;

6.17.2.24    Parking lots and garages;

6.17.2.25    Personal, business, and professional services;

6.17.2.26    Pharmacies;

6.17.2.27    Public utility stations;

6.17.2.28    Radio and television stations;

6.17.2.29    Residential dwellings on the upper floors of buildings;

6.17.2.30    Restaurants;

6.17.2.31    Schools, public and private;

6.17.2.32    Stores and shops conducting retail trade;

6.17.2.33    Temporary uses, not to exceed ninety (90) days;

6.17.2.34    Vehicular sales and services; and

6.17.2.35    Wholesale businesses, warehouses, and storage buildings.

6.17.3    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.17.3.1    Light manufacturing, provided no more than fifty (50) employees are working per shift;

6.17.3.2    Outdoor storage yards, but not including junk yards, provided they are buffered (Type 1 buffer) from public view from streets granting access;

6.17.3.3    Pet Daycare provided:

A.    All facilities shall provide a fenced area in the rear yard;

B.    All facilities shall not be located within two-hundred (200) feet of a single-family use or district, including RP districts, measured from property line to property line; and

C.     The outside keeping of animals shall be between the hours of 8:00 a.m. to 10:00 p.m.

6.17.3.4    Self-service storage units and mini warehouses provided:

A.     All service storage units and mini warehouse buildings shall be constructed perpendicular to the street where the visual impact is the greatest;

B.     No exterior storage shall be permitted with the exception of recreation vehicles, boats, and other watercraft;

C.     The site shall be fenced and, as a minimum, a Type I evergreen buffer shall be provided on three sides. No buffer shall be required along the front property line; however, a row of evergreen shrubs spaced a maximum of five (5) feet on center and approved by the City Forrester shall be provided adjacent to the fence; and

D.     Parking shall be provided for accessory uses and shall not be permitted in required setback areas.

6.17.3.5    Substance Abuse Treatment Facility provided:

A.  The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

B.     A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.     The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-6, RO-1, and RO-2 districts;

D.     The facility shall not operate before 7:00 a.m. or after 8:00 p.m.;

E.     The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F.     The petitioner shall provide the Board of Zoning Appeals with information regarding the number of staff to be employed; and

G. The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3; and

6.17.3.6 Tower structures, provided the provisions of subsection 10.3.2.2 are complied with.

6.17.4 AREA REGULATIONS:
The following area regulations shall apply to each project in the B-4 zoning district developed under an approved site plan. Setbacks shall apply to the perimeter of each tract; no additional setback regulations shall apply to interior lots created within a single comprehensive development.

6.17.4.1 Front Yard:
The minimum depth of a front yard and any yard abutting a public street shall be:

| Type Street | Setback |
|-------------|---------|
| Arterial    | 45 feet |
| Collector   | 35 feet |
| Minor       | 25 feet |

6.17.4.2 Side Yard:
A. Where adjacent to an R-1, R-2, R-2A, R-2B, or R-2C zone, the minimum depth of the side yard setback shall be twelve and one-half (12.5) feet for a one-story building and ten (10) feet times the number of stories for a multi-story building.

B. Where adjacent to an R-3, R-4, R-5, R-6, RP, RM, RO-1, or MS-1 zone, the minimum depth of the side yard setback shall be the same as the adjacent zoning district.

C. Where adjacent to any other zoning district, there shall be no required minimum side yard setback.

6.17.4.3 Rear Yard:
The minimum rear yard setback shall be twenty-five (25) feet except where abutting a residential zone, in which case the minimum shall be forty (40) feet.

6.17.5 MAXIMUM LOT COVERAGE: No restrictions.

6.17.6 HEIGHT REGULATIONS: No restrictions.

6.17.7    SUBDIVISION SITE PLAN REQUIRED:

Within the B-4 District, any subdivision of land shall be accompanied by a site plan that addresses: stormwater management, curb-cut number and location, buffering and landscaping, pedestrian walkway, utility system design, and similar factors prior to construction. Within the B-4 District, the subdivision on permanent private easements shall be permitted, subject to meeting other requirements of this code, and approval of the subdivision plat in accordance with the Subdivision Regulations. Please refer to Article V.

## 6.18 - B-5 PLANNED COMMUNITY BUSINESS DISTRICT

6.18.1    INTENT:
          This District is intended to provide for selected community retail sales, service, office, and public use establishments in an orderly, coordinated manner so that any adverse impact on the area's existing character, surrounding uses, and traffic circulation can be minimized.

6.18.2    PERMITTED USES:
          Within the B-5 Planned Community Business District the following uses are permitted:

          6.18.2.1    All uses permitted in the B-4, Planned Arterial Business District with the exception of 6.17.2.17, Liquor stores.

6.18.3    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
          The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

          6.18.3.1    All special exception uses permitted in the B-4, Planned Arterial Business District.

6.18.4    PROHIBITED USES

          6.18.4.1    Liquor stores.

6.18.5    AREA REGULATIONS:
          All buildings and uses, unless otherwise specified in this Code, shall comply with the following area requirement:

          6.18.5.1    Minimum lot size:  Not restricted.

          6.18.5.2    Front Yard:  The minimum depth of the front yard shall be:

          | Type Street | Minimum Setback |
          | --- | --- |
          | Arterial | 45 feet |
          | Collector | 35 feet |
          | Minor Street | 25 feet |

          6.18.5.3    Side Yard:  The minimum width of the side yard shall be as follows:
                      A.    Where adjacent to an R-1, R-2, R-2A, R-2B, or R-2C zone, the minimum depth of  the side yard setback shall be twelve and one-

half (12.5) feet for a one-story building and ten (10) feet times the number of stories for a multi-story building.

B.      Where adjacent to an R-3, R-4, R-5, R-6, RP, RM, RO-1, or MS-1 zone, the minimum depth of the side yard setback shall be the same as in the adjacent zoning district.

C.      Where adjacent to any other zoning district, there shall be no required minimum side yard setback.

6.18.5.4   Rear Yard:  The minimum depth of the rear yard setback shall be twenty-five (25) feet except where abutting a residential zone in which case the minimum depth shall be forty (40) feet.

6.18.6    MAXIMUM LOT COVERAGE: No Restrictions.

6.18.7    HEIGHT RESTRICTIONS:  No Restrictions.

6.17.8    SUBDIVISION SITE PLAN REQUIRED:
Within the B-5 District, any subdivision of land shall be accompanied by a site plan that addresses: stormwater management, curb-cut number and location, buffering and landscaping, pedestrian walkway, utility system design, and similar factors prior to construction.   Within the B-5 District, the subdivision on permanent private easements shall be permitted, subject to meeting other requirements of this code, and approval of the subdivision plat in accordance with the Subdivision Regulations. Please refer to Article V.

## 6.19 - I-1 LIGHT INDUSTRIAL DISTRICT

6.19.1    INTENT:
The I-1 Light Industrial District is designed to accommodate wholesale, warehouse, storage, research and development, and manufacturing activities whose external effects are restricted to the site and have no detrimental effects on the surrounding area.  The I-1 district generally permits the manufacture, compounding, processing, packaging, assembly and treatment of finished or semi-finished products from previously prepared material or materials.  The sale of goods produced on-site may be allowed with certain restrictions.  It is not the intent of this district to permit the processing of raw materials, unless such activity is minor and accessory to the permitted use and where there is no external evidence of such activity.

6.19.1.1    Approval process shall be one of the following:
A.    If the site has been rezoned from a nonindustrial zone since the adoption of this ordinance (June 1989), then development review shall be by the site plan review procedure as outlined in Subsection 6.19.9.

B.    If the site has not been rezoned to I-1 since the adoption of this ordinance (June 1989), then the development review process shall be by staff review only.

6.19.2    PERMITTED USES:
Within the I-1 Light Industrial district the following uses are permitted:

6.19.2.1    Animal hospitals;

6.19.2.2    Vehicular sales and/services;

6.19.2.3    Dry cleaning and laundry establishments;

6.19.2.4    Gasoline service stations and neighborhood convenience centers, provided:
A.    Service stations, principal accessory buildings, and gasoline pumps shall not be constructed closer than forty (40) feet to any residential district.

B.    Gasoline pump islands shall not be located closer than twenty (20) feet to any street right-of-way line; however, where pump islands are constructed perpendicular to the pavement edge, the pump island shall be located not less than thirty (30) feet off the right-of-way line.

C. Canopies shall not be constructed closer than fifteen (15) feet from any street right-of-way. (Since the Code states that variances may only be given when special conditions prevent the beneficial use of land, if a gasoline station may be constructed on a lot, the land has resulted in beneficial use; and, therefore, no waiver may be given permitting the canopy to extend closer than fifteen (15) feet to the street right-of-way).

D. Retail sale of beverages having an alcohol content of five (5) percent or less by weight, provided, that no such sale shall occur at any business closer than two hundred (200) feet to any school, playground, park, or church edifice as measured in a straight line from the center of the front door of the licensee's place of business.

E. Total floor area of the neighborhood convenience center shall not exceed three thousand (3,000) square feet.

6.19.2.4   Printing and engraving establishments;

6.19.2.5   Municipal, county, state, or federally owned buildings or land uses;

6.19.2.6   Truck terminals;

6.19.2.7   Supervised vocational, recreational, or institutional activities;

6.19.2.8   National fraternal organizations not operated for profit;

6.19.2.9   Wholesale establishments;

6.19.2.10   Public utilities, including buildings, necessary structures, storage yards, and related uses;

6.19.2.11   Research, development, or testing laboratories and facilities;

6.19.2.12   Electric or acetylene welding shops;

6.19.2.13   Ice plants;

6.19.2.14   Equipment rental and repair establishments;

6.19.2.15   Auction houses, not including flea markets where merchandise is sold at retail;

6.19.2.16    Service, communication, and distribution centers not conducting on-site retail sale of merchandise;

6.19.2.17    Offices;

6.19.2.18    Alternative tower structures;

6.19.2.19    Building materials yards;

6.19.2.20    Coal yards;

6.19.2.21    Contractors' yards;

6.19.2.22    Gasoline, propane, oil, or alcohol storage above ground, provided no storage tank shall be closer than fifty (50) feet to any property line other than a property line abutting a railroad right-of-way;

6.19.2.23    Parking lots and garages;

6.19.2.24    Warehouses;

6.19.2.25    Bottling works;

6.19.2.26    Cabinet making;

6.19.2.27    Carpenters' shops;

6.19.2.28    Cloth bag manufacturing;

6.19.2.29    Clothing manufacturing;

6.19.2.30    Electrical home appliance and equipment assembly;

6.19.2.31    Fruit or vegetable canning or packing;

6.19.2.32    Leather goods fabrication;

6.19.2.33    Optical and dental goods manufacturing;

6.19.2.34    Paper box manufacturing;

6.19.2.35    Stone cutting and polishing;

6.19.2.36    Tin smith shops;

6.19.2.37    Upholstery shops;

6.19.2.38     Plants engaged in the manufacturing, processing and/or curing of asbestos automotive brake pads and metal backup pads;

6.19.2.39     The manufacturing and assembly of paint brushes, paint pads, paint rollers, paint trays, paint sprayers, and paint sundry items;

6.19.2.40     Similar, related uses to the above, which involve the fabrication, compounding, assembly, processing, repair, manufacturing, or packaging of finished or semi-finished materials and products where all operations, including storage of materials and finished goods are contained within closed buildings. Such allowed uses shall not produce exterior smoke, dust, noise, odor, unusual lighting, vibrations, fumes, fire hazards, or other objectionable, noxious, or injurious conditions;

6.19.2.41     Showroom featuring the display and sale of goods produced or assembled on-site. The total floor area devoted to the display and sale of goods shall be no greater than the total floor area devoted for production and front office uses;

6.19.2.42     Accessory structures and uses;

6.19.2.43     Clinics; and

6.19.2.44     Business Services.

6.19.3     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as special exceptions as provided by Section 15.4:

6.19.3.1     All structures which exceed the height of thirty-five (35) feet and located within one hundred (100) feet of a residential zone.

6.19.3.2     Day-care centers provided:
      A.     The principal building shall have a minimum rear yard setback of fifty (50) feet and a minimum side yard setback of twenty-five (25) feet;

      B.     If access is gained from an arterial or collector street, a paved driveway connected to the arterial or collector street must be provided. This driveway must include an exit and an entrance to facilitate safe, off-street loading and unloading which does not require backing into the street;

C.     Sufficient evidence is presented to the BZA to insure that children will be isolated from any real or potential industrial hazards. The BZA may impose additional requirements to insure the safety of the children; and

D.     All necessary state and city permits, certifications, and requirements shall be obtained.

6.19.3.3    Tower structures.

6.19.3.4    Adult-oriented businesses provided:

A.     The use shall be located a minimum distance of one-thousand (1000) feet from any residential use or residential district;

B.     The use shall be located a minimum distance of one-thousand (1000) feet from any other adult-oriented business;

C.     The use shall be located a minimum distance of one-thousand (1000) feet from any school, public or private educational facility, child daycare facility, nursery school, preschool, kindergarten, elementary school, private school, intermediate school, junior high school, middle school, high school, vocational school, secondary school, continuing school, special education school, community college, junior college, college, university, playground, public park, indoor or outdoor swimming pool under city management or used by members paying membership dues to either a public or private entity, publicly owned athletic field under the ownership or management of any governmental entity, publicly owned basketball or tennis court under the ownership or management of any governmental entity, public or private or family cemetery, church, synagogue, mosque, temple, or building used primarily for religious worship and related religious activities; and

D.     The use shall be located a minimum distance of one-thousand (1000) feet from any premises licensed pursuant to State or local law or regulation concerning the sale of alcoholic beverages, whether such beverages are sold on-premises or off-premises.

E.     For the purpose of Subsections A-D above, measurement shall be made in a straight line, without regard to the intervening structures or objects, from the nearest point of the property lines used as part of the premises where an adult-oriented business is conducted, to the nearest point of the property lines of the premises of a use listed in Subsection A-D above. The presence of a city, county, or other political subdivision boundary shall be irrelevant for

purposes of calculating and applying the distance requirements of this Subsection.

F.      The applicant shall submit maps showing existing land use and zoning within one-half mile of the proposed site along with site plans, surveys, or other such special information as might be reasonably required by the Board of Zoning Appeals for use in making a thorough evaluation of the application.

6.19.3.5    Security housing provided:

A.  The dwelling unit shall be considered an accessory use to the principal use;
B.  The dwelling unit shall be only used by an employee of the property owner, existing business, or lessor.   Members of the employee's immediate family (spouse and dependent children) may also reside in the dwelling unit;
C.  The dwelling unit shall meet all applicable building codes;
D.  On sites of ten (10) acres or greater a separate structure not exceeding 2,500 square feet in floor area may be used for security housing purposes;
E.  If at any time, a portable structure intended for security housing remains vacant for a period of six (6) months or more, it shall be removed from the site;
F.  The structure shall not be located in any front yard; and
G.  Any additional requirements of the Board of Zoning Appeals.

6.19.3.6    Substance Abuse Treatment Facility provided:

A.      The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

B.      A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.      The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-6, RO-1, and RO-2 districts;

D.      The facility shall not operate before 7:00 a.m. or after 8:00 p.m.;

E.      The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F.       The petitioner shall provide the Board of zoning Appeals with information regarding the number of staff to be employed; and

G.       The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3.

6.19.4      MINIMUM STANDARDS:

6.19.4.1      Lot coverage shall not exceed fifty (50) percent.  Minimum lot size is not restricted.

6.19.4.2      Front Yard:
The minimum depth of the front yard shall be as follows:

| Type Street | Setback |
| --- | --- |
| Arterial | 45 feet |
| Collector | 35 feet |
| All Other | 25 feet |

6.19.4.3      Side Yards:
The minimum depth of the side yard shall be ten (10) feet or one-half of the principal building height whichever is greater except:
A.       Where an interior sprinkling system is provided as approved by the Fire Marshal in which case the minimum side yard shall be ten (10) feet.
B.       Where adjacent to any residential zone, in which case the setback shall be forty (40) feet.

6.19.4.4      Rear Yard:
The minimum depth of the rear yard shall be twenty-five (25) feet, except:
A.       Where adjacent to any residential zone, in which case the setback shall be forty (40) feet.

B.       Where adjacent to a railroad right-of-way, in which case there shall be no required setback if such is needed to obtain desirable rail service.

6.19.5      HEIGHT REGULATIONS:
Not restricted except as provided in Subsection 6.19.3 above.

6.19.6      PROTECTION FOR SURROUNDING AREAS:

The following site design considerations shall be required to reduce potentially adverse impacts by the industry:

6.19.6.1    All parking shall be located outside of the required front yard with the exception of ten (10) or fewer visitor parking spaces;

6.19.6.2    All site design work shall be done by a state-certified architect, engineer, or surveyor;

6.19.6.3    All transportation, storage, and use of hazardous material shall comply with the Federal Environmental Protection Agency (EPA) and Tennessee Department of Health and Environment regulations;  and

6.19.6.4    The City Engineer may require additional submittals to evaluate on-site and off-site stormwater drainage controls and traffic improvements.

6.19.7    APPEAL PROCESS:
If the developer believes that the staff-determined requirements are unreasonable, an appeal may be submitted to the Planning Commission for relief. The developer and the appropriate staff shall submit in writing their disagreements and justifications and present the same to the Planning Commission at its earliest convenient meeting.  The decision by the Planning Commission shall be included fully in the minutes.

6.19.8    SIDEWALK REQUIREMENT:
Sidewalks shall be required for all developments along their collector and arterial street frontages in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.

6.19.9    APPLICATION AND GENERAL PROCEDURE FOR COMMISSION SITE PLAN REVIEW:

6.19.9.1    Preliminary Plan:
    A.    The preliminary plan submitted shall be drawn to scale and shall show all roads and drainage, existing and proposed; drives and parking areas; setback lines enclosing the portion of the tract within which buildings are to be erected; buildings to be erected within the setback lines shown; boundaries of the tract; proposed use of land and buildings.  The relation of the project to the street system, to the surrounding property, and to surrounding use districts shall also be shown.

    B.    At least the following construction plans must be submitted; profiles of proposed sanitary sewers and stormwater sewers with

grades, sizes, and elevations indicated; proposed water distribution system showing pipe sizes and the location of valves and fire hydrants; and complete grading plan.

C.   Limitations:
Before recommending approval of a plan within the I-1 or I-2 zoning district, the Planning Commission may make reasonable additional requirements concerning, but not limited to, the limitation of uses, landscaping, lighting, signs, screening or plantings, setback and height of buildings, paving and location of drives and parking areas, drainage and the location of access ways, taking into consideration the character of the surrounding area so as to protect adjoining residentially zoned lots and residential uses, to provide for public safety and prevent traffic congestion.

D.   Within forty-five (45) days after application for Preliminary Plan review has been submitted, the Planning Commission shall make a written recommendation to the Board of Commissioners approving, conditionally approving, or disapproving the plan.

6.19.9.2   Final Plan:
A.   A final plan embodying all additional requirements imposed by the Planning Commission, if any, shall be prepared and submitted by the applicant to the Board of Commissioners. Or, if preferred, the applicant may submit the plan as originally reviewed by the Planning Commission without recommended changes for the Board to consider; however, in no case shall a plan be submitted for consideration which has not been reviewed by the Planning Commission.

B.   This plan, to be known as the Final Plan, shall be drawn to scale and include, in addition to requirements of Subsection 6.19.9.1, the boundaries of the entire district and a certificate by a licensed civil engineer that said boundaries have been surveyed and are correct. After approval by the City Commission, said plan shall be placed on record with the City Engineer and the Development Coordinator.

6.19.9.3   Permits, Licenses, and Certificate of Occupancy:
No building permit, zoning compliance permit, or license to operate a business within an I-1 or I-2 zone shall be issued until after approval by the City Commission of the final site plan, or any portion for which a permit or license is sought.

6.19.9.4   Enforcement, Violation, and Penalty:

Everything shown in the Final Plan, including all construction plans for site improvements, become part of the zoning regulations of the district once the plan is approved by the City Commission. Nothing in conflict with the Final Plan shall be done on the site. Enforcement and penalties for violation shall be as provided in Article XVI.

6.19.10    CONCEPT PLAN REQUIRED:
Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/I1.doc

## 6.20 - I-2 HEAVY INDUSTRIAL DISTRICT

6.20.1    INTENT:
The I-2 Heavy Industrial District is designed to establish and preserve areas for certain industrial and related uses which require separation from others.

    6.20.1.1    Approval process shall be one of the following:
        A.    If the site has been rezoned from a nonindustrial zone since the adoption of this ordinance (June 1989), then development review shall be subject to the site plan review procedure in Subsection 6.19.9.

        B.    If the site has not been rezoned since the adoption of this ordinance (June 1989), then the development review process shall be by staff review only.

6.20.2    PERMITTED USES:
Within the I-2 Heavy Industrial district, the following uses are permitted:

    6.20.2.1    All uses permitted in the I-1 Light Industrial District, including the outdoor storage of goods and materials;

    6.20.2.2    Any manufacturing process which does not cause injurious or obnoxious noise, vibrations, smoke, gas, fumes, odors, dust, fire hazards, or other objectionable conditions;

    6.20.2.3    Railroad yards; and

    6.20.2.4    Accessory structures and uses.

6.20.3    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as special exceptions as provided by Section 15.4:

    6.20.3.1    All structures which exceed the height of thirty-five (35) feet and located within one hundred (100) feet of a residential zone;

    6.20.3.2    Day-care centers provided:
        A.    The principal building shall have a minimum rear yard setback of fifty (50) feet and a minimum side yard setback of twenty-five (25) feet;

B.   A paved driveway for the off-street loading and unloading of children providing a separate entrance and exit to and from the property without backing into the street;

C.   Sufficient evidence is presented to the BZA to insure that children will be isolated from any real or potential industrial hazards.  The BZA may impose additional requirements to insure the  safety of the children;  and

D.   All necessary state and city permits, certifications, and requirements shall be obtained.

6.20.3.3   Golf driving ranges provided:

A.   A generalized site plan drawn to scale showing the location and size of all golf tees, putting greens, and similar related structures, the location and extent of proposed driveways and parking areas, location of proposed water and sewer systems, width and cross-section details of all drives and parking areas, other proposed facilities such as walls, landscaping, walkways, accessory buildings, and location of any outdoor lighting structures;

B.   Driving tees shall be oriented to direct golf balls away from any street or highway;

C.   Noise is to be minimized as follows: loud speakers, juke boxes, public address systems, electric amplifiers, and similar electronic devices shall not be permitted; and

D.   Retail sale of merchandise or food shall be permitted only as an accessory to the driving range function.

6.20.3.4   Tower structures;

6.20.3.5   Adult-oriented businesses provided:

A.   The use shall be located a minimum distance of one-thousand (1000) feet from any residential use or residential district;

B.   The use shall be located a minimum distance of one-thousand (1000) feet from any other adult-oriented business;

C.   The use shall be located a minimum distance of one-thousand (1000) feet from any school, public or private educational facility, child daycare facility, nursery school, preschool, kindergarten, elementary school, private school, intermediate school, junior high school, middle school, high school, vocational school, secondary

school, continuing school, special education school, community college, junior college, college, university, playground, public park, indoor or outdoor swimming pool under city management or used by members paying membership dues to either a public or private entity, publicly owned athletic field under the ownership or management of any governmental entity, publicly owned basketball or tennis court under the ownership or management of any governmental entity, public or private or family cemetery, church, synagogue, mosque, temple, or building used primarily for religious worship and related religious activities; and

D.     The use shall be located a minimum distance of one-thousand (1000) feet from any premises licensed pursuant to State or local law or regulation concerning the sale of alcoholic beverages, whether such beverages are sold on-premises or off-premises.

E.     For the purpose of Subsections A-D above, measurement shall be made in a straight line, without regard to the intervening structures or objects, from the nearest point of the property lines used as part of the premises where an adult-oriented business is conducted, to the nearest point of the property lines of the premises of a use listed in Subsection A-D above. The presence of a city, county, or other political subdivision boundary shall be irrelevant for purposes of calculating and applying the distance requirements of this Subsection.

F.     The applicant shall submit maps showing existing land use and zoning within one-half mile of the proposed site along with site plans, surveys, or other such special information as might be reasonably required by the Board of Zoning Appeals for use in making a thorough evaluation of the application.

6.20.3.6     Substance Abuse Treatment Facility provided:

A.     The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

B.     A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.     The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-6, RO-1, and RO-2 districts;

D.    The facilty shall not operate before 7:00 a.m. or after 8:00 p.m.;

E.    The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F.    The petitioner shall provide the Board of zoning Appeals with information regarding the number of staff to be employed; and

G.    The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3.


6.20.4    MINIMUM STANDARDS:

6.20.4.1    Lot coverage shall not exceed fifty (50) percent.  Minimum lot size is not restricted.

6.20.4.2    Front Yard:
The minimum depth of the front yard shall be as follows:

| Type Street | Setback |
| --- | --- |
| Arterial | 60 feet |
| Collector | 45 feet |
| All Other | 25 feet |

6.20.4.3    Side Yards:
The minimum depth of the side yard shall be twenty-five (25) feet, except:
A.    Where adjacent to any residential zone, in which case the setback shall be forty (40) feet.


6.20.4.4    Rear Yard:
The minimum depth of the rear yard shall be twenty-five (25) feet, except:
A.    Where adjacent to any residential zone, in which case the setback shall be forty (40) feet.

B.    Where adjacent to a railroad right-of-way, in which case there shall be no required setback if such is needed to obtain desirable rail service.


6.20.5    HEIGHT REGULATIONS:
Not restricted except as provided in Subsection 6.20.3.

6.20.6    PROTECTION FOR SURROUNDING AREAS:
The following site design considerations shall be required to reduce potentially adverse impacts by the industry:

6.20.6.1    All parking shall be located outside of the required front yard with the exception of thirty (30) or fewer visitor parking spaces;

6.20.6.2    All site design work shall be done by a state-certified architect, engineer, or surveyor;

6.20.6.3    All transportation, storage, and use of hazardous material shall comply with the Federal Environmental Protection Agency (EPA) and Tennessee Department of Health and Environment regulations;  and

6.20.6.4    The City Engineer may require additional submittals to evaluate on-site and off-site stormwater drainage controls and traffic improvements.


6.20.7    APPEAL PROCESS:
If the developer believes that the staff-determined requirements are unreasonable, an appeal may be submitted to the Planning Commission for relief. The developer and the appropriate staff shall submit in writing their disagreements and justifications and present the same to the Planning Commission at its earliest convenient meeting.  The decision by the Planning Commission shall be included fully in the minutes.

6.20.8    SIDEWALK REQUIREMENT:
Sidewalks shall be required for all developments along their collector and arterial street frontages, in accordance with Article IX, Sidewalk Regulations, and The Standards of Design for Streets and Drainage.


6.20.9    CONCEPT PLAN REQUIRED:
Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/I2.doc

## 6.21 - A-1 - AGRICULTURAL DISTRICT

6.21.1     INTENT:
This district is intended to provide space for agricultural and similar rural uses and activities. A second intent is to conserve the city's active farms, agricultural lands, and other rural areas until urban development occurs and the appropriate zoning changes are made.

6.21.2     PERMITTED USES:
Within the A-1 Agricultural District the following uses are permitted:

6.21.2.1     Agricultural uses, including the raising of crops, horticulture, and floriculture;

6.21.2.2     The raising of animals, fowl, and poultry, provided approval of the city health officer is obtained;

6.21.2.3     Agricultural industries or businesses including fruit packing plants, wineries, dairies, orchards, nurseries, feed mills, and similar fiber or food processing uses where products are produced on the premises;

6.21.2.4     Bed-and-breakfast inns, subject to the conditions of Subsection 6.12.1.18;

6.21.2.5     Churches and cemeteries;

6.21.2.6     Clubs and lodges whether civic, patriotic, or fraternal;

6.21.2.7     Day-care centers, subject to the conditions of Subsection 6.7.2.2;

6.21.2.8     Fairgrounds;

6.21.2.9     Golf courses and driving ranges;

6.21.2.10     Home occupations, subject to the conditions of Subsection 6.1.1.9;

6.21.2.11     Marinas and boat-launching facilities;

6.21.2.12     Public uses and buildings such as community centers, schools, offices, and parks, which are owned or operated by local, state, or federal agencies;

6.21.2.13     Public utility stations and facilities for the distribution of local service; and

6.21.2.14     Single-family residences.

6.21.3    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.21.3.1    Commercial kennels, veterinary services, and animal hospitals, provided:
A.    Except where animals are confined in soundproof air-conditioned buildings, no structure or area occupied by animals shall be closer than five hundred (500) feet to any residential lot line. In no case shall any such structure be located closer than two hundred (200) feet to any residential lot line;

B.    For non-soundproofed animal confinements, an external fence or wall not less than six (6) feet in height shall be provided; and

C.    In all cases, animals shall be confined in an enclosed building from 10:00 p.m. to 6:00 a.m.

6.21.3.2    Horse show grounds and related support structures and uses provided:
A.    Fencing and other methods of animal confinement are maintained at all times;

B.    Loud speakers, public address systems, and similar electronic devices shall not be operated between the hours of 10:00 p.m. and 8:00 a.m.; and

C.    Riding rings and other riding surfaces shall be covered and maintained with a material such as pine bark to minimize dust and erosion.

6.21.3.3    Sawmills, planing mills, and woodyards, provided:
A.    No structure and no storage of lumber, logs, or timber shall be located closer than one hundred (100) feet to any lot line;

B.    Activities shall be restricted to materials grown and harvested on the premises; and

C.    No sawing, planing, chipping, or operation of other processing machinery shall occur between 7:00 p.m. and 7:00 a.m.

6.21.3.4    Wayside stand, provided:
A.    The sale of agricultural products shall be limited to produce grown on the premises; and

B.    Structures shall not exceed five hundred (500) square feet in aggregate floor area.

6.21.3.5   Tower structures and alternative tower structures.


6.21.4   AREA REGULATIONS:
All buildings and uses, unless otherwise specified in this Code, shall comply with the following setback, coverage, and area requirements.

6.21.4.1   Minimum Lot Size:
A.   Minimum lot size shall be three (3) acres for single-family residences and one (1) acre for non-residential uses.

B.   Minimum lot width shall be of one hundred twenty-five (125) feet at the front building line.

6.21.4.2   Yard Area:
A.   Front Yard:
The minimum depth of the front yard setback shall be as follows:

| Type Street | Setback |
| --- | --- |
| Arterial | 50 feet |
| Collector | 40 feet |
| All Other | 30 feet |

B.   Side Yards:
The minimum depth of each side yard setback shall be twenty-five (25) feet.

C.   Rear Yard:
The minimum depth of the rear yard shall be fifty (50) feet.


6.21.5   MAXIMUM LOT COVERAGE:
The principal building and all accessory buildings shall cover not more than thirty (30) percent of the total lot area.


6.21.6   HEIGHT REGULATIONS:
Principal buildings shall not exceed the height of thirty-five (35) feet and accessory buildings shall not exceed the height of fifteen (15) feet with the exception of agricultural buildings, barns, silos, windmills, and other agricultural structures not intended for dwelling purposes.


zonecode/articles/A1.doc

**6.22 - BP - BUSINESS PARK DISTRICT**

6.22.1    INTENT:
The purpose of the BP Business Park District is to provide for a variety of office, wholesale, distribution, warehouse, light manufacturing, and service uses in a planned, coordinated development. Development within the district is expected to be of high quality design for buildings, site design, and site amenities. Development will be expected to conform to higher levels of standards to protect adjacent residential areas as well as to enhance development within the district. To assure that any proposal for a BP district can fulfill the intent of the district and to encourage planned developments, the minimum area necessary for the initial establishment of a BP district is twenty (20) acres.

6.22.2    PERMITTED USES:
Within the BP Business Park District the following uses are permitted:

6.22.2.1    Manufacturing, fabrication, compounding, assembly, processing, repair, or packaging of finished or semi-finished materials and products. Such uses shall not produce: exterior smoke, dust, noise, odor, unusual lighting, vibrations, fumes, fire hazards or objectionable, noxious, or injurious conditions, or other factors detrimental to the health, safety, and welfare of the area;

6.22.2.2    Business, professional, corporate, or governmental offices;

6.22.2.3    Research, medical, dental, and optical laboratories;

6.22.2.4    Service, communication, or distribution center not conducting on site retail sale of merchandise;

6.22.2.5    Financial institutions;

6.22.2.6    Day-care centers subject to the provisions of Subsection 6.1.2.2;

6.22.2.7    Graphics and printing facilities;

6.22.2.8    Manufacturer's representatives, including offices and repair and service facilities;

6.22.2.9    Wholesale sales including warehousing within an enclosed building, but excluding self-service storage units;

6.22.2.10   Federal, State, County, City, or public utility buildings and uses;

6.22.2.11   Parking structures;

6.22.2.12   Computer and data processing services;

6.22.2.13   Business incubator facilities and services;

6.22.2.14   Engineering, surveying, architectural, and design services;

6.22.2.15   Accessory structures and uses; and

6.22.2.16   Alternative tower structures.


6.22.3     USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
           The following uses are permitted when approved by the Board of Zoning Appeals as
           special exceptions as provided by Section 15.4:

6.22.3.1   Tower structures.


6.22.4     AREA REGULATIONS:
           All buildings and uses, unless otherwise specified in this Code, shall comply with the
           following setback, coverage, and area requirements:

6.22.4.1   Minimum District Area:  Twenty (20) acres.

6.22.4.2   Minimum Lot Area:  One (1) acre.

6.22.4.3   Minimum Lot Width:  One hundred fifty (150) feet.


6.22.5     MINIMUM YARD REQUIREMENTS:

6.22.5.1   Front Yard:  Fifty (50) feet.  Parking in the front yard is not permitted
           within twenty-five (25) feet of the right-of-way line.

6.22.5.2   Side Yard:  Thirty (30) feet.

6.22.5.3   Street Side Yard:  Same as Front Yard.

6.22.5.4   Rear Yard:  Same as Side Yard.

6.22.5.5   No loading or unloading areas permitted in any front or side yard.


6.22.6     MAXIMUM BUILDING HEIGHT:

There shall be no maximum height, provided all minimum yards are increased five (5) feet for each story over thirty-five (35) feet.

6.22.7    MAXIMUM LOT COVERAGE:
Not more than thirty-five (35) percent of the lot may be covered by structures.

6.22.8    APPLICATION AND APPROVAL PROCEDURE:
Site plan approval shall be subject to the provisions of Subsection 6.17.4.

6.22.9    Development standards shall be subject to the provisions of Subsection 6.17.5.

zonecode/articles/BP.doc

**6.23 - RTP - RESEARCH/TECHNOLOGY PARK DISTRICT**


6.23.1     INTENT:

The purpose of the RTP Research/Technology Park District is to provide a planned employment district within a park-like atmosphere. The RTP District is oriented toward education, research and development, offices, medical uses, and high technology activities and uses. Development within the district is characterized by a landscaped environment with emphasis on architectural, aesthetic, and environmental considerations.

6.23.2     PERMITTED USES:

Within the RTP Research/Technology Park district the following uses are permitted, provided no outside storage shall be allowed:

6.23.2.1    Laboratories for research, development, testing, and related production activities;

6.23.2.2    Medical research and manufacturing facilities including but not limited to pharmaceuticals, biomedical technologies medical instruments and supplies, surgical appliances and supplies, dental equipment and supplies, x-ray apparatus, and electromedical equipment;

6.23.2.3    Educational, scientific, and research activities;

6.23.2.4    Federal, state, county, city, or public utility buildings, and uses;

6.23.2.5    Clinics;

6.23.2.6    Laboratories – medical, dental, optical, pharmaceutical, and related;

6.23.2.7    Hospitals for the treatment of human ailments, including psychiatric hospitals;

6.23.2.8    Computer programming and other software and telecommunications services and uses;

6.23.2.9    Office Buildings: medical, government, and professional;

6.23.2.10    Branch banks; personal services; business services; and professional services; restaurants, excluding drive-thru facilities; and day-care centers not to exceed 25 percent of the gross floor area within a permitted multi-story building on a single or collective basis. Outdoor uses associated with a day-care facility shall be located in the rear yard and shall be screened from view from any adjoining public right-of-way;

6.23.2.11 Medical, surgical, and dental production and supply businesses, both wholesale and retail;

6.23.2.12 Alternative tower structures; and

6.23.2.13 Business incubator facilities;


6.23.3 USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as special exceptions as provided by Section 15.4:

6.23.3.1 Tower structures; and

6.23.3.2 Substance Abuse Treatment Facility provided:

A. The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

B. A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C. The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-6, RO-1, and RO-2 districts;

D. The facilty shall not operate before 7:00 a.m. or after 8:00 p.m.;

E. The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F. The petitioner shall provide the Board of zoning Appeals with information regarding the number of staff to be employed; and

G. The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3.


6.23.4 AREA REGULATIONS:

All buildings and uses, unless otherwise specified in the Code shall comply with the following setback, coverage, and area requirements:

6.23.4.1    Minimum Lot Area:  Not restricted

6.23.4.2    Minimum Lot Width:  Not restricted

6.23.5    MINIMUM YARD REQUIREMENTS:

6.23.5.1    Front Yard:  Twenty-five (25) feet.

6.23.5.2    Side Yard:  Twenty-five (25) feet.

6.23.5.3    Street Side Yard:  Fifty (50) feet.

6.23.5.4    Rear Yard:  Fifty (50) feet.

6.23.5.5    No loading or unloading areas shall be permitted in any front or side yards.

6.23.6    MAXIMUM BUILDING HEIGHT:
There shall be no maximum height, provided all minimum yards are increased five (5) feet for each story over thirty-five (35) feet.

6.23.7    MAXIMUM LOT COVERAGE:
Not more than fifty (50) percent of the lot may be covered by structures.

6.23.8    APPLICATION AND APPROVAL PROCEDURE:
Site plan approval shall be subject to the provisions of Subsection 6.17.4.

6.23.9    DEVELOPMENT STANDARDS:
Development standards shall be subject to the provisions of Subsection 6.17.5.

6.23.10    PARKING:
A.  Parking in front of the building shall be as follows: No more than two rows of parking with a travel aisle between;
B.  No more than a total of 30% of the parking on the side(s) of the building; and
C.  All remaining parking shall be located in the rear of the building.

6.23.11    CONCEPT PLAN REQUIRED:
Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/RTP.doc

**6.24 - MX - MIXED USE DISTRICT**

6.24.1    INTENT:
The purpose of the MX Mixed Use District is to accommodate the development of a wide-range of residential and compatible non-residential uses (including major employment and institutional activities) which are designed and developed within the framework of a coordinated master plan. To encourage high quality design and innovative arrangement of buildings and open space, the district provides flexibility from conventional use and dimension requirements of other zoning districts. Structures with commercial, service, or office uses on the first floor and upper level residential uses are encouraged. Outside storage is prohibited except in conjunction with one and two-family residential uses.

6.24.2    PERMITTED USES:
Within the MX Mixed Use District the following uses are permitted:

6.24.2.1    Residential dwellings not exceeding twenty-two (22) units per acre;

6.24.2.2    Light manufacturing, fabrication, compounding, assembly, processing, repair, or packaging of finished or semi-finished materials and products. Such uses shall not produce: exterior smoke, dust, noise, odor, unusual lighting, vibrations, fumes, fire hazards or objectionable, noxious or injurious conditions, or other factors detrimental to the health, safety, and welfare of the area;

6.24.2.3    Business, professional, corporate, or governmental offices;

6.24.2.4    Research, medical, dental, and optical laboratories;

6.24.2.5    Neighborhood retail and service establishments allowed in the B-1 district, Subsection 6.14.1, except that Subsection 6.14.1.14. shall not apply to accessory buildings;

6.24.2.6    General retail and service establishments which are more intense than neighborhood retail, subject to the conditions of Subsection 6.24.4.1;

6.24.2.7    Day-care centers, subject to the provisions of Subsection 6.1.2.2;

6.24.2.8    Computer programming and other software services;

6.24.2.9    Educational, scientific, and research activities;

6.24.2.10    Group homes, subject to the provisions of Subsection 6.6.1.5;

6.24.2.11    Home occupations, subject to the provisions of Subsection 6.1.1.9;

6.24.2.12    Nursing and convalescent homes;

6.24.2.13    Retirement communities;

6.24.2.14    Cultural uses;

6.24.2.15    Federal, state, county, city, or public utility buildings and uses;

6.24.2.16    Accessory structures and uses; and

6.24.2.17    Alternative tower structures.


6.24.3    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as special exceptions as provided by Section 15.4.

6.24.3.1    Tower structures.


6.24.4    DEVELOPMENT STANDARDS:

6.24.4.1    General retail and service developments as referenced in Subsection 6.24.2.6 shall be subject to the development standards set forth in this entire section, Subsection 6.24.4, unless a different standard is specified below.

A.    General retail and service establishments shall include those uses permitted in the B-4 District, Subsection 6.17.2.

B.    All uses shall be located within a seven hundred fifty (750) foot radius of the intersection of a freeway and a collector or arterial street as measured at the right-of-way lines at the intersection.

C.    No individual use, including required parking, landscaping, accessory uses, and open space, or any assembly or collection of uses or comprehensive development shall occupy more than twenty-five (25) acres.

D.    No single building or group of adjoining buildings shall exceed one hundred thousand (100,000) square feet in area. Only one business or occupancy within a building may

exceed twenty thousand (20,000) square feet in area and it shall not exceed forty thousand (40,000) square feet in area.

E.   Local streets shall have a maximum pavement width of twenty-eight (28) feet from back of curb to back of curb. On-street parking may be allowed on at least one side of the street.

F.   Buildings shall have a maximum setback of seventy-five (75) feet from the front property line.  In no case shall the property line adjacent to a freeway be designated as the front property line.

G.   The maximum building height shall be sixty (60) feet.

6.24.4.2   General Development Standards for the MX District are as follows:

A.   STREETS,   CURB   CUTS,   &   INTERNAL CIRCULATION.

1.   Local streets (defined as all streets other than freeways, collectors, and arterials) shall have a pavement width of twenty-four (24) feet from back of curb to back of curb with parking on one side of the street or thirty-two (32) feet with parking on both sides of the street. Where medians or traffic calming devices are provided these local street standards may be varied and must be approved by the City Engineer.  Other street classifications shall comply with the pavement widths set forth in Article IV of the Subdivision Regulations of the Johnson City Regional Planning Commission.  Any street exceeding thirty-six (36) feet in width shall have a raised landscaped median a minimum of eight (8) feet wide.

2.   Street intersections and intersections of driveways with streets shall be as close to ninety (90) degrees as possible. Where a local street intersects any other street, the curb radius shall not exceed twenty (20) feet.  These standards may be exceeded if it can be demonstrated to the City Engineer that compliance is not possible or feasible.

3.   All streets, except local streets, shall contain bike lanes which, at a minimum, meet AASHTO

standards.  Lanes may be a part of, or separate from the street.

4. Lots with two hundred (200) feet or less of frontage on a collector or arterial street and lots with one hundred (100) feet or less of frontage on a local street shall be permitted only one curb cut or access point.  No lot shall have more than two curb cuts or access points on any street regardless of length of frontage.  Cross access agreements and shared accesses between non-residential properties are required except where it can be demonstrated that such an agreement is not feasible.

5. Driveways shall not exceed twenty-four (24) feet in width at the property line unless a raised median a minimum of five (5) feet wide is provided as part of the driveway.  No driveway shall exceed fifty (50) feet in total width.

6. Streets shall be designed to connect with other streets whenever possible.  Cul-de-sacs should be avoided except in cases of severe topographic or other physical conditions.  Where cul-de-sacs are provided, other non-vehicular connections to nearby streets shall be provided.

B. SIDEWALKS.  Sidewalks which are a minimum of five (5) feet wide are required along all street frontages and are to be separated from the back of curb by a strip consisting of landscaping or decorative pavement which is a minimum of four (4) feet wide.  Trees shall be placed in this strip as specified in the Subsection 6.24.4 (F) of this Code.  All buildings must have a defined pedestrian connection to the sidewalk system along all street frontages.  Internal sidewalk connection between properties is encouraged to facilitate pedestrian movement.

C. AREA REGULATIONS.  There are no required minimum setbacks or maximum lot coverage specified in the MX zoning district.  Minimum setbacks from the street are encouraged.

1. All buildings shall have the primary entrance visible and accessible from the street.

2.      All nonresidential buildings are encouraged but not required to have awnings or covered walkways along public walkways and streets.

3.      The maximum amount of impervious surface permitted on any lot shall not exceed eighty-five (85) percent.

4.      The maximum building height shall be thirty-five (35) feet unless uses are mixed vertically (i.e. ground floor commercial with office or residential in upper floors) in which case the maximum height may be increased to forty-five (45) feet.

D.      ACCESSORY STRUCTURES. A maximum of two (2) accessory structures, one (1) of which may contain an accessory residential unit, may be permitted if the following requirements are met:

1.      One accessory structure may exceed one hundred (100) square feet and it must be constructed of similar exterior building materials as the primary building.

2.      The cumulative area of all structures which are accessory to residential uses shall not exceed fifty (50) percent of the square foot area of the principal structure.

3.      Accessory structures shall be located to the rear of the primary building.

4.      Accessory structures which are less than one hundred (100) square feet may be located on the side or rear property line and structures which are one hundred (100) square feet or larger must be set back a minimum of three (3) feet from the property line except where existing easements require a larger setback.

E.      PARKING. A mixed use district will contain uses which experience parking demands at different times, allowing them to take advantage of shared parking. It can accommodate more activities with fewer vehicle trips by providing a variety of uses in a pedestrian setting. The

following standards are designed to encourage a reasonable balance between the private automobile, the pedestrian, and alternative means of transportation.

1.     On-street parking located adjacent to any lot may be counted toward meeting the parking requirements for that lot as set forth in Article XI of this Code.

2.     All off-street parking lots shall be located in the rear or side yard of any building.

3.     Shared parking is encouraged between appropriate uses and can be approved as part of the site plan review process.     Approval shall not require a Special Exception approval by the Board of Zoning Appeals as specified in Section 11.5.

4.     Any public parking or commonly owned parking lots may be counted toward meeting the required parking for uses on other lots within one thousand (1000) feet of the common lot.  The allocation of such spaces shall be documented as part of the Comprehensive Development Plan and will be approved through that process.

5.     Any development which exceeds current requirements with design features which encourage and facilitate pedestrian movement between uses may reduce the parking required by Article XI of this Code by a maximum of ten (10) percent.

F.     LANDSCAPING.   The MX District shall be subject to Article XII Landscape Regulations; excluding:   Section 12.2 Landscape Yards, 12.4 Buffer Yards, and 12.5 Protective Screening.

G.     SCREENING AND BUFFERING.

1.     The MX District shall be exempt from buffering requirements of this Code.  All buffers between uses shall be identified on the concept plan and detailed on the Comprehensive Development Plan and site plan.

2.      Loading docks, dumpsters, and satellite dishes shall be screened from public streets and walkways by walls, trellises, fences, or opaque landscaping. Walls and fences must be constructed of similar exterior building materials as that of the primary building.

3.      Except for single-family and two-family residential properties, mechanical equipment shall be screened from public view.

H.    UTILITIES.

1.      No overhead utility lines may be installed in the MX District.

2.      All street lighting shall be designed to address pedestrian as well as vehicular needs.

3.      Reseeding or sodding of any cleared or graded site shall be required when no building activity has occurred within a three (3) month period. This may be extended to six (6) months by the Development Coordinator if justification is presented.

4.      All development shall comply with the erosion control and drainage specified in the Subdivision Regulations and all water and sewer improvements shall comply with the "Standards of Design for Water and Sewer Lines" as adopted by the Board of Commissioners.

6.24.5    APPROVAL PROCESS FOR MX ZONING:
The following process shall be required for any development within the MX District.

6.24.5.1    CONCEPT PLAN. Application to the Planning Commission for rezoning to MX must contain, at a minimum, a general description of all proposed uses with their intensity, location, relationship to each other, and densities. This requirement may be met in writing or graphically, provided there is sufficient detail for adequate review.

6.24.5.2    COMPREHENSIVE DEVELOPMENT PLAN (CDP).  A CDP is a generalized plan for the coordinated development of areas within the Mixed Use (MX) zoning district.  The purpose of this plan is to examine the impacts of various types of uses with respect to land use, site design, aesthetics, harmony, compatibility, intensity, phasing, the need for off site improvements, and conformance to the <u>Comprehensive Plan</u>.

Prior to the development of any property with a zoning designation of MX, five (5) copies of the CDP will be required to be submitted to the Development Coordinator.  If the CDP conforms to the concept plan referenced in Subsection 6.24.5.1, only staff review and approval will be required.  If there has been no rezoning or concept plan approved by the City Commission, if the CDP varies significantly from the approved concept plan, or if an approved concept plan is to be significantly amended, approval shall be by the City Commission following Planning Commission and staff review and recommendation.  At a minimum, the CDP shall include the following:

A.    Required plans, drawings, and illustrations:

    1.    A development plan identifying each type of land use with acreage tabulations and proposed phasing. The plan shall show the placement of proposed uses and buildings, the number and size of residential units, the square footage of non-residential buildings, a layout of lots, open space designations, location of landscaped and buffer areas, on and off street parking, loading facilities, conceptual utility location and connection, and refuse collection locations.

    2.    The plan must show site accessibility, internal and external, involving all vehicular and pedestrian traffic.

    3.    An overall drainage plan with sufficient detail to demonstrate orderly collection and disposal of stormwater from the development site, taking into account the impact that any discharge will have on downstream properties.  The quality of stormwater discharged must be acceptable as regulated by State and Federal agencies.

4.      Conceptual architectural elevations and sketches demonstrating style, colors, textures, and materials in sufficient detail to evaluate compatibility.

B.      Analysis of the following factors:

1.      Compatibility of proposed and existing uses and potential impact on adjoining and surrounding uses.

2.      Impacts on surrounding natural or architectural features in terms of design compatibility, harmony, and intensity of the proposed development.

3.      Impacts on the health and safety of customers, residents, employees, and the general population, specifically as related to environmental factors such as, but not limited to, noise, odors, hazardous materials, fire, fumes, vibration, and traffic.

4.      Impact of traffic and parking areas particularly as related to pedestrian, transit, and bicycle provisions.

5.      Adequacy of existing municipal facilities and services to support the development. Consideration should be given to, but not limited to, water, sanitary sewer, stormwater, fire protection, street systems, public safety, schools, and recreational facilities.

6.      Consistency of the proposed CDP with the intent of the MX district, the adopted Comprehensive Plan, and sound planning and development practices.

Upon approval of a Comprehensive Development Plan, two (2) copies of that plan shall be signed by the applicant and the City Manager or designee. Signed copies shall be retained on file by the Development Coordinator and the applicant.

6.24.5.3    SITE PLAN APPROVAL. The site plan is the detailed engineering document which must be submitted and approved prior to the issuance of any clearing, grading, development, construction, or building permit. Each site plan for development in an MX district shall conform to the appropriate recorded CDP. Each MX site plan shall be submitted and reviewed in conformance with the regulations set forth in Subsection 6.17.4 of this Code.

zonecode/articles/mx.doc

## 6.26 - HCZO - HISTORIC/CONSERVATION OVERLAY DISTRICT

6.26.1    INTENT:
The Historic/Conservation Overlay District provisions are established in order that appropriate measures may be taken to ensure preservation of structures of historic value to Johnson City pursuant to the authority contained in Section 13-7-401 of the <u>Tennessee Code Annotated</u>.  The general intent includes, among others, the following specific purposes:

A.       To preserve and protect the historical and/or architectural value of buildings, other structures, or historically significant areas;

B.       To regulate exterior design, arrangement, texture, and materials proposed to be used within the historic district to ensure compatibility;

C.       To create an aesthetic appearance which complements the historic buildings or other structures;

D.       To stabilize and improve property values;

E.       To foster civic beauty;

F.       To strengthen the local economy;  and

G.       To promote the use of Historic/Conservation Overlay Districts for the education, pleasure, and welfare of the present and future citizens of Johnson City.

6.26.2    CREATION OF HISTORIC/CONSERVATION OVERLAY DISTRICT:
The Historic District and/or Conservation District boundaries shall be shown on the zoning map or on special overlays thereto and are made a part of this ordinance and noted by name on said map.  Any Historic District and/or Conservation District shall be created by the Johnson City Board of Commissioners upon the recommendations of the Johnson City Regional Planning Commission and the Historic Zoning Commission.  Within an Historic District no structure shall be constructed, relocated, demolished, or altered unless the action complies with the requirements set forth in this Code.   Within a Conservation District, no structure shall be constructed, relocated, demolished, or increased in habitable area unless the action complies with the requirements set forth in this Code.

6.26.3    DEFINITION OF HISTORIC/CONSERVATION OVERLAY DISTRICT:
A Historic/Conservation Overlay District shall be defined as a geographic area which possesses a significant concentration, linkage, or continuity of sites, buildings, structures, or objects which are united by past events or aesthetically by plan or physical development, and which meets one (1) or more of the following criteria:

6.26.3.1   Associated with an event which has made a significant contribution to local, state, or national history;  or

6.26.3.2    Includes structures associated with the lives of persons significant in local, state, or national history;  or

6.26.3.3    Contains structures or groups of structures which embody the distinctive characteristics of a type, period, or method of construction, or that represents the work of a master, or someone that possesses high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction;  or

6.26.3.4    Yielded or may be likely to yield archaeological information important in history or prehistory;  or

6.26.3.5    Is listed in the National Register of Historic Places.


6.26.4    CREATION OF A HISTORIC ZONING COMMISSION:
A Historic Zoning Commission is hereby created for the city of Johnson City, Tennessee, consisting of seven members who shall have been bona-fide residents of the city for not less than 3 years immediately prior to appointment and who shall continue to be so eligible as long as they serve.

6.26.4.1    Membership on the Historic Zoning Commission:
Membership on the Historic Zoning Commission shall be composed of at least the following members: a) one architect who is a member, or meets membership requirements, of the American Institute of Architects; b) one member of the Johnson City Regional Planning Commission; c) one member with knowledge of the history of Johnson City; and d) remaining members selected from the community at large.

6.26.4.2    Appointment to the Historic Zoning Commission:
Members of the Historic Zoning Commission shall be appointed by the Johnson City Board of Commissioners.

6.26.4.3    Terms of Appointment, Removal, and Vacancies:
The members of the Historic Zoning Commission shall serve 5-year terms. All members shall serve without compensation and may be removed from membership by the Board of Commissioners for just cause.   Any vacancies on the Historic Zoning Commission shall be filled in the manner herein provided for the appointment of such member.  Such appointment shall be for the duration of the expired term.

6.26.4.4   Election of Officers, Rules, and Meetings:
The Historic Zoning Commission shall elect from its members a Chairman and Vice-Chairman.  The Commission shall adopt rules of procedure and shall keep records of application and action thereon, which shall be public record.   Meetings of the Commission shall be held at the call of the Chairman and at such times as two or more members of the Commission may determine.  All meetings shall be open to the public.  At least three members of the Commission shall constitute a quorum for the transaction of its business.  Actions and recommendations of the Commission shall be by majority vote.  The Secretary of the Historic Zoning Commission, who shall be the Planning Director or designee, shall conduct all official correspondence, keep the minutes and records of the Commission, give adequate public notice of meetings, keep a file on each item which comes before the Commission, and attend to such other duties as are normally the function of a Secretary.

6.26.4.5   Conflict of Interest:
When any member of the Historic Zoning Commission shall have a conflict of interest in a matter before the Commission, it is expected that he or she declare that conflict of interest prior to considering whether to vote upon the matter.

6.26.5   POWERS AND DUTIES OF THE HISTORIC ZONING COMMISSION:

6.26.5.1   The Historic Zoning Commission shall review applications regarding the creation of Historic Districts and/or Conservation Districts.  The review of such applications shall be in accordance with the criteria set forth in the Definition of Historic/Conservation Overlay District in this Article. The Commission shall furnish to the Planning Commission, in writing, its recommendations regarding the creation of any Historic District and/or Conservation District.

6.26.5.2   Prior to the establishment of a Historic District and/or Conservation District, and subsequent to Board of Commissioners adoption of the District, the Historic Zoning Commission shall adopt for each such proposed District a set of review guidelines, which it will apply in ruling upon the granting or denial of a certificate of appropriateness as provided for in this ordinance.  Such review guidelines shall be consistent with the purposes of this ordinance and with regulations and standards adopted by the Secretary of the Interior pursuant to the National Historic Preservation Act of 1966, as amended, applicable to the construction, alteration, rehabilitation, relocation or demolition of any building, structure, or other improvement situated within a Historic District and/or Conservation District.  Reasonable public notice and opportunity for public comment,

by public hearing or otherwise, shall be required before the adoption of any such review guidelines.

6.26.5.3    It shall further be the duty of the Historic Zoning Commission to make the following determinations with respect to the Historic District and/or Conservation District when applicable:

A.    Appropriateness of altering or demolishing any building or structure within the Historic District and/or Conservation District. The Commission may require interior and exterior photographs, architecturally measured drawings of the exterior, or other notations of architectural features to be used for historical documentation as a condition of any permission to demolish a building or structure, such photographs, drawings, etc. shall be at the expense of the Commission.

B.    Appropriateness of exterior architectural features, including signs and other exterior fixtures, of any new buildings and structures to be constructed within the Historic District and/or Conservation District.

C.    Appropriateness of front yards, side yards, rear yards, off-street parking spaces, location of entrance drives into the property, sidewalks along the public right-of-way, which might affect the character of any building or structure within the Historic District and/or Conservation District.

D.    Appropriateness of the general exterior design, arrangement, texture, material, of the building or other structure in question and the relation of such factors to similar features of buildings in the immediate surroundings and entire district. However, the Historic Zoning Commission shall not consider interior arrangement or design.

E.    That all work to be undertaken in the Historic District and/or Conservation District complies with the applicable review guidelines, with primary consideration to be given to:

1)    historical or architectural value of the present structure;
2)    the relationship of the exterior architectural features of such structure to the rest of the structures, to the surrounding area, and to the character of the District;
3)    the general compatibility of exterior design, arrangement, texture, and materials proposed to be used; and
4)    to any other factor, including aesthetic, which is reasonably related to the purpose of this Article.

6.26.5.4     Right of Entry Upon Land:
              The Commission, its members and employees, in the performance of its
              work, may enter upon any land within its jurisdiction and make
              examinations and surveys and place or remove public notices as required
              by this Ordinance, but there shall be no right of entry into any building
              without the consent of the owner.

6.26.6     SUBMITTAL OF APPLICATION TO THE HISTORIC ZONING COMMISSION:
           Prior to issuance of any building permit for the construction, alteration, repair,
           demolition, or relocation of a building or other structure within any *Historic District
           and/or Conservation District*, the applicant shall first receive a Certificate of
           Appropriateness from the Historic Zoning Commission.    Application for such
           certificate shall be made by the applicant to the Secretary of the Historic Zoning
           Commission and shall include all plans, elevations, or other information as may be
           required to determine the appropriateness of the proposed actions.

6.26.7     MEETINGS ON APPLICATION:
           The Historic Zoning Commission shall meet within fifteen (15) days after notification
           by the Secretary of the Historic Zoning Commission of the filing of an application
           relating to the Historic District and/or Conservation District.

6.26.8     APPROVAL BY THE HISTORIC ZONING COMMISSION:
           Upon approval of any application, the Historic Zoning Commission shall forthwith
           transmit a report to the Chief Building Official stating the basis upon which such
           approval was made and cause a Certificate of Appropriateness to be issued. The
           provisions of the Certificate of Appropriateness, and any conditions attached thereto,
           shall become a part of the Building Permit upon issuance. Upon failure of the Historic
           Zoning Commission to take final action with thirty (30) days after receipt of the
           application, the case shall be deemed approved, except when mutual agreement has
           been made for an extension of the time limit. When a Certificate of Appropriateness
           has been issued, a copy thereof shall be transmitted to the Chief Building Official,
           who shall from time to time inspect the construction or alteration of the exterior
           approved by such certificate, and report to the Historic Zoning Commission any work
           not in accordance with such certificate before issuing a certificate of occupancy.

6.26.9     DISAPPROVAL BY THE HISTORIC ZONING COMMISSION:
           In the case of disapproval of any application, the Historic Zoning Commission shall
           state the reasons therefore in a written statement to the applicant, in terms of design,
           arrangement, texture, color, material, and the like of the property involved.  Notice of
           such disapproval and a copy of the written statement of reasons therefore shall also be
           transmitted to the Chief Building Official.
6.26.10    APPROVAL OF REMOVAL OR DEMOLITION:

In the event an application for removal or demolition of a building or other structure within a *Historic District and/or Conservation District* is submitted or such demolition is required, the governmental agency receiving such request or initiating such action shall transmit a copy thereof to the Historic Zoning Commission and said Commission shall have a period of thirty (30) days from the date the application was filed to act upon the application. Upon failure of the Historic Zoning Commission to take final action within thirty (30) days after the filing of the application, the case shall be deemed approved, except when mutual agreement has been made for an extension of the time limit.

6.26.11    DETERMINATION OF ECONOMIC HARDSHIP:
Any applicant denied a Certificate of Appropriateness by the Commission within thirty (30) days thereafter and any applicant seeking demolition of a landmark or contributing structure within a district may make application for a Certificate of Economic Hardship from the Commission.

6.26.11.1   The applicant shall submit all the following information by affidavit for an application to be considered:

A.    The assessed value of the property and/or the structure. In the case of a demolition, two (2) recent assessments;

B.    For the previous two (2) years, the real property taxes paid;

C.    The amount paid for the property by the owner, the date of purchase, the name of the party from whom it was purchased, and a description of the relationship, if any, between the current owner and the previous owner;

D.    The current balance of any mortgage or any other financing secured by the property owner and the annual debt service, if any, for the previous two (2) years;

E.    All appraisals obtained within the previous two (2) years by the owner or applicant in connection with purchase, offerings for sale, financing, or ownership of the property, or state that none were obtained;

F.    All listings of the property for sale or rent, price asked and offers received, if any, within the previous four (4) years, or state that none were obtained;

G.    All studies commissioned by the owners as to profitable renovation, rehabilitation, or utilization of any structures or objects on the property for alternative use, or a statement that none were obtained;

H.   For income producing property, itemized income and expense statements from the property for the previous two (2) years;

I.   Estimate of the cost of the proposed alteration, construction, demolition, or removal and an estimate of any additional cost that would be incurred to comply with the recommendations of the Commission for changes necessary for it to approve a Certificate of Appropriateness; and

J.   Form of ownership or operation of the property, whether sole proprietorship, for-profit, or not-for-profit corporation, limited partnership, joint venture, or other.

6.26.11.2  In the event that the information required to be submitted by the applicant is not reasonably available, the applicant shall file with the affidavit a statement of the information that cannot be obtained and shall describe the reasons why such information is unavailable.

6.26.11.3  Not withstanding the submission of the above information, the Commission may require additional evidence.

6.26.11.4  The Commission shall hold a public hearing on the application within thirty (30) days following receipt of the completed application form.

6.26.11.5  The determination by the Commission shall be made within forty-five (45) days following the close of the public hearing and submission of all information, documentation, or evidence requested by the Commission. The determination shall be accompanied by findings of fact.

6.26.11.6  The Commission shall not grant approval of any application involving demolition, unless the Commission determines, upon clear and convincing evidence that one or more of the following circumstances applies:
A.   The structure is not subject to this article; or

B.   Denial of a demolition permit would result in a hardship to the property owner so great that it would effectively deprive the owner of all reasonable use of the structure. The extent of any demolition permitted shall be limited to the amount necessary to allow reasonable use of the structure. Where the condition of the structure is not the result of the acts of neglect of the owner or his predecessors in title occurring in whole or in part after August 1, 1988.

6.26.11.7  If the determination of the Commission is to disapprove the application for a Certificate of Economic Hardship, the applicant shall be notified within

five (5) business days.  The notice shall include a copy of the findings of fact and report.

6.26.12    APPEALS FROM DECISION OF THE HISTORIC ZONING COMMISSION: Appeals from any decision of the Historic Zoning Commission may be taken to a court of competent jurisdiction as provided for by law.

Nothing in this article shall be interpreted as giving the Historic Zoning Commission any authority to consider, review, examine, or control the use of property classified as a conservation zoning district.  Use shall be controlled solely by the zoning of such property prior to its classification as a Historic District and/or Conservation District or as may be rezoned by subsequent amendments.

zonecode/articles/HCZO.doc

## 6.27 - PB PLANNED BUSINESS DISTRICT

6.27.1 INTENT:
The purpose of the PB Planned Business District is to ensure that certain retail, office, and service developments are designed and constructed to minimize any negative impact or nuisance on adjacent residential development prior to the approval of the rezoning. It is further intended to permit the establishment of such districts only where planned business districts with carefully-related buildings, parking and service area, and landscaped areas will serve clearly demonstrated public needs, reduce traffic impact, and protect property values in surrounding neighborhoods. This district is also intended to serve infill commercial needs where compatibility with adjoining neighborhoods is of primary importance. Location on a collector street is required as a minimum.

6.27.2 PERMITTED USES:
Within the PB Planned Business District the following uses are permitted:

6.27.2.1 Accessory structures and uses, provided they are not located in the front or side yard nor within seven and one-half feet of the rear property line;

6.27.2.2 Alternative tower structures;

6.27.2.3 Amusements, and recreation, including theaters;

6.27.2.4 Beer serving/sales establishments;

6.27.2.5 Clinics;

6.27.2.6 Day-care centers, provided:
A. If access is gained from an arterial or collector street, a paved driveway connected to the arterial or collector street must be provided. This driveway must include an exit and an entrance to facilitate safe, off-street loading and unloading which does not require backing into the street; and

B. They meet all state licensing requirements;

6.27.2.7 Financial institutions;

6.27.2.8 Home occupations (Subject to Section 6.1.1.7);

6.27.2.9 Municipal, county, state, or federal building or land uses;

6.27.2.10  Neighborhood convenience center, provided:

    A.    Auto servicing operations such as oil changes shall be permitted; however, no vehicle repair shall be permitted;

    B.    A one-bay drive-thru car wash shall be permitted only in conjunction with the neighborhood convenience center; and

    C.    Canopies shall not be constructed closer than fifteen (15) feet to any street right-of-way.  Since the Code states that variances may only be given when special conditions prevent the beneficial use of land, if a neighborhood convenience center can be constructed on a lot, the land has resulted in beneficial use.  Therefore, no waiver shall be given permitting a pump island or canopy to be constructed closer than fifteen (15) feet to any right-of-way.

6.27.2.11  Offices; both governmental and private;

6.27.2.12  Personal, business, and professional services;

6.27.2.13  Pharmacies;

6.27.2.14  Residential uses on the upper floors of buildings;

6.27.2.15  Restaurants;

6.27.2.16  Stores and shops conducting retail trade; and

6.27.2.17  Temporary uses not to exceed ninety (90) days.

6.27.3  USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.27.3.1  Tower structures, provided the provisions of Subsection 10.3.2.2 are complied with; and

6.27.3.2  Substance Abuse Treatment Facility provided:

    A.  The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

    B.    A certificate of need, if required, shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.     The Facility shall not be located adjacent to or within 200 feet of a residential district including R-1, R-2, R-2A, R-2B, R-2C, R-3, R-4, R-5, R-6, RP-2, RP-3, RP-4, RP-5, RM-3, RM-4, RM-5, RO-1, and RO-2 districts;

D.     The facility shall not operate before 7:00 a.m. or after 8:00 p.m.;

E.     The facility shall be located on a collector street, arterial street, or State of Franklin Road;

F.     The petitioner shall provide the Board of Zoning Appeals with information regarding the number of staff to be employed; and

G.     The facility, if located within a single tenant structure, shall meet the off-street parking requirements as specified in Article XI, Section 11.3.

6.27.4     AREA REGULATIONS:
The following area regulations shall apply to each project in the PB zoning district developed under an approved Concept Plan.  Setbacks shall apply to the perimeter of each tract; no additional setback regulations shall apply to interior lots created within a single comprehensive development.

6.27.4.1     FRONT YARD:
The minimum depth of a front yard and any yard abutting a public street shall be:

| Type Street | Setback |
|---|---|
| Arterial | 45 feet |
| Collector | 35 feet |
| Minor | 25 feet |

6.27.4.2     SIDE YARD:
A.     Where adjacent to an R-1, R-2, R-2A, R-2B, or R-2C zone, the minimum depth of the side yard setback shall be twelve and one-half (12.5) feet for a one-story building and ten (10) feet times the number of stories for a multi-story building.

B.     Where adjacent to an R-3, R-4, R-5, R-6, any RP, any RM, RO-1, RO-2, or MX-1 zone, the minimum depth of the side yard setback shall be the same as the adjacent zoning district.

C.     Where adjacent to any other zoning district, there shall be no required minimum side yard setback.

6.27.4.3     REAR YARD:

The minimum rear yard setback shall be twenty-five (25) feet except where abutting a residential zone, in which case the minimum shall be forty (40) feet.

6.27.4.4    MAXIMUM LOT COVERAGE: No restrictions.

6.27.4.5    HEIGHT REGULATIONS:  No more than one-story above the tallest surrounding building as measured within 200 feet from property line to property line.

6.27.5  CONCEPT PLAN REQUIRED:

6.27.5.1    Each application for a rezoning request to PB shall be accompanied by five sets of a Concept Plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such Concept Plan shall be as described in Subsection 14.2.2.2.

## 6.28    CO – CORRIDOR OVERLAY DISTRICT

6.28.1    INTENT:
The purpose of this overlay district is to establish higher environmental, aesthetic, and design standards for designated areas of Johnson City that includes properties visible from specified roadways. Because these standards shall apply without regard to the underlying use of the land, they are created in a special overlay district which shall be applied over any zoning district located along a designated roadway.

6.28.2    APPLICABILITY:
The Corridor Overlay District shall be in effect in all zoning districts along designated roadways.  The district as measured extends from a parcel's front property line for a distance of 300 feet. Any parcel having area within the overlay is subject to these requirements. As an overlay, this district is applied in addition to those standards of the underlying district.  Any developments within the geographic limits of this district shall conform to the requirements of both districts or the more restrictive of the two. Single-family and two-family land uses shall be exempt from the provisions of this overlay.

*6.28.3*    DEVELOPMENT STANDARDS:
The following standards and guidelines shall apply to all development, construction, reconstruction, or alteration:

6.28.3.1    Utilities:
All new utility lines, including, but not limited to, electric, telephone, and TV cable, shall be placed underground.

6.28.3.2    Mechanical Equipment:
Ground-mounted mechanical equipment shall not be located in the front yard. All ground-mounted mechanical equipment shall be screened from view from the designated street by the use of walls, fences, or landscaping. All roof-mounted mechanical equipment shall be properly screened to minimize visual impact from the designated street, where such screening will be effective. Where screening will not be effective, the color of the equipment shall be the same as or complementary to the building.

6.28.3.3    Building Facades:
Buildings shall be designed and constructed to avoid lengthy, unbroken facades with no scale, detailing, or fenestration. Examples of architectural details include: recessed or articulated wall surfaces; columns and beams; windows and other openings that reflect and enhance the character and style of the building; and defined rooflines. The use of sloped roofs in combination with flat roofs, may be used to vary the building profile and to provide equipment screening.

Exterior building materials that are prohibited, when visible from the designated roadway or abutting residential development, include: corrugated metal siding; vinyl siding; and unpainted concrete block. Painted smooth-faced concrete block may be utilized, in an amount not to exceed five percent (5%).

6.28.3.4    Service, Loading, and Equipment Storage Areas:
Service areas, including storage, special equipment, maintenance, and loading areas, shall be screened so as to minimize visibility from the designated roadway or abutting residential development. Refuse collection areas shall be located in the side or rear yard and shall be screened so as to minimize visibility. If architectural elements are employed for screening, they shall be of the same building materials as the principal structure.

6.28.3.5    Signage:
All signage located within this overlay shall comply with the requirements of the underlying zoning unless modified below.

No freestanding or development identification sign shall exceed thirty (30) feet in height as measured from the surface grade at the base of the sign or from the surface grade of the highway to which this overlay is applied. The surface grade of the designated highway shall be measured from the centerline of the travel lane closest to the sign. No freestanding sign or development identification sign shall exceed two hundred (200) square feet in sign area.  If the distance from the outside driving lane of the adjacent right-of-way to the property line is greater than sixty (60) feet, then the setback for a permitted freestanding or development identification sign may be reduced to ten (10) feet.

6.28.3.6    Lighting:
Direct light and glare from lights can be both a hazard and a nuisance to drivers and neighboring residential development. Exterior lighting shall not emit any light above a horizontal plane. Searchlights, laser source lights, or any similar high intensity light for advertising purposes shall be prohibited. The maximum height of lights not located in the public right-of-way shall be thirty-five (35) feet.

6.28.4    PROHIBITED USES:
The following uses shall be prohibited in the CO district:
A.    Adult-oriented businesses;

B.    Transmission tower structures;

*C.*    Mobile home sales; and

*D.*    Salvage and/or junk yards.

6.28.5    USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
When allowed in the underlying district, the following use is permitted when approved by the Board of Zoning Appeals as a Special Exception as provided by Section 15.4:

A.    Self Service Storage, as a primary use: provided that 1) all buildings adhere to the development standards; 2) all storage buildings on site are located perpendicular to the primary adjoining public right-of-way; 3) decorative fencing (examples: wood, wrought iron, vinyl, aluminum) is installed along adjoining right-of-way(s); 4) chain link fencing may be used on side and rear property lines, provided that it is not adjoining a public right-of-way or residential use, and the fencing is buffered by maintained landscaping; and 5) the colors utilized for all buildings shall be compatible earth tones.

6.28.6    GREENWAYS:
At the time of subdivision or development, whichever comes first, all parcels which abut a flood zone shall provide a drainage and transportation easement of up to fifteen (15) feet in the flood zone to ensure the continued safe flow and unimpeded access.

6.28.7    DRAINAGE AND EROSION CONTROL:
The construction of storm sewers and storm water management systems shall be in accordance with the Johnson City Public Works Department's standards of latest issue. Reseeding or sodding any cleared or graded site shall be required where no building activity has occurred within a three (3) month period. Additional reseeding or sodding will be required in the event the initial application(s) are unsuccessful.

## 6.29 - HVO - HIGHWAY VISTA OVERLAY DISTRICT

6.29.1   INTENT:
The purpose of this overlay district is to establish higher environmental, aesthetic, and design standards for designated areas of Johnson City which are visible from specified highways.   Because these standards shall apply without regard to the underlying use of the land, they are created in a special overlay district which can be applied over any zoning district located along a designated highway.

6.29.2   APPLICABILITY:
The Highway Vista Overlay District shall be in effect in all zoning districts along designated highways.  Any parcel with more than half of its area within the overlay is subject to these requirements.  As an overlay, this district is applied in addition to those standards of the underlying district.  Any development within the geographic limits of this district shall conform to the requirements of both districts or the more restrictive of the two.  Single-family and two-family land uses shall be exempt from the provisions of this overlay.

6.29.3   DEVELOPMENT STANDARDS:
The following standards and guidelines shall apply to all development, construction, reconstruction, or alteration:

6.29.3.1   Utilities:
All new utility lines, including, but not limited to, electric, telephone, and TV cable, shall be placed underground.

6.29.3.2   Mechanical Equipment:
All ground-mounted mechanical equipment shall be screened from view from the designated highway by the use of walls, fences, or landscaping. All roof-mounted mechanical equipment shall be properly screened to minimize visual impact, where such screening will be effective.  Where screening will not be effective, the color of the equipment shall be the same as the building.

6.29.3.3   Building Facades:
Buildings which have their back or side facing the designated highway shall be designed and constructed to avoid lengthy, unbroken facades with no scale, detailing, or fenestration or they shall be required to plant shade or evergreen trees on twenty-five (25) foot centers within twelve (12) feet of the rear or side of the building, except in front of entrances or signage. In the area in front of wall signs, there shall be a row of hedges a minimum of eight (8) feet on center.

6.29.3.4   Service, Loading, and Equipment Storage Areas:

Service areas, including storage, special equipment, maintenance, and loading areas, shall be screened with landscaping and/or architectural treatment, so as not to be visible from the highway. Refuse collection areas shall be visually screened with a solid perimeter wall consisting of materials and colors compatible with those of the adjacent structure and shall be roofed if the contents are visible from the highway.

6.29.3.5    Signage:
All freestanding and development identification signs shall be ground-mounted signs that do not exceed ten (10) feet in height and two hundred (200) square feet in sign area.

6.29.3.6    Building Heights:
No building shall exceed thirty-five (35) feet in height, measured as the vertical distance from the mean grade elevation taken at the fronting street side of a structure. Towers, spires, steeples, and enclosed roof top mechanical equipment are not counted in the height measurements.

6.29.3.7    Prohibited Uses:
The following use shall be prohibited in the HVO district:
A.      Tower structures.

6.29.3.8    Uses Permitted By Approval As Special Exception:
The following use is permitted when approved by the Board of Zoning Appeals as a Special Exception as provided by Section 15.4:
A.      Alternative tower structure.

zonecode/articles/hvo.doc

## 6.30 - DO – DESIGN OVERLAY DISTRICT

6.30.1    INTENT:
The purpose of this overlay district is to establish higher environmental, aesthetic, and design standards for designated areas of Johnson City that includes properties visible from specified streets.  Because these standards shall apply without regard to the underlying use of the land, they are created in a special overlay district which can be applied over any zoning district located along a designated street.

6.30.2    APPLICABILITY:
The Design Overlay District shall be in effect in all zoning districts along designated streets.  The district as measured extends from a parcel's front property line for a distance of 300 feet. Any parcel having area within the overlay is subject to these requirements. As an overlay, this district is applied in addition to those standards of the underlying district.  Any developments within the geographic limits of this district shall conform to the requirements of both districts or the more restrictive of the two. Single-family and two-family land uses shall be exempt from the provisions of this overlay.

6.30.3    DEVELOPMENT STANDARDS:
In the DO district, architectural building elements and/or elevations shall be submitted in conjunction with plans for site plan approval depicting sufficient detail to determine conformance with this district.

The following standards and guidelines shall apply to all development, construction, reconstruction, or alteration:

6.30.3.1    Utilities:
All new utility lines, including, but not limited to, electric, telephone, and TV cable, shall be placed underground.

6.30.3.2    Mechanical Equipment:
Ground-mounted mechanical equipment shall not be located in the front yard. All ground-mounted mechanical equipment shall be screened from view from the designated street by the use of walls, fences, or landscaping. All roof-mounted mechanical equipment shall be properly screened to minimize visual impact from the designated street, where such screening will be effective. Where screening will not be effective, the color of the equipment shall be the same as or complementary to the building.

6.30.3.3    Building Facades:
Buildings shall be designed and constructed to avoid lengthy, unbroken facades with no scale, detailing, or fenestration. Examples of architectural details include: recessed or articulated wall surfaces; columns and beams;

windows and other openings that reflect and enhance the character and style of the building; and defined rooflines. The use of sloped roofs in combination with flat roofs, may be used to vary the building profile and to provide equipment screening.

Exterior building materials that are prohibited, when visible from the designated roadway or abutting residential development, include: corrugated metal siding; vinyl siding; and unpainted concrete block.

A minimum of seventy percent (70%) of every exterior building wall, excluding glass, that is visible from a public right-of-way or an abutting residential development shall be comprised from the following materials: brick; stone; hard-coat stucco; pre-cast concrete; or synthetic stucco (EIFS). Colored split-faced block may also be utilized, in an amount not to exceed sixty-five percent (65%). Painted smooth-faced concrete block may be utilized, in an amount not to exceed five percent (5%).

6.30.3.4    Service, Loading, and Equipment Storage Areas:
Service areas, including storage, special equipment, maintenance, and loading areas, shall be screened so as to minimize visibility from the designated roadway or abutting residential development. Refuse collection areas shall be located in the side or rear yard and shall be screened so as to minimize visibility. If architectural elements are employed for screening, they shall be of the same building materials as the principal structure.

6.30.3.5    Signage:
All signage located within this overlay shall comply with the requirements of the underlying zoning unless modified below.

No freestanding or development identification sign shall exceed thirty (30) feet in height as measured from the surface grade at the base of the sign or from the surface grade of the highway to which this overlay is applied. The surface grade of the designated highway shall be measured from the centerline of the travel lane closest to the sign. No freestanding sign or development identification sign shall exceed two hundred (200) square feet in sign area. If the distance from the outside driving lane of the adjacent right-of-way to the property line is greater than sixty (60) feet, then the setback for a permitted freestanding or development identification sign may be reduced to ten (10) feet.

6.30.3.6    Parking:
A landscaped pedestrian way, a minimum of five (5) feet in width, is encouraged to be provided between the rows of parking that lead into the primary customer entrance(s) of the business establishment. Parking shall not encroach into the pedestrian way.

6.30.3.7    Lighting:
Direct light and glare from lights can be both a hazard and a nuisance to drivers and neighboring residential development. Exterior lighting shall not emit any light above a horizontal plane. Searchlights, laser source lights, or any similar high intensity light for advertising purposes shall be prohibited. The maximum height of lights not located in the public right-of-way shall be thirty-five (35) feet.

6.30.4        PROHIBITED USES:
The following uses shall be prohibited in the DO district:
A.    Adult-oriented businesses;

B.    Transmission tower structures;

C.    Auto repair, as a primary use;

D.    Mobile home sales; and

E.    Self service storage, as a primary use; and

F.    Salvage and/or junk yards.

6.30.5        GREENWAYS:
At the time of subdivision or development, whichever comes first, all parcels which abut a flood zone shall provide a drainage and transportation easement of up to fifteen (15) feet in the flood zone to ensure the continued safe flow and unimpeded access.

6.30.6        DRAINAGE AND EROSION CONTROL:
The construction of storm sewers and storm water management systems shall be in accordance with the Johnson City Public Works Department's standards of latest issue. Reseeding or sodding any cleared or graded site shall be required where no building activity has occurred within a three (3) month period. Additional reseeding or sodding will be required in the event the initial application(s) are unsuccessful.

## 6.31 - UPO – UNIVERSITY PARKWAY OVERLAY DISTRICT

6.31.1    INTENT:
It is the intent of the Overlay District to ensure that any nonresidential development proposed is given the highest standard of review possible by the citizens most affected by the development and the civic leaders sworn to serve the residents of the city. Additionally, it is the intent of the city that zoning within the University Parkway Overlay District shall be consistent with the goals, objectives, and policies of the city's Comprehensive Plan. To ensure this consistency, any rezoning request, excluding residential and historic rezoning requests, within the specified overlay district shall be deferred until the following procedures are completed.

6.31.2    SCHEDULING OF PUBLIC MEETING AND NOTICE:
Following the submission of a rezoning request to the Planning Department, the Planning Department shall coordinate a public meeting between the Planning Department staff, the petitioner seeking the rezoning, and the residents of the University Parkway Overlay District. Notice of the meeting shall be given to the property owners within the Overlay District by certified mail no later than fourteen (14) days prior to the date of the meeting and no longer than thirty (30) days prior to the date of the meeting. The petitioner shall be responsible for: (1) obtaining property owners' names and addresses as they appear in the records of the Washington County Assessor of Property; (2) preparing the letters and envelopes for certified mail delivery; and (3) paying all costs associated with the certified mail notification. Prior to the meeting with property owners, the petitioner shall provide the Planning Department with a list of all property owners to whom certified letters were sent and a map indicating each parcel whose owner was notified.

6.31.3    PUBLIC MEETING OF RESIDENTS AND PETITIONER:
At the scheduled public meeting, the residents of the Overlay District and the petitioner shall compile a list of questions and comments regarding the proposed development. To the best of its ability, the petitioner shall within thirty (30) days answer each question proffered at the meeting. The list of questions and comments as well as the list of answers proffered by the petitioner shall be provided to the Planning Department staff, the Planning Commission, and the City Commission.

6.31.4    PLANNING COMMISSION PUBLIC HEARING:
Following the submission of the list of answers by the petitioner to the Planning Department or after the expiration of thirty (30) days following the scheduled public meeting between the Overlay District residents and the petitioner, whichever is first, the Planning Commission shall schedule a public hearing at the earliest convenient regularly scheduled meeting to discuss the proposed rezoning and development. At the conclusion of the public hearing, upon motion being properly made, seconded and approved by a majority of those present, the Planning Commission may extend the public hearing for

whatever purpose deemed necessary, said extension shall not exceed thirty-nine (39) days.  Re-opening of the public hearing shall be conducted at a regularly scheduled meeting of the Planning Commission.  Once the public hearing is re-opened, the Chairperson shall call for a vote at such time it is determined that debate on the rezoning has been exhausted.

6.31.5       PLANNING COMMISSION VOTE:
A positive vote by the majority of the Planning Commission for the rezoning shall forward the rezoning request to the City Commission in ordinance form.  A negative vote by the majority of the Planning Commission shall terminate the request; however, a negative vote is subject to appeal to the City Commission by the petitioner.  Passage of the ordinance on three readings shall allow the development to proceed in accordance with the terms and conditions set forth by the City Commission.

zonecode/articles/upo.doc

## 6.32 - RO-2 MEDIUM DENSITY RESIDENTIAL-PROFESSIONAL OFFICE DISTRICT

6.32.1    PERMITTED USES:
Within the RO-2 Medium Density Residential- Professional Office District the following uses are permitted:

6.32.1.1    Single-family, two-family, and multi-family dwellings;

6.32.1.2    Day-care centers, adult day-care centers, and dance schools;

6.32.1.3    Churches, including parish houses and Sunday school buildings;

6.32.1.4    Fraternal organizations and clubs not operated for profit;

6.32.1.5    Public utility stations;

6.32.1.6    Municipal, County, State, or Federal Buildings or Land Uses;

6.32.1.7    Elementary and secondary schools, colleges, universities, and similar institutions, public or private with or without students in residence;

6.32.1.8    Libraries, museums, and art galleries;

6.32.1.9    Clinics;

6.32.1.10    Office Buildings: government and private office buildings, including professional offices.  For the purposes of this Section, a permitted office building is defined as a building having not less than fifty (50) percent of its total floor area occupied by medical, dental, governmental, private, or professional office uses;

6.32.1.11    Drug stores, located within a permitted office building as defined in Subsection 6.12.1.12;

6.32.1.12    Barber and beauty shops, located within a permitted office building as defined in Subsection 6.12.1.12;

6.32.1.13    Branch banks, located within a permitted office building as defined in Subsection 6.12.1.12;

6.32.1.14    Accessory structures and uses, provided they are located in the rear yard and setback a minimum of seven and one-half (7 ½) feet from all property lines;

6.32.1.15    Bed-and-breakfast inns, provided:

A. There shall be no more than twelve (12) registered adult guests at one time and a current guest register must be kept by the owner (or manager);

B. The owner (or manager) must reside on the premises;

C. Parking shall be located at the rear or side of the building and not be visible from any public right-of-way (excluding alleys) or adjacent property;

E. All necessary state and city permits, certifications, or requirements be obtained as a condition of a bed-and-breakfast inn service; and

F. No exterior alterations, other than those necessary to assure safety of the structure, shall be made to any building for the purpose of providing bed-and-breakfast; and

6.32.1.16 Residential homes for the aged, subject to the requirements of Subsection 6.6.1.6;

6.32.1.17 Portrait studio, provided:
A. The use shall be located on an arterial or collector street; and
B. Off-street parking shall be provided in either the side or rear yard at one (1) space per three hundred (300) square feet of floor area used in conjunction with the business; and

6.32.1.18 Professional Services

6.32.2 USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:
6.32.2.1 Restaurants, provided:
A. Food is prepared to be consumed within the principal building only; and
B. The restaurant is located within a permitted office building as defined in Subsection 6.12.1.12.

6.32.2.2 Mortuary establishments, provided such establishments will not cause undue traffic congestion or create a traffic hazard;

6.32.2.3 Hospitals for the treatment of human ailments, provided they are located on an arterial or collector street, on a street constructed to industrial or commercial standards, or where a portion of the property lies within five hundred (500) feet of an arterial or collector street;

6.32.2.4    Group homes subject to the requirements of Subsection 6.6.1.5.

6.32.2.5    Group homes subject to the requirements of Subsection 6.8.2.3.

6.32.2.6    Antique sales and home decorating service.

6.32.2.7    Alternative tower structures.

6.32.2.8    Tearoom provided:

    A.    The structure shall be located on an arterial street;

    B.    The use shall be located either in a residential structure or bed-and-breakfast inn with the owner residing on the premises of the residential structure of the bed-and-breakfast inn. Tearooms not part of a bed-and breakfast inn shall provide a minimum of five (5) off-street parking spaces located in the side or rear yard;

    C.    No exterior alterations designed to increase seating capacity shall be permitted;

    D.    Kitchen facilities shall meet applicable code requirements;

    E.    Outside dining shall be screened from adjacent residential uses by a six-foot opaque wooden fence, Type 1 buffer, or other acceptable screening approved by the BZA;

    F.    Operation shall be limited to the hours of 11:00 AM to 9:00 PM, seven days a week; and

    G.    Any other conditions deemed appropriate by the BZA to ensure protection of surrounding residential uses.

6.32.2.9    Emergency or temporary shelters provided:

    A.    The shelter houses no more than eight (8) persons for no more than thirty (30) days per person. Length of stay may be extended when extenuating circumstances can be shown to the Shelter Director; and

    B.    All other applicable conditions for approval listed in Subsection 6.6.1.7 are met.

6.32.3    AREA REGULATIONS:
          All buildings and uses, unless otherwise specified in this Code, shall comply with the
          following setback, coverage, and area requirements:

          6.32.3.1   Minimum Lot Size:
                     A.    Minimum lot size shall be 6,000 square feet.

                     B.    Minimum lot width shall be fifty (50) feet at the front building
                           line.

          6.32.3.2   Density:
                     Maximum density shall be fourteen (14) dwelling units per acre.

          6.32.3.3   Yard Area:
                     A.    Front Yard:
                           Minimum front yard setback shall be twenty-five (25) feet on an
                           arterial or collector street and ten (10) feet on all other streets.
                           Front-facing garages shall have a minimum setback of twenty-five
                           (25) feet on all streets.

                     B.    Side Yard:
                           Minimum side yard setback shall be eight (8) feet.

                     C.    Rear Yard:
                           Minimum rear yard setback shall be thirty (30) feet.


6.32.4    MAXIMUM LOT COVERAGE:
          The principal building and all accessory buildings shall cover not more than
          thirty-five (35) percent of the total lot area.


6.32.5    HEIGHT REGULATIONS:
          Principal buildings shall not exceed the height of sixty-five (65) feet.


6.32.6    SIDEWALK REQUIREMENT:
          Sidewalks shall be required for all adult day care centers, churches, dance schools,
          day-care centers, fraternal organizations, government buildings, hospitals,
          libraries/museums/art galleries, public utility stations, schools, bed-and-breakfast
          inns, multi-family residential, office, and commercial developments along their
          public street frontages in accordance with the Article IX, Sidewalk Regulations, and
          The Standards of Design for Streets and Drainage.


6.32.7    CONCEPT PLAN REQUIRED:

Each application for a rezoning request shall be accompanied by five sets of a concept plan as described in Article XIV, Subsection 14.2.2.1. The review and approval process for such concept plan shall be as described in Subsection 14.2.2.2.

zonecode/articles/ART 06-32, RO2.doc

**6.33 - UCO  URBAN COMMERCIAL OVERLAY**

6.33.1    INTENT:
The intent of the Urban Commercial Overlay District is to address the unique characteristics of existing and future development along West Walnut Street to allow for developments and/or changes in land use while addressing the required parking requirements and concerns of the adjacent residential neighborhood.

6.33.2    APPLICABILITY:
The Urban Commercial Overlay District shall be in effect along the designated area of the zoning map of Johnson City.  As an overlay, this district is applied to the underlying districts.  Development within the geographic limits of this overlay district shall conform to the requirements of all underlying districts with the exception of parking, changes in intensity, and any other factor governed by the overlay district.

6.33.3    DEVELOPMENT STANDARDS:
The following guidelines shall apply to all development, construction, reconstruction, alterations, or changes in land use:

6.33.3.1    As of March 2, 2006 existing uses and structures are exempt from meeting setbacks and off-street parking requirements;

6.33.3.2    Any new development shall be required to provide the required off-street parking for that development. Any expansion in exterior or interior floor area of an existing use or structure shall be required to provide the required off-street parking for that portion of the use or structure being expanded;

6.33.3.3    Off-premise parking shall be approved by the Board of Zoning Appeals and shall be exempt from the following provisions of Article XI, Off-Premise Parking:
A.    The property shall lie within four hundred (400) feet of the main entrance of the principal use;
B.    The property shall not be separated from the principal use by a collector or arterial street as designated on the zoning map and shall be located on the same street as the principal use; and
C.    Such spaces shall not exceed twenty-five (25) percent of the required parking.

The Board of Zoning Appeals shall review each approval for off-premise parking on an annual basis to ensure the parking remains available. Failure to retain the off-premise parking shall be considered a violation of the Zoning Code;

6.33.3.4   Any expansion of an existing structure or use shall not reduce the existing number of required off-street parking spaces;

6.33.3.5   Required off-street parking shall be allowed to back into the public right-of-way;

6.33.3.6   Uses serving alcohol shall be located not closer than five hundred (500) feet as measured from property line to property line to any other uses serving alcohol. The Board of Zoning Appeals shall review, as a special exception, any use that desires to serve alcohol that is closer than five hundred (500) feet to an existing alcohol serving establishment within the overlay district; provided:

A)   The main entrance is on West Walnut Street;
B)   Off-street parking requirements are met for any new establishment that involves an increase in intensity. New establishments shall prepare a site plan for BZA approval and any documentation necessary concerning offsite parking;
C)   There are no outside dining/entertainment areas located in the rear yard; and
D)   The total floor area shall not exceed three thousand five hundred (3,500) square feet and total patron seating shall not exceed one hundred and twenty-five (125).

6.33.3.7   Any change in a permitted use or special exception that is considered to be more parking intensive, i.e. change in use from office to retail, or from retail to restaurant, shall be required to provide a minimum of seventy-five (75) percent of the required parking either on-premise or off-premise as a special exception by the Board of Zoning Appeals. Off-premise parking shall be located within 1,000 feet of the nearest property line of the intended use. The remaining twenty-five (25) percent may include existing on-street parking;

6.33.3.8   Rear entrances, provided they meet Health Department and Fire Marshall requirements, shall be allowed to be used for service use and emergency exit purposes. Rear entrances may be used for patron ingress and egress prior to 11:00 PM on days of

operation. Outside activity (eating and drinking) shall not be permitted at the rear of buildings past 11:00 PM. Any location of outside activity to the rear of a building will require that a Type I buffer of a minimum of 10 feet in width with a solid wood fence 10 feet in height be installed. Vegetation shall be allowed to be placed on either side of the fence and shall be approved by the City Forester. The installation of fencing will require Fire Marshall and other service providers approval;

6.33.3.9 With the exception of 6.33.3.8 outdoor entertainment/dining areas shall be located along the frontage of West Walnut Street in order to reduce noise and other adverse impacts on the adjoining residential area. Required parking shall not be used for outdoor entertainment/dining purposes; and

6.33.3.10 A Special Use Permit, obtained from the Building Division and approved by the City Commission, shall be required for outdoor events extending past 11:00 PM. Outdoor events include, but are not limited to, festivals, outdoor music/entertainment, and other similar activities. In order to be considered for City Commission approval, a completed Special Use Permit shall be received by the Building Division no later than fourteen (14) days prior to the City Commission meeting at which it is to be considered.

zonecode/articles/ART 06-33, UCO.doc

# ARTICLE VII
## SIGN REGULATIONS


## 7.1 - GENERAL PROVISIONS

7.1.1    PURPOSE:
The purpose of this Article is to provide a comprehensive system of sign regulations which will promote and carry out the objectives of the city of Johnson City, as identified in the Johnson City Comprehensive Plan. It is the intent of this Article to establish regulations which:

A.    Regulate the number, type, location, and size of signs and other graphic devices within the city;

B.    Protect and enhance the scenic beauty of the natural environment and avoid sign clutter in the city and the surrounding area;

C.    Emphasize the assets of community appearance and high environmental quality in promoting industrial recruitment and economic development;

D.    Promote the public health, safety, and welfare by prohibiting improperly designed or located signs which could distract, confuse, mislead, or obstruct vision;

E.    Ensure safe construction and maintenance of signs;

F.    Protect and enhance public and private property; and

G.    Ensure equity in the distribution of the privilege of using the public visual environment to communicate private information;

H.    Improve the appearance of the city's business areas, especially along major thoroughfares.


7.1.2    DEFINITIONS:

ABANDONED SIGN:  A sign which identifies or advertises a discontinued business, lessor, owner, product, or activity.

ANIMATED SIGN: An electronic message board that uses change of lighting to depict motion, with a slightly progressive change.  The display of video shall be prohibited.

AWNING:  A shelter projecting from and supported by the exterior wall of a building

constructed of non-rigid materials on a supporting framework.

AWNING SIGN:  A sign painted on, printed on, or attached to the surface of an awning or canopy.  For purposes of determining permitted use, area, or location within this Code, an awning sign shall be considered a wall sign.

BALLOON:  A tethered gas- or air-filled figure used for advertising purposes and not certified for flight by the Federal Aviation Administration.

BANNER:  A temporary sign made of fabric or any non-rigid material with no enclosing framework. and displayed outside of a building.   This would include FEATHER BANNERS.

BUSINESS SIGN:  A sign which advertises the name, logo, slogan, prices, products, or services offered by the business or activity on the premises.

CANOPY:  A permanent shelter supported by a framework upon the ground.  A canopy may be either freestanding or attached to a building.

CONSTRUCTION SIGN:  A temporary freestanding sign identifying an architect, contractor, subcontractor, engineer, financier, and/or material supplier participating in construction on the property on which the sign is located.

COMPREHENSIVE DEVELOPMENT: A single parcel initially under the ownership of a single entity.  Subdivision may occur within the development with access to public streets or private easements.

DIRECTIONAL SIGN:  An on-premise sign giving directions, instructions, or facility information, such as parking, loading, entrance, or exit.  The maximum size of each such sign shall be four (4) square feet and the maximum height shall be three (3) feet.

DIRECTIONAL SIGN - HOSPITAL CAMPUSES:  In addition to the standard DIRECTIONAL SIGNS  (4 square feet maximum), hospital campuses in excess of seven (7) acres may erect one (1) or more larger directional signs, provided such signs are approved by the city's Traffic Engineer as part of a site plan.  Such additional DIRECTIONAL SIGNS shall comply with the vision clearance provisions of Section 4.11.  Such additional DIRECTIONAL SIGNS for hospital campuses shall be limited to:

    A.  One (1) directional sign with a maximum height of nine (9) feet and maximum size of fifty-four (54) square feet to be located near the main entrance;  and

    B.  Other directional signs with a maximum height of six (6) feet and a maximum size of twenty-four (24) square feet.

DIRECTORY SIGN:  A sign which gives the names and locations of occupants or uses in a multi-occupant, nonresidential development, building, or organized merchant association.  Such sign shall be oriented to the view of pedestrians or to vehicles on the site, rather than to view from the adjacent public right-of-way.  The maximum size of a DIRECTORY SIGN shall not exceed one (1) square foot per listed occupant or use.

ELECTRONIC MESSAGE BOARD:  A sign that uses electronic technology to display information.

FEATHER BANNERS: A sign typically made of a flexible fabric attached to a long pole in the general shape of a feather, teardrop, or similar shape.

FESTOONS: A string of ribbons, pennants, streamers, tinsel, small flags, or pinwheels.

FLASHING SIGN:  A sign or portion thereof, which exhibits sudden changes in lighting or transitory bursts of lighting of less than one (1) second in duration.

FREESTANDING SIGN:  A SIGN supported upon the ground by poles, braces, fences or other supports and not attached to any building.

GOVERNMENT SIGN:  Any temporary or permanent sign erected and maintained by the city, county, state, or federal government for traffic direction or for designation of, direction to, or announcement of activities at any school, hospital, historic site, or other public property or facility.  This definition shall also include signs giving necessary traffic information or warning, such as railroad signs or temporary traffic signs erected by contractors working within or adjacent to a public street.

GROUND-MOUNTED SIGN:  A freestanding sign which is mounted directly on the ground, with the entire bottom portion of the structure in contact with the ground.

HUMAN SIGNS:  A temporary sign that may be worn as a costume or held or manipulated by a human that is used for commercial advertising purposes.

MANSARD:  A sloped roof or roof-like facade architecturally comparable to a building wall.

MENU BOARD:  A sign associated with drive-thru windows.  The sign shall not exceed thirty-two (32) square feet and oriented toward drive-thru window traffic.  A permit is required, but such a sign will not be counted toward the freestanding sign allowance for the business or property.

NIT: A unit of measurement of luminous intensity or brightness of electronic message boards as determined by the PR-650 SpectraScan Colorimeter or an industry approved

alternate.

MURAL:  A graphic display that covers all or a portion of a wall and depicts a scene or event of natural, social, cultural, or historic significances, including, but not limited to painting, fresco, or mosaic.  It shall not include any on or off-premises advertising.

OFF-PREMISE ADVERTISING SIGN:  A freestanding, ground mounted, or wall sign directing attention to a business, product, service, or entertainment which:

    A.      Is not conducted, sold, or offered on the premises where the sign is located, or

    B.      Is a minor and incidental activity upon the premises where the sign is located.

POLITICAL SIGN:  A temporary sign used in connection with a political, religious, or civic, noncommercial campaign.

PORTABLE SIGN:  Any sign designed to be moved easily and not permanently attached to the ground or to a structure or building.

PROJECTING SIGN:  A sign attached non-parallel to the wall of a building.  A projecting sign may extend no more than four (4) feet from that wall or one-half the distance between the wall of the building and the curb line of the adjacent street, whichever is less.  No such sign shall extend above the roof line of its building nor shall it be placed less than ten (10) feet above the sidewalk or ground level.

REAL ESTATE SIGN:  A sign which announces the auction, sale, rental, or lease of the property upon which the sign is located

Real estate signs shall be removed within ten (10) days after the property has been sold, rented, or leased.

SANDWICH BOARD:  a self-supporting, A-shaped freestanding temporary sign with only two visible sides that are situated adjacent to a business, on the sidewalk.  The maximum area of a sign shall be no more than six (6) square feet per side of sign with the maximum height being (42) inches.

SCROLLING:  A type of animated sign that uses change of lighting to create the appearance of words, numbers, or objects moving across the face of the sign horizontally, vertically, or diagonally.

SIGN:  Any device, structure, placard, surface, or fabric using graphics, letters, symbols, pictures, or sculptured matter designed to convey information visually and exposed to public view from the outside.

SIGN AREA:

1.     The area of a WALL SIGN shall be the area of the smallest rectangle which will enclose the sign face and its cabinet. If the sign is composed of individual letters or symbols using the wall as a background with no added decoration, the total sign area shall be the sum of the areas of the smallest rectangles which enclose each individual letter or symbol.



**Wall Signs**

**Individual letters or symbols**

2.     The area of a FREESTANDING SIGN or GROUND-MOUNTED SIGN shall be the area of the smallest rectangle which encloses the sign and its cabinet, if any. For a sign with two parallel faces, only the area of a single face shall be considered. If the faces of a multiple-faced sign are not parallel, then the total sign area shall be the sum of the areas of the individual, non-parallel faces.



**Ground Mounted Sign**          **Freestanding Sign**

SIGN HEIGHT: The height of a FREESTANDING SIGN or GROUND-MOUNTED SIGN shall be the vertical distance from the highest point of the sign and its structure to either (a) the surface grade at the base of the sign, or (b) the surface grade of the nearest adjacent street granting access to the property upon which the sign is located, whichever is higher.

SUBDIVISION IDENTIFICATION SIGN: A ground-mounted sign identifying a specific development that is located on one or both sides of each principal roadway entrance into the development or in the roadway median inside at the entrance to the development.

TEMPORARY SIGN: Any sign that is intended for temporary use and a limited period. This includes, but is not limited to: real estate signs; construction signs, political signs, garage sales or any other non-commercial messages.

UNDER-AWNING SIGN: A sign located under a permitted awning or canopy at the entrance to the premises. Such sign shall be perpendicular to the entrance wall of the building, and shall be placed at least eight (8) feet above the sidewalk or ground level so as not to constitute a hazard or impediment to pedestrians. The maximum size of

an UNDER-AWNING SIGN shall be four (4) square feet.

UNSAFE SIGN: Any sign or structure or appurtenance which, in the opinion of the Chief Building Official of the city, poses an imminent or potential threat to the public health or safety, whether personal or property.

VIDEO: The display or transmission of moving pictures (not animated) such as television images or video recordings.

VEHICULAR SIGN: A sign placed on a vehicle or trailer which is parked or located for the primary purpose of displaying said sign. This does not apply to signs or lettering on buses, taxis, or vehicles operating during the normal course of business.

WALL SIGN: A SIGN attached parallel to and extending not more than eighteen (18) inches from the wall of a building. This definition includes painted, individual letter, and cabinet signs located on the outside of the building. No such sign shall extend above the roof line of its building or canopy structure.

WINDOW SIGN: Any sign, picture, symbol or combination thereof designed to communicate information about an activity, business, commodity, product, sale, or service that is placed inside or outside of a window and is visible from the exterior of the window.

7.1.3    MINIMUM STANDARDS AND CONFORMANCE:

7.1.3.1    Minimum Standards:
The minimum standards set forth herein shall not be construed as relieving any owner or tenant of the responsibility for compliance with other local ordinances, codes, and regulations, including established requirements and provisions of the International Building Code or National Electrical Code or other authority having jurisdiction.

7.1.3.2    Conformance Required:
All signs erected, replaced, reconstructed, expanded, or relocated on any property shall conform with the provisions of this Article and with all other pertinent laws or ordinances of the city of Johnson City. For the purposes of sign regulation, this Article shall supersede the provisions of Article III where the two Articles conflict. Properties located within a historic/conservation district shall conform to the Design Guidelines for that district.

7.1.3.3    Electrical Safety:
All signs having electric wiring shall bear a seal of approval of a nationally recognized electrical testing laboratory. Each sign with electrical wiring

must have an external disconnect.  Where appropriate, label numbers shall be registered with the Building Division at the time a sign permit is issued.

7.1.3.4    Setback:
The following signs shall be erected no closer than ten (10) feet to any property line or public street right-of-way.  In addition, such signs shall comply with Section 4.11 of the Zoning Code, which deals with vision clearance at street intersections. If the adjoining street right-of-way is less than fifty (50) feet in width, each such sign shall be located no closer than thirty-five (35) feet from the centerline of the right-of-way.

A.    Freestanding signs;

B.    Real estate signs;

C.    Political signs;

D.    Construction signs;

E.    Directory signs;

F.    Ground-mounted signs; and

G.    Temporary signs.

7.1.3.5    Noncommercial Copy:
Any sign, display, or device allowed under this ordinance may contain, in lieu of any other copy, any otherwise lawful noncommercial message which does not direct attention to a business operated for profit, or to a product or service for sale, provided that such sign complies with the size, height, and location requirements of this ordinance or those regulations in effect at the time the sign was erected.

7.1.3.6    Sign Maintenance:
Every sign and its structure shall be maintained in a safe, presentable, and good structural condition at all times, including the replacement of defective parts and wiring, painting, repainting, cleaning, and other acts required for the general maintenance of said sign.  Signs not adequately maintained shall result in the owner being cited to court.  For the purpose of this regulation, repairing or replacing a sign shall be deemed general maintenance.

7.1.4    ADMINISTRATION AND PERMITS:

    7.1.4.1    The regulations of this Article shall be administered by the Chief Building Official of the city of Johnson City.

    7.1.4.2    Permit Required:
Unless otherwise provided, no sign shall be erected, replaced, reconstructed, expanded, or relocated without first securing a permit from the Chief Building Official of the city of Johnson City. No permit shall be required for a mere change of copy on a sign, the customary use of which involves frequent and periodic changes of copy, e.g., reader boards with changeable letters, movie theater marquees, and service station price signs. Any change in a sign associated with a change of ownership or tenancy shall in all cases require a permit.

    7.1.4.3    Revocation of Permits:
The Chief Building Official is hereby authorized and empowered to revoke any permit upon failure of the holder to comply with any provision of this Code or with the terms of the permit at the time of its issuance.

    7.1.4.4    Inspection of Signs:
At any time deemed necessary, the Chief Building Official, or designee, shall inspect each sign regulated by this Article to ensure that such sign conforms to this Article and to all other ordinances of the city.

    7.1.4.5    Expiration of Permit:
A sign permit shall expire if the work has not been substantially initiated within six (6) months from the date of issuance.


## 7.2 - EXEMPT AND PROHIBITED SIGNS

7.2.1    EXEMPT SIGNS:
The following signs shall be allowed in any zoning district without permit. However, these signs are still subject to the applicable size and setback requirements.

    A.    DIRECTIONAL SIGNS;

    B.    Flags of any nation, government, or noncommercial organization;

    C.    GOVERNMENT SIGNS;

    D.    REAL ESTATE SIGNS;

    E.    Memorial signs, cornerstones, and similar signs containing the name of the

building and date of erection, provided such signs are permanently installed on the building;

F. Window signs which consist entirely of letters, numerals, and symbols, none of which are greater than three (3) inches in height;

F. POLITICAL SIGNS;

H. Noncommercial seasonal displays customarily associated with a national, local, or religious holiday, provided such are not used to advertise the name of a product, service, or business. Such displays shall be removed promptly after the holiday; and

I. MURALS.


7.2.2   PROHIBITED SIGNS:
The following signs shall be prohibited in all zoning districts:

A. ABANDONED SIGNS:
Any sign, or part thereof, that is not conforming to the minimum standards of this ordinance, and which is advertising a discontinued use, occupant, product, or service shall be removed or made conforming within 45 days of the discontinuance. If such sign is not removed within this period, the Chief Building Official shall cite the property owner to court

B. UNSAFE SIGNS:
If the Chief Building Official shall find that any sign is unsafe or insecure, or is a menace to the public, or has been constructed or erected or is being maintained in violation of the provisions of this ordinance, he shall give written notice to the owner of the sign and/or of the property and/or the architect, builder, contractor, or agent for both or either requiring the sign to be made safe and secure or to be removed. If the sign is not removed or altered so as to render it safe and secure, the Chief Building Official shall proceed with action as provided by law. The Chief Building Official may cause any sign which is an immediate danger to persons or property to be removed immediately and without notice. The written notice required in this section is not required for signs allowed in Subsection 7.2.1 above;

C. PORTABLE SIGNS;

D. Any sign located within, upon, or over the public right-of-way, except GOVERNMENT SIGNS, AWNING SIGNS, UNDER-AWNING SIGNS, SANDWICH BOARD SIGNS (in the B-2 district), PROJECTING SIGNS, and special event BANNERS;

E. BANNERS, festoons, pennants, ribbons, streamers, pinwheels, balloons, A-frame, sandwich, and similar temporary signs, except as permitted in Subsections 7.3.3.1, 7.3.4.2-C, 7.3.4.2-D or 7.3.4.2-H of this Code;

F. Any sign located on a telephone pole, power pole, or streetlight pole, except special event banners in the B-2 (Central Business) district;

G. Any sign which contains flashing or intermittent red, blue, green, or amber illumination;

H. Any sign located on the roof of a building which is not an integral part of the building design and construction, except as permitted in Subsection 7.3.4.2-H of this Code;

J. Any sign which constitutes a traffic hazard; No sign or light shall be positioned and designed to appear official where it may interfere with any authorized official traffic sign, signal, or device. Neither shall it obstruct the view of an official traffic control device. Nor shall any sign interfere with safe navigation of traffic upon any public way. Any such sign or light shall be removed immediately at the direction of the Chief Building Official;

K. VEHICULAR SIGNS;

L. Any sign having or consisting of any rotating, revolving, or otherwise moving parts;

M. HUMAN SIGNS;

N. OFF-PREMISES ADVERTISING SIGNS; and

O. Any sign not specifically included in these regulations.


## 7.3 - REGULATIONS BY ZONING DISTRICT

7.3.1    R-1 - R-6, RP-2 - RP-5, RM-3 - RM-5, and A-1 DISTRICTS:
         The following regulations shall apply in the R-1 through R-6, RP-2 through RP-5, RM-3 through RM-5, and A-1 zoning districts.

         7.3.1.1    Permitted Signs:
                    A.    For single- and two-family dwellings. One (1) nameplate attached to the building, not to exceed two (2) square feet in area, shall be permitted for each dwelling unit.

B.  For multi-family residential developments, group dwellings, permitted nonresidential uses, and legal nonconforming uses. One (1) WALL or FREESTANDING SIGN per street frontage granting access to the premises shall be permitted. The maximum size of each sign shall be thirty-two (32) square feet. Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences. SIGNS for churches may be internally illuminated.

C.  For bed-and-breakfast inns, one (1) WALL OR FREESTANDING SIGN shall be permitted. The maximum size of such sign shall be twelve (12) square feet in area with a sign height of no more than eight (8). Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences.

D.  For restaurants, museums, and art galleries, one (1) WALL or FREESTANDING SIGN shall be permitted. The maximum size of such sign shall be twelve (12) square feet in area with a sign height of no more than eight (8) feet. Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences.

E.  TEMPORARY SIGNS: The maximum area of such signs shall be six (6) square feet. Any sign announcing an event shall be removed within forty-eight (48) hours after the event.

F.  SUBDIVISION IDENTIFICATION SIGNS:

1.  Such sign shall not exceed fifty-two (52) square feet in area;

2.  Ground mounted signs located within the right-of-way of the entrance shall be located in a median of not less than fifty (50) feet in length and ten (10) feet in width and be setback at least ten (10) feet from the right-of-way line when projected across the entrance. Signs located at the side of the entrance must be located on private property within an easement; and

3.  The petitioner shall provide documentation that a homeowners association has been created to maintain sign.

7.3.1.2  No sign shall be internally illuminated, except as provided in Section 7.3.1.1(B).

7.3.2       RO-1, MS-1, B-1, MX-1, and RTP DISTRICTS.
            The following regulations shall apply in the RO-1, MS-1, B-1, MX-1, and RTP districts.

    7.3.2.1   Permitted Signs:
            A.     For single- and two-family dwellings. One (1) nameplate, not to exceed two (2) square feet in area, shall be permitted for each dwelling unit.

            B.     For multi-family residential and other permitted group dwellings not otherwise identified. One (1) WALL or FREESTANDING SIGN per street frontage granting access to the premises shall be permitted. The maximum size of each such sign shall be thirty-two (32) square feet in area. Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences.

            C      For bed-and-breakfast, one (1) WALL OR FREESTANDING SIGN shall be permitted. The maximum size of such sign shall be twelve (12) square feet in area with a sign height of no more than eight (8) feet. Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences.

            D.     For permitted uses, the following shall be permitted:

                   1.     One (1) DIRECTORY SIGN per development.

                   2.     In RO-1, B-1, and RTP districts one (1) WALL SIGN for each building side facing an abutting street. An allowable wall sign may be placed either on the building or upon a freestanding canopy, if such exists. The maximum area of each such sign shall be thirty-two (32) square feet.

                          In the MS-1 district each nonresidential building shall be permitted one or more wall signs. An allowable wall sign may be placed on the building or upon a freestanding canopy, if such exists. Two (2) square feet of wall sign area shall be allowed for each horizontal linear foot of exterior wall length. If an exterior wall length is less than sixteen (16) feet, the maximum allowable sign area on the wall shall be thirty-two (32) square feet. In multiple-occupant buildings, the owner shall determine how the authorized sign area is allocated among the occupants.

3.    In RO-1, B-1, and RTP districts each business or premise shall be entitled to one (1) freestanding sign, one (1) ground-mounted sign, or one (1) projecting sign for each street frontage granting access to the premises.

In the MS-1 district each comprehensive development shall be permitted one (1) freestanding sign, one (1) ground-mounted sign, or one (1) projecting sign per street frontage granting access to the parcel or center. If the length of a single street abutting the development is greater than four hundred (400) feet, the development shall be permitted a second freestanding sign along that frontage. In computing the allowable number of signs for parcels with more than one qualifying frontage, each frontage shall be considered separately. If a development is divided by a street, then only one side of the street is used to compute frontage length.

A permitted sign in RO-1, MS-1, B-1, and RTP districts may be either freestanding or ground-mounted. However, a freestanding sign is not permitted in the MX-1 district. The maximum height of a ground-mounted sign shall be six (6) feet. The maximum height of a freestanding sign shall be as follows:

| RO-1 | MS-1 and RTP | B-1 | MX-1 |
|---|---|---|---|
| 8 ft | 20 ft. | 20 ft. | N/A |

The maximum areas (measured in square feet) of such freestanding signs shall be as follows:

| Freestanding | | Ground-mounted | |
|---|---|---|---|
| RO-1 | 32 | 32 | (lots $\leq$ 100 ft wide) |
| | | 64 | (lots $>$ 100 ft wide) |
| MS-1 / RTP | 64 | 96 | |
| B-1 | 64 | 96 | |

Corner lot developments in the MS-1, B-1, and RTP districts may combine their pole signage allowance into one (1) larger sign with an area of 96 square feet.

4.    One (1) MENU BOARD for each permitted drive-thru lane.

5.    A comprehensive development having one or more road frontages exceeding 1,200 feet in length shall be permitted

one DIRECTIONAL SIGN (with maximum height of six (6) feet and maximum square area of twenty-four (24) square feet) at each entrance along that qualifying frontage, in lieu of any other directional signs otherwise permitted. The location, size, height, and orientation of all directional signs permitted under this section shall be shown on a site plan and reviewed and approved by the City Engineer for traffic safety and vision clearance.

E.   TEMPORARY SIGNS:  The maximum area of such signs shall be fifteen (15) square feet.  Any sign announcing an event shall be removed within forty-eight (48) hours after the event.

F.   SUBDIVISION IDENTIFICATION SIGNS:

  1.  Such sign shall not exceed fifty-two (52) square feet in area;

  2.  Ground mounted signs located within the right-of-way of the entrance shall be located in a median of not less than fifty (50) feet in length and ten (10) feet in width and  be setback at least ten (10) feet from the right-of-way line when projected across the entrance. Signs located at the side of the entrance must be located on private property within an easement; and

  3.  The petitioner shall provide documentation that a homeowners association has been created to maintain sign.

G.   WINDOW SIGNS:

7.3.2.2   No residential use/development shall have a sign that is internally illuminated.

7.3.2.3   No sign shall advertise a product, service, or other business not situated on the same premises or within the same comprehensive development.

7.3.3   B-2 DISTRICT.
In the B-2 Central Business District, the following regulations shall apply.

7.3.3.1   Permitted Signs:
A.   For single and two-family dwellings, one (1) nameplate, not to exceed two (2) square feet in area, shall be permitted for each dwelling unit.

B.   For multi-family residential and other permitted group dwellings, one (1) WALL SIGN per street frontage granting access to the premises shall be permitted.  The maximum size of each such sign shall be thirty-two (32) square feet in area.

C.   For permitted nonresidential uses, the following shall be permitted.

1.   DIRECTORY SIGN:  One (1) directory sign per development or merchant association.

2.   WALL SIGN:  Each nonresidential building shall be permitted one or more wall signs.  One (1) square foot of wall sign area shall be allowed for each horizontal linear foot of exterior wall length.  If an exterior wall length is less than thirty-two (32) feet, the maximum allowable sign area on that wall shall be thirty-two (32) square feet.  The maximum allowable sign area on any single wall shall be one hundred (100) square feet, regardless of the length of that wall. A permitted wall sign must be placed on the wall surface for which it is authorized; sign area for two or more walls cannot be combined and placed on a single wall.  In multiple-occupant buildings, the owner shall determine how the authorized sign area is allocated among the occupants.

3.   FREESTANDING SIGN OR PROJECTING SIGN:  Each business or premises shall be entitled to one (1) freestanding sign or one (1) projecting sign for each street frontage granting access to the premises.  Maximum height of each freestanding sign shall be twenty-five (25) feet.  Maximum area of each freestanding sign shall be thirty-two (32) square feet.  No freestanding sign shall be permitted which does not meet the required ten (10) foot setback from any property line or public right-of-way.

4.   UNDER-AWNING SIGN:  Each business or premises shall be permitted one (1) such sign per qualifying entrance.

5.   BANNER:  A business or merchant association shall be permitted to erect a temporary BANNER  for a maximum of ninety (90) days during any one calendar year.

6.   SANDWICH BOARD:  Each restaurant receiving a special exception, allowing outdoor dining on public property,  shall  be  allowed  one  (1)  Sandwich  Board,

provided the sign does not encroach into the four (4)-foot unobstructed pedestrian way.

D.   TEMPORARY SIGNS: The maximum area of such signs shall be fifteen (15) square feet. Any sign announcing an event shall be removed within forty-eight (48) hours after the event.

E.   WINDOW SIGN:  The window sign(s) shall not cover more than twenty (20) percent of any given window.

F.   Commercial signs in the B-2 district may be internally or externally illuminated.

7.3.3.2   Blinking signs, conventional motion picture theater signs, or lighted marquee signs are permitted in the B-2 Central Business District.

7.3.4   B-3, B-4, B-5, I-1, I-2, BP, and PB DISTRICTS.
The following regulations shall apply in the B-3, B-4, B-5, I-1, I-2, BP, and PB zoning districts.

7.3.4.1   Permitted signs for residential uses:
A.   For single- and two-family dwellings. One (1) nameplate, not to exceed two (2) square feet in area, shall be permitted for each dwelling unit.

B.   For multi-family residential and other group dwellings.  One (1) WALL or FREESTANDING SIGN per street frontage granting access to the premises shall be permitted.

1.   The maximum size of each sign shall be thirty-two (32) square feet.

2.   The maximum height of a freestanding development identification sign shall be fifteen (15) feet.

7.3.4.2   Permitted signs for nonresidential uses:

A.   WALL SIGNS:  Each nonresidential building shall be permitted one or more signs.  Two (2) square feet of wall sign area shall be allowed for each horizontal linear foot of exterior wall length.  If an exterior wall length is less than sixteen (16) feet, the maximum allowable sign area on that wall shall be thirty-two (32) square feet. In multiple-occupant buildings, the owner shall determine how the authorized sign area is allocated among the occupants.

For a business utilizing a building and a freestanding canopy, the maximum allowable wall sign area shall be based on either the length of the exterior wall or the length of the canopy, but not both combined. The maximum allowable wall sign area may be apportioned between wall and the canopy as the owner chooses.

A permitted wall sign must be placed on the wall surface for which it is authorized; sign areas for two or more walls cannot be combined and placed on a single wall.

B.  FREESTANDING SIGNS, GROUND-MOUNTED SIGNS, or PROJECTING SIGNS: Each business or premises in a B-3, I-1, I-2 district or each comprehensive development in the B-4, B-5, BP, or PB district shall be permitted one (1) freestanding sign or one (1) projecting sign for each street frontage under the following conditions:

1.  Number of Signs: A parcel in a B-3, I-1, or I-2 district or a comprehensive development in a B-4, B-5, BP, or PB district is permitted one freestanding sign or one projecting sign per street frontage, not including Interstate 26 and State of Franklin Road between Sunset Drive and the Bristol Highway. If the length of a single street frontage is greater than four hundred (400) feet, the parcel or center shall be permitted a second freestanding sign along that frontage.

In computing the allowable number of signs for parcels with more than one qualifying frontage, each frontage shall be considered separately.

Any freestanding sign allowed under this section may be exchanged for two (2) ground-mounted signs which do not exceed ten (10) feet in height nor two hundred (200) square feet in area.

2.  Height: The maximum height of each freestanding sign shall be determined by its setback distance from the adjoining qualifying street, according to the following table:

| setback distance | maximum height |
|---|---|
| 10 to 25 feet | 20 feet plus setback distance |
| 25 feet or greater | 45 feet |

The maximum height of each ground-mounted sign shall be ten (10) feet.

3.  Sign area:  The maximum area of each freestanding sign shall be determined by its setback distance from the adjoining qualifying street, according to the following table:

| setback distance | maximum area |
| --- | --- |
| 10 to 45 feet | 100 square feet + (the setback distance - 10 feet x 2) |
| 45 ft or greater | 250 square feet |

The maximum area of a ground-mounted sign authorized under 7.3.4.2(B)(1) shall be two hundred (200) square feet.

C.  BANNERS:  A parcel in a B-3, I-1, or I-2 district or a comprehensive development in a B-4, B-5, BP, or PB district shall be permitted to erect a temporary BANNER for a maximum of ninety (90) days during any one calendar year.

D.  FESTOONS, PENNANTS, RIBBONS, AND STREAMERS: Such temporary devices may be erected in a B-3, B-4, B-5, I-1, I-2, or PB district without limit on the frequency or duration.

E.  DIRECTORY SIGNS:  One (1) directory sign per development, shopping center, or merchant association shall be permitted.

F.  UNDER-AWNING SIGNS:  Each business or premises shall be permitted one (1) such sign per qualifying entrance.

G.  One (1) MENU BOARD for each permitted drive-thru lane.

H.  BALLOONS:  A balloon shall be allowed to be displayed on the premises of a permitted use for a maximum of seven (7) days per event and not more than four (4) events per calendar year for any premise.  The maximum height of any balloon shall not exceed the height permitted for a freestanding sign at the same location, according to the provisions of Subsection 7.3.4.2-(B)(2) of this Code.  The maximum allowable size of a balloon shall be determined by first calculating the largest plane projection of the balloon on a vertical axis, in square feet.  This calculated area shall not exceed the maximum area permitted for a freestanding sign at the same location, according to the provisions of Subsection 7.3.4.2-(B)(3) of this Code.  Balloons shall be permitted to be placed either on the ground or on the roof of a building.

I.      TEMPORARY SIGNS: The maximum area of such signs shall be twenty-five (25) square feet. Any sign announcing an event shall be removed within forty-eight (48) hours after the event.

J.      SUBDIVISION IDENTIFICATION SIGNS:

1.  Such sign shall not exceed fifty-two (52) square feet in area;

2.  Ground mounted signs located within the right-of-way of the entrance shall be located in a median of not less than fifty (50) feet in length and ten (10) feet in width and be setback at least ten (10) feet from the right-of-way line when projected across the entrance. Signs located at the side of the entrance must be located on private property within an easement; and

3.  The petitioner shall provide documentation that a homeowners association has been created to maintain sign.

K.      WINDOW SIGNS:

L.      Commercial signs in the B-3, B-4, B-5, I-1, I-2, BP, and PB districts may be internally or externally illuminated.


7.3.4.3     No sign shall have or consist of any rotating, revolving, or otherwise moving part or depict or describe any "specified sexual activities" or "specified anatomical areas" as defined in Article II of the Zoning Code of the city of Johnson City.


7.3.5       MX DISTRICT.
            In the MX Mixed Use District, the following regulations shall apply.

7.3.5.1     Permitted signs.
            A.      For single-family and two-family dwellings, one (1) nameplate, not to exceed two (2) square feet in area, shall be permitted for each dwelling unit.

            B.      For multi-family residential and other permitted group dwellings, one (1) WALL OR FREESTANDING SIGN per street frontage granting access to the premises shall be permitted. The maximum size of each sign shall be thirty-two (32) square feet in area. Such sign may be externally illuminated, provided the light is directed so that it does not shine into nearby residences.

C. Permitted signs for permitted nonresidential uses:

1. DIRECTORY SIGN: One (1) directory sign per development or merchant association.

2. WALL SIGN: Each nonresidential building shall be permitted one or more wall signs. Two (2) square feet of wall sign area shall be allowed for each horizontal linear foot of exterior wall length. If an exterior wall length is less than sixteen (16) feet, the maximum allowable sign area on that wall shall be thirty-two (32) square feet. An allowable wall sign may be placed either on the building or upon a freestanding canopy, if such exists. A permitted wall sign must be placed on the wall for which it is authorized; sign areas for two or more walls cannot be combined and placed on a single wall. In multiple-occupant buildings, the owner shall determine how the authorized sign area is allocated among the occupants.

3. FREESTANDING SIGNS, GROUND-MOUNTED SIGNS, OR PROJECTING SIGNS: Each principal building in an MX district shall be permitted one (1) freestanding, one (1) ground-mounted sign, or one (1) projecting sign per street frontage granting access to the site under the following conditions:

General retail and service developments as referenced in Subsection 6.25.2.6 shall be permitted one (1) freestanding sign, one (1) ground-mounted sign, or one (1) projecting sign which shall have a maximum sign area of ninety-six (96) square feet. Freestanding signs shall have a maximum height of twenty (20) feet as measured from the surface grade at the base of the sign or from the surface grade of the nearest adjacent street. Ground-mounted signs shall have a maximum height of ten (10) feet as measured from the surface grade at the base or from the surface grade of the nearest adjacent street.

All other development in the MX district shall be entitled to one (1) freestanding sign, one (1) ground-mounted sign, or one (1) projecting sign which shall have a maximum sign area of thirty-two (32) square feet and a maximum height of twenty (20) feet.

4. UNDER-AWNING SIGN: Each business shall be

permitted one (1) such sign per qualifying entrance.

5.     BANNER:  A business or merchant association shall be permitted to erect a temporary BANNER  for a maximum of ninety (90) days during any one calendar year.

6.     DEVELOPMENT IDENTIFICATION SIGN:  General retail and service developments as referenced in Subsection 6.25.2.6 shall be permitted one (1) such sign per development.  The maximum size shall be two hundred (200) square feet, the maximum height shall be forty-five (45) feet, and it shall be setback a minimum of twenty-five (25) feet from the right-of-way line.

D.     SUBDIVISION IDENTIFICATION SIGNS:

1.  Such sign shall not exceed fifty-two (52) square feet in area;

2.  Ground mounted signs located within the right-of-way of the entrance shall be located in a median of not less than fifty (50) feet in length and ten (10) feet in width and  be setback at least ten (10) feet from the right-of-way line when projected across the entrance. Signs located at the side of the entrance must be located on private property within an easement; and

3.  The petitioner shall provide documentation that a homeowners association has been created to maintain sign.

E. TEMPORARY SIGNS:  In addition to the other signs identified in this subsection, temporary freestanding signs may be posted on any lot in a residential district at any given time. This category includes, but is not limited to: real estate signs; construction signs, political signs, garage sales or any other non-commercial messages.  The maximum area of such signs shall be twenty-five (25) square feet.  Any sign announcing an event shall be removed within forty-eight (48) hours after the event.

F. WINDOW SIGNS:

G. Commercial signs in the MX district may be internally or externally illuminated.

## 7.4 - ANIMATED SIGNS

Animated signs shall be allowed in the following commercial districts: B-4 (Planned Arterial Business); B-5 (Planned Community Business); and PB (Planned Business) only along and facing designated arterial streets as identified on the Zoning Map and only on parcels with a minimum arterial road frontage of 300 feet. Those properties fronting on arterial streets where animated signs shall be allowed are depicted on Figure 1 and include: (1) the Bristol Highway extending northeast from Spring City Drive to Green Valley Drive; and (2) North Roan Street extending north from properties adjoining Canary Street to properties abutting Oakland Avenue. Developments or parcels which are allowed multiple signs, including wall signs, shall be allowed only one (1) electronic message board/animated sign, which shall be counted towards the total allowable signage for the development (including wall signs). Animated signs shall not be permitted in the Corridor Overlay District or the Design Overlay District or on any existing billboard/off-premise sign. Properties located within a historic/conservation district shall conform to the Design Guidelines for that district. Electronic message boards that are animated shall include an automatic dimmer. The maximum allowable brightness of an electronic message board/animated sign shall not exceed 4000 Nits during the hours between sunrise and sunset and 1000 Nits after sunset and before sunrise. No permit for an electronic message board/animated sign shall be issued for any sign display that interferes with traffic signal devices as determined by the City Traffic Engineer. Animated signs shall not be used for off-premise advertising, but may be used for noncommercial copy (see Section 7.1.3.5).

The maximum area of an animated wall sign is sixty-two and one-half (62.5) square feet. The minimum area of a freestanding animated sign is thirty-two (32) square feet. The maximum area of a freestanding animated sign is thirty-two (32) square feet, or 25 percent of the maximum sign area allowed, whichever is greater. The maximum freestanding sign area allowed is determined by its setback distance from the adjoining qualifying street, according to the following table:

| setback distance | maximum area |
|---|---|
| 10 to 45 feet | 32 square feet + (the setback distance – 10); not to (exceed 62.5 square feet) |
| 45 feet or greater | 62.5 square feet |

7.4.1      Nonconforming animated signs which have received building permits prior to the effective date of this ordinance shall be grandfathered.

## 7.5 – ELECTRONIC MESSAGE BOARDS

Electronic Message Boards that are not animated shall be allowed in the following districts: B-3 (Supporting Central Business); B-4 (Planned Arterial Business); B-5 (Planned Community Business); PB (Planned Business); MX (Mixed Use); MS-1 (Medical Services); I-1 (Light Industrial); I-2 (Heavy Industrial) and RTP (Research/ Technology Park) only along and facing collector and arterial streets as designated on the Zoning Map and only on parcels with a minimum road frontage of 100 feet. Developments or parcels which are allowed multiple signs, including wall signs, shall be allowed only one (1) electronic message board, which shall be counted towards the total allowable signage for the development (including wall signs). Properties located within a historic/conservation district shall conform to the Design Guidelines for that district. Electronic message boards that are not animated shall include an automatic dimmer. The maximum allowable brightness of an electronic message board shall not exceed 4,000 Nits during the hours between sunrise and sunset and 1000 Nits after sunset and before sunrise. No permit for an electronic message board shall be issued for any sign display that interferes with traffic signal devices as determined by the City Traffic Engineer. Any display on an electronic message board shall be for a minimum of ten (10) seconds in duration. Electronic message boards shall not be used for off-premise advertising, but may be used for noncommercial copy (see Section 7.1.3.5).

The maximum area of an electronic message board wall sign is sixty-two and one-half (62.5) square feet. The maximum area of an electronic message board on a billboard, not regulated by the state, shall be sixty-two and one-half (62.5) square feet. The maximum area of a freestanding electronic message board is thirty-two (32) square feet, or 25 percent of the maximum sign area allowed, whichever is greater. The maximum freestanding sign area allowed is determined by its setback distance from the adjoining qualifying street, according to the following table:

| setback distance | maximum area |
|---|---|
| 10 to 45 feet | 32 square feet + (the setback distance – 10); (not to exceed 62.5 square feet) |
| 45 feet or greater | 62.5 square feet |

7.5.1    Nonconforming electronic message boards which have received building permits prior to the effective date of this ordinance shall be grandfathered.

## ARTICLE VIII - FLOODPLAIN REGULATIONS

## 8.1 - PURPOSE AND OBJECTIVES

8.1.1    FINDINGS OF FACT:

8.1.1.1    The Board of Commissioners of the city of Johnson City wishes to maintain eligibility in the National Flood Insurance Program and in order to do so must meet the requirements of 60.3(d) of the Federal Insurance Administration Regulations found at 44 CFR Ch. 1 (10-1-04 Edition) and subsequent amendments.

8.1.1.2    Areas of Johnson City are subject to periodic inundation which could result in loss of life and property, health and safety hazards, disruption of commerce and governmental services, extraordinary public expenditures for flood protection and relief, and impairment of the tax base, all of which adversely affect the public health, safety, and general welfare.

8.1.1.3    These flood losses are primarily caused by the cumulative effect of obstructions in floodplains, causing increases in flood heights and velocities; and by uses in flood hazard areas which are vulnerable to floods; or construction which is inadequately elevated, flood-proofed, or otherwise unprotected from flood damages.

8.1.2    PURPOSE:
It is the purpose of the Floodplain Regulations to promote the public health, safety, and general welfare, and to minimize public and private losses due to flood conditions in specific areas.  The Floodplain Regulations are designed to:

8.1.2.1    Restrict or prohibit uses which are vulnerable to water or erosion hazards, or which cause damaging increases in erosion, flood heights, or velocities;

8.1.2.2    Require uses vulnerable to floods, including community facilities, to be protected against flood damage at the time of initial construction;

8.1.2.3    Control the alteration of natural floodplains, stream channels, and natural protective barriers which accommodate flood waters;

8.1.2.4    Control filling, grading, dredging and other development which may increase erosion or flood damage;

8.1.2.5    Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands;

8.1.2.6    Protect karst drainage systems from sedimentation and debris, and

8.1.2.7    Protect groundwater resources from contamination due to pollution runoff into karst drainage systems.

8.1.3    OBJECTIVES:
The objectives of the Floodplain Regulations are:

8.1.3.1    To protect human life and health, and property;

8.1.3.2    To minimize expenditure of public funds for costly flood control projects;

8.1.3.3    To minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

8.1.3.4    To minimize prolonged business interruptions;

8.1.3.5    To minimize damage to public facilities and utilities such as water and gas mains, electric, telephone, sewer lines, streets and bridges located in flood prone areas;

8.1.3.6    To help maintain a stable tax base by providing for the sound use and development of flood prone areas in such a manner as to minimize blight in flood areas;

8.1.3.7    To ensure that potential homebuyers are notified that property is in a floodable area; and

8.1.3.8    To establish eligibility for participation in the National Flood Insurance Program.


## 8.2 - GENERAL PROVISIONS

8.2.1    BASIS FOR ESTABLISHING THE AREAS OF SPECIAL FLOOD HAZARD:
The areas of special flood hazard within Johnson City, Tennessee, Community Number 475432 are identified by the Federal Emergency Management Agency (FEMA), Flood Insurance Studies (FIS) and the Flood Insurance Rate Maps (FIRM) for Washington, Carter and Sullivan Counties. These special flood hazard areas are shown more specifically for Washington County Map Panel Numbers 47179C0045D, 4179C0061D, 47179C0062D, 47179C0063D, 47179C0064D, 47179C0066D. 47179C0067D, 47179C0068D, 47179C0069D, 47179C0086D, 47179C0088D, 47479C0089D, 47179C0151D, 47179C0152D, 47179C0153D, 47179C0154D, 47179C0156D, 47179C0157D, 47179C0158D, 47179C0159D, 47179C0167D, 47179C0169D, 47179C0176D, 47179C0177D, 47179C0178D, 47179C0179D, 47179C0181D, 47179C0186D, 47179C0187D, 47179C0188D, effective dates

September 29, 2006; for Carter County Map Panel Numbers 0053 and 0065, effective dates October 16, 1996; and for Sullivan County Map Panel Number 47018C0290D, effective date September 29, 2006. These Flood Insurance Studies and Flood Insurance Rate Maps, subsequent map amendments and revisions that have been approved by the Federal Emergency Management Agency, and all other supporting technical data, are adopted by reference and declared to be part of this ordinance.

8.2.2    ESTABLISHMENT OF A SINKHOLE OVERLAY ZONE:
The city of Johnson City administratively establishes the geographic limits of application of this policy to any portion of the city through the use of a Sinkhole Overlay Zone. Properties with karst or sinkhole topography or development/redevelopment of properties that drain either partially or exclusively to karst or sinkhole topography, shall follow the applicable rules and procedures of this Article.

8.2.3    REQUIREMENT FOR DEVELOPMENT PERMIT:
A development permit shall be required in conformity with this Article prior to the commencement of any development activity.

8.2.4    INTERPRETATION:
In the interpretation and application of the Floodplain Regulations, all provisions shall be: (1) considered as minimum requirements; (2) liberally construed in favor of the governing body, and; (3) deemed neither to limit nor repeal any other powers granted under Tennessee statutes.

8.2.5    WARNING AND DISCLAIMER OF LIABILITY:
Conformance with this policy does not relieve the developer and his engineer from making sound engineering judgement and taking measures which go beyond the scope of this policy where necessary. The degree of flood protection required by the Floodplain Regulations is considered reasonable for regulatory purposes and is based on scientific and engineering considerations. Larger floods can and will occur on rare occasions. Flood heights may be increased by man-made or natural causes. The Floodplain Regulations do not imply that land outside the Areas of Special Flood Hazard or uses permitted within such areas will be free from flooding or flood damages. The Floodplain Regulations shall not create liability on the part of the city of Johnson City, Tennessee or any officer or employee thereof for any flood damages that may result from reliance on the Floodplain Regulations or any administrative decision lawfully made hereunder. This policy is a regulations instrument only, and is not to be interpreted as an undertaking by the city to design any structure or facility.

8.2.6    ADMINISTRATION   AND   ENFORCEMENT   OF   THE   FLOODPLAIN
         REGULATIONS:
         The Chief Building Official's duties and responsibilities regarding the administration
         and enforcement of the Floodplain Regulations are provided in this Article and
         Article XVI, Penalties and Remedies.


## 8.3 - ADMINISTRATIVE PROCEDURES FOR THE FLOODLAIN REGULATIONS

8.3.1    PERMIT PROCEDURES:
         Application for a development permit shall be made to the Chief Building Official on
         forms furnished by the city of Johnson City prior to any development activity. The
         development permit may include, but is not limited to the following:  plans in
         duplicate drawn to scale, showing the nature, location, dimensions, and elevations of
         the area in question; existing and/or proposed structures, earthen fill placement,
         storage of materials or equipment, drainage facilities, and the limits of the floodplain
         and  floodway, with base flood elevations, across the property.  Specifically, the
         following information is required:

         8.3.1.1    Application stage:
                    A.    Elevation in relation to mean sea level of the proposed lowest floor
                          of all buildings where base flood elevations (BFE's) are available,
                          or to the highest adjacent grade or to the normal flow elevation of
                          an adjacent stream when applicable under this ordinance. (see
                          Subsection 8.3.1.2)  A copy of the Certification of Elevation is
                          included in the Floodplain Development Permit Guide.

                    B.    Elevation in relation to mean sea level to which any nonresidential
                          building will be flood-proofed, where base flood elevation data is
                          available, or to the highest grade or to the normal flow elevation of
                          an adjacent stream when applicable under this Ordinance.

                    C.    Design certificate from a registered professional engineer or
                          architect that the proposed nonresidential flood-proofed building
                          will meet the flood-proofing criteria in Subsection 8.3.1.2, where
                          base flood elevation data is available.  A copy of the flood
                          proofing-certificate is included in the Floodplain Development
                          Permit Guide.

                    D.    Description of the extent to which any watercourse will be altered
                          or relocated as a result of proposed development.

         8.3.1.2    Construction Stage:
                    Within unnumbered A Flood Zones, where flood elevation data is not
                    available, the Chief Building Official shall record the elevation of the
                    lowest floor on the development permit.  The elevation of the lowest floor

shall be determined as the measurement of the lowest floor of the building relative to the highest adjacent grade or to the normal flow elevation of an adjacent stream. The elevation of the highest grade adjacent to the structure and the normal flow elevation of the stream shall also be recorded. USGS Quadrangle maps may be utilized when no more detailed reference exists to establish reference elevations.

Within all flood zones where base flood elevation data are utilized, for all new construction and substantial improvements the Chief Building Official shall require: (a) that prior to installation the proposed elevation for the lowest floor or flood-proofing is verified as correct, (b) that upon completion of the lowest floor, or flood-proofing by whatever construction means, whichever is applicable, it shall be the duty of the permit holder to submit to the Chief Building Official an as-built certification of the elevation of the lowest floor, or flood-proofed elevation, whichever is applicable, as built, in relation to mean sea level. Said certification shall be prepared by, or under the direct supervision of, a registered land surveyor, professional engineer, or architect and certified by same. When flood-proofing is utilized for a non-residential building, said certification shall be prepared by, or under the direct supervision of, a professional engineer or architect and certified by same. Any work undertaken prior to submission of the certification shall be at the permit holder's risk. The Chief Building Official shall review the above-referenced certification data submitted. Deficiencies detected by such review shall be corrected by the permit holder immediately and prior to further progressive work being permitted allowed to proceed. Failure to submit the certification survey or failure to make said corrections required hereby, shall be cause to issue a stop-work order for the project, and/or deny issuance of a Certificate of Occupancy. Within unnumbered A zones, where flood elevation data is not available, the elevation of the lowest floor or flood-proofing shall be determined as the measurement of the lowest floor or flood-proofing of the building relative to the highest adjacent grade or the normal flow elevation of an adjacent stream.

For any altered or relocated watercourse, submit engineering data/analysis within six (6) months to the Federal Emergency Management Agency to ensure accuracy of community flood maps through the Letter of Map Revision Process. Assure that the flood carrying capacity within an altered or relocated portion of any water course is maintained.

8.3.2      PROVISIONS FOR FLOOD HAZARD REDUCTION:

8.3.2.1      General Standards:

In flood prone areas the following provisions are required:

A.   New construction and substantial improvements to existing buildings shall be anchored to prevent flotation, collapse, or lateral movement of the structure;

B.   Manufactured homes shall be elevated and anchored to prevent flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This standard shall be in addition to and consistent with applicable state requirements for resisting wind forces;

C.   New construction and substantial improvements to existing buildings shall be constructed with materials and utility equipment resistant to flood damage;

D.   New construction or substantial improvements to existing buildings shall be constructed by methods and practices that minimize flood damage:

1.   Whenever possible, structures shall be constructed with the longitudinal axis parallel to the directions of flood flow; and

2.   So far as practicable, structures shall be placed approximately on the same flood flow lines as those of adjoining structures.

E.   All electrical, heating, ventilation, plumbing, air conditioning equipment, and other service facilities shall be designed and/or located one (1) foot above the base flood elevation (or as specified by flood-proofing requirements) to prevent water from entering or accumulating within the components during conditions of flooding;

F.   New and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

G.   New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the systems and discharges from the systems into flood waters;

H.   On-site waste disposal systems shall be located and constructed to avoid impairment to them or contamination from them during flooding by the base flood;

I.      Any alteration, repair, reconstruction, or improvements to a building, which is in compliance with the Floodplain Regulations, shall meet the requirements of new construction as contained in the Flood Plan Regulations; and

J.      Any alteration, repair, reconstruction, or improvements to a building, which is not in compliance with the provision of the Floodplain Regulations, shall be undertaken only if said non-conformity is not extended or replaced.

8.3.2.2    Specific Standards:

These provisions shall apply to all areas of special flood hazard as provided herein. In areas of special flood hazard where base flood elevation data have been provided, including flood zones A, A1-30, AE, AO, AH, and A99, and has provided a regulatory floodway, as set forth in Subsection 8.2.1, the following provisions are required:

A.      Residential Construction.
Where base flood elevation is available, new construction or substantial improvement of any residential building or manufactured home shall have the lowest floor, including basement, elevated no lower than one (1) foot above the base flood elevation.  Should solid foundation perimeter walls be used to elevate a structure, openings sufficient to facilitate equalization of the flood hydrostatic forces on both sides of exterior walls and to ensure the unimpeded movements of flood waters shall be provided in accordance with the standards of Subsection 8.3.2.2.C.

Within unnumbered A zones, where base flood elevations have not been established and where alternative data is not available, the Chief Building Official shall require the lowest floor of a building to be elevated or flood-proofed to a level of five and one-half (5.5) feet above the normal flow elevation of the adjacent stream channel or three (3) feet above the highest adjacent grade, whichever is greater.  All applicable data including elevations or flood proofing certifications shall be recorded as set forth in 8.3.1.

B.      Non residential Construction.
New construction or substantial improvement of any commercial, industrial, or non residential building, when BFE data is available, shall have the lowest floor elevated or flood-proofed no lower than one (1) foot above the level of the base flood elevation.

Within unnumbered A zones, where base flood elevations have not been established and where alternative data is not available, the

Chief Building Official shall require the lowest floor of a building to be elevated or flood-proofed to a level of five and one-half (5.5) feet above the normal flow elevation of the adjacent stream channel or three (3) feet above the highest adjacent grade, whichever is greater.  All applicable data including elevations or flood proofing certifications shall be recorded as set forth in 8.3.1.

Buildings located in all A-zones may be flood-proofed, in lieu of being elevated, provided that all areas of the building below the required elevation are watertight, with walls substantially impermeable to the passage of water, and are built with structural components having the capability of resisting hydrostatic and hydrodynamic loads and the effects of buoyancy.  A registered professional engineer or architect shall certify that the design and methods of construction are in accordance with accepted standards of practice for meeting the provisions above, and shall provide such certification to the Chief Building Official as set forth in 8.3.1.

C.      Elevated Building.
New construction or substantial improvements of elevated buildings, that include fully-enclosed areas formed by foundation and other exterior walls below the base flood elevation, or required height above the highest adjacent grade, shall be designed to preclude finished living space and designed to allow for the entry and exit of flood waters to automatically equalize hydrostatic flood forces on exterior walls.

1.      Designs for complying with this requirement must either be certified by a professional engineer or architect or meet the following minimum criteria:
(a)     Provide a minimum of two (2) openings having a total net area of not less than one (1) square inch per square foot of enclosed area subject to flooding;
(b)     The bottom of all openings shall be no higher than one (1) foot above grade; and
(c)     Openings may be equipped with screens, louvers, valves, or other coverings or devices provided they permit the automatic flow of flood waters in both directions.

2.      Access to the enclosed area shall be the minimum necessary to allow for parking of vehicles (garage door), limited storage of maintenance equipment used in connection with the premises (standard exterior door), or entry to the living area (stairway or elevator); and

3. The interior portion of such enclosed area shall not be partitioned or finished into separate rooms in such a way which impedes the movement of flood waters and all such partition shall comply with the provisions of Subsection 8.3.2.2.

D. Standards for Manufactured Homes and Recreational Vehicles.

1. All manufactured homes placed, or substantially improved on: (1) individual lots or parcels, (2) in expansions of existing manufactured home parks or subdivisions, or (3) in new or substantially improved manufactured home parks or subdivisions, shall meet the requirements of new construction, including elevations and anchoring.

2. All manufactured homes placed or substantially improved in an existing manufactured home park or subdivision shall be elevated so that either:

A. 1. When base flood elevations are available the lowest floor of the manufactured home is elevated on a permanent foundation no lower than one (1) foot above the level of the base flood elevation; or

2. Absent base flood elevations the manufactured home chassis is elevated and supported by reinforced piers (or other foundation elements) five and one-half (5.5) feet above the normal flow elevation of the adjacent stream channel or three (3) feet above the highest adjacent grade at the building site, whichever is greater.

B. All manufactured homes shall be securely anchored to an adequately anchored foundation system to resist flotation, collapse and lateral movement; and

C. In or outside of an existing or new manufactured home park or subdivision, or in an expansion of an existing manufactured home park or subdivision, on which a manufactured home has incurred substantial damage as the result of a flood, any manufactured home placed or substantially improved shall meet the standards of Subsections 8.3.2.2.D.2(a) and 8.3.2.2.D.2(b).

3. All recreational vehicles placed on sites shall either:

A. Be on the site for fewer than one hundred eighty (180) consecutive days;

B. Be fully licensed and ready for highway use. A recreational vehicle is ready for highway use if it is licensed, on its wheels or jacking system, attached to the site only by quick disconnect type utilities and security devices, and has no permanently attached structures or additions;

C. The recreational vehicle shall meet the requirements for new construction, including anchoring, and elevation requirements of Subsections 8.3.2.2.D.1 or 8.3.2.2.D.2(a) and 8.3.2.2.D.2(b) above if on the site for longer than one hundred eighty (180) consecutive days;

D. In areas of special flood hazard where base flood elevation data or floodway data have not been provided, the provisions of Subsection 16.2.6.8 shall be utilized for requirements relative to the base flood elevation or flood ways.

8.3.2.3 Standards for Subdivisions:

Subdivisions and other proposed new developments, including manufactured home parks, shall be reviewed to determine whether such proposals will be reasonably safe from flooding. If a subdivision proposal or other proposed new development is in a flood-prone area, any such proposals shall be reviewed to ensure that:

A. All subdivision proposals shall be consistent with the need to minimize flood damage;

B. All subdivision proposals shall have public utilities and facilities such as sewer, gas, electrical, and water systems located and constructed to minimize or eliminate flood damage;

C. All subdivision proposals shall have adequate drainage provided to minimize or reduce exposure to flood hazards; and

D. Base flood elevation data shall be shown on plats and plans for subdivision proposals and for other proposed developments, including manufactured home parks and subdivisions. When base flood elevations have not been established for subdivisions that are greater than two lots or other proposed developments that are greater than one acre, the developer shall provide an engineering study with certification by a registered professional engineer, which will establish base flood elevations and designate floodway

locations. The engineering study should be supported by technical data that conforms to standard hydrologic and hydraulic engineering principles.

8.3.2.4    Standards For Areas of Special Flood Hazard With Established Base Flood Elevation and With Floodways Designated:

Located within the areas of special flood hazard established in Subsection 8.2.1, are areas designated as floodways. A floodway may be an extremely hazardous area due to the velocity of floodwaters, debris or erosion potential. In addition, the area must remain free of encroachment in order to allow for the discharge of the base flood without increased flood heights and velocities. Therefore, the following provisions apply:

A.    Encroachments are prohibited, including earthen fill material, new construction, substantial improvements, or other developments within the regulatory floodway. Development may be permitted, however, provided it is demonstrated through hydraulic analyses performed in accordance with standard engineering practices that the cumulative effect of the proposed encroachments or new development, when combined with all other existing and anticipated development, shall not result in ANY increase of the water surface elevation of the base flood level, velocities or floodway widths during the occurrence of a base flood discharge at any point within the community. A registered professional engineer must provide supporting technical data and certification thereof.

B.    New construction or substantial improvements of buildings shall comply with all applicable flood hazard reduction provisions of Subsection 8.3.2.2.

8.3.2.5    Standards for Areas of Special Flood Hazard Zones AE with Established Base Flood Elevations but Without Floodways Designated:

Located within the areas of special flood hazard established in Subsection 8.2.1, where streams exist with base flood data provided but where no floodways have been designated (Zones AE), the following provisions apply:

A.    No encroachments, including fill material, new structures, or substantial improvements shall be located within areas of special flood hazard, unless an engineering study with certification by a registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not

increase the water surface elevation of the base flood more than one (1) foot at any point within the community. The engineering study should be supported by technical data that conforms to standard hydrologic and hydraulic engineering principles.

B.     New construction or substantial improvements of buildings shall be elevated or flood-proofed to elevations established in accordance with Subsection 8.3.2.2.

8.3.2.6     Standards for Streams without Established Base Flood Elevations or Floodways (A Zones):

Located within the Areas of Special Flood Hazard established in Subsection 8.2, where streams exist, but no base flood data has been provided (A Zones), OR where a Floodway has not been delineated, the following provisions shall apply:

A.     When base flood elevation data or floodway data have not been provided in accordance with Subsection 8.2, then the Chief Building Official shall obtain, review and reasonably utilize any scientific or historic base flood elevation and floodway data available from a Federal, State or other source, in order to administer the provisions of Subsection 8.3.2. ONLY if data is not available from these sources, then the following provisions, B and C may apply. B and C shall not be applied, if the size of the water shed above the development site is greater than 500 acres. If the development site is greater than 500 acres, then the following provision D shall apply.

B.     No encroachments, including fill material, new structures, or substantial improvements shall be located closer than three times the average width of the stream as it traverses the site or 30 feet, which ever is greater, measured from the centerline of the stream. The determination of the floodway limits is illustrated in the Floodplain Development Permit Guide. The width of the stream should be measured at all locations deemed appropriate to accurately reflect the variations in width along the length of the affected area. In floodway areas where the natural topography prevents the floodway from being equally distributed on each side of the stream, this estimated floodway width shall be shifted in the direction of lower elevations. A registered professional engineer shall determine the magnitude of the floodway shift, and the shift shall be based on actual ground elevations at the site.

C. In special flood hazard areas without base flood elevation data, new construction or substantial improvements of existing structures shall have the lowest floor of the lowest enclosed area elevated or flood-proofed five and one-half (5.5) feet above the normal flow elevation of the adjacent stream channel or three (3) feet above the highest adjacent grade at the building site, whichever is greater. This situation is depicted in the Floodplain Development Permit Guide. Openings sufficient to facilitate the unimpeded movements of floodwaters shall be provided in accordance with the standards of Subsection 8.3.2.2.C, "Elevated Buildings".

D. If the size of the water shed above the development site is greater than 500 acres, then an engineering study with certification by a registered professional engineer must be provided, which establishes base flood elevations and designates the location of the floodway. The study must demonstrate that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one (1) foot at any point within the community. The engineering study should be supported by technical data that conforms to standard hydrologic and hydraulic engineering principles.

8.3.2.7 Standards for Areas of Shallow Flooding (AO and AH Zones):

Located within the areas of special flood hazard established in Subsection 8.2.1 are areas designated as shallow flooding areas. These areas have special flood hazards associated with base flood depths of one (1) to three (3) feet where a clearly defined channel does not exist and where the path of flooding is unpredictable and indeterminate; therefore, the following provisions apply:

A. All new construction and substantial improvements of residential and non residential buildings shall have the lowest floor elevated to at least one (1) foot above the flood depth number specified on the Flood Insurance Rate Map (FIRM), in feet, above the highest adjacent grade. If no depth number is specified, the lowest floor shall be elevated at least three (3) feet above the highest adjacent grade. Openings sufficient to facilitate the unimpeded movements of floodwaters shall be provided in accordance with standards of Subsection 8.3.2.2.C, and "Elevated Buildings".

B. All new construction and substantial improvements of nonresidential buildings may be flood-proofed in lieu of elevation. The structure together with attendant utility and sanitary facilities

must be flood proofed and designed watertight to be completely flood-proofed to at least one (1') foot above the specified Flood Insurance Rate Map (FIRM) flood level, with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and the effects of buoyancy. If no depth number is specified, the lowest floor shall be flood proofed to at least three (3) feet above the highest adjacent grade. A registered professional engineer or architect shall certify that the design and methods of construction are in accordance with accepted standards of practice for meeting the provisions of this ordinance and shall provide such certification to the Chief Building Official as set forth above and as required in Subsection 8.3.1.

C.      Adequate drainage paths shall be provided around slopes to guide flood waters around and away from proposed structures.

D.      The Chief Building Official shall certify the elevation or the highest adjacent grade, where applicable, and the record shall become a permanent part of the permit file.

8.3.2.8     Standards for Areas Protected by Flood Protection System (A-99 Zones):

Located within the areas of special flood hazard established in Subsection 8.2, are areas of the 100-year floodplain protected by a flood protection system, but where base flood elevations and flood hazard factors have not been determined. Within these areas (A-99 Zones) all provisions of Subsection 8.3 and Subsection 8.3.2.1 shall apply.

8.3.2.9     Standards for Unmapped Streams:

Located within Johnson City, Tennessee are unmapped streams where areas of special flood hazard are neither indicated nor identified. Adjacent to such streams the following provisions shall apply:

A.      In areas adjacent to such unmapped streams, no encroachments including fill material, new structures, or substantial improvements shall be located no closer than three times the average width of the stream as it traverses the site or 30 feet, which ever is greater, measured from the centerline of the stream. The determination of the floodway limits is illustrated in the Floodplain Development Permit Guide. The width of the stream should be measured at all locations deemed appropriate to accurately reflect the variations in width along the length of the affected area. In floodway areas where the natural topography prevents the floodway from being equally distributed on each side of the

stream, this estimated floodway width shall be shifted in the direction of lower elevations. A registered professional engineer shall determine the magnitude of the floodway shift, and the shift shall be based on actual ground elevations at the site.

B.    In areas adjacent to such unmapped streams, new construction or substantial improvements of existing structures shall have the lowest floor of the lowest enclosed area elevated or flood-proofed five and one-half (5.5) feet above the normal flow elevation of the adjacent stream channel or three (3) feet above the highest adjacent grade at the building site, whichever is greater. This situation is depicted in the Floodplain Development Permit Guide. Openings sufficient to facilitate the unimpeded movements of floodwaters shall be provided in accordance with the standards of Subsection 8.3.2.2.C, "Elevated Buildings".

C.    If the size of the water shed above the development site is greater than 500 acres, then an engineering study with certification by a registered professional engineer must be provided, which establishes base flood elevations and designates the location of the floodway. The study must demonstrate that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one (1) foot at any point within the community. The engineering study should be supported by technical data that conforms to standard hydrologic and hydraulic engineering principles.

## 8.4 - ADMINISTRATIVE PROCEDURES FOR THE SINKHOLE REGULATIONS

8.4.1    OVERVIEW:
Certain areas of the city and surrounding areas drain exclusively or predominantly to sinkhole systems. As such, these sinkhole systems must remain available for the temporary storage and drainage of surface runoff in a manner similar to established riparian floodways and floodplains. Sinkhole areas are also known to be unstable for construction and drainage. Structures placed on soil foundations in sinkhole areas may be subject to flooding, settling or collapse. All sinkholes are herein defined to have 25-year "no-build" and 100-year "floodplain" line locations and elevations which will restrict or modify development adjoining or draining to sinkholes. Some of these locations and elevations have been established by the city as part of its master planning or sinkhole investigation process. For those sinkholes that have not been evaluated, a person developing contiguous to or within the watershed draining to such sinkholes shall establish these elevations in accordance with the procedures described herein.

It is not possible to determine a generalized rule for sinkhole capacity. Each sinkhole behaves differently from all other sinkholes, and the discharge from each is a function of unknown subterranean stream configurations. Sinkholes must not be used as an integral part of the drainage system unless no other outlet is feasible, as shown in a study by a licensed professional with expertise in karst topography. The location of structures surrounding sinkholes shall be regulated. More strict requirements may be imposed if analysis demonstrates the possibility of water backing up through a sinkhole.

Sinkholes are also known to be part of fragile drainage systems. Any substance or object, including construction siltation, placed within a sinkhole has the potential of clogging the throat of the sinkhole and/or polluting groundwater. The immediate area surrounding a sinkhole must be disturbed as little as possible. Extreme care should be taken in planning, constructing and operating such land uses as may store and handle potential groundwater pollutants (such as gas stations) or in the design and construction of septic systems.

8.4.2    PURPOSE:
The purposes of the sinkhole policy are: to supplement the policies established in the Floodplain Regulations, to protect existing and future development from flooding due to sinkhole overflow and backup, to protect underground drainage systems from clogging due to sediment and debris, to protect the structural integrity of buildings and roads built near sinkholes, and to work with the State of Tennessee to protect groundwater resources from contamination due to pollutant runoff into sinkholes.

8.4.3    APPLICABILITY:
This policy shall be applicable to all areas of the city which drain either partially or totally to a sinkhole or underground karst system and which involves alterations to existing developments, the construction of new developments, disruption of the vegetative covering for land clearing activities, topographic alterations, or utility construction projects.

8.4.4    PERMIT PROCEDURES:
Application for a development permit shall be made to the Chief Building Official prior to any development activity. The development permit may include, but is not limited to, the following: plans in duplicate drawn to scale, showing the nature, location, dimension, and elevations of all pertinent features of the area in question, existing and/or proposed structures, storage of materials or equipment, drainage facilities, the location of the 25-year no-build line and the 100-year floodplain elevation or hydrologic and hydraulic calculations supporting methods to alter the flood elevation line(s), evidence of appropriate off-site easements, and evidence of the determination of need for a State of Tennessee permit. Specifically, the following information is required:

8.4.4.1    Application stage:

      A.     A generalized site plan with all pertinent information, including the location and extent of all sinkholes involved, existing and proposed drainage structures, and the elevation in relation to mean sea level of the proposed lowest floor (including basement) of all structures;

      B.     All plans and corresponding calculations shall be produced by a licensed professional having expertise in karst topography;

      C.     If the site relies on any sinkhole(s) for any portion of its drainage, a hydrogeologic study will be required as part of the grading and drainage plan;

      D.     For those sinkholes that have been previously evaluated, the location and limits of the 25-year no-build line(s) and the 100-year floodplain line(s);

      E.     For those sinkholes that have not been previously evaluated, calculations supporting the establishment of 25-year no-build lines and 100-year floodplain elevations;

      F.     For those sinkholes that have been previously evaluated and re-evaluation is desired, hydrologic and hydraulic calculations to support the alteration of the established flood elevation lines;

      G.     Evidence of appropriate off-site easements for sites relying either partially or completely on off-site sinkholes for drainage;

      H.     Description and location of all erosion and sedimentation control measures to be used, both on-site and off-site;

      I.     Copies of applications submitted to the State Department of Environment and Conservation shall be submitted to the city prior to the issuance of grading or drainage permits. Permit issuance by the city may be made contingent on prior approval by the State; and

      J.     Any additional supporting information deemed necessary by the Chief Building Official to ensure the protection of the site, surrounding properties, or the sinkhole system.

8.4.4.2    Construction Stage:

      A.     All disturbed areas covered by this policy shall provide adequate structural and non-structural erosion and sedimentation controls

both on-site and around the perimeter of any sinkhole inlet receiving drainage to reduce the potential for sediment entering and clogging the sinkhole. On-site controls shall be initiated prior to commencement of clearing operations. Sinkhole perimeter controls shall be established prior to the initiation of any clearing and grubbing operations. All controls shall be inspected by a qualified and responsible party periodically and within 48 hours after heavy precipitation events. Adequate structural controls include but are not limited to: entrenched and staked straw bale barriers, synthetic filter fabric barriers, slope protection, temporary sediment traps and basins, improved sinkhole outlets with elevated openings, or other inlet protection and diversions. Adequate nonstructural controls shall include but are not limited to: limitation of clearing, temporary seeding, erosion control blankets and/or mulching, construction timing, location of debris and trash piles, and proper storage of construction related chemicals and petroleum products. All sinkhole openings shall be inspected and cleaned out after completion of construction and after establishment of permanent vegetative cover.

B.     The Chief Building Official shall require that, upon placement of the lowest floor, it shall be the duty of the permit holder to submit to the Chief Building Official a certification of the elevation of the lowest floor, as-built, in relation to mean sea level. Said certification shall be prepared by, or under the direct supervision of, a registered land surveyor, professional engineer, or architect and certified by same. The Chief Building Official shall review the floor elevation survey data submitted. Deficiencies detected by such review shall be corrected by the permit holder immediately and prior to further progressive work being permitted to proceed. Failure to submit the survey or failure to make said corrections required hereby, shall be cause to issue a stop-work order for the project, and/or deny issuance of a Certificate of Occupancy.

8.4.5     General Standards:

8.4.5.1     No person shall place or cause to be placed any substances or objects, other than stormwater runoff, in any sinkhole or in the depression of any sinkhole relied on for stormwater drainage, or place or cause to be placed any substances or objects in such a way so as to allow such substances or objects to be washed into a sinkhole inlet during storm events.

8.4.5.2     No person shall fill or obstruct the outlet to a sinkhole or system of sinkholes, or fill over a spring or sink outlet without first defining the flow area to that outlet or spring and ascertaining, through dye tracing or other means, the areas that rely on the outlet for drainage and that filling of such

outlet or spring will not increase flooding in the sink system through denial of use of the system or sink outlet.

8.4.5.3      Extreme care should be taken in planning, constructing and operating such land uses as may store and handle potential groundwater pollutants (such as gas stations) or in design and construction of septic systems.

8.4.5.4      The immediate area around a sink must be disturbed as little as possible. The use of mechanized equipment near the subterranean drain shall be done with caution.

8.4.5.5      Flow exiting from culverts or other concentrated drainage should be carried by riprap or concrete drain to the drain inlet, with the inclusion of energy dissipators as appropriate. Where an identified throat exists which is to be improved, a steel grate of adequate proportions should encase the inlet to prevent debris stoppage. The city must approve throat improvement methods and designs prior to construction.

8.4.5.6      The city strongly recommends that appropriate geotechnical studies be done and measures taken to insure structure foundations are designed to take into account potential sinkhole locations and instability. Such studies should account for potential foundation problems for both undisturbed sink areas and those previously filled by others. In addition, the placement of fill material within sinkholes is generally undesirable because the placement of fill reduces the volume within the sink available for stormwater storage.

Geotechnical studies for sites within karst terrain routinely include, but are not limited to, drilling to assess subsurface conditions, recommendations for site preparation, and a discussion of specific geologic hazards such as sinkhole collapse and subsidence. The impact on foundation alternatives, such as shallow or deep foundations, may be presented as a cost versus risk decision to the property owner/developer.

8.4.6      Estimated No-Build and Floodplain Line Locations:

8.4.6.1      An estimated "no-build line" shall be established and indicated on all preliminary and final plans and drainage easements dedicated which indicates the level to which water would rise assuming no outflow for the 4 percent probability (25-year return period), 6-hour storm. This runoff volume is to be calculated by assuming that the 4 percent (25-year), 6-hour storm depth of four inches over the whole drainage basin to the sink flows into the sink with no outflow. The area encompassed by this line shall be defined as a "no-build" zone for all structures. No portion of any development can be located within this zone.

8.4.6.2    An estimated sinkhole 1 percent storm (100-year storm) floodplain line shall be delineated on all preliminary and final plans which indicates the level to which water would rise, assuming no outflow for the 1 percent (100-year), 6-hour storm.  This runoff volume is to be calculated by assuming that the 1 percent (100-year), 6-hour storm depth of five inches over the whole site flows into the sink with no outflow.  The lowest habitable floor elevation for any habitable structure shall be located a minimum of one (1) foot above this floodplain elevation.

8.4.6.3    Electrical, heating, ventilation, plumbing, air conditioning equipment, and other service facilities shall be designed and/or located at least one (1) foot above the 1 percent storm floodplain line (or as specified by flood-proofing requirements) to prevent water from entering or accumulating within the components during conditions of flooding.

8.4.6.4    The estimated no-build and floodplain line locations must be established after volume lost to anticipated fill or structure placement within the sink has been removed.  If the established lines overtop the sink and there is a surface outflow the line shall be approximately located one (1) foot above the sink top.

8.4.6.5    These estimated line locations shall remain intact unless adjusted and potentially lowered using the analysis procedure given in Subsection 8.4.7.

8.4.7    Adjustments to No-Build and Floodplain Line Locations:
8.4.7.1    Two basic methods to potentially lower the line elevations and reduce the building setback are discussed in the following paragraphs.  The methods require the routing of watershed  runoff  hydrographs through the sink areas in a manner similar to detention pond design.   The runoff hydrographs shall be developed using the SCS 24-hour storm and curve number methodology.  The city reserves the right to approve runoff flow and timing factors.  The methods can be used alone or in combination.

8.4.7.2    Any applicable software may be used.  However, the use of software with which the city is familiar will expedite review.  In any case the designer must submit the following information: rainfall amounts, curve number and time-of-concentration tabulations, inflow and outflow hydrograph (in graphical and tabular form), stage-discharge curves (in tabular form) based on site topographic survey with control mapping included, site layout sketch plan showing the 4 percent (25-year) and 1 percent (100-year) setback lines and elevations, the location and elevations (ground and first habitable floor where applicable) of all adjacent structures, and sketch plan of the sinkhole system showing the outlet points and giving pertinent information on increased flow rates and downstream system capacity.

8.4.7.3    The no-build and floodplain limits can be reduced through the provision of a surface overflow to a suitable receiving point or points. In such cases, to establish the applicable delineated zones, the runoff hydrograph from the (4 percent) 25-year, 24-hour and (1 percent) 100-year, 24-hour storms shall be routed through the sinkhole calculating the surface overflow in a manner similar to detention pond design routing. Other engineering means to lower the floodplain line can also be used such as: upstream manmade holding ponds (retention), detention, diversions, storm drain piping and pump stations. Full buildout conditions in the entire watershed draining to the sink shall be used for all routing analyses.

8.4.7.4    The establishment of the no build and floodplain line limits may also rely on outflow from the sink and routing of the runoff hydrographs from the 4 percent (25-year), 24-hour and 1 percent (100-year), 24-hour storms. This can be done only if no flooding would occur with total sink blockage for the 4 percent (25-year), 6-hour storm; the developer submits a hydrogeologic study which indicates, using appropriate methods, the calculated flow rates (stage-discharge curve) through the sinkhole considering the possibility of high groundwater table or downstream flow backing into the sink to reduce or stop outflow during wet or flood conditions; the outlet point(s) from the sink is (are) established through dye tracing; full buildout conditions for the entire watershed draining to the sink are used for all routing analyses; the throat of the sink has been permanently improved in a manner approved by the city; State approvals (if necessary) are obtained; and the city grants permission to use the sink outflow.

8.4.8    Off-Site Sinkholes:

8.4.8.1    For flow into an offsite sinkhole, the developer must perform the routing analysis contained in Subsection 8.4.7 using either existing or improved sink conditions (if permission for sink improvement or modification is granted by the property owner). There are two cases which may occur. Either existing qualified structures are located within the 4 percent chance (25-year) storm no-build line or below the one percent chance (100-year) elevation, or no existing qualified structure is so located.

8.4.8.2    In the case where existing structures are located within the limits of the no-build or floodplain lines a development may not increase flow elevations to sinks which are located on another's property without obtaining the written permission of the sink owner. All other requirements shall apply for use of such offsite sink. Full buildout conditions shall be used for all routing analysis. If such permission cannot be obtained the upstream property owner must design his site such that the peak flow elevations within the sink are no greater than at predevelopment

conditions.  This can normally be accomplished using on-site detention or retention or finding another suitable outlet site.

8.4.8.3    In the case where no structures are located within the calculated lines no controls are required as long as the proposed development would not expand the no-build and floodplain lines established by routing according to Subsection 8.4.7.

zonecode/articles/ART8.doc

# ARTICLE IX - SIDEWALK REGULATIONS

## 9.1 - PURPOSE

The purpose of this Article is to provide a comprehensive system of sidewalk regulation that will implement the policies of the city of Johnson City as identified in the <u>Johnson City General Plan</u>. Specifically, these policies seek to promote improved pedestrian safety and interaction, expanded opportunity for recreational walking and running activities, more cohesive neighborhoods, and easier access to shopping and other commercially related pursuits.

## 9.2 - REQUIREMENTS

9.2.1    LOCATION:
Sidewalks shall be required as specified by the following, except as provided by Subsection 9.2.2, Exceptions:

   9.2.1.1    Sidewalks shall be constructed along the public street frontage, excluding limited access highway frontage, of all commercial, office, and multi-family residential developments.

   9.2.1.2    Sidewalks shall be constructed along the collector and arterial public street frontages of all industrial developments.

   9.2.1.3    Sidewalks shall be constructed whenever a new principal building is built or an existing principal building is renovated or expanded sufficiently to increase its value by twenty-five (25) percent before a Certificate of Occupancy may be issued.

9.2.2    EXCEPTIONS:
Under the following circumstances, exceptions to required construction of sidewalks under Subsection 9.2.1 are permitted.

   9.2.2.1    Optional Fee in Lieu of Construction:
   A.    For required sidewalks under Subsection 9.2.1, the developer may choose to pay a fee in lieu of construction, except when one or more of the following circumstances exists:

      1.    The location is specified for sidewalks in the city's adopted Sidewalk Plan;

      2    The location is within one thousand (1,000) feet of an existing sidewalk on the same side of the street;

3 The development is expected to generate significant numbers of pedestrians. Examples of such facilities include, but are not limited to schools, day-care centers, office buildings, churches, multi-family residential, and other residential facilities (i.e. group homes, nursing homes, and residential homes for the aged);

4 The development contains retail uses expected to attract customers from residences, retail areas, places of employment, or places of public assembly within fifteen hundred (1,500) feet of the development;

5 The development is within fifteen hundred (1,500) feet (street distance) of a regular Johnson City Transit stop; or

6 The development is within one-half mile (street distance) of an existing or proposed school.

B. The developer shall be required to grade the location of the proposed future sidewalk, unless waived by the Public Works Director.

C. The fee shall be calculated as a fixed amount per linear foot. This amount shall be established by the City Commission by resolution upon the recommendation of the Public Works Director and reviewed periodically.

D. The fee shall be paid before a Certificate of Occupancy is issued.

E. All funds collected in lieu of construction shall be in addition to all other sidewalk funding and shall be placed in a separate account to be used only for new sidewalk construction.

9.2.2.2 Street Construction Plan:
A. When the adjoining public street does not have curbing and is scheduled for improvement within five years, as outlined in the Public Works Street Construction Plan, the developer shall pay a fee in lieu of construction.

B. The fee shall be calculated as a fixed amount per linear foot. This amount shall be established by the City Commission by resolution upon the recommendation of the Public Works Director and reviewed periodically.

C. The fee shall be paid before a Certificate of Occupancy is issued.

D. The fee shall be held by the city's Finance Department in an interest-bearing escrow account to be used for sidewalk construction to be done at the time of street reconstruction. To cover the cost of inflation, all accrued interest shall be applied to the cost of sidewalk construction.

## 9.3 - SIDEWALK CONSTRUCTION AND DESIGN

### 9.3.1 CONSTRUCTION DETAILS:

9.3.1.1 Construction of sidewalks shall be in accordance with General Requirements & Standards of Design of the Subdivision Regulations.

9.3.1.2 The office of the City Engineer shall be responsible for inspection of sidewalks during construction. Completion of sidewalk construction shall be required, to the satisfaction of the City Engineer, before a Certificate of Occupancy may be issued.

9.3.1.3 Insufficient Right-of-Way:

A. When the sidewalk is to be built at the time of development and there is insufficient right-of-way for the sidewalk, the dedication of an additional width for a transportation and drainage easement shall be required. An easement agreement shall be entered into by the city and the property owner. The agreement, provided by the city's Staff Attorney, shall stipulate guaranteed public access in perpetuity and shall be recorded with the appropriate county Register of Deeds.

B. When the sidewalk is to be built after the time of development and the right-of-way width is less than the standard for that street's designation (minor, collector, or arterial), dedication of additional right-of-way to the width standard for that street, as measured from the center line, shall be required. Such right-of-way dedication shall be platted at the time of development and shall be approved by the Johnson City Regional Planning Commission. Said plat shall remain on file with the Planning Department and a copy shall be filed with the appropriate county Register of Deeds.

### 9.3.2 DESIGN DEVIATION:

9.3.2.1 In certain circumstances it may be desirable or necessary to adjust the standards for sidewalk construction to conform to the unique characteristics of a site. Economic benefit alone is not sufficient grounds

for deviation;  unusual or exceptional topographic, physical, or natural conditions must be present to justify a design deviation.

9.3.2.2　　Any deviation from established sidewalk design standards must be reviewed and approved by the City Engineer.  If the City Engineer denies the deviation, the applicant may appeal to the Planning Commission for approval of the design deviation.  The Planning Commission shall hear the appeal for design deviation and make its recommendation to the City Commission, which shall have final authority to grant or deny any design deviation.

## 9.4 VARIANCE PROCEDURE

9.4.1　　A variance to the sidewalk regulations shall be granted only upon approval by the Board of Zoning Appeals provided that the decision of the Board of Zoning Appeals may be appealed to the proper court of jurisdiction either by the applicant or the city.

9.4.2　　Prior to applying for a variance, the applicant shall make a bona fide attempt to identify and design an alternative method to provide for pedestrian access and movement, according to the provisions of Section 9.3.2 of the Johnson City Zoning Code.

9.4.3　　The general procedures and powers authorized and stated in the Zoning Code, Article XV, Board of Zoning Appeals, shall apply to the Board of Zoning Appeals when considering sidewalk variances.  Decisions of the Board must be based solely on the findings contained in the record.

9.4.4　　In considering a sidewalk variance request, the Board of Zoning Appeals shall apply the following criteria, all of which must be satisfied before a variance may be granted.  The burden of proof shall be on the applicant to demonstrate that the criteria are satisfied before a variance may be granted.

9.4.4.1　　A variance may be granted only where exceptional physical conditions (such as rock, extreme slope, or other natural or manmade obstacle) exist.  Said condition must cause the installation of a standard sidewalk to be extremely difficult or prohibitively expensive.  In considering this question, the Board of Zoning Appeals shall balance the present or future need for the sidewalk with the additional cost of installation.

9.4.4.2    Any variance granted under the provisions of this section shall be the minimum adjustment necessary, and every attempt shall be made to ensure that the needs of pedestrians are accommodated to the maximum extent possible.

9.4.4.3.   The granting of a variance shall be in harmony with the general purpose and intent of the Zoning Code and the Sidewalk Element of the General Plan.   No variance may be granted which is injurious to the neighborhood or detrimented to the public safety and welfare.

zonecode/articles/ART9.doc

# ARTICLE X
## TRANSMISSION TOWER REGULATIONS

## 10.1 - PURPOSE

The purposes of the following regulations are to: facilitate the provision of wireless service facilities and services to the community; minimize adverse visual effects of towers through design, siting, landscaping, and innovative construction techniques; avoid potential damage to adjacent properties from tower structure failure through structural standards and setback requirements; maximize the use of existing and approved tower structures and facilities to accommodate new wireless transmission facilities to reduce the number of tower structures needed to serve the community; and ensure removal of abandoned structures.

## 10.2 - GENERAL PROVISIONS

The following regulations shall apply to all tower structures, including alternative tower structures, antenna arrays, co-location, city-owned utility towers, and location on existing structures.

10.2.1    USES:
Tower structures may be considered as either principal or accessory uses.

10.2.2    EXEMPT STRUCTURES:
The following structures shall be exempt from the provisions of this Article:
A.   City-owned utility towers; and
B.   Facilities used for amateur radio antennas which are under thirty (30) feet in height.

10.2.3    TEMPORARY FACILITY:
A temporary transmission tower or antenna array may be erected at a location where an existing transmission tower or antenna array is out-of-service due to construction or repair of the transmission tower, antenna array, or facility at which the transmission tower or antenna array is located. The temporary facility may be used for a maximum of six (6) months and shall be removed within six (6) months of installation, unless an extension is granted by the Chief Building Official. Maximum height shall be one-hundred (100) feet. Temporary facilities shall be subject to Administrative Review.

10.2.4    BUILDING CODES:
To ensure the structural integrity of tower structures, tower structures shall be maintained in compliance with standards contained in applicable building codes and the applicable standards for tower structures of latest edition as published by the Electronic Industries Association.

10.2.5   HEIGHT:

The maximum height of any tower structure shall be based on the potential number of users for each tower.  A tower structure with the ability for only one user shall not exceed one-hundred (100) feet in height.  A tower structure with the ability for two users shall not exceed one-hundred twenty five (125) feet in height.  A tower structure with the ability for three or more users shall not exceed one-hundred fifty (150) feet in height.  A tower structure or antenna array placed on an existing structure, such as a building, water tank, or light pole, shall not increase the height of said structure by more than thirty (30) feet.  An antenna array placed on an existing tower structure shall not exceed the maximum height permitted for said structure.

10.2.6   SETBACK:

The following setback requirements shall apply to tower structures, excluding alternative tower structures and the co-location of an antenna array on an existing tower structure:

10.2.6.1   The minimum setback of a tower structure from all property lines which do not abut a residential zone shall be fifty (50) feet;

10.2.6.2   The minimum setback of a tower structure from all property lines which abut a residential zone shall be two (2) times the height of said tower structure;

10.2.6.3   All support buildings and equipment, including guy wires, shall be subject to the minimum setback requirements for a primary use of the zoning district where the tower structure is located; and

10.2.7   LIGHTING:

Tower structures shall not be artificially lighted unless required by the Federal Aviation Administration (FAA), city of Johnson City, or other applicable authority.

10.2.8   POWER:

Auxiliary power from a generator may be used as a back-up power source only during emergency situations on a temporary basis.

10.2.9   SIGNS:

No commercial advertising signs shall be located on any tower structure.

10.2.10   LANDSCAPING:

Excluding an alternative tower structure, all tower structures and support buildings and equipment shall be screened on all sides by a Type 1 buffer.

10.2.11  SUPPORT BUILDINGS AND EQUIPMENT:
Support buildings and equipment associated with a tower structure shall not exceed a maximum height of fifteen (15) feet and a maximum square footage of four-hundred (400) square feet.

10.2.12  SURETY BOND:
The tower structure owner shall post a cash bond for the amount of the tower structure's demolition as determined by an engineering report submitted by the applicant and approved by the City Engineer after all approvals and prior to the issuance of a building permit.  An engineering report shall be submitted annually to the Chief Building Official stating the tower continues to be in operation.

10.2.13  INSPECTION:
If, upon inspection by the Chief Building Official or designee, a tower structure fails to comply with applicable building and zoning codes, the owner of the tower structure has thirty (30) days to bring it into compliance with such codes.  Failure to bring it into compliance within  thirty (30) days shall constitute grounds for removal by the city at the expense of the tower structure owner. If the tower is not removed by the tower structure owner, the city shall revoke the bond to pay for its removal.

10.2.14  ABANDONMENT:
If any tower structure is not in use for twelve (12) consecutive months, it shall be deemed abandoned by the Chief Building Official and be removed by the owner of the tower structure. Failure to remove the tower structure within ninety (90) days shall constitute grounds for removal by the city at the expense of the owner of the tower structure.  If the tower is not removed by the tower structure owner, the city shall revoke the bond to pay for its removal.

**10.3 - SUBMITTAL AND REVIEW**

10.3.1  ADMINISTRATIVE REVIEW:

10.3.1.1  The following uses shall be subject to administrative review by the Chief Building Official:
A. The co-location of an antenna array on an existing tower structure or existing structure such as a building, water tank, or light pole. The existing tower structure must meet the latest standards for wind and ice loads;
B. The placement of additional support buildings or equipment;
C. A replacement tower structure which does not exceed the height of the existing tower structure.   If the existing tower

structure encroached into the minimum setback, the replacement tower structure shall conform to minimum setbacks; and

D. A temporary facility.

10.3.1.2 The following shall be submitted to the Chief Building Official for administrative review:

A. A site plan drawn to scale indicating the location and height of the tower structure and any new improvements including any additional site and tower structure modifications; and

B. Review fee.

10.3.1.3 Within sixty (60) days of receiving a complete application, the Chief Building Official shall notify the applicant of approval or reason for denial. If the Chief Building Official fails to notify the applicant within sixty (60) days of receiving a completed application, the application shall be deemed approved.

10.3.2 SPECIAL EXCEPTION REVIEW:

10.3.2.1 The following uses shall be subject to review by the Board of Zoning Appeals as a Special Exception:

A. A new tower structure;

B. An alternative tower structure; and;

C. A replacement tower structure which exceeds the height of the existing tower structure.

10.3.2.2 The following information shall be submitted for tower structures:

A. If there are any tower structures within one (1) mile of the proposed tower structure, the applicant shall submit a report by a registered engineer citing one of the following factors why the other tower structure(s) are not suitable:

1. Existing tower structures are not of sufficient height or do not have sufficient structural strength to support additional equipment;

2. The applicant's proposed tower structure would cause electromagnetic interference with existing tower structures;

3. Fees, costs, or contractual provisions required by the tower structure owner are financially or contractually prohibitive; or

4. The applicant demonstrates other limiting factors which make the other tower structure unsuitable.

B. A report by a registered engineer stating the total number of potential users for the tower structure;

C. A site plan drawn to scale indicating setback distances, height, landscaping, ingress and egress, support buildings and equipment, and parking areas;

D. Elevation drawing of the tower structure including materials, color, and height;

E. Any additional conditions required by the Board of Zoning Appeals to promote compatibility with the surrounding neighborhood; and

F. Review fee.

10.3.2.3    The following information shall be submitted for alternative tower structures:

A. If there are any tower structures within one (1) mile of the proposed tower structure, the applicant shall submit a report by a registered engineer citing one of the following factors why the other tower structure(s) are not suitable:

1. Existing tower structures are not of sufficient height or do not have sufficient structural strength to support additional equipment;

2. The applicant's proposed tower structure would cause electromagnetic interference with existing tower structures;

3. Fees, costs, or contractual provisions required by the tower structure owner are financially or contractually prohibitive; or

4. The applicant demonstrates other limiting factors which make the other tower structure unsuitable.

B. A report by a registered engineer stating the total number of potential users for the tower structure;

C. A site plan drawn to scale indicating setback distances, height of the proposed structure, materials, and color;

D. Elevation drawing of the tower structure demonstrating that the proposed structure is compatible with the surrounding area, buildings, and vegetation;

E. Any additional conditions required by the Board of Zoning Appeals to promote compatibility with the surrounding neighborhood; and

F. Review fee.

10.3.2.4    Within sixty (60) days of receiving a complete application, the Chief Building Official shall notify the applicant of approval or reason for denial. If the Chief Building Official fails to notify the applicant within sixty (60) days of receiving a completed application, the application shall be deemed approved.

zonecode/atricles/ART10.doc

# ARTICLE XI
## PARKING REGULATIONS

## 11.1  -  PURPOSE

The purpose of these regulations is to ensure adequate parking is provided and maintained throughout the city. Parking shall be provided in the amount specified by this section, at the time of erection of any structure, or at the time when any main structure is enlarged or increased in capacity by adding dwelling units, guest rooms, seats or floor area; or before conversion from one zoning use or occupancy to another. The provisions of this section shall not apply to the B-2 Central Business District.

## 11.2  - GENERAL PROVISIONS

11.2.1  Parking spaces provided to meet the requirements of this section shall not be reduced in size or number, modified, eliminated, or assigned to another use at the same time, except as allowed by these regulations.  The use of required parking for the display of equipment, material, or supplies, or for the sale, repair, or dismantling of vehicles shall not be permitted.

11.2.2  Excluding single-family and two-family residential uses, parking for residential uses shall not be located between the right-of-way line and the front building line.  On corner lots, parking shall not be located between the building and any right-of-way line, excluding alleys.

11.2.3  Each required parking space, aisle, and drive shall be paved and provide paved vehicular access to a public or private street or alley. Each parking space shall be unobstructed and independently accessible from an aisle or drive.

11.2.4  With the exception of required spaces for single-family and two-family dwelling units, adequate on-site turning space shall be provided so that no vehicle will be required to back into the street.

11.2.5  Each required parking space shall be marked by painted lines extending the full length of the space.

11.2.6  Parking requirements may be reduced up to a total of ten (10) percent by one, or a combination, of the following:

11.2.6.1  One (1) space per one (1) bike locker or one (1) space per ribbon rack; or

11.2.6.2  One (1) space per two (2) Type 1 shade trees in excess of the

minimum required amount.

11.2.7  When several uses occupy a single structure or lot, the total required parking shall be the sum of the requirements of the individual uses or as specified herein.

11.2.8  The minimum pavement specifications for required parking areas and accesses thereto shall conform to the following:

11.2.8.1  Concrete:
The minimum thickness shall be four (4) inches for residential structures and five (5) inches for all other uses.

11.2.8.2  Bituminous:
The minimum thickness shall be four (4) inches of compacted crushed stone base with a one and one-half (1 ½)-inch compacted asphaltic concrete surface for residential use and a five (5)-inch compacted crushed stone base with a two (2)-inch compacted asphaltic concrete surface for other uses.

11.2.8.3  Pervious Parking Surfaces:
The use of alternative, pervious (permeable) parking surfaces excluding gravel surfaces are permitted and encouraged.  Such surfaces shall be accompanied by an underlying drainage system which meets stormwater requirements as determined by the City Engineer.  Such surfaces may include, but are not limited to, porous concrete, porous asphalt, and concrete pavers.  All pervious parking shall be subject to the approval of the City Engineer.

11.2.9  Parking areas and loading facilities shall be maintained by the owner or lessee in a clean and orderly condition, free of debris and other foreign substances.  Parking and loading areas shall be properly maintained, pavement markings periodically repainted, and on-site traffic signs properly maintained, as necessary to maintain a clear and safe identification of individual parking spaces and to facilitate the safe movement of pedestrian and automobile traffic.

11.2.10  When calculations indicate a percentage of one (1) space is required, one (1) additional full space shall be required.

11.2.11  Each parking space and aisle shall have the minimum dimensions specified by the following standards and illustrations.

# PARKING DESIGN STANDARDS

| Type of Space | | Parking Angle *** | Minimum Space Width | Minimum Space Depth | Minimum Aisle Width* (1-Way Drives) | Minimum Aisle Width (2-Way Drives) |
|---|---|---|---|---|---|---|
| Automobile Parking Spaces | | 0º parallel | 9' | 25' | 15' | 20' |
| | | 15º | 9' | 23' | 15' | 20' |
| | | 30º | 9' | 22' | 15' | 20' |
| | | 45º | 9' | 21' | 15' | 20' |
| | | 60º | 9' | 20' | 18' | 20' |
| | | 75º | 9' | 19' | 22' | 24' |
| | | 90º | 9' | 18' | 24' | 24' |
| Handicapped Spaces | Standard | ** | 14'**** | 18'-25'** | ** | ** |
| | Van Accessible | ** | 17'**** | 18-25'** | ** | ** |
| Motorcycle Spaces | | ** | 4 1/2' | 7' | ** | ** |

\*        Measured perpendicular to traffic flow in aisle.

\*\*      Same as requirements for automobiles.

\*\*\*    Use the graph below to determine parking angle.

\*\*\*\*  Includes 9-foot parking spaces and 5-foot access aisle for standard spaces and 8-foot access aisle for van accessible spaces. Access aisles may be shared by two adjacent spaces.

## PARKING SPACE AND TRAVEL AISLE ILLUSTRATIONS



TWO WAY AISLE    TWO WAY AISLE
90° PARKING LAYOUT

TWO WAY AISLE    ONE WAY AISLE
60° PARKING LAYOUT

TWO WAY AISLE    ONE WAY AISLE
45° PARKING LAYOUT

11.2.12  For uses not specifically mentioned herein, off-street parking requirements shall be interpreted by the Director of Planning based upon requirements for similar uses established herein or upon acceptable standards.

11.2.13  All space requirements which are based upon employment shall be computed on the basis of the greatest number of persons employed at any

one period during the day or night.

11.2.14 Any use which is required by this Code to provide off-street parking spaces may reduce the total number of required parking spaces by the number of qualified on-street parking spaces which are adjacent to the property containing the use in question. On-street parking spaces shall meet the following conditions to qualify for credit under this section:

A. Proposed on-street parking shall be shown on a site plan and approved by the City Traffic Engineer. All such spaces shall comply with all applicable city Codes;

B. Each qualifying on-street parking space shall be adjacent to the property for which the parking is intended;

C. Any street where on-street parking will be credited shall be curbed and shall be a minimum of twenty (20) feet wide as measured from face of curb to face of curb;

D. On-street parking shall not be located within thirty (30) feet from any intersection; within ten (10) feet from any driveway; or within eight (8) feet from any side of a fire hydrant;

E. Each space shall be a minimum of twenty-five (25) feet in length;

F. On-street parking shall not be marked by or be used exclusively for the use for which it is being credited; and

G. Required handicap parking spaces shall not be located on-street and shall be appropriately marked and located in an off-street parking lot.

## 11.3 - REQUIRED PARKING SPACES

| Residential | Spaces required |
|---|---|
| Bed-and-breakfast inns\house | One (1) parking space per guest room plus two (2) additional parking spaces for the permanent residence. |
| Elderly housing, assisted living | One (1) space per unit plus one (1) space per employee on the largest shift. |
| Elderly housing, congregate care | One-half (1/2) space per bed or one (1) space per bedroom whichever is greater plus one (1) space per employee on the largest shift. |
| Elderly/retirement housing | One and one-quarter (1 1/4) spaces per unit. |
| Home occupation | Two (2) spaces for the dwelling unit plus one (1) space per one-hundred square feet of floor area devoted to the home occupation. |

| | | |
|---|---|---|
| Manufactured (Mobile) home parks | | Two (2) spaces per dwelling unit. |
| Multi-family units in the R-6 district with four (4) or more bedrooms | | 1.1 spaces per bed. |
| Multi-family, one bedroom multi-family dwelling unit with floor area of four-hundred twenty five (425) square feet or less | | One and one-quarter (1 1/4) spaces per dwelling unit. |
| Multi-family, one bedroom multi-family dwelling units with a floor area greater than four-hundred twenty five (425) square feet | | One and one-half (1 1/2) spaces per dwelling unit. |
| Multi-family, two or more bedroom multi-family dwelling unit | | Two (2) spaces per dwelling unit. |
| Residential facilities for developmentally disabled | | Two (2) parking spaces for the first dwelling unit and one (1) additional parking space provided for each additional dwelling unit. |
| Rooming and boarding houses, excluding bed and breakfast houses | | One (1) space per rented bedroom plus two (2) spaces for the permanent residence. |
| Single-family and two family dwelling units | | Two (2) spaces per dwelling unit. |

| Commercial | | Spaces Required |
|---|---|---|
| Adult day-care centers | | One (1) space per employee and one (1) space per five (5) persons enrolled in the program. |
| Automobile repair garages | | One (1) space per employee plus one (1) space per two-hundred fifty (250) square feet of floor area used for repair work. |
| Automobile sales | | One (1) space per employee plus one (1) space per two-hundred fifty (250) square feet of floor area for service area, plus one (1) space per one-thousand (1,000) square feet of gross building area (exclusive of service area). |
| Barber/beauty shop (other than home occupation) | | Three (3) spaces per chair or beautician station for the first two (2) chairs or station, plus two (2) spaces for each additional chair or station. |
| Bowling lanes | | Four (4) spaces per lane plus any additional spaces required for other uses. |
| Child day-care centers | | One (1) space per four-hundred (400) square feet of gross floor area. |

| | | |
|---|---|---|
| Commercial centers, including office, retail, and restaurants not exceeding 20,000 square feet. | | One (1) space per one-hundred and fifty (150) square feet of gross floor area. |
| Commercial recreational and amusement places not otherwise specified. | | One (1) space per two-hundred and fifty (250) square feet of gross floor area. |
| Convenience centers | | One space per one-hundred and fifty (150) square feet of retail area plus one (1) space per employee |
| Dance/gymnastic schools | | One (1) space per two-hundred and fifty (250) square feet of gross floor area. |
| Fraternal organizations, lodges, and clubs | | One (1) space per two-hundred (200) square feet of gross floor area. |
| Funeral home or mortuary | | One (1) space per four (4) seats in the chapel plus four (4) additional spaces per one-hundred (100) square feet of floor area in each viewing room, and one (1) space per vehicle operated by the establishment. |
| Gasoline service stations | | Two (2) spaces per bay plus one (1) space per employee. |
| Golf and country clubs, swimming clubs, tennis clubs, and other similar recreational activities | | One (1) space per five (5) families with membership in the club. |
| Golf course | | Forty-eight (48) spaces for a par-3 course; ninety-six (96) spaces for an executive or regulation golf course; and one (1) space per employee and one (1) space per two-hundred (200) square feet of gross floor area of the pro-shop and snack bar. |
| Golf driving ranges | | One (1) space per tee, plus one (1) space per putting green, plus one (1) space per employee. |
| Health/fitness club | | One (1) space per two-hundred (200) square feet of gross floor area. |
| Kennels | | One (1) space per five-hundred (500) square feet of gross floor area plus one (1) space per employee. |
| Motels, hotels | | One (1) space per rental unit, plus one (1) space for each two (2) employees, plus one (1) space per two-hundred (200) square feet of gross floor area devoted to eating and entertainment. |
| Movie theatre | | One (1) space per four (4) seats. |

| | |
|---|---|
| Night clubs | One (1) space per one-hundred (100) square feet of gross floor area. |
| Outdoor sales areas not otherwise specified | One (1) space per five-hundred (500) square feet of sales area, plus one (1) space per employee. |
| Personal, business, or professional services not otherwise specified | One (1) space per two-hundred (200) square feet of gross floor area. |
| Plant nurseries | One (1) space per two-hundred (200) square feet of gross floor area, plus one (1) space per four-thousand (4,000) square feet of gross acreage. |
| Restaurants | |
| | A. Sit-Down: One (1) space per one-hundred (100) square feet of gross floor area. |
| | B. Carry-Out Only: One (1) space per two-hundred (200) square feet of gross floor area. |
| | C. Drive-Thru Only: One (1) space per employee. |
| | D. Restaurants located inside retail malls with an excess of four-hundred thousand (400,000) square feet of gross leasable area (GLA) shall be calculated at the same rate as the remainder of the mall. |
| Retail sales, general | One (1) space for each two-hundred (200) square feet of retail area. |
| Retail sales, specialty | One (1) space for each four-hundred (400) square feet of retail area. |
| Retail sales, bulk | One (1) space per five-hundred (500) square feet of retail area, or one (1) space per one-thousand (1,000) square feet of gross floor area, whichever is greater. |
| Retail mall | Retail malls having in excess of four hundred-thousand (400,000) square feet of gross leasable area (GLA), according to the table below: |

| Square Feet of GLA (SFGLA) | Spaces Required (per 1000 SFGLA) |
|---|---|
| 400,000 – 500,000 | 5 |
| 500,000 – 600,000 | 4.9 |
| 600,000 – 700,000 | 4.8 |
| 700,000 – 800,000 | 4.7 |
| 800,000 – 900,000 | 4.6 |
| 900,000 + | 4.5 |

| Wholesale business | | One (1) space per three-thousand (3,000) square feet of gross floor area plus one (1) space per employee |
| --- | --- | --- |

| Office | | Spaces Required |
| --- | --- | --- |
| Call centers | | One (1) space per (2) employees in the largest shift. |
| General offices | | One (1) space per three-hundred (300) square feet of gross floor area. |
| Medical and dental offices | | Five (5) spaces per doctor plus one (1) space per employee or one (1) space per two-hundred (200) square feet of gross floor area, whichever is greater. |

| Industry | | Spaces Required |
| --- | --- | --- |
| Industry | | One (1) space per two (2) employees in the largest shift. |
| Warehouses | | One (1) space per employee. |

| Institutional | | Spaces Required |
| --- | --- | --- |
| Ambulance service | | One (1) space for each ambulance plus one (1) space per employee. |
| Animal hospitals, veterinary clinics | | One (1) space per three-hundred (300) square feet of gross floor area. |
| Churches, chapel, mosque, synagogue, or other place of worship | | One (1) space per four (4) seats in the main sanctuary, a seat being defined as at least eighteen (18) inches of row seating or each individual chair. |
| Community center | | One (1) space per three-hundred (300) square feet of gross floor area plus one (1) space per employee. |
| Emergency or temporary shelters | | One and one-half (1 1/2) space per five (5) persons staying at the shelter. |
| Fraternity or sorority houses | | One (1) space per bed. |
| Group homes for the mentally retarded, mentally handicapped, or physically handicapped | | Three (3) spaces for the first ten (10) residents, plus two (2) additional spaces for facilities with eleven (11) to fifteen (15) residents. |
| Hospitals | | One (1) space per two (2) beds (exclusive of bassinets) plus one (1) space per two (2) staff or visiting physicians plus one (1) space per employee. |

| | |
|---|---|
| Libraries, museums, and art galleries | One (1) space per four-hundred (400) square feet of gross floor area. |
| Places of public assembly | One (1) space per four (4) seats in the principal assembly room. |
| Public utility buildings | One (1) space per employee plus one (1) space per company vehicle. |
| Schools | |
| A. Elementary school | One (1) space per employee or staff plus one (1) space per twenty-five (25) students. |
| B. Middle school | One (1) space per employee or staff plus one (1) space per twenty-five (25) students. |
| C. High school | One (1) space per employee or staff plus one (1) space per four (4) students. |
| D. Colleges, universities, technical schools | One (1) space per employee or staff plus one (1) space per three (3) students. |
| Stadium | One (1) space per four (4) seats. |

## 11.4 - OFF PREMISES PARKING

If the required parking spaces cannot be provided on the same lot as the principal use, the Board of Zoning Appeals may, as a Special Exception, permit such spaces to be located on other property, provided;

11.4.1   The property used for parking shall lie within four-hundred (400) feet of the property line of the principal use.

11.4.2   The property used for parking shall not be in an R-1, R-2, R-2A, R-2B or R-2C zoning district.

11.4.3   The property used for parking shall not be separated from the principal use by a collector or arterial street as designated on the zoning map.

11.4.4   The property used for parking shall meet all buffering requirements of the district in which the principal use is located.

11.4.5   The parking shall be buffered from any local streets with a Type 1 buffer, including an eight (8)-foot opaque wooden fence or masonry wall.

11.4.6   Such spaces shall not exceed fifty (50) percent of the required parking. Off-premises parking shall be paved and striped.

11.4.7   Ingress and egress to the parking lot shall not be through a local residential street and is provided through the property of the non-residential principal use.

11.4.8    When off-street parking is located on a lot other than the lot where the principal use is located, the applicant shall submit an instrument duly executed and acknowledged along with the application for a building permit which requires the lot to be available for parking as long as required by the principal use.  The applicant shall deposit the necessary fee and upon the issuance of a building permit, the Chief Building Official shall cause said instrument to be registered in the Office of the Registrar of Deeds.

## 11.5 - JOINT USE OF PARKING SPACES

Required parking spaces may be shared cooperatively by two or more nonresidential uses by Special Exception approval of the Board of Zoning Appeals.  The BZA, in approving an arrangement, shall make a determination that the uses involved can be adequately served by the same parking spaces by reason of the characteristics of the land uses and different hours of operation.  The BZA is authorized to require restrictions on the use and hours of operation of any uses which share parking spaces, and may require appropriate instruments to be filed in the Office of the Register of Deeds to ensure the availability of the shared parking spaces.

## 11.6 - HANDICAP PARKING

Except for single-family, two-family, and multiple-family dwellings offered for sale, all uses shall provide off-street parking spaces for handicapped persons.

11.6.1  The number of handicapped parking spaces required shall be based on the total number of parking spaces according to the following table:

| Total Spaces | Required Number to be Reserved for the Handicapped |
|---|---|
| Up to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1,000 | 2% of total |
| Over 1,000 | 20 plus 1 for each 100 over 1,000 |

11.6.2  Each handicapped parking space shall be identified by an above-grade sign conforming to the requirements of the Manual on Uniform Traffic Control

Devices. Each sign shall be no less than seven (7) feet in height to the bottom of the sign, and the sign itself shall be twelve (12) inches in width by eighteen (18) inches in height. Other methods identifying handicapped parking spaces, such as painting on asphalt surfaces, shall not be considered as acceptable alternatives to the required signage, but may be installed in addition to these requirements.

11.6.3   Handicap spaces shall be provided at the closest possible location to the entrance of the building, and shall be connected to that entrance by a paved surface no less than five (5) feet in width, which does not exceed one (1) foot rise or fall per twelve (12) feet of length. In no case shall a handicapped individual, in proceeding from a handicapped parking space to an entrance, be required to walk or wheel behind non-handicapped parking.

## 11.7 - MOTORCYCLE PARKING

11.7.1   Any off-street parking facility of fifty (50) or more spaces may install, as an option, motorcycle parking spaces in lieu of required automobile parking. The maximum percentage of such spaces that may be counted toward the required parking requirement shall be one (1) percent, with fractions being rounded to the nearest whole number.

11.7.2   Any such spaces provided shall be grouped in the parking area and at the ends of parking aisles where possible.

11.7.3   Motorcycle spaces shall be identified by above grade signs, no less than seven (7) feet in height to the bottom of the sign as being reserved for such use. The sign itself shall be twelve (12) inches in width by eighteen (18) inches in height. Other methods of identification, including painting of asphalt surfaces, shall not be considered as acceptable alternatives to the required signage, but may be installed in addition to these requirements.

## 11.8 - LOADING AREAS

All nonresidential uses shall provide an area outside of the public right-of-way sufficient for loading and unloading goods; excluding uses located in the B-2, Central Business District.

## 11.9 - STACKING LANES FOR DRIVE-UP WINDOWS

11.9.1   A required stacking space shall be an area measuring nine (9) feet by eighteen (18) feet with direct forward access to an order window or device of a drive-through facility. A required stacking space shall be located to minimize any vehicle from extending into the public right-of-way. Stacking spaces for drive-through or drive-in uses may not be counted as required parking spaces.

11.9.2   Stacking spaces begin at the ordering device of a drive-through facility. Uses providing drive-up or drive-through services shall provide stacking spaces as follows:

11.9.2.1   For a drive-through restaurant with indoor seating, a minimum of seven (7) stacking spaces shall be provided;

11.9.2.2   For each drive-up window of a bank or other financial institution, a minimum of five (5) stacking spaces shall be provided per service window or device.

11.9.2.3   For other uses, a minimum of three (3) stacking spaces shall be provided per service window.

zonecode/articles/ART11.doc

**ARTICLE XII**
**LANDSCAPE REGULATIONS**


## 12.1 - GENERAL PROVISIONS

12.1.1    INTENT:

It is the intent of these regulations to make Johnson City a more beautiful, environmentally sound, and more memorable place through the requirement of new landscaping and the preservation of existing landscaping. The landscaping of parking areas, street yards, and buffer yards is intended to break-up large expanses of asphalt to reduce heat build-up, control erosion, modify the rate of storm water run-off, increase groundwater recharge, filter the air, control water and light pollution, and lessen the impact of high intensity uses on the community.

12.1.2    APPLICABILITY:

A.    All new development, excluding active agricultural use and the individual development of one single-family or two-family detached dwelling unit, shall comply with Section 12.1, Landscape Regulations. All development located in the MX zone shall be subject to the landscape provisions of the MX zone.

B.    Any parking lot constructed as a result of the expansion of an existing development shall comply with Section 12.1, Landscape Regulations.

C.    Expansion of all existing development which, after the passage of this ordinance, exceeds twenty-five (25) percent of the existing gross floor area (G.F.A.) or any change of use which results in the property becoming a higher impact use, shall comply with the following:

1.    The site shall be modified to provide at least twenty-five (25) percent of the amount of landscaping which would be required for a comparable new development. The placement of the landscaping shall not be required to meet Section 12.1. If it is not feasible to meet the quantity or placement requirements, the required landscaping with the approval of a detailed landscape plan by the City Forester of designee.

2.    Any change in use, which results in a higher impact, shall require buffers as specified in section 12.4.

12.1.3    LANDSCAPE PLAN:

A.    A generalized landscape plan shall be submitted as part of the site plan and shall contain adequate information to determine compliance with this Code. The following elements shall be shown on the landscape site plan:

• Title, name of owner, date, graphic scale, and north arrow;

- Name and phone number of person or firm responsible for landscape plan;
- Common name and size of plant materials to be used;
- Boundary lines and lot dimensions;
- Zoning of site and adjoining properties;
- Proposed contours at 5 feet intervals or less;
- Proposed building locations;
- Location of existing and proposed streets, driveways, sidewalks, and parking areas;
- Location, sizes, and spacing of plant material;
- Size and location of landscaped areas, islands, screening, and buffers;
- Planting detail(s);
- Location, species, size diameter breast height (dbh), and location of root zone protection area of any tree(s) to be preserved;
- The location and extent of utilities, including electric, telephone, cable TV, natural gas, utility poles, and interior lighting poles.

B.      Landscape plans shall be designed to assure adequate sight distance and maintain appropriate clear sight triangles at all entrances and exits to developments and parking areas.

C.      Review Fee

12.1.4     TREE PRESERVATION:
It is the goal of the city to encourage and facilitate the preservation of healthy trees wherever possible.  The following incentives are designed to achieve that goal:

A.      Preservation of healthy trees, six (6) inches dbh or greater, shall be credited toward the required number of trees per the following ratio:  for every six (6) inches of diameter preserved, a credit of one tree shall be granted, provided credit is limited to twenty-five (25) percent of required trees.   The City Forester shall approve any tree to be preserved for which credit is to be given.

B.      Existing trees with a diameter greater than six (6) inches dbh, may be relocated within the site and shall be credited toward the required number of trees per the following ratio:  for every four (4) inches of diameter preserved, a credit of one tree shall be granted, provided credit is limited to fifty (50) percent of required trees.  The City Forester shall approve any tree to be relocated for which credit is to be given.

C.      To facilitate the preservation of a specimen tree, setback requirements may be reduced up to twenty-five (25) percent by the Development Coordinator or designee.

D.      To facilitate the preservation of a specimen tree in the subdivision of land, lot sizes may be reduced up to twenty-five (25) percent of the minimum lot size for that district, provided no lot is reduced so as to require a

variance to be buildable, and the required density of the district is maintained for each phase.

12.1.5     TREE PROTECTION DURING CONSTRUCTION:

In order to receive credit for an existing tree or grove of trees, a critical root zone (CRZ) shall be established. The critical root zone shall have a minimum area equal to the distance from the trunk to the dripline or the distance derived from the CRZ calculation, whichever is greater.

CRZ calculation = (tree dbh in inches * .75 feet)

*Example: a tree with a thirty (30) inch dbh would require a minimum CRZ of 22.5 feet or the distance from the trunk to the dripline, whichever is greater.*



*In this example the CRZ is determined to be the distance from the trunk to the dripline due to the fact that the distance derived from the CRZ calculation is less than the distance to the dripline.*

The critical root zone shall not be disturbed by construction activity, excluding sodding or the placement of other landscape materials. This area shall be barricaded and marked with signage during construction. Curbing placed around preserved trees shall be located no closer than the edge of the critical root zone. Damage to trees, including injuries resulting from chemical poisoning, concrete wash water, construction equipment, soil compaction, grading, paving and/or other mechanical injuries to the roots, trunk, or branches of the tree that will result in their death within one year of construction shall negate any credit given for preservation.

12.1.6    MIXTURE OF TREES:
Sites with required new trees of ten (10) or more, excluding buffer trees, shall provide the following variety of trees:

| Number of Required Trees | Minimum Required Variety of Trees | Maximum Percent of Any Variety |
|---|---|---|
| 10-19 | 2 | 65% |
| 20-29 | 3 | 50% |
| 30-39 | 4 | 40% |
| 40+ | 5 | 35% |

12.1.7    LISTS OF ACCEPTABLE TREES:
The City Forester shall keep a list of acceptable shade trees and buffer trees. Shade trees and Evergreen buffer trees are separated into two groups, Type 1 and Type 2. Type 1 trees are those that have a mature height of thirty (30) feet or more. Type 2 trees are those that have a mature height of less than thirty (30) feet. A petition, stating justification, may be made to the Tree and Appearance Board to add or remove a tree from the approved lists.

12.1.8    SIZE AND SPACING REQUIREMENTS:
At the time of planting, Type 1 shade trees shall have a minimum trunk diameter of two (2) inches measured at six (6) inches above ground level. Type 2 shade trees shall have a minimum trunk diameter of one and one-half (1 ½) inches above ground level. Type 1 buffer trees shall have a minimum height of five (5) feet. Type 2 buffer trees shall have a minimum height of four (4) feet All required shade trees and buffer trees shall have a minimum horizontal separation from other required trees of ten (10) feet. All trees shall be placed no closer than four (4) feet from any curb or sidewalk. All newly planted trees shall have a minimum radius of three (3) feet located around the base of the trunk containing mulch.

Screen and buffer shrubs shall have a minimum height of two and one-half (2.5) feet and shall have a maximum spacing of five (5) feet. Screen and buffer shrubs shall have a mature height of between six (6) and twelve (12) feet. The minimum size of shrubs used to create a parking lot screen shall be eighteen (18) inches and shall be able to achieve a minimum mature height of four (4) feet.

12.1.9    PLANT QUALITY STANDARDS:
Plant material installed to satisfy the requirements of this Article shall conform to the plant quality standards of the most recent edition of the American Standard for Nursery Stock (ANSI Z60.1), published by the American Association of Nurserymen. Trees with co-dominant stems shall not count toward meeting the requirements of this Article.

12.1.10    MAINTENANCE:
    A.    Failure to maintain landscaped areas as required shall be considered a violation of this Article. The property owner shall be responsible for the

routine maintenance of all required plant material.  Maintenance activities include but are not limited to watering, pruning, mulching, mowing, weeding, and fertilizing.  All landscaped areas must present a healthy, neat and orderly appearance and shall be kept free from refuse and weeds.  Trees or shrubs that are dead, diseased, or otherwise deemed by the City Forester to be in an unsafe condition shall be removed by the property owner and replaced with new plantings provided that the new plantings are in compliance with this Article.

B.      Walls and fences used as screening structures shall be repaired or replaced so that they remain in a structurally sound condition.

C.      Shrubs used to create a parking lot screen shall not be pruned to a height less than three (3) feet.  Shrubs used in buffer yards shall not be pruned to a height less than five (5) feet.

D.      Tree topping of any required tree is prohibited and may, at the determination of the City Forester, negate a tree from being used to satisfy the requirements of this Article.

12.1.11    REMOVAL OF REQUIRED PLANT MATERIAL:
A property owner shall notify and receive approval from the City Forester or designee before any healthy tree or shrub is removed.  Notification is not required for the removal of dead or diseased plant material.  All plant material must be replaced in accordance with the requirements of Article XII.

12.1.12    MODIFICATIONS:
The City Forester shall have the authority to grant a request for modification of any requirements in this Article upon receipt of a written request, which outlines the rationale for the modification.  The City Forester shall review each request and grant a modification only: under unusual circumstances such as extreme topography or geology, which cause an unreasonable hardship; or, when an innovative or alternative approach can be made which still meets the intent and purpose of this Article.

12.1.13    APPEALS:
Any person aggrieved by the administration, interpretation, or enforcement of this Section may appeal to the Board of Zoning Appeals within 30 days of a decision of the City Forester or designee.

12.1.14    VIOLATIONS:
Any violation of the terms of this Article shall be a violation of the zoning ordinance, and shall be subject to the penalties established for violations established in the zoning ordinance.

## 12.2 - LANDSCAPE YARDS

12.2.1    APPLICABILITY:
Landscape Yards are required in all zones, excluding single-family and two-family detached dwelling units.

12.2.2    PLANTING REQUIREMENTS:
A landscape yard shall be established along all abutting streets.  Minimum width shall be ten (10) feet, excluding those zones where the front yard setback is less than ten (10) feet, in which case landscape yard width shall equal the front yard setback or ten (10) feet, whichever is less.  One (1) Type 1 shade tree from the approved list, or two (2) Type 2 shade trees shall be provided per fifty (50) linear feet, or any fraction thereof, of street frontage.  Trees may be spaced or grouped at the discretion of the developer in the landscape yard.  Required trees shall not be placed in street rights-of-way.  When the landscape yard occurs near utility lines, Type 2 shade trees, specified for use near power lines, shall be planted at a rate of one (1) tree for each fifty (50) feet of frontage occurring near utility lines.

12.2.3    EXCEPTION:
When parking spaces in a parking lot abut a street right-of-way, the landscape yard may be replaced by a parking lot screen, which is a minimum of four (4) feet in width with tire stops in the parking lot to prevent vehicles from overhanging the curb and damaging the landscaping.  Parking spaces adjacent to the parking lot screen may be reduced by two (2) feet in length.  The screen shall include one (1) Type 1 shade tree for every one hundred (100) feet of frontage.  The trees may be situated in a landscape island which is connected to the landscape yard and shall have a minimum area of 160 square feet.  Parking lot screens shall be provided in one of the following configurations:

    A.    A brick or masonry wall which, measured from the edge of the parking lot, is a minimum of three (3) feet in height.

    B.    A row of evergreen shrubs spaced a maximum of five (5) feet on center. The entire landscape yard containing shrubs used as a parking lot screen shall be mulched and shall not have a slope exceeding a ratio of 2:1.



C.    Adequate access for pedestrians to enter the development shall be provided in the form of walkways at appropriate intervals.

## 12.3 - PARKING AREA LANDSCAPING

12.3.1    APPLICABILITY:
Off-street parking areas of ten (10) spaces or more, excluding parking garages, shall be landscaped in all zoning districts.

12.3.2    PLANTING REQUIREMENTS:
Thirty-five (35) square feet of interior landscaped area shall be provided per parking space. One (1) Type 1 shade tree shall be provided per ten (10) parking spaces, or any fraction thereof. A maximum of thirty (30) percent of the required Type 1 shade trees may be replaced by Type 2 shade trees at a ratio of one and one-half (1 1/2) Type 2 trees for each Type 1 tree replaced.

12.3.3    LANDSCAPED AREA REQUIREMENTS:
Parking area landscaping shall be located within the parking area or the area abutting the parking area not extending more than fifteen (15) feet beyond any paved surface including sidewalks. All interior landscaped areas shall be a minimum of three-hundred twenty (320) square feet except that those landscape islands which terminate a single row of parking abutting the building or the edge of the parking lot may be a minimum of one hundred sixty (160) square feet in area. The minimum dimension of any portion of an interior landscaped area shall be nine (9) feet. All measurements for landscape islands shall be made from the back of the curb.  A minimum of one (1) required tree shall be located in each landscaped area. All landscaped areas shall be surrounded with a six (6) inch high concrete raised curb. Small curb breaks are encouraged for drainage into or out of a planted area. If asphalt, concrete, or sub-base exists where the landscaped area is to be located, it shall be removed down to uncompacted soil prior to planting.

12.3.4    LOCATION:
No vehicle parking space shall be located more than seventy-five (75) feet from the trunk of one (1) shade tree.  A tree, preserved in accordance with Subsection 12.1.5, may be used to satisfy this requirement.

12.3.5    HEAD-ON PARKING:
Where two rows of head-on parking are separated by a landscaped area, not less than nine (9) feet wide, or where parking spaces abut a perimeter landscaped area, said parking spaces may be shortened by two (2) feet from the Parking Design Standards found in this Code.

12.3.6    LANDSCAPE INCENTIVE:
Landscaping provided in excess of that required by this Code shall reduce the required parking in Section 11.2 by the following amount:  one (1) parking space may

be eliminated for every Type 1 shade tree provided in excess of the required amount. Reduction of parking shall not exceed ten (10) percent of the total required parking.

12.3.7    MULTI-FAMILY PARKING SCREENING:
A visual screen in the form of a masonry wall, wood fence, or a landscaped area with a minimum width of four (4) feet capable of creating an opaque screen with shrubs spaced a maximum of five (5) feet on center shall be provided for all multi-family residential parking areas to prevent public view from any street right-of-way (excluding alleys) or adjoining residential property.


## 12.4 - BUFFER YARDS

12.4.1    APPLICABILITY:
Buffer Yards are required where the development of a higher impact use abuts a lower impact use, as classified in Subsections 12.4.4 and 12.4.5. The Board of Zoning Appeals, the Johnson City Regional Planning Commission, or the Johnson City Board of Commissioners may increase Buffer Yard requirements where it has approval authority.

12.4.2    EXCEPTIONS:
Any property with a zoning designation of B-2 or MX is exempt from the requirements of Section 12.4 where it abuts the same zoning district.

12.4.3    IMPACT CLASSIFICATION:
A.    No impact (N):
All permitted uses in the following zones are considered to have no impact, unless a specific use is listed elsewhere; A-1, R-1, R-2, R-2A, R-2B, R-2C, and RP-2.  The following uses shall be considered to have no impact, regardless of zoning classification; cemeteries, golf courses without night lighting, parks, single-family and two-family residential.

B.    Low impact (L):
All permitted uses in the following zones are considered to have a low impact, unless a specific use is listed elsewhere; B-1, MX-1, R-3, R-4, R-5, R-6, RM-3, RM-4, RM-5, RO-1, RO-2, RP-3, RP-4, RP-5, and RTP. RM-3, RM-4, and RM-5, shall comply with Subsection 6.11.2.3.  The following uses shall be considered to have a low impact, regardless of zoning classification; churches, day-care centers, community recreational facilities, neighborhood recreational facilities, public buildings, schools, and swim clubs.

C.    Medium impact (M):
All permitted uses in the following zones are considered to have a medium impact, unless parking total exceeds four hundred fifty (450) spaces or a specific use is listed elsewhere; B-2, B-3, B-4, B-5, PB, BP, I-1, MS-1, and MX.  The following uses shall be considered to have a medium

impact, regardless of zoning classification; gasoline service stations, neighborhood convenience stores and centers, parking garages (without first floor retail or office), and self-storage or mini-warehouses.

D.   High impact (H):
All permitted uses in the following zone are considered to have a high impact, unless a specific use is listed elsewhere; I-2. The following uses shall be considered to have a high impact, regardless of zoning classification; junk yards, outdoor storage yards, any property with parking for more than four-hundred fifty (450) cars, and off-site parking areas located in residential zones.

12.4.4   BUFFER TYPE:
Required buffer types are determined according to the following chart:

**Proposed Use Classification**

|  |  | N | L | M | H |
|---|---|---|---|---|---|
| | **N** | none | **1** | **2** | **3** |
| **Adjoining Use Classification** | **L** | none | none | **1** | **2** |
| | **M** | none | none | none | **1** |
| | **H** | none | none | none | none |

*Example:  A new strip shopping center located in a B-4 zone is considered a medium impact use.  Directly behind the shopping center is a residential neighborhood zoned R-2, a no impact use.  The shopping center is required to provide a type 2 buffer yard.*

12.4.5   LOCATION REQUIREMENTS:
A buffer yard shall be provided by the Proposed Use along the rear and side property lines abutting a lesser impact Adjoining Use.  Where a development occurs on only a portion of a tract, the City Forester may approve the placement of the buffer yard at the edge of the development or at a location between the property line and the development that maximizes the effectiveness of the buffer yard.  Buffer yards shall not exceed a 2:1 slope.

12.4.6   PLANTING REQUIREMENTS:
Buffer plantings shall be spaced so that a uniform screen is provided.  All wood fences shall have the finished side facing outward.  The following chart describes the planting requirements for every 100 feet, or fraction thereof, of buffer yard:

| MINIMUM BUFFER REQUIREMENTS <u>FOR EVERY 100 FEET OF BUFFER YARD</u> | | |
|---|---|---|
| Buffer Type | Buffer Width (ft.) | Plant Material Options |
| | | |
| TYPE 1 | 15 | a) 10 Type 1 Evergreen Trees |
| | 10 | b) 6 ft. Wood Fence or Masonry Wall and 6 Type 1 Evergreen Trees |
| | | |
| TYPE 2 | 20 | a) 14 Type 1 Evergreen Trees |
| | 15 | b) 6 ft. Wood Fence or Masonry Wall and 8 Type 1 Evergreen Trees |
| | | |
| TYPE 3 | 35 | a) 18 Type 1 Evergreen Trees |
| | 25 | b) 8 ft. Wood Fence or Masonry Wall 12 Type 1 Evergreen Trees |
| | | |
| TYPE 4 | 35 | a) 8 ft. Wood Fence or Masonry Wall and 18 Type 1 Evergreen Trees |

12.4.7    BUFFER TREE SUBSTITUTIONS
Type 2 evergreen trees and evergreen shrubs may be used to substitute a maximum of fifty percent (50%) of the required number of Type 1 evergreen trees. Type 1 evergreen trees shall be substituted at a rate of one (1) Type 1 evergreen tree for every one and a half (1 ½) Type 2 evergreen trees or three (3) evergreen shrubs. Deciduous trees can be used to substitute up to 35% of the total number of required buffer trees. Deciduaous trees used to replace Type 1 evegreen trees shall be selected from the Type 1 shade tree list. Deciduaous trees used in place of Type 2 evergreen trees shall be selected from the Type 2 shade tree list. A maximum of fifty percent (50%) of the required buffer shrubs may be replaced by deciduous shrubs provided that they meet the mature plant height requirements stated in Section 12.1.8.

12.4.8    MIXTURE OF BUFFER TREES
Sites with required buffer trees of ten (10) or more shall provide the following variety of trees:

| Number of Required Buffer Trees | Minimum Required Variety of Buffer Trees | Maximum Percent of Any Variety |
| --- | --- | --- |
| 10-40 | 2 | 65% |
| 41-100 | 3 | 50% |
| 101+ | 4 | 35% |

12.4.9    BUFFER YARD DIAGRAMS
A buffer planting plan can be configured in many ways.  Plant selection and spacing should be based on each plant's growing habit and site characteristics.  The following illustrations are examples of buffer configurations based on the type of buffer required:

Type I Buffer Example



Type 2 Buffer Example



Type 3 Buffer Example



12.4.10   NATURAL BUFFER:
The City Forester may approve the use of existing vegetation to satisfy the buffer yard requirements. The vegetation shall be in healthy condition and consist of native, non-invasive species. The existing vegetative buffer shall be of substantial depth as to provide a natural screen. The City Forester may require additional plantings to areas of the natural buffer where the screening effect is deficient.

## 12.5 - PROTECTIVE SCREENING

12.5.1   APPLICABILITY:
Excluding mechanical equipment of individual single-family or two-family detached dwelling units, protective screening shall be provided in all zones.

12.5.2   PRIVATE DEVELOPMENT SCREENING REQUIREMENTS:
A protective screen to prevent public view from any street right-of-way (excluding alleys) or adjoining property shall be provided for the following:
A.  Dumpsters: If visible from any street right-of-way or residentially zoned property, screening shall be required on three (3) sides by either a seven (7) foot masonry wall or wood fence. Where screening is required, the dumpster shall be oriented so that the enclosure opening is not visible from any street right-of-way and shall be accessible to waste management collection. If this orientation is not possible, then a gate shall be required on the enclosure opening to prevent view from the street right-of-way.

B. All mechanical equipment, which is larger than five (5) feet by five (5) feet by four (4) feet high, shall be screened on three (3) sides by either a masonry wall or wood fence. Said fence or wall shall exceed the height of the mechanical equipment by a minimum of six (6) inches. The maximum height of a required fence or wall shall be 7 feet. The mechanical equipment may also be screened by a minimum of one (1) row of evergreen shrubs as listed in the Screening and Buffer List.

12.5.3    PUBLIC UTILITY FACILITIES SCREENING REQUIREMENTS:
Public utility facilities include any public or private building or structure used for the production, storage, transmission, distribution, and recovery of communications, water, sewage, gas, energy, and other similar utilities.

Utilities which exceed four (4) feet in height, excluding sanitary sewer plants, water treatment facilities, and any utilities located within the public right-of-way shall be screened on three (3) sides by either a masonry wall or wood fence. Said fence or wall shall exceed the height of the mechanical equipment by a minimum of six (6) inches. The mechanical equipment may also be screened by a minimum of one (1) row of evergreen shrubs as listed in the Screening and Buffer List.

12.5.4    MAINTENANCE
All required screening shall be maintained by the property owners.

SCREENING AND BUFFER LIST
(This list is not all-inclusive; other shrubs may be used with approval of
the City Forester)

| 1.  NEEDLEPOINT HOLLY (Ilex cornuta 'Needlepoint') | 6.  COMMON ABELIA  (Abelia x grandiflora) |
|---|---|
| 2.  SCHIPKA LAUREL (Prunus laurocerasus 'Schipkaensis) | 7.  HICKS YEWS (Taxus x media 'Hicksii) |
| 3.  SEA GREEN JUNIPER (Juniperus chinensis 'Sea Green) | 8.  RUSSIAN OLIVE  (Elaeagnus x ebbingei) |
| 4.  LEATHERLEAF VIBURNUM (Viburnum hytidophyllum) | 9.  DWARF BURFORD HOLLY (Ilex cornuta 'Burfordii Nana') |
| 5.  PRAGENSE VIBURNUM (*Viburnum x pragense)* | 10. WAX LEAF PRIVET (Ligustrum japonicum) |

# ARTICLE XIII
## LIGHTING REGULATIONS

## 13.1 - PURPOSE

Outdoor lighting enables people to see essential detail for work or recreation, facilitates the safety or security of persons or property, emphasizes features of architectural or historical significance, lights parks and gardens, promotes products or services, or calls attention to commercial premises. But, with the benefits of lighting also comes a need to protect travelers or adjacent properties from the use of inappropriate lighting practices and systems. The reduction of glare, light trespass, and excess illumination can maximize the effectiveness of site lighting, and conserve energy and resources. Through the regulation of the placement, orientation, distribution patterns and fixture types of electronically-powered illuminating devices, it is the intent of this Code to encourage better lighting practices and systems to reduce visual glare and conserve energy without decreasing safety or utility.

## 13.2 - APPLICABILITY

These regulations shall apply to all exterior lighting fixtures including, but not limited to, boundary, parking lot, landscape, building (architectural), product display area, and driving lane lighting. It shall also apply to externally-lighted advertising signs. The following lighting applications, are specifically exempted from these regulations:

13.2.1      Communication towers or motion sensor devices controlling not more than three hundred (300) watts total connected load;

13.2.2      Temporary construction or emergency lighting provided it is discontinued immediately upon completion of the required work;

13.2.3      Special event lighting including circus, fair, carnival or civic uses, and fireworks displays;

13.2.4      Permanent emergency or security lighting for buildings or uses, provided it is required by building or electrical codes, or government regulation;

13.2.5      Exterior lighting for public monuments;

13.2.6      Exterior lighting fixtures for single-family and duplex residential dwelling units, provided that the maximum intensity of directional lighting (the center of the light beam) is not directed off-site;

13.2.7      Incandescent lighting fixtures of one hundred and sixty (160) watts or less, or any other light fixture (metal halide, HPS, fluorescent, etc.) of fifty (50) watts or less;

13.2.8      Internally-illuminated signs where the bare bulb cannot be seen directly;

13.2.9       Transportation lighting, including street lighting, automobiles, traffic signals, aircraft, trains and railroad signals;

13.2.10      State, federal, or municipal facilities. However, voluntary compliance with the intent of this Code is encouraged;

13.2.11      Temporary exemptions that may be approved by the Chief Building Official, as outlined below; and

13.2.12      Free-standing, antique or ornamental-style parking lot or private street lighting fixtures, using HPS or LPS lamps having no more than one hundred and fifty (150) watts output per lamp, or any fixtures using HPS or LPS lamps with no more than one hundred (100) watts output per lamp, provided that the light emitted above the horizontal plane be restricted to no more than twenty-five (25) percent of the lamp's total output, that no more than two (2) such lamps shall be located within fifty (50) feet of each other, and that all illumination standards from Section 13.4.1 are met.


## 13.3   - TEMPORARY EXEMPTIONS

Any person may submit a written request to the Chief Building Official for a temporary exemption to these regulations. A temporary exemption request shall contain the following information: the specific exemption requested, the type and use of outdoor fixture involved, the duration of the requested exemption, the type and wattage of the luminaires, calculated lumens and/or estimated footcandle levels, the proposed location and mounting height, the type of baffling or shielding to be provided, and any other data or information that may be deemed necessary by the Chief Building Official. A temporary exemption, if approved, shall be valid for not more than thirty (30) days from the date of issuance. The approval may be renewable at the discretion of the Chief Building Official, and any renewed exemption shall also be valid for not more than thirty (30) days.


## 13.4   - GENERAL STANDARDS

13.4.1       All non-exempt exterior lighting and illuminated signs shall be designed, installed, and directed in such a manner to prevent glare beyond the property line. The horizontal and vertical illuminance standards established by this Code shall be observed during the design, construction, and subsequent modification of any fixture.

*Maximum Illumination Levels (fc)**

Horizontal Illuminance
General site lighting, open parking facilities                                    15 fc

Building entrances, security areas,  drive-thrus, fuel pump                        40 fc
islands, active storage areas such as lumber yards and
automobile sales displays, and general advertising signs

Vertical Illuminance
Light trespass along a residentially-zoned property or a street          1.5 fc
(excluding the possible contribution of off-site sources such as
street lighting)

*Based on initial footcandle values.  The use of initial footcandle
levels usually results in field measurements that are less intense over
the life of a lamp, sometimes as much as thirty (30) percent lower.

13.4.2    Exterior lighting fixtures, except as otherwise allowed, shall be recessed or flush-mounted, or otherwise properly shielded to reduce glare on-premises and  eliminate glare off-site.

13.4.3    All exterior lighting shall, as a minimum, be full cut-off fixtures, not allowing any distribution of light above the horizontal plane.  Excepted is floodlighting, if it is properly shielded to prevent glare or light trespass.

13.4.4    A minimum uniformity ratio of 10:1 between the maximum level of illumination and the minimum level is recommended for open parking facilities, to reduce eye adaptation difficulty between lighter and darker areas.

13.4.5    It is recommended all non-essential lighting be turned off after business hours, excluding lighting for security purposes.

13.4.6    Single-family or duplex residential directional lighting, such as floodlighting, that has the center of its light beam directed off-site is prohibited.

13.4.7    Luminaires shall not have a mounting height in excess of forty (40) feet.

13.4.8    Except as allowed in Subsection 13.4.6, the cut-off angle for exterior lighting fixtures shall not extend beyond the property line, unless proper shielding, baffling, or buffering techniques are employed. When buffering techniques are employed, allowances are not to be made for potential buffer growth and the Code requirements must be immediately met.

13.4.9    Any buffering approved and installed to facilitate compliance with the provisions of this section shall be deemed to be a required buffer under Section 12.4 and must be maintained as a required buffer.

## 13.5 -  SITE PLAN REVIEW

An exterior lighting plan, drawn to scale, shall be submitted for review and approval for all developments utilizing non-exempted exterior lighting. Included in the plan shall be, as a minimum:

13.5.1    The location, mounting height, and orientation of all exterior lighting fixtures;

13.5.2     The make, model, lamp type, and wattage of each lighting fixture;

13.5.3     Initial footcandle data calculated by the point method (using horizontal illuminance calculations) for all lighted areas, using isofootcandle calculations on a thirty (30) foot or less grid spacing or isofootcandle lines;

13.5.4     Vertical illuminance calculations along all property lines;

13.5.5     Technical specifications for all luminaires, including the beam angle, field angle, isofootcandle diagrams, and cut-off angle of individual luminaires; and

13.5.6     Any baffles, shielding, or other light protection measures to be employed.

## 13.6  - COMPLIANCE

13.6.1     Modifications to exterior lighting fixtures shall not be made without the approval of the Chief Building Official.  The upgrading of a fixture to a higher wattage or higher illumination lamp shall be considered a modification.

13.6.2     Approval of a lighting plan does not relieve the property owner or developer of responsibility should any lighting fixture fail to perform as approved.  The Chief Building Official may require modifications to installed lighting if a violation is determined to exist.   The city reserves the right to conduct post-installation inspections and/or illuminance measurements to verify compliance, and to require timely remedial action at the expense of the landowner or other responsible person.

13.6.3     Any use existing on the effective date of this ordinance that does not fully comply with the requirements pertaining to lighting then in effect shall be abated forthwith.

zonecode/articles/ART13.doc

# ARTICLE XIV
## AMENDMENTS

## 14.1 - PROCEDURE

Such regulations, restrictions, and boundaries as provided for in this Code may be amended, supplemented, changed, modified, or repealed. All changes and amendments shall be effective only after approval by the Board of Commissioners.

## 14.2 - INITIATION OF AMENDMENTS

14.2.1 An amendment to the Zoning Map may be initiated by one of the following three methods: (1) a petition by a property owner or anyone having a contractual interest in the property; (2) a resolution of the Planning Commission; (3) a resolution of the Board of Commissioners; or (4) a proposal from the Planning Department.  If a Concept Plan is required with the rezoning request, the application is not considered complete until the required Concept Plan is submitted.

An amendment to the text of the Zoning Code may be initiated by one of the following four methods: (1) a petition by a property owner of the city; (2) a resolution of the Planning Commission; (3) a resolution of the Board of Commissioners; or (4) a proposal from the Planning Department.

A petitioner is encouraged to meet with planning staff prior to the initiation of an amendment. In the submission of a text amendment, the petitioner shall provide the staff with proposed language desired to be added or deleted from the Code.

No Zoning Code, zoning classification, or approval process or plan related to the Zoning Code creates a property right in the owner of the property or any other person.  The City of Johnson City has the sole and exclusive authority to establish and modify all land use classifications within its jurisdiction.

14.2.2 APPLICATION, FEE, AND CONCEPT PLAN:
Citizens wishing to have the Code amended shall complete the application process according to the regulations of the Planning Commission. To partially defray the administrative cost and cost of giving public notice, the applicant shall pay the appropriate filing fee to the City of Johnson City when requesting an amendment to the Zoning Map or an amendment to the text of this Code. When required, the applicant shall prepare a Concept Plan demonstrating compliance with the applicable zoning district as well as the following:
  A. use(s), or the number of dwelling units in each building;
  B. buffers and/or screening;
  C. building location, size and height, with setbacks;

D.　　parking, vehicular and pedestrian circulation patterns;
　　　　　　E.　　location of swimming pools, tennis courts and clubhouses, when it
　　　　　　　　　applies; and
　　　　　　F.　　any additional information requested by the Planning Commission
　　　　　　　　　or the Board of Commissioners.


## 14.3 - CONCEPT PLAN:

14.3.1　　Concept Plan Required:  A Concept Plan shall be required for the rezoning requests
　　　　　specified below:

　　　　　　A.　　For all rezoning requests that abut a single-family neighborhood
　　　　　　　　　or single-family district;

　　　　　　B.　　For all other rezoning requests where a Concept Plan is
　　　　　　　　　required as part of the district regulations.

14.3.2　　REVIEW AND APPROVAL FOR CONCEPT PLAN:
　　　　　　A.　　The Concept Plan shall be reviewed by city staff in conjunction
　　　　　　　　　with the rezoning request.

　　　　　　B.　　The Concept Plan shall be submitted to the Planning Commission
　　　　　　　　　in conjunction with the rezoning request (with staff comments) for
　　　　　　　　　consideration.

　　　　　　C.　　Following approval by the Planning Commission, the rezoning
　　　　　　　　　request and Concept Plan shall be submitted to the Board of
　　　　　　　　　Commissioners for consideration. Should the Planning
　　　　　　　　　Commission recommend denial of the rezoning request and
　　　　　　　　　Concept Plan, the request does not move forward to the Board of
　　　　　　　　　Commissioners. The petitioner may appeal the recommendation
　　　　　　　　　for denial in writing to the City Manager within sixty (60) days of
　　　　　　　　　the Planning Commission meeting on which denial occurred.

　　　　　　D.　　Upon approval of the Concept Plan by the Board of
　　　　　　　　　Commissioners, all development of the subject property shall be in
　　　　　　　　　conformance with the approved Concept Plan. No site plan shall be
　　　　　　　　　approved except in conformance with the approved Concept Plan.
　　　　　　　　　Any significant amendment to an approved Concept Plan as
　　　　　　　　　determined by staff, i.e., change in use, increase in intensity or
　　　　　　　　　density, substantial change in building location, ingress and egress,
　　　　　　　　　or other changes that would negatively impact the surrounding
　　　　　　　　　properties shall be resubmitted to the Planning Commission and
　　　　　　　　　the Board of Commissioners for reconsideration and approval.

## 14.4 – NEIGHBORHOOD MEETING AND NOTIFICATION:

The developer/petitioner shall hold a neighborhood meeting to inform property owners within two-hundred (200) feet of the proposed development/rezoning prior to the Planning Commission meeting. Property owners within two-hundred (200) feet of the proposed development/rezoning shall be notified in writing by the petitioner at least ten (10) days prior to the neighborhood meeting. The neighborhood meeting shall be held prior to Planning Commission consideration of the rezoning request and Concept Plan. In addition, if the property abuts a neighborhood association recognized by the Johnson City Police Department then the president of that neighborhood association shall also be notified in writing at least ten (10) days prior to the neighborhood meeting.

The purpose of this meeting is for the developer/petitioner to inform property owners of the proposed plan and to provide an opportunity for the neighborhood to express its issues and concerns. The developer/petitioner may take these concerns into consideration; however, if the developer/petitioner modifies the Concept Plan or other plan in response to neighborhood concerns or suggestions, those changes are not to be construed by those participating in a neighborhood meeting or any other person as creating an entitlement from either the developer/petitioner or the city in any way whatsoever. Although neighborhood consensus is desirable, it is not necessary for Planning Commission/Board of Commissioners consideration and approval or rejection of the request. When a Concept Plan is approved by the City Commission, the developer/petitioner is obligated only to the city (not the neighborhood) to construct the project in accord with the Concept Plan, if the project is developed. However, there is no obligation for the petitioner/developer to construct the approved Concept Plan without reconsideration and approval by the Planning Commission and City Commission.

If the developer/petitioner finds for any reason that the approved project becomes unfeasible, not viable, or undesirable to construct, the developer/petitioner may request to amend a previously approved Concept Plan or may request to amend the current zoning of the property. A request to amend the current zoning of the property shall require the submission of the appropriate rezoning fee. A neighborhood meeting shall be required for either amendment.

## 14.5 - APPROVAL PROCESS

14.5.1    Per T.C.A. 13-7-204, no amendment to the text of the Zoning Ordinance, zoning map, or approval of a Concept Plan shall become effective until it is first submitted to the Planning Commission for consideration. If approved, the request shall be forwarded to the Board of Commissioners for consideration. If the Planning Commission recommends denial, the petitioner may appeal the recommendation in writing to the City Manager within sixty (60) days of the Planning Commission

meeting on which the denial occurred. An approval of an appeal must receive the favorable vote of at least three members of the Board of Commissioners.

14.5.2    Per T.C.A. 13-7-203, the Board of Commissioners shall hold a public hearing on all rezonings and text amendments. At least fifteen (15) days prior to the public hearing by the Board of Commissioners, notice of the time and place thereof shall be published in a newspaper of general circulation in the City of Johnson City.

## 14.6 - REAPPLICATION

No reapplication shall be accepted within six (6) months of final action by the Board of Commissioners, but this in no way shall restrict the initiation of applications by the Planning Commission or Board of Commissioners. A re-application is an application with the same rezoning request relating to all or a part of the same property involved in the previous application. A request involving a change to a different zoning classification, a portion of the property different than the previous request, or a significant change to the Concept Plan, as determined by the staff, shall not be considered a reapplication; however, Planning Commission consideration is required prior to consideration by the Board of Commissioners.

zonecode/articles/ART14.doc

# ARTICLE XV
## BOARD OF ZONING APPEALS

## 15.1 - CREATION AND APPOINTMENTS

15.1.1    A Board of Zoning Appeals is hereby established in accordance with Section 13-207 of the Tennessee Code Annotated. The Board of Zoning Appeals shall consist of five (5) members, who may be members of the Johnson City Regional Planning Commission, and shall be appointed by the Chief Executive, and confirmed by a majority vote of the Board of Commissioners. The term of membership shall be three (3) years. Vacancies shall be filled for any unexpired term by appointment by the Chief Executive and confirmed by the Board of City Commissioners.

## 15.2 - PROCEDURE

15.2.1    Meetings of the Board of Zoning Appeals shall be held at the call of the chairman, and at such other times as the Board may determine. The chairman or, the acting chairman, may administer oaths and compel the attendance of witnesses. All meetings of the Board shall be open to the public. The Board shall adopt rules of procedure and shall keep records or applications and action thereon, which shall be a public record.

## 15.3 - APPEALS: HOW TAKEN

15.3.1    An appeal to the Board of Zoning Appeals may be taken by any person, firm or corporation aggrieved, or by any governmental officer, department, board, or bureau affected by any decision of the Chief Building Official based in whole or in part upon the provisions of this Code. An appeal must be made to the Board of Zoning Appeals within 30 days of the date of the decision of the Chief Building Official. The Chief Building Official shall send written notice of the decision to the aggrieved party on the date the Chief Building Official renders a decision, specifying the grounds, thereof. The Chief Building Official shall transmit to the Board all papers constituting the record upon which the action appealed was taken. The Board shall fix a reasonable time for the hearing of appeal, give public notice thereof, at least five (5) days but not more than fifteen (15) days prior to the date of the meeting, as well as due notice to the parties in interest, and decide the same within a reasonable time. Upon the hearing any person or party may appear in person or by agent or by attorney.

15.3.2    To insure that all interested parties will be notified in the case of variances and special exception, the applicant shall prepare and submit with his application, in stamped unsealed envelopes, to be mailed by the Chief Building Official's office letters of notification to each resident and property owner within two hundred (200) feet of the property for which variance or special exception is sought.

15.3.3   When a request has been made for a variance or special exception, a sign shall be posted on the property to be considered. Said sign shall comply with the following.

A.   The following information shall be on the notification sign: the reason (variance or special exception), time, and location of the meeting.

B.   Be posted fifteen (15) days prior to the public hearing date given on the sign.

C.   Be placed to face the public street right-of-way on which the property fronts and be within twenty-five (25) feet from said right-of-way with letters which measure at least two (2) inches in height.

15.3.4   To partially defray administration cost and cost of giving public notice, the applicant shall pay a filing fee to the city of Johnson City.


## 15.4  -  POWERS

The Board of Zoning Appeals shall have the following powers:

15.4.1   ADMINISTRATIVE REVIEW:  To hear and decide appeals where it is alleged by the appellant that there is error in any order requirement, permit, decision, determination or refusal made by the Chief Building Official or other administrative official in the carrying out or enforcement of any provision of this Code. Applications for Administrative Review shall be made to the Board of Zoning Appeals within thirty (30) days of the date of the decisions of the Chief Building Official.  The Chief Building Official shall send written notice of the decision to the aggrieved party on the date the Chief Building Official renders a decision, specifying the grounds, thereof.

15.4.2   SPECIAL EXCEPTIONS:  To hear and decide, in accordance with the provisions of this Code, requests for special exceptions, and for decisions on other special questions upon which the Board of Zoning Appeals is authorized to pass by this Code.  Any special exception shall be subject to such conditions as the Board may require to preserve and promote the character of the district in which the use is located and otherwise promote the purpose of this Code.  Only those special exceptions listed in Article VI as Uses Permitted By Approval As Special Exceptions may be acted upon by the Board; and the Board must observe any conditions imposed by this Code regarding any special exception use permitted.

15.4.3   VARIANCE:  To hear and decide applications for variance from the terms of this Code, but only where by reason of exceptional narrowness, shallowness or shape of a specific piece of property, which at the time of the adoption of this Code, was a lot of record; or where, by reason of exceptional topographic conditions or other extraordinary or exceptional situation or condition of a piece of property, the strict application of the provisions of this Code would result in practical difficulties to or undue hardship upon the owner of such property, provided that such relief may be granted without substantial detriment to the public good and without substantially

impairing the intent and purpose of this Code. In granting a variance, the Board may attach thereto such conditions regarding the location, character and other features of the proposed building, structure, or use as it may deem advisable in furtherance of the purposes of this Code.

15.4.3.1 Variances shall be granted only where special circumstances or conditions (such as exceptional narrowness, topography, or siting) fully described in the findings of the Board, do not apply generally in the district.

15.4.3.2 Variances shall not be granted to allow a use otherwise excluded from the particular district in which requested; nor shall a variance be granted which will alter the density standards established by this Code.

15.4.3.3 For reasons fully set forth in the findings of the Board, the aforesaid circumstances or conditions are such that the strict application of the provisions of this Code would deprive the applicant of any reasonable use of his land. Mere loss in value shall not justify a variance; there must be a deprivation of beneficial use of land.

15.4.3.4 Any variance granted under the provisions of this Section shall be the minimum adjustment necessary for the reasonable use of the land.

15.4.3.5 The granting of any variance is in harmony with the general purposes and intent of this Code and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the comprehensive plan for development.

15.4.3.6 The Board of Zoning Appeals shall have no authority to consider a variance to Article VII - Sign Regulations.

15.4.3.7 The Board of Zoning Appeals shall have no authority to consider a variance which would reduce the number of trees or the total area of landscaping required under Article VI or Article XII of this Code.

15.4.4 VARIANCE: (EXCLUSIVELY IN REGARDS TO ARTICLE VIII, FLOODPLAIN REGULATIONS)

Conditions for Variances: Variances shall be issued upon a determination that the variance is the minimum relief necessary, considering the flood hazard; and in the instance of a historical building, a determination that the variance is the minimum relief necessary not to destroy the historic character or design of the building. Variances shall be issued only upon: a showing of good and sufficient cause; a determination that failure to grant the variance would result in exceptional hardship; and a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisance, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances. Any applicant to whom a variance is granted shall be given written notice by the Chief Building Official that the issuance of a variance to

construct a structure below the base flood level may result in increased premium rates for flood insurance, and that such construction below the base flood level increases risks to life and property. The Chief Building Official shall maintain the records of all appeal actions and report any variances to the Federal Emergency Management Agency upon request.

15.4.4.1 In passing upon such applications the Board shall consider all technical evaluations, all relevant factors, all standards specified in other sections of the Floodplain Regulations, the Zoning Code's general requirements for variances, and:

A. The danger that materials may be swept onto other property to the injury of others;

B. The danger to life and property due to flooding or erosion;

C. The susceptibility of the proposed facility and its contents to flood damage;

D. The importance of the services provided by the proposed facility to the community;

E. The necessity of the facility to a waterfront location, in the case of a functionally dependent facility;

F. The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use;

G. The relationship of the proposed use to the <u>Comprehensive Plan</u> and floodplain management program for that area;

H. The safety of access to the property in times of flood for ordinary and emergency vehicles;

I. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site; and

J. The costs of providing governmental services during and after flood conditions including maintenance and repair of public utilities and facilities such as sewer, gas, electrical, and water systems, and streets such as bridges.

15.4.4.2 The Board of Zoning Appeals shall have no authority to consider variances within any designated floodway or sinkhole "no-build" line, if any increase in flood levels during the base flood discharge would result.

15.4.4.3    Exclusively in regards to Article VIII, Floodplain Regulations, the Board of Zoning Appeals shall have authority to consider variances for the repair or rehabilitation of historic structures upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum to preserve the historic character and design of the structure.

15.4.4.4    Upon consideration of the factors listed above, and the purposes of this Ordinance, the Board of Zoning Appeals may attach such conditions to the granting of variances as it deems necessary to effectuate the purposes of this Ordinance.

# RULES OF PROCEDURE
## BOARD OF ZONING APPEALS


## Article I
### Officers

Sec. 1    The Board shall organize and elect a Chairman and Vice-Chairman annually in the month of January.

Sec. 2    The Chairman shall preside at all meetings and hearings of the Board and have the duties normally conferred by parliamentary procedure on such officers.  He shall have the privilege of discussing all matters before the Board and to vote thereon.  The Vice-Chairman shall assume the duties of the Chairman in his absence.  In the event of the absence of both the Chairman and the Vice-Chairman, the members may elect a temporary Chairman for that meeting and proceed with the order of business.

Sec. 3    The secretary of the Board, who shall be the City Manager or his designee(s), shall conduct all official correspondence and keep the minutes and records of the Board, give adequate notice to all property owners within two hundred (200) feet of any variance or special exception request, and keep a file on each request which comes before the Board, and attend to such other duties as are normally the function of a secretary.

Sec. 4    Nomination of officers shall be made from the floor.  The nominees for each office receiving a majority vote of the membership of the Board present and voting shall be declared elected.  All officers shall be elected for a term of one (1) year and shall serve until their successors are elected and shall be eligible to succeed themselves.  Vacancies on the Board should be filled at the next regular meeting by the Board of Commissioners after the vacancy occurs for the unexpired term by regular election procedures.


## Article II
### Meetings

Sec. 1    Meetings of the Board of Zoning appeals shall be held on the second Tuesday of each month at 9:00 AM in the Commission Chambers of the Municipal and Safety Building, unless no cases are pending, in which case no meeting shall be held.  Meetings may be canceled by the Chairman for good cause.

Sec. 2    Special meetings may be called by the Chairman, and at such other times as the Board may determine.  It shall be the duty of the Chairman to call a meeting when requested to do so in writing by two members of the Board.

Sec. 3    The secretary shall provide adequate notice to all members of the Board in advance of a special meeting. Adequate public notice shall also be given prior to the date of the meeting.

Sec. 4    The Chairman, or in his absence, the acting Chairman, may administer oaths and compel the attendance of witnesses.

Sec. 5    All meetings of the Board shall be open to the public.

Sec. 6    A majority of the Board, three (3) members, shall constitute a quorum. A quorum shall be present before any business is transacted.

Sec. 7    All actions and recommendations of the Board shall be approved by a majority of those present and voting.

Sec. 8    When a member of the Board has a conflict of interest in a matter brought before the Board, it is customary that he or she declare that conflict of interest prior to considering whether to vote upon the matter.

Sec. 9    A record of the vote of each member on each question shall be kept as a part of the minutes.

Sec. 10   The order of business at all regular meetings of the Board shall be as follows: (a) call to order, (b) approval of minutes of previous meeting or meetings, (c) reports of officers or committees, (d) old business, (e) new business, and (f) adjournment.

Sec. 11   At the time of the meeting the applicant may appear in his own behalf or be represented by counsel or agent. Failure of the applicant, counsel, or agent to appear may result in the case being continued or such other action as the Board deems appropriate.

Sec. 12   On each item, the staff's recommendation shall be made first, followed by the applicant's statement, and the statement of any private citizen for or against the proposal.


### Article III
#### Member Attendance

In order for the Board to carry out its duties and responsibilities, it is necessary for all members to attend the Board's meetings. When any member has been absent for three (3) consecutive meetings, the secretary shall notify such member in writing of such absences, and if such member fails to attend the next regular meeting following such notification, the Board may take such action as it deems proper.

## Article IV
### Applications

Sec. 1    Applications to the Board of Zoning Appeals may be made by any person affected by any decision of the zoning administrator, by applicants for a special exception, or by applicants for a variance.  All Applications must be signed by a vested party, either the owner or someone with a signed contract to represent the owner.  Applications shall be filed with the secretary of the Board on the forms provided by the Board of Zoning Appeals.  The Secretary of the Board will transmit all records of the application to each member of the Board prior to the meeting.

Sec. 2    All application for matters to be brought before the Board shall be made in accordance with established regulations and procedures.  Incomplete applications will not be accepted.

Sec. 3    The applicant shall provide the secretary with all information requested on the form or forms prescribed by the Board of Zoning Appeals, and any such additional information and data as may be requested by the secretary in order to advise the Board fully with reference to the application.  No application will be considered by the Board unless it is made on the form required.   All requests shall include a site plan drawn to scale depicting all lot lines, existing and proposed structures and building setback lines.

Sec. 4    Applications must be filed on or before the fifteenth (15th) day of the month preceding the month in which the request is to by considered.  If the fifteenth day of the month falls on a weekend or on a legal holiday observed by the City of Johnson City, then such application shall by filed before 9:00 AM (Eastern Time) on the next regular working day following the fifteenth.

Sec. 5    No reapplication shall be accepted within six (6) months of final action by the Board, but this in no way shall restrict the initiation of applications by the Board, Planning Commission, or City Commission.  A reapplication is an application relating to all or a part of the same property involved in the previous application, for the same purpose and requesting the same relief.

## Article V
### Deferrals

Sec. 1    Requests to defer matters to be considered by the Board should be made to the secretary.

Sec. 2    Deferral requests will be honored unless property owner notifications have been made or the agenda has been distributed to the Board.  In such cases, the request will remain on the agenda for Board consideration.

## Article VI
## Limits of Authorization

Sec. 1    Variances or special exceptions granted by the Board are based upon conditions and evidence presented at the time of the granting of the variance or special exception.  The granting of a variance or special exception does not entitle an owner or developer to extend or construct additional facilities that would require an additional variance or special exception, since the specific circumstances may have changed from the time when the original variance or special exception was granted.  In such a case, an additional variance or special exception would be required.

Sec. 2    Upon the expiration of three (3) years from the authorization hereunder of any variance or special exception for consideration which has not been completed or commenced and an extension of time for completion granted, the authorization shall expire.  Variances or special exceptions previously granted by the Board prior to the adoption of this section shall not be subject to this time limitation.

## Article VII
## Adoption and Amendments

Sec. 1    These Rules of Procedure may be adopted by a majority vote of the membership of the Board of Zoning Appeals present.

Sec. 2    These by-laws may be amended by a majority vote of the membership of the Board of Zoning Appeals present.

Adopted _____February 12, 1991_____

Effective Date _____February 12, 1991_____

zonecode/articles/ART15.doc

# ARTICLE XVI
## PENALTIES AND REMEDIES

## 16.1 - ESTABLISHMENT OF ADMINISTRATIVE OFFICER

The provisions of this Code shall be administered by the Chief Building Official.

## 16.2 - DUTIES AND LIMITATIONS OF THE CHIEF BUILDING OFFICIAL

16.2.1   The Chief Building Official shall have the power to grant zoning compliance and occupancy permits, to make inspections of buildings or premises necessary for the enforcement of this Code.

16.2.2   It shall be unlawful for the Chief Building Official to approve any plans or issue a zoning compliance permit for any filling and leveling, excavating or construction until he has inspected such plans in detail and found them in conformity with this Code.  To this end, the Chief Building Official shall require that every application for a zoning compliance permit for filling and leveling, excavation, construction, moving, alteration, or change in the type of use or type of occupancy, shall be accompanied by written statements and plans or plats drawn to scale showing the following in sufficient detail to enable him to ascertain whether the proposed work or use is in conformity with this Code:

    16.2.2.1   The actual shape, location, and dimensions of the lot;

    16.2.2.2   The shape, size, and location of all buildings or other structures to be erected, altered, or moved and of any buildings or other structures already on the lot;

    16.2.2.3   The existing and intended use of the lot and of all structures upon it;

    16.2.2.4   Such other information concerning the lot or adjoining lots or other matters as may be essential for determining whether the provisions of this Code are being observed; and

    16.2.2.5   When a sign, is to be erected or constructed, a dimensioned sketch of the proposed location of the sign shall be shown in relation to other structures on the property and a dimensioned drawing of the sign itself shall be submitted.

16.2.3   If the proposed filling, leveling, excavation, construction, moving, alteration, or use of land as set forth in the application are in conformity with the provisions of this Code, the Chief Building Official shall issue a zoning compliance permit.  If any application for such permit is not approved, the reason for disapproval shall be stated in writing on an appropriate denial form.

16.2.4    The Chief Building Official may accept a preliminary application and a lesser number of submitted documents than those listed above in situations where a basic clarification is desired ahead of proceeding with further technical work; and the Chief Building Official may on such preliminary submittal take the formal action of denial and referral to the Board of Zoning Appeals, however, that a zoning compliance permit may not be issued until all information required in Subsection 16.2.2 is filed and approved.

16.2.5    The Chief Building Official is under no circumstance permitted to grant exceptions to the actual meaning of any clause, order, or regulation contained in this Code to any person making application to excavate, construct, move, alter, or use buildings, structures or land; nor is the Chief Building Official permitted to make changes or vary the terms of this Code.

16.2.6    The duties and responsibilities of the Chief Building Official for Article VIII, Floodplain Regulations, shall include, but not be limited to, the following:

    16.2.6.1    Review of all development permits to assure that the permit requirements of the Floodplain Regulations have been satisfied, and that proposed building sites will be reasonably safe from flooding.

    16.2.6.2    Advise permittee that additional federal or state permits may be required, and if specific federal or state permit requirements are known, require that copies of such permits be provided and maintained on file with the development permit.  This shall include Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U. S. C. 1334.  Copies of the Joint Army Corp. and TVA permits and Tennessee Department of Environment and Conservation Aquatic Resources Alteration Permit (ARAP) are included in the Floodplain Development Permit Guide.

    16.2.6.3    Notification to adjacent communities and the Tennessee Department of Economic and Community Development, Local Planning Office, prior to any alteration or relocation of a watercourse, and submission of evidence of such notification to the FEMA and the Tennessee Department of Environment and Conservation.

    16.2.6.4    Record the actual elevation (in relation to mean sea level or highest adjacent grade, whichever is applicable) of the lowest floor (including basement) of all new or substantially improved buildings, in accordance with Subsection 8.3.1.2.

    16.2.6.5    Record the actual elevation (in relation to mean sea level or highest adjacent grade, which ever is applicable) to which the new or substantially improved buildings have been flood-proofed, in accordance with Subsection 8.3.1.2.

16.2.6.6    When flood-proofing is utilized for a structure, the Chief Building Official shall obtain certification of design criteria from a registered professional engineer or architect, in accordance with Subsection 8.3.1.2.

16.2.6.7    Where interpretation is needed regarding the exact location of boundaries of the areas of special flood hazard (for example, where there appears to be a conflict between a mapped boundary and actual field conditions) the Chief Building Official shall make the necessary interpretation.   Any person contesting the location of the boundary shall be given a reasonable opportunity to appeal the interpretation as provided in Article XV.

16.2.6.8

A.    When base flood elevation data or floodway data have not been provided by the Federal Emergency Management Agency then the Chief Building Official shall obtain, review, and reasonably utilize any base flood elevation and floodway data available from a Federal, State, or other source, including data developed as a result of these regulations, as criteria for requiring that new construction, substantial improvements, or other development in Flood Zone A on the Community FHBM or Community FIRM meet the requirements of this Article.

B.    Within unnumbered A Flood Zones or for unmapped streams, where base flood elevations have not been established and where alternative data is not available, the Chief Building Official shall require the lowest floor of a building to be elevated or flood-proofed to a level of at least three (3) feet above the highest adjacent grade (lowest floor and highest adjacent grade being defined in the definitions) or five and one-half (5.5) feet above the elevation of the normal flow of the adjacent stream channel, whichever is greater.   This is illustrated in the Floodplain Development Permit Guide.   All applicable data including the highest adjacent grade elevation, elevation of the normal flow, stream channel elevation, and the elevations of the lowest floor of flood-proofing shall be recorded as set forth in Subsection 8.3.1.

16.2.6.9    All records pertaining to the provisions of the Floodplain Regulations shall be maintained in the office of the Chief Building Official and shall be open for public inspection.  Permits issued under the provisions of this Ordinance shall be maintained in a separate file or marked for expedited retrieval within the combined files.

16.2.6.10  Assure the flood carrying capacity within an altered or relocation portion of any water course is maintained.

## 16.3 - ZONING COMPLIANCE PERMIT REQUIRED

16.3.1     It shall be unlawful to commence filling, leveling, excavation, or construction of any building or other structure, including an accessory structure, or to commence moving, alteration, or repair of any structure, including accessory structures which changes land use, encloses previously open structures, adds new structures, or adds dimensions to existing structures, costing more than one hundred dollars ($100.00) or exceeding one hundred (100) square feet in area, until the Chief Building Official has issued a zoning compliance permit including a statement of his opinion that plans, specifications, and intended use of such structure does in all respects conform to the provisions of this Code.

16.3.2     It shall be unlawful to change the type of use or occupancy of any building, or to extend any use of any lot on which there is a non-conforming use, until the Chief Building Official has issued of such intended use a zoning compliance permit including a statement of his opinion that the proposed use does in all respects conform to the provisions of this Code.

16.3.3     Any repair, alteration, construction, removal, filling, leveling, excavation, or change of use must conform to the regulations for the district in which the structure or land is located; and the fact that in some instances a zoning compliance permit need not be secured in no way relaxes such requirements.

16.3.4     Application for a zoning compliance permit shall be made not less than ten (10) days prior to the time when a new or enlarged use of a building or premises or part thereof is intended to begin. This application shall be made in writing to the Chief Building Official on forms provided for that purpose. A record of all such applications shall be kept on file by the Chief Building Official. Any zoning compliance permit issued under the provisions of this Code shall be valid only for a period of six (6) months following the date of issuance.

16.3.5     When the Chief Building Official receives an application for a zoning compliance permit which requires approval by the Board of Zoning Appeals such application shall be conveyed to the Board for action before a zoning compliance permit is issued.

16.3.6     At the time a zoning compliance permit is issued by the Chief Building Official, the applicant shall also obtain a placard stating that a zoning compliance permit has been issued. This placard shall be conspicuously posted throughout the period of construction by the applicant on the premises for which the zoning compliance permit is issued; and said placard shall be posted in such a manner to permit viewing from the street on which the property fronts.

16.3.7     The issuance of a zoning compliance permit shall in no case be construed as waiving any provisions of this Code.

**16.4 - FEES**

A schedule of fees for permits issued under the provisions of this Code may be established by the Board of Commissioners.

## 16.5 - CERTIFICATE OF OCCUPANCY

16.5.1    No building or structure or use for which a zoning compliance permit has been issued shall be used or occupied until the Chief Building Official has, after final inspection, issued a Certificate of Occupancy indicating his opinion that all provisions of this Code are being complied with.

16.5.2    However, the issuance of a Certificate of Occupancy shall in no case be construed as waiving any provisions of this Code.

16.5.3    Before a Certificate of Occupancy may be obtained all site improvements shown on the final plan, where required, shall have been completed and approved by the Chief Building Official.

16.5.4    It is provided, that a portion of a commercial site prior to the completion of site may be occupied prior to the completion of site improvements if a certified check or performance bond, issued and secured by a reliable, legally authorized and established bonding firm, acceptable to the Board of Commissioners, in an amount sufficient to complete the work to be done as determined by the City Engineer, is posted with the Board of Commissioners authorizing the Board to use the proceeds from said bond or check to complete the required improvements in the event the developer fails to comply with these regulations within twelve (12) months from the date of the agreement.

16.5.5    ENFORCEMENT, VIOLATION, AND PENALTY:
         All things shown on the final plan, including all construction plans for site improvements, upon final approval by the City Commission, become part of the zoning regulations of the district, and nothing in conflict therewith shall be done on the premises.

## 16.6 - PENALTIES

16.6.1    Any person violating any provision of this Code shall be guilty of a misdemeanor, punishable as other misdemeanors as provided by laws. Each day such violation shall continue shall constitute a separate offense.

## 16.7 - REMEDIES

16.7.1    In case any building or structure is erected, constructed, reconstructed, repaired, converted or maintained, or any building, structure, or land used in violation of this Code, the Chief Building Official or any other adjacent or neighboring property owner who would be damaged by such violation, in addition to other remedies may institute injunction, mandamus, or other appropriate action or procedure to prevent the occupancy of such building, structure or land.

16.7.2    The Chief Building Official is charged with the duty to prosecute these matters before the City Court and is authorized to instigate such proceedings before this court.

## 16.8 - CONFLICT WITH OTHER ORDINANCES

16.8.1    All ordinances and parts of ordinances in conflict herewith are hereby repealed.

## 16.9 - VALIDITY

16.9.1    If any section, clause, provision, or portion of this Code shall be held to be invalid or unconstitutional by any court of competent jurisdiction, such holding shall not affect any other section, clause, provision, or portion of this Code which is not of itself, invalid or unconstitutional.

## 16.10 - EFFECTIVE DATE

16.10.1    BE IT ORDAINED, that this Code shall become effective after passage on third and final reading and publication as required by law Ordinance 1925 of the city of Johnson City, Tennessee.

**Section 2. BE IT FURTHER ORDAINED** that all ordinances and parts of ordinances in conflict herewith be and the same are hereby repealed.

**Section 3. BE IT FURTHER ORDAINED** that this ordinance shall become operative from and after its passage on third and final reading and publication as required by law, the public welfare requiring it.

PASSED ON THE FIRST READING          _____
PASSED ON THE SECOND READING       _____
PASSED ON THE THIRD READING         _____

APPROVED AND SIGNED IN OPEN MEETING ON THE
_____DAY OF _____, 20_____

_____
Mayor

ATTEST:

_____
City Recorder

APPROVED AS TO FORM:

_____
City Attorney

zonecode/articles/ART16.doc

# REVISED FEE SCHEDULE
## ADOPTED BY CITY COMMISSION ON JUNE 7, 2001

| DESCRIPTION | FEE |
|---|---|
| **Rezoning** | |
| To R-1, R-2, R-2A, R-2B, or R-2C and ≤ 5 acres | $200 |
| To R-1 through R-2C between 5 acres and 20 acres And all other rezonings ≤ 20 acres | $450 |
| Any rezoning > 20 acres | $500 |
| **Zoning text change** | $150 |
| **R-O-W abandonment** | $130 |
| **Street renaming** | $335 |
| **Variance** | $105 |
| **Special Exception** | $115 |
| **Code interpretation/administrative ruling** | $120 |
| **Called meeting of BZA (plus request fee)** | $145 |
| **Cell Tower** Co-location | $350 |
| New Transmission Towers | $1,500 |
| **Standard subdivision** | $40/lot |
| **Minor subdivision/condominium location plat** | $25 |
| **Multiple building development or PUD** | $20/unit |
| **Mobile home development** | $25/unit |
| **Site plan review** <10,000 sq. ft. of GFA* | $55 |
| 10,000 – 100,000 sq. ft. of GFA* | $155 |
| >100,000 sq. ft. of GFA | $250 |

*Gross Floor Area

# CITY OF JOHNSON CITY
## APPLICATION FOR REZONING REQUEST

All required materials for the **rezoning request must be received by the Planning Division by the 15th of the month** in order to be placed on the following month's Johnson City Regional Planning Commission agenda. **See below, ARTICLE XIV of the Zoning Code, adopted by the City Commission on 5/7/09.**

**14.2.2 NOTICE TO PROPERTY OWNERS:**

**14.2.2.1** **The developer/petitioner shall hold a neighborhood meeting to inform abutting property owners of the proposed development/rezoning prior to the Planning Commission meeting. Property owners within two hundred (200) feet of the proposed development/rezoning shall be notified in writing at least ten (10) days prior to the neighborhood meeting. In addition, if the property abuts a neighborhood association recognized by the Johnson City Police Department then the president of that neighborhood association shall also be notified in writing at least 10 days prior to the neighborhood meeting.**

Please provide two (2) copies of a Concept Plan, drawn to scale, and that meets Zoning Code requirements, if a Concept Plan is required by the rezoning request.

A check made payable to the **City of Johnson City** must accompany this application.

**Petitioner's Name** _____   **Email:** _____

**Address** _____   **Telephone Number** _____

**Owner's Name (if different from petitioner)** _____

**Address** _____   **Telephone Number** _____

All required information is necessary for application processing; use additional blank pages if necessary. Attach all photocopied materials, such as deeds or subdivision plat, that are used as information sources.

**Legal Description**   See attached _____

_____

Legal Description of requested area must include all dimensions and calls (may be either a written description or a map).

Tax Map(s)           Group(s)           Parcel(s)
**Location of requested area; include tax block and lot number.**

**Current Zoning Designation**           **Requested Zoning Designation**

**Contemplated use of land, if rezoned** _____

_____

# City of Johnson City Tennessee

601 East Main Street • P.O. Box 2150 • Johnson City, TN 37605 • (423) 434-6000

**DEVELOPMENT SERVICES DEPARTMENT- PLANNING DIVISION**

# REQUIRED NEIGHBORHOOD MEETING

**The developer/petitioner shall hold a neighborhood meeting to inform abutting property owners of the proposed development/rezoning prior to the Planning Commission meeting. Property owners within two hundred (200) feet of the proposed development/rezoning shall be notified in writing at least ten (10) days prior to the neighborhood meeting. In addition, if the property abuts a neighborhood association recognized by the Johnson City Police Department then the president of that neighborhood association shall also be notified in writing at least 10 days prior to the neighborhood meeting.**

## Building Department Frequently Asked Questions

- **For what do I need a permit?** *You will need a permit for anything other than cosmetic repairs.*

- **At what point and time do I get the permit?** *The permit needs to be purchased before any work starts.*

- **If I hire the work to be done, who is responsible for obtaining the permit?** *The person performing the work needs to buy the permit.*

- **What codes are enforced in the City of Johnson City?** *2006 International Building Code, 2008 National Electric Code, Handicap - 2002 North Carolina Code with 2004 amendments.*

- **Do I need a permit for a driveway?** *Yes, and the application is available through the Building Department.*

- **What information do I need when I get a permit?** *Single-Family: application; set of plans showing setbacks; erosion control and driveway location; job costs; and address. Commercial: application; set of stamped plans by a design professional; construction costs; and address.*

- **If I am building a new house, when can I move in?** *After a final inspection has been done and approved and the Certificate of Occupancy has been issued.*

## Important Phone Numbers for Development Issues

- City Hall  (423) 434-6000
- Engineering  (423) 232-1226
- Water and Sewer  (423) 434-6061
- Building Department  (423) 434-6047
- Planning Department  (423) 434-6071
- Public Works  (423) 434-6080
- Geographic Information Services (423) 434-6188
- Traffic Division  (423) 975-2732
- Addressing (423) 434-6073
- Tennessee Department of Environment and Conservation  (423) 854-5400
- Johnson City Power Board  (423) 282-5272
- ATMOS Natural Gas  888-286-6700

### What do I need for Major Subdivision Plans?

- Title Sheet with proper contact information
- Preliminary Plat / Final Plat
- Site Plan (Street Construction Plan and Profile)
- Storm Drainage Plan
- Grading and Erosion Control Plan
- Water and sewer plans with calculations
- TDEC Notice of Coverage (NOC)
- Final Plat - All improvements approved, bond

**CITY OF JOHNSON CITY**

601 E. Main Street
PO Box 2150
Johnson City, TN 37605



# Looking to Develop in Johnson City?

**Tel: 423-434-6000**

**www.johnsoncitytn.org**

## MATERIALS AGREEMENT

If you are planning to develop a subdivision in the city limits of Johnson City then you want to know about the materials agreement policy. Under certain conditions, the City of Johnson City will provide water and sewer materials for a land developer's use within a proposed major subdivision subject to the following criteria and upon proper approval of an executed written Materials Agreement between the City and the developer.

- The property must be a Major Subdivision as defined by the Johnson City Regional Planning Commission's Subdivision Regulations.

- The property must be located within the City of Johnson City's corporate limits.



## How Can We Help?

Johnson City maintains an up to date website designed to assist our customers. The following information is readily available.

**Zoning Code**

**Subdivision Regulations**

**City Street Map**

**Zoning Map**

**Building Permit Applications**

**"Power Tools" for Contractors**

**Engineering Ordinances**

**Stormwater Documents**

**BMP Manual**

## CHECK US OUT ON THE WEB FOR MORE INFORMATION.

**www.johnsoncitytn.org**

## DEVELOPMENT SERVICES

**Planning Department**

- Annexation
- Zoning / Rezoning
- Right-of-Way Abandonment
- Planning Commission
- Historic Zoning Commission
- Board of Zoning Appeals

**Water / Sewer Department**

- Water / Sewer Availability
- Water / Sewer Taps

**Engineering**

- Design Approval
- Road Approval
- Storm Drainage Design
- Storm Drainage Calculations
- Water Quality
- Grading Approval

**Building Department**

- Plans Review
  (Residential and Commercial)
- Building Permit
- Inspection
- Certificate of Occupancy

# TYPE 1 SHADE TREE LIST

(deciduous trees with an average mature height of 30 feet or more)

| | |
|---|---|
| 1. **RED MAPLE** (Acer rubrum) | 16. **SCARLET OAK** (Quercus coccenia) |
| 2. **SUGAR MAPLE** (Acer saccharum) | 17. **OVERCUP OAK** (Quercus lyrata) |
| 3. **RIVER BIRCH** (Betula nigra)<br>    • 10 ft. minimum height for multi-stem trees | 18. **BUR OAK** (Quercus macrocarpa) |
| 4. **GREEN ASH** (Fraxinus pennsylvanica) | 19. **NUTTALL OAK** (Quercus nuttallii) |
| 5. **GINKGO** (Ginkgo biloba)<br>    • Male trees only | 20. **PIN OAK** (Quercus palustris) |
| 6. **HONEYLOCUST** (Gleditsia tricanthos var. inermins) | 21. **WILLOW OAK** (Quercus phellos) |
| 7. **SWEETGUM** (Liquidambar styraciflua)<br>    • 'Rotundiloba' is a fruitless cultivar | 22. **NORTHERN RED OAK** (Quercus rubra) |
| 8. **YELLOW POPLAR** (Liriodendron tulipifera) | 23. **SHUMARD OAK** (Quercus shumardii) |
| 9. **BLACKGUM** (Nyssa sylvatica) | 24. **PONDCYPRESS** (Taxodium ascendens) |
| 10. **DAWN REDWOOD** (Metasequoia glyptostoboides) | 25. **BALDCYPRESS** (Taxodium distichum) |
| 11. **SYCAMORE** (Plantanus occidentalis) | 26. **LITTLELEAF LINDEN** (Tilia cordata) |
| 12. **LONDON PLANETREE** (Plantanus x acerifolia) | 27. **SILVER LINDEN** (Tilia tomentosa) |
| 13. **SAWTOOTH OAK** (Quercus acutissima) | 28. **LACEBARK ELM** (Ulmus parviflora) |
| 14. **WHITE OAK** (Quercus alba) | 29. **JAPANESE ZELKOVA** (Zelkova serrata) |
| 15. **SWAMP WHITE OAK** (Quercus bicolor) | |

# TYPE 2 SHADE TREE LIST

(deciduous trees with an average mature height of less than 30 feet)

| | |
|---|---|
| 1. **TRIDENT MAPLE** (Acer buergerianum)* | 13. **GOLDENRAINTREE** (Koelreuteria paniculata) |
| 2. **HEDGE MAPLE** (Acer campestre)* | 14. **CREPE MYRTLE** (Lagestromia indica)* <br> • 6ft. minimum height, do not use dwarf or semi-dwarf cultivars |
| 3. **JAPANESE MAPLE** (Acer palmatum)* <br> • Use only non-dissected types | 15. **SWEETBAY MAGNOLIA** (Magnolia virginiana) <br> • 6ft. minimum height |
| 4. **SERVICEBERRY** (Amelanchier spp.)* | 16. **CRABAPPLE** (Malus spp.)* |
| 5. **COLUMNAR HORNBEAM** (Carpinus betulus 'Fastigiata')* | 17. **OKAME CHERRY** (Prunus campanulata 'Okame')* |
| 6. **AMERICAN HORNBEAM** (Carpinus caroliniana)* | 18. **SARGENT CHERRY** (Prunus sargenttii) |
| 7. **REDBUD** (Cersis canadensis)* | 19. **ORIENTAL CHERRY** (Prunus serrulata)* <br> • 'Kwanzan' and 'Snowgoose' are popular cultivars |
| 8. **DOGWOOD** (Cornus florida)* | 20. **HIGAN CHERRY** (Prunus subbhirtella)* <br> • Use non-pendula types, 'Autumnalis' for example |
| 9. **KOUSA DOGWOOD** (Cornus kousa)* | 21. **YOSHINO CHERRY** (Prunus x yedoensis)* |
| 10. **COCKSPUR HAWTHORN** (Crataegus crusgalli var. inemis)* | 22. **CALLERY PEAR** (Pyrus calleryana) <br> • 'Bradford', 'Cleveland Select', 'Aristocrat', 'New Bradford' are popular cultivars |
| 11. **WINTER KING HAWTHORN** (Crataegus virdis 'Winter King')* | 23. **JAPANESE SNOWBELL** (Styrax japonicus)* |
| 12. **CAROLINA SILVERBELL** (Halesia tetraptera)* | 24. **JAPANESE TREE LILAC** (Syringa reticulata)* |
| **\*trees appropriate for use within 20 feet of over-head electric utility lines** | |

# TYPE 1 BUFFER TREE LIST

(evergreen trees with an average mature height of 30 feet or more)

| | | | |
|---|---|---|---|
| 1. | **ALASKA CEDAR** (Chamaecyparis nootkatensis) | 7. | **ORIENTAL SPRUCE** (Picea orientalis) |
| 2. | **JAPANESE CRYPTOMERIA** (Cryptomeria japonica) | 8. | **COLORADO SPRUCE** (Picea pungens) |
| 3. | **LEYLAND CYPRESS** (x Cupressocparis leylandii) | 9. | **WHITE PINE** (Pinus strobes) |
| 4. | **AMERICAN HOLLY** (Ilex opaca) | 10. | **AUSTRIAN PINE** (Pinus nigra) |
| 5. | **SOUTHERN MAGNOLIA** (Magnolia grandiflora) | 11. | **GIANT ARBORVITAE** (Thuja Plicata) |
| 6. | **NORWAY SPRUCE** (Picea abies) | 12. | **CANADIAN HEMLOCK** (Tsuga canadensis) |

# TYPE 2 BUFFER TREE LIST

(evergreen trees with an average mature height of less than 30 feet)

| | | | |
|---|---|---|---|
| 1. | **NEEDLEPOINT HOLLY** (Ilex cornuta 'Needlepoint') | 6. | **ROCKY MOUNTAIN JUNIPER** (Juniperus scopulorum) <br> • 'Wichita Blue', 'Moffetii', 'Cologreen', 'Sutherland', 'Pathfinder' cultivars only |
| 2. | **GREENLEAF HOLLY** (Ilex opaca 'Greenleaf') | 7. | **AMERICAN ARBORVITAE** (Thuja occidentalis) <br> • 'Nigra', 'Wintergreen', 'Emerald', 'Techny' or 'Brandon' cultivars only |
| 3. | **FOSTER HOLLY** (Ilex x attenuata 'Fosteri') | 8. | **LITTLE GEM MAGNOLIA** (Magnolia grandiflora 'Little Gem') |
| 4. | **NELLIE R. STEVENS HOLLY** (Ilex x 'Nellie R. Stevens') | 9. | **CAPITATA JAPANESE YEW** (Taxus cuspidata 'Capitata') |
| 5. | **CHINESE JUNIPER** (Juniperus chinensis) <br> • 'Spartan', 'Mountbatten', or 'Fairview' cultivars only | | |