TRI-CITIES HOLDINGS LLC, JANE DOE　　　　)
NOS. 1-2, and JOHN DOE NOS. 1-6,　　　　　)
　　　　Plaintiffs,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
V.　　　　　　　　　　　　　　　　　　　　) No. 2:13-CV-305
　　　　　　　　　　　　　　　　　　　　　　)
TENNESSEE HEALTH SERVICES AND　　　　　)
DEVELOPMENT AGENCY; CITY OF JOHNSON　)
CITY, TENNESSEE; JOHNSON CITY BOARD OF　)
COMMISSIONERS; JOHNSON CITY BOARD OF　)
ZONING APPEALS; MELANIE M. HILL, in her　　)
official capacity as Executive Director of the Tennessee )
Health Services & Development Agency; and KEITH　)
GAITHER, ELISHA HODGE, LISA JORDAN,　　　)
D. LYNN JOHNSON, JAMES L. WRIGHT,　　　　)
CHARLOTTE C. BURNS, CLAUDIA H. BYRD,　　)
ROBERT S. DOOLITTLE, MARK D. FLORA, M.D.,　)
BARRETT G. HAIK, MD, FACS, and THOM MILLS,　)
in their official capacities as members of the Board of the )
Tennessee Health Services & Development Agency,　　)
　　　　Defendants.　　　　　　　　　　　　　)

## MEMORANDUM OPINION AND ORDER

Pending before the Court are three motions: (1) Plaintiffs' motion for partial summary judgment, [Doc. 212]; responses, [Docs. 228, 231]; amended motion for summary judgment (withdrawing requests for relief)[1], [Doc. 233]; replies, [Docs. 236, 237]; (2) Defendant Johnson City's[2] motion for summary judgment, [Doc. 215]; response, [Doc. 222]; reply, [Doc. 239]; and (3) the motion of the State Defendants[3] for summary judgment on Counts 8, 10, and 12[4] of

---

[1] Plaintiffs had moved alternatively that the Court grant summary judgment on a number of "discrete issues" set forth in paragraphs 10-35 of their motion, [Doc. 212], but have now withdrawn their request for partial summary judgment on those issues.

[2] The City of Johnson City, Johnson City Board of Commissioners, and the Johnson City Board of Zoning Appeals will be referred to collectively as Johnson City.

[3] The Tennessee Health Services and Development Agency, (hereinafter referred to as "HSDA") Melanie M. Hill, in her official capacity as Executive Director of the Tennessee Health Services & Development Agency; and Keith

plaintiffs' second amended complaint, [Doc. 218]; response, [Doc. 223]; reply, [Doc. 240]. For the reasons which follow, plaintiffs' motion for summary judgment will be DENIED, Johnson City's motion for summary judgment will be GRANTED, the State Defendants' motion for summary judgment will be GRANTED, and plaintiffs' complaint will be DISMISSED.

## I.     Background

The suit before the Court, No. 2:13-CV-305, is the second of three lawsuits filed by Tri-Cities Holding, LLC ("TCH") and various Jane and John Does (the "individual defendants") (referred to collectively as "plaintiffs") related to TCH's efforts to open an opioid treatment program (OTP) in Johnson City, Tennessee. In its first complaint, in case No. 2:13-CV-108, filed April 19, 2013 (*TCH I*), TCH, a Georgia limited liability company which proposed to establish an out-patient methadone maintenance treatment service, or OTP, in Johnson City, Tennessee, and eight prospective patients of TCH, Jane Does 1-2 and John Does 1-6, sued Johnson City seeking declaratory and injunctive relief under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 793 (the "Rehabilitation Act") and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"). More specifically, the plaintiffs alleged that Johnson City's zoning ordinance relating to methadone clinics was facially invalid and that Johnson City's actions in denying TCH occupancy and operation permits to operate TCH's proposed OTP were in violation of the Rehabilitation Act and the ADA. Plaintiffs sought a preliminary injunction, but the Court subsequently ordered plaintiffs to show cause why the request for injunction was "not premature inasmuch as the plaintiff, Tri-Cities Holdings, LLC, has no Certificate of Need from the

---

Gaither, Elisha Hodge, Lisa Jordan, D. Lynn Johnson, James I. Wright, Charlotte C. Burns, Claudia H. Byrd, Robert S. Doolittle, Mark D. Flora, J.D., Barrett G. Haik, M.D., FACS, and  Thom Mills, in their official capacities as members of the Board of the Tennessee Health Services & Development Agency will be referred to collectively as the "State Defendants."

[4]     Counts 7, 9 and 11 of the second amended complaint make claims against the State Defendants under the Rehabilitation Act.  These claims were previously dismissed by the Court.  [*See* Doc. 163 (dismissing claims against the State defendants under the Rehabilitation Act)].  Counts 8, 10 and 12 make claims against the State Defendants under the ADA.

Tennessee Health Services and Development Agency or license from the Tennessee Department of Health." [Doc. 10, No. 2:13-CV-108]. On June 12, 2013, the Court held that plaintiffs' claims were not ripe for disposition and dismissed the case without prejudice.

The plaintiffs did not appeal the Court's judgment in *TCH I*, and it has now become final. Instead, they filed the instant action on July 8, 2013, in the United States District Court for the Middle District of Tennessee (*TCH II*). [Doc. 1]. On November 13, 2013, the case was transferred from the Middle District to this Court. [Doc. 95]. Plaintiffs have once again sued Johnson City, and have added the State Defendants,[5] again claiming violation of the Rehabilitation Act and the ADA. On April 10, 2014, this Court granted in part and denied in part HSDA's motion to dismiss and dismissed plaintiffs' claims under the Rehabilitation Act and their state law claims.[6] [Doc. 163]. Also on April 10, 2014, the Court granted the motion of Johnson City to stay the case and denied plaintiffs' motion for summary judgment and for a preliminary injunction without prejudice to their renewal after the lifting of the stay, [Doc. 164]. Plaintiffs appealed the Court's orders to the Sixth Circuit Court of Appeals, [Doc. 166]. The Sixth Circuit affirmed the denial of the preliminary injunction and dismissed the appeal of the denial of summary judgment and dismissal of the state law claims for lack of jurisdiction, [Doc. 172]. Plaintiffs were ordered to file periodic status reports with the Court on the status of the administrative appeal of the denial of their Certificate of Need ("CON") application by HSDA. [Docs. 175, 181, 184-190, 198, 199]. On August 22, 2016, TCH moved to lift the stay, [Doc. 193], and the Court granted the motion on October 21, 2016, [Doc. 205]. The motions currently pending before the Court were then filed.

---

[5] HSDA's executive director and members were added as party defendants in an amended complaint filed on November 26, 2013, [Doc. 113]. A second amended complaint was filed on December 11, 2013, [Doc. 136], and that complaint supersedes the first two and is the operative complaint in this case.

[6] The Court declined to exercise supplemental jurisdiction over plaintiffs' state law claims and dismissed those claims without prejudice.

The third lawsuit, No. 2:14-CV-233, was filed by TCH on May 19, 2014, and alleges violations of the Rehabilitation Act and the ADA by the state administrative law judge assigned to the appeal of HSDA's denial of TCH's CON, the Tennessee Department of State and its Secretary, and the Tennessee Department of Mental Health & Substance Abuse Services and its Commissioner. The Johnson City defendants are not parties to that suit. The third lawsuit was dismissed by the Court on May 31, 2017.[7] The appeal of the dismissal is pending in the Sixth Circuit.[8]

## II. Standard of Review

Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800

---

[7] *See* No. 2:14-CV-233, [Docs. 86, 88].
[8] United States Court of Appeals for the Sixth Circuit, No. 17-5628.

(6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id*. A genuine issue for trial is not established by evidence that is merely colorable, or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

## III.    Analysis

Plaintiffs have moved for summary judgment on Counts 1 through 6 of the second amended complaint, all of which make claims against the Johnson City defendants. The Johnson City defendants have responded and moved for summary judgment on the same basis upon which they have responded to the plaintiffs' motion. Plaintiffs then respond to the motion of the Johnson City defendants on the same basis raised in their motion. The same is true for the State Defendants. Plaintiffs move for summary judgment as to Counts 8, 10 and 12 of the second amended complaint, all of which allege illegal discrimination by the State Defendants, i.e.,

HSDA's illegal discrimination against plaintiffs in violation of the ADA (Counts 8 and 10), and HSDA's failure to provide plaintiffs with a reasonable accommodation in violation of the ADA (Count 12). Plaintiffs have submitted the declaration of Steve Kester, [Doc. 46], Dr. David Lentz, [Doc. 49], Dr. Robert J. Newman, [Doc. 47], Jane Does 1-2, [Docs. 48-50], and John Does 1-6, [Docs. 42-56]. The State defendants likewise have responded to plaintiffs' motion and filed a cross-motion for summary judgment. The Court will, for the sake of clarity, consider the issues as they relate to the Johnson City defendants first and then will consider the claims which relate to the State Defendants.

### A. Claims Against Johnson City

Johnson City responds to plaintiffs' motion for partial summary judgment by invoking the doctrines of ripeness, issue preclusion, standing and/or mootness as a bar to plaintiffs' claims, and, in turn, seeks summary judgment on the same grounds. Plaintiffs address the issue of ripeness in one paragraph of their 25-page opening memorandum in support of their motion, [Doc. 213], one paragraph in their 30-page reply brief, [Doc. 236], and in four pages of their 30-page response to Johnson City's motion for summary judgment, [Doc. 222]. Johnson City argues that all of plaintiffs' claims against Johnson City are barred by ripeness/issue preclusion and, because this issue is completely dispositive of plaintiffs' claims, the Court will address it first.

In the prior action, *TCH I*, the Court dismissed the complaint without prejudice because the "'issues [were] not ripe for disposition'" since TCH "had not obtained, and might never obtain, the [required] CON and license from the State of Tennessee." [*See* Doc. 163 at 2, No. 2:13-CV-108]. This Court previously stayed this case and denied plaintiffs' motion for a preliminary injunction, stating in its April 10, 2014 memorandum that:

> This is the second suit on the same claims filed by plaintiffs
> against the City of Johnson City, Johnson City Board of

Commissioners, and the Johnson City Board of Zoning Appeals (the "Johnson City defendants"). The instant suit also adds as a party defendant the Tennessee Health Services and Development Agency ("HSDA"), and the Executive Director and members of the Board of HSDA. The first suit was filed in this Court on April 19, 2013 (No. 2:13-CV-108). After a hearing on plaintiffs' motion for a preliminary injunction, the Court dismissed the complaint because the "issues [were] not ripe for disposition," [Doc. 45, No. 2:13-CV-108], for reason that Tri-Cities Holdings, LLC ("TCH"), had not obtained, and might never obtain, the required Certificate of Need ("CON") or license from the State of Tennessee.

Plaintiffs' complaint was dismissed without prejudice and the Court provided that plaintiffs would be permitted to reopen the case by motion upon a showing of ripeness rather than requiring the filing of a new complaint. [*Id.* at 10, fn. 7]. Judgment was entered by the Clerk on June 12, 2013, [Doc. 46, No. 2:13-CV-108], and the judgment became final thirty (30) days after the date of filing of the judgment since no notice of appeal was filed. *See* Fed. R. App. P. 4. No motion has ever been filed to reopen the case upon a showing of ripeness. Instead, plaintiffs filed the instant action in the Middle District of Tennessee on July 8, 2013. The Johnson City defendants filed a motion for change of venue and the Court ultimately transferred the case to this district. The case was opened here on November 14, 2013.

The Johnson City defendants moved to dismiss on the bases of issue preclusion and lack of ripeness, [Doc. 87]. Because the issue of ripeness has been previously litigated adversely to plaintiffs and because they did not appeal the prior judgment, the Johnson City defendants argue that the doctrine of issue preclusion bars the plaintiffs from relitigating that issue in this Court (or from seeking a different answer from a different federal court). Plaintiffs respond that the Court's prior judgment was without prejudice, does not operate as an adjudication on the merits, and thus does not have any *res judicata* effect. Plaintiffs argue that a plaintiff always has the right to refile a complaint dismissed without prejudice.

The Johnson City defendants subsequently moved for a stay of these proceedings "until there is a resolution of whether Tri-Cities Holdings is entitled to a Certificate of Need and a license," [Doc. 98], asserting that a stay is more appropriate than another dismissal without prejudice at this point to avoid the possibility that plaintiffs will simply refile their complaint in some other federal judicial district. Plaintiffs respond, arguing that the case is ripe for adjudication and that the administrative appeal of the denial of their

CON application is irrelevant to their ADA claims. In essence, plaintiffs argue that the Court's prior determination that plaintiffs' claims against the Johnson City defendants are not ripe for determination until TCH has obtained the required CON and license from the State of Tennessee is erroneous. Although the Magistrate Judge previously ordered a stay of discovery, the pending motion to stay the case was deferred by the Magistrate Judge to this Court.

*Res judicata,* i.e., the preclusive effect given a judgment, consists of two conceptually different doctrines--claim preclusion and issue preclusion. *Stryker v. National Union Fire Insurance Co.*, 681 F.3d 819, 824 (6th Cir. 2012) (citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the very same issue as the earlier suit.'" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). "Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (quoting *New Hampshire*, 532 U.S. at 748-49).

In order for issue preclusion to apply to the prior ruling, the party seeking estoppel must show:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Stryker*, 601 F.3d at 825 (*quoting Pfeil v. St. Bank & Trust Co.*, 671 F.3d 585, 601 (6th Cir. 2012) (internal quotation marks and citations omitted).

Plaintiffs argue only that the Court's prior judgment was without prejudice and therefore does not have any preclusive effect. Plaintiffs' argument, however, completely misses the point. Plaintiffs are not barred from refiling their complaint, nor are they precluded from ultimately pursuing any of their claims against the Johnson City defendants. The Johnson City defendants argue only

that the issue of ripeness has been conclusively decided in the prior litigation between plaintiffs and the Johnson City defendants and, that issue having been conclusively decided, plaintiffs may not proceed with their claims until they have shown that the claims are ripe for adjudication. Upon examination of the relevant factors, the Court agrees with the Johnson City defendants.

First, the precise issue now raised, i.e., ripeness, was actually raised and actually litigated in the prior proceeding. Plaintiffs' argument that the issue was erroneously decided by the Court in the prior proceeding is beside the point. Plaintiffs did not seek reconsideration of the Court's ruling nor did they appeal. The Court entered judgment and the judgment became final and binding on the plaintiffs. It has now been conclusively established that the case is not ripe for determination and the Court lacks subject matter jurisdiction until plaintiffs obtain the necessary CON and license. The issue cannot be relitigated by plaintiffs in this or any other action in federal court. To the extent plaintiffs believed the Court's ruling on the issue was incorrect, they should have appealed the judgment. They did not. They instead chose to attempt to relitigate the issue in the Middle District of Tennessee. Likewise, plaintiffs' argument that they have discovered precedents which they did not previously call to the Court's attention are similarly unavailing.

Second, the determination of the ripeness issue was clearly necessary to the outcome of the prior proceeding. Indeed, it was the sole basis for the Court's prior determination. Judgment was entered on that very issue. The second requirement for issue preclusion is met.

Third, the prior proceeding resulted in a judgment on the merits, notwithstanding that none of the plaintiffs' claims were decided on the merits. Plaintiffs appear to argue that this prerequisite has not been met because the Court's dismissal of the complaint was without prejudice. That is not the proper inquiry in deciding whether issue preclusion applies to this proceeding. The inquiry is whether the issue for which preclusion is sought was decided and a judgment on the merits entered on that issue. *See, e.g., Sandy Lake Band of Mississippi Chippewa v. United States*, 714 F.3d 1098 (8th Cir. 2013) (dismissal without prejudice for lack of subject matter jurisdiction meets requirement because "[a]lthough dismissal for lack of subject matter jurisdiction does not adjudicate the merits of the claims asserted, it does adjudicate the court's jurisdiction.") (citing *Kulinski v. Medtronic Bio-Medicus, Inc.*, 112 F.3d 368, 373 (8th Cir. 1997) (holding that the complaint's dismissal without prejudice for lack of subject matter

jurisdiction would preclude plaintiff from bringing another claim on the same jurisdictional basis)). In other words, plaintiffs may reassert the claims in their first lawsuit against the Johnson City defendants, but only after they establish that the claims are ripe for adjudication, i.e., only after they obtain the required CON and license.

Finally, plaintiffs had a full and fair opportunity to litigate the ripeness issue in the prior proceeding. On April 25, 2013, the Court ordered plaintiffs to show cause why the proceeding was not "premature inasmuch as the plaintiff, Tri-Cities Holding, LLC, has no Certificate of Need from the Tennessee Health Services and Development Agency or license from the Tennessee Department of Health." [Doc. 10, No. 2:13-CV-108]. Plaintiffs responded to the order on May 1, 2013, in a 17 page brief which specifically addressed whether "Plaintiffs' claims are ripe for adjudication." [Doc. 14, No. 2:13-CV-108, at 3]. The Court heard oral argument on May 10, 2013, after giving notice of a hearing on the issue of whether the motion for preliminary injunction was premature. [*See* Notice, No. 2:13-CV-108, May 6, 2013]. Indeed, plaintiffs make absolutely no suggestion that they did not have a full and fair opportunity to litigate the ripeness issue in the prior proceeding.

This Court has previously determined, in the prior litigation between these parties, that plaintiffs' claims against the Johnson City defendants are not ripe for adjudication because they do not have, and may never have, a CON or a license to operate their proposed methadone clinic, even if the Court were to declare the Johnson City Zoning Ordinance invalid. The Court's prior judgment on the issue of ripeness has become final. Plaintiff, TCH, still does not have the required CON and license. Because the prerequisites for issue preclusion on this issue are met, plaintiffs are bound by the Court's prior ruling on the issue. Defendants' motion to stay will, therefore, be GRANTED, [Doc. 98]. The Johnson City defendants motion to dismiss, [Doc. 87], and plaintiffs' motion to lift stay on discovery and for decision on plaintiffs' motions for a preliminary injunction and for partial summary judgment, [Docs. 153, 154], will be DENIED. Plaintiffs' motion for a preliminary injunction, [Doc. 82], and plaintiffs' motion for summary judgment, [Doc. 127], are DENIED WITHOUT PREJUDICE and may be renewed, if appropriate, once the stay in this case is lifted.

[Doc. 164 at 2-7].

As noted above, plaintiffs largely ignore the ripeness/issue preclusion problem they face. They apparently believe the Court's prior ruling was wrong and once again argue that challenges to facially invalid laws or ordinances are "ripe by their very nature," quoting *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 155 (W.D.N.Y. 2006) and citing *MacDonald v. Safir*, 206 F.3d 183, 189 (2d Cir. 2000). As Johnson City notes, however, that argument was rejected and these cases distinguished by the Sixth Circuit in its order on plaintiffs' interlocutory appeal of this Court's denial of a preliminary injunction.[9] The Sixth Circuit sated:

> (1) *Likelihood of success on the merits.* The district court did not address the merits of Plaintiffs' discrimination claims, concluding they were not ripe. Plaintiffs have not shown any error in that conclusion.
>
> Ripeness is a threshold determination. The district court considered three factors in finding that Plaintiffs' claims were not ripe: (1) the likelihood that the harm alleged will ever come to pass; (2) the hardship resulting if judicial relief is denied at that point; and (3) whether the factual record was sufficiently developed to produce a fair adjudication of the merits. The court found that none of these factors was satisfied.
>
> Plaintiffs argue that facial challenges to invalid laws are "always ripe by their very nature." (Appellants' Brief at 28) They cite *Ecogen, LLC v. Town of Italy,* 438 F.Supp.2d 149, 155 (W.D.N.Y.2006), and *MacDonald v. Safir,* 206 F.3d 183, 189 (2d Cir.2000). These cases are factually distinguishable. In *Ecogen,* the plaintiff alleged that a township's moratorium on construction of wind turbines violated its substantive due process and equal protection rights. Prior to the moratorium, plaintiff purchased property and acquired easements for its planned wind facilities. When the project was publicly announced, the town passed a six-month moratorium on wind turbines, stating it needed time to consider and adopt a master zoning plan. The town repeatedly renewed the moratorium but failed to adopt a master plan. Plaintiff did not require any state or local permits to proceed with its project, and the district court found the plaintiff's facial challenge

---

[9]    In addition, not only are the cases cited by plaintiffs factually distinguishable, those jurisdictions do not have a requirement for a CON or comparable state approval.  In other words, in the cases cited, the only thing standing in the way of approval was the challenged ordinance.  No other permit or approval was required.

to the moratorium ordinance was ripe. Tri–Cities is not in a comparable position: it concedes it cannot open a methadone clinic without a CON and a license from the state.

*MacDonald v. Safir,* 206 F.3d 183 (2d Cir.2000), involved a First Amendment challenge to New York City's parade permit regulations. The Second Circuit held that a facial challenge is proper "... whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech ...". *Id.* at 189, citing *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Plaintiffs' supplemental authorities are similarly distinguishable, as they involve facial challenges to zoning ordinances that infringe First Amendment rights of speech and free expression. Plaintiffs are not raising First Amendment claims. And they cite no authority suggesting that the ripeness doctrine should be similarly relaxed or excused when an ordinance or statute is challenged under the ADA or the Rehabilitation Act.

Plaintiffs also contend that their claims are ripe because they face a "Catch 22" dilemma that requires immediate judicial relief. They argue that they must show their compliance with local laws in order to obtain a CON from HSDA. They also cite the Johnson City zoning ordinance's requirement that Tri–Cities obtain a CON in order to obtain a special exception approval under that ordinance. This potential "Catch 22" was mentioned several times during the Board of Zoning Appeals' hearing on Tri–Cities's application. Mr. Neilson, Johnson City's Traffic Engineer, summarized Tri-Cities's application at the start of the hearing, and reviewed the requirements of Section 613.3.3 of the City's zoning code governing methadone treatment clinics. Neilson stated that one of the code's requirements is that the clinic be fully licensed and certified by the state, and a CON obtained from HSDA, prior to BZA approval. Mr. Neilson stated that if the Board chose to grant the two waivers sought by Tri–Cities (permission to open at 5 a.m., and a location that was not an arterial street), the approval "should be conditioned upon granting-that the State grants them the certificate of need. Since they can't get their certificate of need prior to BZA approval, it's kind of a catch–22, so you'll probably see an amendment to that code in the future." Mr. Neilson also opined that the Board lacked legal authority to grant a variance or exception to the conditions of the zoning ordinance regarding hours of operation and arterial street location.

Mr. Herrin, counsel for Johnson City, also spoke at the hearing. He opined that the Board did not have legal authority to

overrule the criteria adopted by the City Commission in the zoning code. The City's position was that two of those criteria (arterial street and hours of operation) were not satisfied. Mr. Herrin agreed with Neilson that the Board should not consider the fact that Tri–Cities did not have an approved CON, as that would amount to a "Catch–22." He urged the Board not to consider that issue in reaching its decision regarding the other two criteria. At the close of the hearing, a Board member made a formal motion to deny Tri–Cities's request, stating that the "... hours of operation and the location having access from an arterial street are not met. The way that the board has acted on special exceptions ... in the past when a special exception request comes before us, if it meets all the conditions we have no choice but to approve that special exception. This does not meet all those conditions and based on that fact, I move that we deny the request." The record before us does not reasonably support an argument that the Board denied Tri–Cities's zoning application because it lacked a CON.

Plaintiffs also contend that they faced this "Catch–22" dilemma before HSDA, and suggest that HSDA denied a CON because Tri–Cities lacked a zoning permit, and because of Johnson City officials' opposition to their proposal. Plaintiffs cite the opening remarks of Mr. Christoffersen, HSDA's general counsel, at the HSDA hearing. Christoffersen reported that the federal district court had essentially postponed a decision on Plaintiffs' lawsuit challenging the Johnson City ordinance, and he urged the members to set aside any consideration of local zoning. He specifically recommended that the panel focus its discussions on the three main criteria for issuing a CON: the demonstrated need for the facility; the proposal's economic feasibility; and its contribution to the orderly development of healthcare in Tennessee. Christofferson told the panel: "I would recommend and urge that the decision not be based on zoning itself today, because it hasn't been definitely determined to be a roadblock, and, therefore, that the [other] criteria be looked at rather than that." At oral argument, Plaintiffs' counsel dismissed these statements as "tongue in cheek" subterfuge that should be interpreted as urging the panel to deny a CON because of local opposition. We cannot agree with counsel's characterization. Given the entirety of the hearing testimony and the questions posed by the panel members, there is no reason to suspect that the panel did not follow Mr. Christofferson's advice.

Plaintiffs' counsel also cited a statement by a "lobbyist" for Johnson City, who appeared at the HSDA hearing and spoke in opposition to Tri–Cities's application. This "lobbyist" (Mr. Taylor) summarized the City's position that Tri–Cities had not established

a need for its proposed clinic. He cited the physician-to-patient ratio for area physicians approved to dispense buprenorphine (an alternative to methadone for treating opiate addiction), a ratio that is apparently more favorable than in other more populous areas of the state. He also critiqued Tri–Cities's economic model for its clinic operations. Johnson City's mayor, who is a practicing oral surgeon, also spoke. He described other addiction treatment services currently available in Johnson City, and questioned Tri–Cities's contention that it had shown a need for the clinic. Other questions were raised at the hearing by other speakers and HSDA members about operations at Tri–Cities's other methadone clinics, the adequacy of proposed staffing levels, and the extent of education that would be required for clinic staff. Also, prior to the hearing, HSDA's staff had reviewed Tri–Cities's application and concluded they could not support it "... because the majority of the Criteria and Standards for the type of facility being proposed in the application have not been met ...". Plaintiffs concede that HSDA has issued CON's for 12 other methadone clinics in Tennessee, so this staff recommendation cannot simply be attributed to local opposition or lack of zoning approval, much less bias against opiate-addicted individuals. It is clear that HSDA was aware of local opposition to Tri–Cities's proposal. But we cannot agree that HSDA denied a CON because of that opposition, or because Tri–Cities lacked a zoning variance. As the district court accurately stated, Tenn Code Ann. § 68–11–1624 specifically states that local support or opposition to a methadone maintenance clinic's CON application is informational and advisory only, and is not a prerequisite to obtaining a CON.

These facts strongly support a conclusion that Plaintiffs cannot show a substantial likelihood of success on the merits of their assertion that their claims are ripe. If Tri–Cities's state administrative appeal is ultimately unsuccessful, it cannot open its clinic. And until that appeals process is complete, the district court cannot reasonably determine if Tri–Cities was denied a CON due to some Catch 22 dilemma, or whether the denial was based on issues having nothing to do with Johnson City's zoning ordinance or disability discrimination. We are confident that the district court can address the ramifications of any "Catch–22" dilemma that might appear in the record when Plaintiffs can demonstrate that their claims are ripe.

*Tri-Cities Holdings, LLC v. Tennessee Health Services & Development Agency*, 598 F. App'x 404, 408-11 (6th Cir. 2015).

Plaintiffs appear to be deliberately blind to this Court's prior rulings in both their first lawsuit, No. 2:13-CV-108 (*TCH I*), and the instant lawsuit, as well as the Sixth Circuit's clear holding in the interlocutory appeal in this very case.[10] The only "new" argument put forth by plaintiffs is that the continued "operation" of the zoning ordinance after June 11, 2013[11], the date of the dismissal of *TCH I*, somehow avoids the effect of the Court's prior rulings. They cite no authority for this claim and, in fact, there is none. The simple fact is that the Court has held that plaintiffs are barred by issue preclusion from now contesting the Court's prior holding. Their opportunity to do so was through an appeal of the *TCH I* judgment. Their failure to do so means the Court's holding, whether correct or erroneous, is now binding on them and is the law of this case. TCH has not obtained a CON or license from the State of Tennessee and has now voluntarily dismissed its administrative appeal of the denial of its application by the state agency. TCH therefore does not have a ripe claim because it has not obtained, and cannot obtain, the required CON and license.

Plaintiffs also appear to argue that Johnson City's opposition to their application for a CON at the state agency hearing creates a new cause of action after the June 12, 2013 dismissal of *TCH I*. [Doc. 213]. More specifically, they argue that Johnson City "officially and intentionally violated the ADA's *Olmstead* [12] integration mandate," [*id*. at 8], by "having the mayor appear in his official capacity" before the HSDA hearing on TCH's application for a CON and hiring "a state-registered lobbyist to oppose TCH's CON application and encourage HSDA itself to violate the ADA *Olmstead* mandate by refusing TCH's reasonable modification request

---

[10]   Johnson City argues that plaintiffs' counsel, Mr. Dunlap, has not been candid with the Court "by arguing authority that counsel knows has been explicitly rejected by the Sixth Circuit Court of Appeals in this very case." [Doc. 228 at 3]. As a result, Johnson City suggests that "this Court could sanction plaintiffs' counsel up to and including revocation of his *pro hac vice* privileges." The Court agrees that Mr. Dunlap has not been entirely candid with the Court in this matter and this is not the first time. The Court, however, declines to impose any sanctions at this time.

[11]   *TCH I* was actually dismissed on June 12, 2013.

[12]   *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999).

and denying TCH's CON application." [*Id*.]. Without citation to any case authority, plaintiffs claim that Johnson City "officially and intentionally lobbying against clinics serving the disabled violates the *Olmstead* integration mandate." [*Id*. at 9].

Johnson City responds that there are at least three reasons why this claim fails. First, such a cause of action is not asserted in the second amended complaint; second, the *Olmstead* mandate has no application to these facts; and third, plaintiffs are not entitled to summary judgment on the claim "because Johnson City has a right under the Free Speech Clause to speak on an issue of public concern . . ." [Doc. 228 at 6, citing *Potters Medical Center v. City Hospital Ass'n,* 800 F.2d 568, 578 (6th Cir. 1986) (City hospital's participation in the Certificate of Need process and comments to state agency were protected speech under the *Noerr-Pennington Doctrine*)]. Plaintiffs have filed a 25-page reply brief dedicated almost completely to argument related to events that post-date the dismissal of *TCH I*. [Doc. 236]. In somewhat inflammatory language, plaintiffs' reply brief charges that "Johnson City treated this Court's dismissal without prejudice in *TCH I* on ripeness grounds as a 'get-out-of-jail-free card' to discriminate, violate the ADA going forward, and allow it to deny TCH any and all necessary permits into the indefinite future." [Doc. 236 at 1]. Arguing that the damage from the zoning ordinance is "actual and continuing," plaintiffs assert that "even if this Court deems the ripeness decision to bar the plaintiffs from forever challenging the facial validity of the zoning ordinance, it serves as evidence for plaintiffs' discrimination claims that arose after the date of filing of TCH I and as alleged in plaintiffs' complaint." [*Id*. at 3, 9] (emphasis added). The plaintiffs characterize Johnson City's position as "perpetual immunity from the ADA." [*Id*. at 10]. Plaintiffs point to numerous paragraphs of their original complaint, [Doc. 136], which is not the operative

complaint in the case, as sufficient to state a "plausible claim for relief" for violation of Title II of the ADA for acts occurring post-*TCH I*. [*Id.* at 11, 12].

The Court agrees with the Johnson City defendants. First, plaintiffs did not plead those purported causes of action in their second amended complaint, despite their claims otherwise, and have filed no amended complaint to allege such causes of action. Second, for reasons discussed more fully below, the *Olmstead* case has no application to the facts alleged here. Finally, Johnson City's participation in the CON process is protected speech under clear Sixth Circuit precedent.

### B.    Claims Against State Defendants

The plaintiffs' remaining claims against the State Defendants (Counts 8, 10, and 12) are premised on theories of intentional[13] violation of Title II of the ADA. First, plaintiffs claim that Tennessee Code Annotated § 68-11-1607(c)(3) (2015) is "overtly discriminatory and therefore facially invalid because it requires an OTP CON applicant to notify local officials in the geographic area of the OTP's CON application" (Count 8). Second, plaintiffs claim that HSDA's denial of TCH's CON constituted an intentional violation of the ADA (Count 10).

---

[13]    Plaintiffs now claim that they have made claims of "non-intentional 'discriminatory effect' or 'discriminatory impact' claims in addition to claims of intentional violations of the ADA", [Doc. 223 at 12], citing various paragraphs of their operative complaint. A plaintiff, of course, may establish a violation of the ADA by showing either that defendant was motivated by an intent to discriminate (intentional discrimination) or that the defendant's otherwise neutral action has an unnecessarily discriminatory effect (disparate impact*). See generally, Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Larkin v. Michigan*, 89 F.3d 285, 289 (6th Cir. 1996). A review of the plaintiffs' complaint, however, confirms that plaintiffs are making claims of intentional discrimination. *See* Count 8, ¶ 313 ("Because of HSDA's intentional discriminatory reactions and behavior . . ."); Count 12, ¶ 330 ("Because of HSDA's intentional discriminatory reactions and behavior . . .)" Furthermore, Count 8 alleges that Tennessee Code Annotated Section 61-11-1607(c)(3) is facially invalid. "[F]acially discriminatory actions are just a type of intentional discrimination or disparate treatment, and should be treated as such." *Larkin*, 89 F.3d at 289 (citing *Bangerter v. Orem City Corp*., 46 F.3d 1491, 1500-01 (10th Cir. 1995)). Reasonable accommodation claims are likewise analyzed under the framework for intentional discrimination. *See Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015) (analyzing reasonable-accommodation claim under *McDonnell Douglas* framework). To the extent plaintiffs seek to allege disparate impact claims, those claims are, in any event, analyzed under the *McDonnell Douglas* framework and fail for the same reasons as the claims for intentional discrimination, and establishing a *prima facie* case requires plaintiffs to identify specific discriminatory practices. The only HSDA practices even arguably challenged are based on facial validity of § 68-11-1607(c)(3) and failure to accommodate by granting the CON, both intentional acts.

Third, plaintiffs allege a violation of the ADA because "HSDA failed to make a reasonable accommodation to allow TCH to obtain a CON and establish an OTP in Johnson City" (Count 12). Plaintiffs claim the notice provision of § 68-11-1607(c)(3), one not applicable to any other medical service or healthcare facility, is intended by the State Defendants "to galvanize widespread, well-organized opposition to confront any attempt to locate an OTP" and "gin up public opposition." [Doc. 213 at 2]. Plaintiffs claim they were denied a reasonable accommodation by HSDA, which refused to modify rules "presently stopping the CON from being issued." [*Id*. at 3]. The State Defendants assert these claims are baseless.

### 1. Law Applicable to Claims of Intentional Discrimination

Claims of intentional discrimination brought pursuant to the ADA are analyzed under the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiffs must first establish a *prima facie* case of discrimination. *Id*. at 802. They must show that (1) they have a disability; (2) they are otherwise qualified; and (3) they have been excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of their disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (citing *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)). "In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability; i.e., the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the . . . decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id*. Furthermore, the plaintiff must show that "the discrimination was *intentionally* directed toward him or her in particular." *Tucker*, 539 F.3d at 532 (emphasis in original).

Discriminatory intent may be inferred from the totality of circumstances and a number of sources, including the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, and the legislative history and contemporary statements by members of the decisionmaking body. *Village of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 261 (1977). The courts pay particular attention to legislative or administrative history, "especially where there are contemporary statements by members of the decisionmaking body, minutes of meetings, or reports." *Id*. at 268.

Once a plaintiff establishes a *prima facie* case of discrimination, the defendant "must then offer a legitimate, nondiscriminatory reason" for its challenged action. *Sjostrand v. Ohio State University*, 750 F.3d 596, 599 (6th Cir. 2014). In other words, the defendant must produce evidence that it would have made the same decision even if it had not been motivated by an unlawful purpose. *Smith & Lee Assoc. v. City of Taylor*, 102 F.3d 781, 791 (6th Cir. 1996). This burden is merely one of production, not persuasion. *Sjostrand,* 750 F.3d at 599. Proof that the decision was motivated in part by a discriminatory purpose will not necessarily require invalidation of the challenged legislative action. *Smith & Lee*, 102 F.3d at 791. Rather, if the defendant meets its burden of showing that it would have made the same decision even if not motivated by an unlawful purpose, then the plaintiff must introduce evidence showing that the proffered reason is pretextual. *See Hedrick v. W. Reserve Care Sys*., 355 F.3d 444, 453 (6th Cir. 2004). This evidence must be sufficient to allow a jury to find that the defendant's explanation is a pretext for unlawful discrimination; the plaintiff retains the ultimate burden of persuasion at all times. *See Id.*[14]

---

[14] This statement of the law applicable to intentional discrimination claims is taken largely from the memorandum of the State Defendants filed in this case. State Defendants correctly state the applicable standard and plaintiffs do not

## 2.    Tennessee Code Annotated § 68-11-1607(c)(3)

The "Tennessee Health Services and Planning Act of 2002," codified at Tennessee Code Annotated § 68-11-1601, *et seq*., requires "any person,"[15] before establishing or modifying "a health care institution, facility, or covered health service, at a designated location" to obtain a CON, i.e., "a permit granted by the" HSDA.  Tenn. Code Ann. § 68-11-1602(2).  "Health care institution" includes a "nonresidential substitution-based treatment center for opiate addiction," including stand-alone clinics offering methadone, products containing buprenorphine such as Subutex and Suboxone, or products containing any other formulation designed to treat opiate addiction by preventing symptoms of withdrawal."  Tenn. Code Ann. § 68-11-1602(7)(a), (13).

The Health Services and Planning Act declares it "to be the public policy of [the State of Tennessee] that the establishment and modification of health care institutions, facilities and services shall be accomplished in a manner that is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the health care of the people of Tennessee."  Tenn. Code Ann. § 68-11-1603.  The Act created the HSDA to have "jurisdiction and powers relating to the certification of need" and is composed of eleven (11) members, including various designated state officials, and members appointed by the speaker of the House of Representatives, the speaker of the Senate, and the governor.  Tenn. Code Ann. § 68-11-1604.  The HSDA has the duty to "[r]eceive and consider applications for certificates of need . . . and to grant or deny certificates of need on the basis of the merits of such applications within the context of local, regional and state health needs and plans."  Tenn. Code Ann. § 68-11-1605.

---

suggest otherwise.

[15]  "Person" includes various kinds of business organizations, including LLCs.  Tenn. Code Ann. § 68-11-1602(15).

Applications for a CON must be "published in a newspaper of general circulation in the proposed service area of the project." Tenn. Code Ann. § 68-11-1607(c)(1). For applications for a CON for a nonresidential substitution-based treatment center for opiate addiction, the applicant is required to also send notice of the application by certified mail, return receipt requested, to the county mayor of the county where the proposed facility will be located, the house and senate members representing that county in the Tennessee General Assembly, and the mayor of the municipality where the facility is located, if located within the corporate boundaries of a municipality, "informing such officials that an application for a nonresidential methadone treatment facility has been filed with the agency." Tenn. Code Ann. 68-11-1607(c)(3).

### 3. Analysis

The Court will address each of the remaining counts of the second amended complaint in the context of the case law applicable to claims of intentional discrimination brought under the ADA below. The Court will address each of Counts 8, 10 and 12 in turn.

### a. Count 8-Facial Invalidity of Tennessee Code Annotated § 68-11-1607(c)(3)[16] under Title II of the ADA.

Plaintiffs' second amended complaint alleges that the "Tennessee Legislature has enacted the overtly discriminatory—and therefore facially invalid—Tennessee Code Annotated § 68-11-1607(c)(3) which requires an OTP Certificate of Need applicant to go through cumbersome

---

[16] Tennessee Code Annotated § 68-11-1607(c)(3) has been renumbered as § 68-11-1607(c)(9)(A). For ease of reference, however, the Court will continue to refer to the section as (c)(3). Tennessee Code Annotated § 68-11-1607(c)(3) has also been amended by making it applicable to all non-residential substitution-based treatment centers, not just methadone treatment facilities. At the same time, § 68-11-1624 was amended and its provisions made applicable to all certificate of need applications, not just those for "non-residential substitution-based centers for opiate addiction." Acts 2015, ch. 505. Plaintiffs argue, as noted above, that "the Tennessee legislature tacitly acknowledged the statute's illegality by amending it May 20, 2015." Plaintiffs' argument consists totally of this one line. No further argument is offered and plaintiffs' make no effort to develop it. The argument is therefore waived. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

requirements to provide notice to local politicians of a OTP's CON application, requirements not imposed on any similar medical facility." [Doc. 136 at ¶ 187]. The statute, plaintiffs allege, "encourages widespread, well-organized opposition to confront any attempt to locate an OTP", [*id*. at ¶ 188], and no other medical service is "required to notify opposition in this way." [*Id*. at ¶ 189]. These are the only allegations of plaintiffs 72-page complaint to support Count 8. Plaintiffs simply repeat these same allegations almost verbatim in their brief in support of their motion for summary judgment, except that they state that the notice requirement is "*presumably* intended to encourage widespread, well-organized opposition to locating an OTP anywhere in the state." [Doc. 213 at 27] (emphasis added). In sum, plaintiffs contend § 68-11-1607(c)(3) is facially invalid under the ADA because it imposes a requirement on OTP CON applicants that are not applicable to other health care facilities.

The state defendants respond that the notice statute is not overtly discriminatory on its face because the Legislature has also provided that the purpose of the notice is to allow those officials to express "support or opposition[17] to the granting of a Certificate of Need to the applicant," the same opportunity that is afforded with respect to any CON application, that "the testimony of such officials shall be informational and advisory" only, and that the support of local officials "shall not be a requirement for the granting of a "CON." Tenn. Code Ann. § 68-11-1624.

Plaintiffs respond that the reliance of the State Defendants on the legislature's "support or opposition" language "is logically flawed and has already been rejected by federal courts nationwide." [Doc. 223 at 5]. Plaintiffs make three specific arguments with respect to the

---

[17] Plaintiffs refer to this as a "for and against" argument, stating that "[f]ederal courts reject . . . this argument out of hand." Plaintiffs cite cases from two district courts (Maryland and the Eastern District of New York) in support. The cases, however, are easily distinguished in that they dealt with requirements for much broader neighborhood notification. In any event, those cases from districts outside the Sixth Circuit have no precedential sway on this Court.

arguments of the state defendants: (1) "the Tennessee legislature tacitly acknowledged the statute's illegality by amending it May 20, 2015," (2) federal courts reject the State Defendants' "for and against" argument out of hand, and (3) the State defendants' "support or opposition" argument violates the ADA's *Olmstead mandate*. [*Id*. at 5-6].

These statutes do not impose any burden on an OTP CON applicant which would, in any way, disadvantage TCH in receiving a CON i.e., "exclude[e] from participation in, den[y] the benefits of, or subject [ ] to discrimination" under the CON program. The negligible requirement[18] of certified mail notice to local officials does not change the fact that all CON applicants, not just those who propose to operate an OTP, must show need, economic feasibility, and contribution to the orderly development of health care[19] before a CON may be granted, consistent with Tennessee's "Guidelines For Growth." (2000 Ed., Tennessee's Health Guidelines For Growth, prepared by the Health Planning Commission).

Plaintiffs allege that the legislative purpose in passing the statute was "**presumably**" to gin up local opposition to OTP CON applications and prevent these facilities from locating "anywhere" in the state. [Doc. 213 at 27] In the face of the undisputed facts offered by the state

---

[18]    The statute, § 1607(c)(3), requires only that the notice inform the designated state and local officials "that an application for a non-residential facility has been filed with the agency." The notice need not notify these officials of any right to appear at a hearing (none exists), nor does the statute require that these officials be formally notified of the date for any such hearing. In reality, this provision of the law requires nothing more of the OTP CON applicant than that required of all applicants, *see* Tenn. Code Ann. § 68-11-1607(c)(1) (requiring applicant's letter of intent to be published in a newspaper of general circulation containing a statement that any health care institution or other person wishing to oppose the application must file a written objection with the agency), and the burden placed on the applicant by § (c)(3) is no more than a requirement to mail the letter of intent prepared by all applicants to the named officials, hardly a cumbersome or burdensome requirement. [*See* Doc. 45-1 at 123-127]. Nevertheless, the Court acknowledges that § (c)(3) is problematic in that it requires notice requirements on CON applicants to operate methadone clinics, even though negligible, which are not imposed on other CON applicants. The Tennessee legislature would be well advised to repeal the statute or make it applicable to all CON applicants.

[19]    *See* Tenn. Code Ann. § 18-11-1609(b) ("No Certificate of Need shall be granted unless the action proposed in the application is necessary to provide needed health care in the area to be served, can be economically accomplished and maintained, and will contribute to the orderly development of adequate and effective health care facilities or services. In making such determinations, the agency shall use as guidelines the goals, objectives, criteria and standards in the state health plan.)"

defendants that "[a]t least 12 other methadone clinics have obtained CONs and applicable licenses and operate in other parts of Tennessee," [Doc. 219 at 12 (citing Doc. 82)], that at least some of the applications for an OTP CON have been _supported_ by local and state elected officials, and that the legislature's express purpose in passing the statute was to allow informational and advisory support or opposition, plaintiffs cannot simply stand on their conclusory allegations but must rather come forward with significant probative evidence which establishes a genuine dispute of material fact. *Anderson*, 477 U.S. at 252; *McClain*, 244 F.3d at 800. Plaintiffs' have not met this requirement.[20] There is simply no evidence that any community opposition arose as a result of the notice requirement or that it played any part, much less a significant one, in the denial of the CON. Plaintiffs do not dispute the historical facts presented by the state defendants nor do they point to anything in the legislative history of § (c)(3) to suggest that the legislation had any purpose other than its stated purpose. In addition, nothing in the statute requires OTP CON applicants to comply with any additional regulations or criteria other than those any other CON applicant is ultimately required to meet. The state defendants are therefore entitled to summary judgment on to Count 8.

### b. Count 10—HSDA's Discrimination Against Disabled Persons

It is very difficult to identify and piece together the specific factual allegations which support Count 10 of the plaintiffs' second amended complaint, but so far as the Court can tell, they are these: (1) the state's criteria for a CON set forth in Tennessee Code Annotated § 68-11-1609(b) (need, economic feasibility, and orderly development) and the HSDA interpreting rules are "vague and subjective," [Doc. 223 at 19]; (2) the Guidelines for Growth provided for in the state health plan developed pursuant to § 68-11-1625 are also "vague and subjective," [*Id*. at 19-

---

[20]  Plaintiffs make this assertion in one of their pleadings: "This statute has blocked OTP clinics numerous times and contributed to Tennessee's 10,000 drug overdose deaths in the last decade." [Doc. 213 at 27]. The cite no facts in the record to support such an over-the-top allegation.

20]; (3) at the hearing on the CON application before HSDA, "TCH provided sufficient, indeed overwhelming, evidence of satisfying the vague and subjective requirements" for a CON; [*Id.* at 20]; (4) three of the nine members of HSDA voted "yes" on TCH's CON application, [*Id.*]; (5) TCH provided statistical evidence of "an estimated 1,000 drug overdose[s] in the previous decade, and some 500 area residents were driving . . . daily from the Johnson City area over dangerous mountain roads, as often as daily, for treatment at the nearest OTP's [sic] in North Carolina," [*Id.*]; (6) "[a]bout 145 die of drug overdoses in the Johnson City area annually," *[Id.*]; (7) TCH has "ample assets to build and fit out the clinic," [*Id.* at 21]; (8) TCH projected that an OTP in Johnson City would quickly grow to 1000 patients, providing sufficient income to operate, [*Id.*]; (9) no standard of care MMT existed within 50 miles of Johnson City, [*Id.*]; (10) HSDA bowed to public pressure from Johnson City's "official and frenetic opposition to the clinic" in denying the CON, [*Id.*], (11) TCH's CON application fell within the range of 'reasonable difference of opinion' as to whether it met CON criteria" as evidenced by the three "yes" votes, [*Id.*]; and (12) there is "no evidence that the HSDA panel members were unreasonable in their findings" (apparently referring only to the three members who voted "yes.") [21] [*Id.* at 20-21].[22]

As set forth above, claims of intentional discrimination under the ADA are analyzed under the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green.* Analyzing the claims under that standard, however, has been made a significantly more difficult task for the Court by failure of the parties to address the step-by-step analysis. In fact, plaintiffs completely ignore the analysis in their briefing, never mentioning *McDonnell Douglas* at all. As

---

[21] Plaintiffs make the puzzling claim that the state defendants "bear the burden of proof in showing that the 'yes' votes were unreasonable."

[22] Plaintiffs make these factual allegations without any citation to the record in the case.

best the Court can glean from the pleadings, however, the following reflects the respective positions of the parties on each of the steps of the analysis.

It does not appear that there is any dispute between the parties over the first and second parts of the *prima facie* case, that is, that plaintiffs have a disability and are otherwise qualified. [23] There does appear, however, to be a clear dispute about the third, i.e., whether plaintiffs have been excluded from participation in, denied the benefits of, or subjected to discrimination under the program **because of** their disability. *Anderson*, 798 F.3d at 357 (citing *Tucker*, 539 F.3d at 532) . As the Sixth Circuit succinctly stated in *Anderson*:

> In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the "[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the [ ] decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Turner*, 195 Fed. Appx. at 353; *see also Tucker*, 539 F.3d at 553 (holding that to make out a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must establish [ ] that he or she was *intentionally . . .* subjected to discrimination . . . *because of* his or her disability.") (emphasis original, internal quotation marks and brackets omitted); *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) rejecting a plaintiff's ADA claim for intentional discrimination because the plaintiff could not show that the defendants' actions were "because of her disability").

*Id.* 798 F.3d at 357. Stated slightly differently, the ADA requires plaintiff to present sufficiently "significant" evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior. *Gohl v. Livonia Public School District*, 836 F.3d 672, 682 (6th Cir. 2016). This is all simply another way of saying that plaintiffs "must establish a but-for relationship between the protested act and the individual's disability". To survive summary judgment, plaintiffs must

---

[23] *See M.X. Group, Inc. v. City of Covington*, 293 F.3d 326, 336 (6th Cir. 2002).

"identify specific facts which support a connection between the disability" and the denial of the CON. *See Sheffler v. Lee*, 2016 WL 878499 (W.D. Ky. March 7, 2016).

Plaintiffs apparently claim they were denied a CON by HSDA because of intentional discrimination on account of plaintiffs' disability, i.e., drug addiction. Plaintiffs have no direct proof of discrimination except that they point to some statements made by a couple of members of HSDA about local opposition in the Johnson City community. [Doc.223 at 18]. (Mr. Mills: I'm seeing a lot of opposition from, you know, the City of Johnson City—from, you know, other entities in the area—but I'm not seeing a lot of support at all, except for the applicant and the partner" [Doc. 45-10 at 191]; Mr. Southwick: I see it really as a staunch opposition in this particular area to this kind of treatment and also, obviously, opposition to the provider themselves;" Mr. Southwick: "[T]here is no political support, no community support, no support in the immediate area." [*Id.* at 87-88]). None of these statements, however, are proof that HSDA's decision to deny TCH's CON application was *because of* bias against drug addicts or that local opposition somehow tainted HSDA's decision. The statements are nothing more than a simple acknowledgement by two members of HSDA, one of whom voted "no" and the other of whom voted "yes," that there exists community opposition to the application. They are not evidence of disability discrimination, or even if circumstantially so, do not prove that disability was a but-for cause of the rejection of the CON application. Plaintiffs' claim thus fails at the third step of the analysis for a *prima facie* case. Even if they could, however, establish the third factor that would not change the outcome for the reasons stated below.

Once plaintiffs make out a *prima facie* case, as set out above, the defendant "must then offer a legitimate, nondiscriminatory, reason" for its challenged action, i.e., denial of the CON application. The burden is satisfied if the defendant "simply 'explains what he has done' or

'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (quoting *Bd. Of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2 (1978)). The burden on the defendant is simply one of production, not persuasion. The burden of persuasion never shifts and "remains at all times with the plaintiff." *Id*. at 253. In other words, the defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id*. at 254. The plaintiffs' burden "merges with the ultimate burden of persuading the court . . . of intentional discrimination." *Id*. at 255.

Although not analyzed specifically by the parties in the context of the *McDonnell Douglas* framework, the state defendants clearly claim that the CON application was denied because HSDA did not find that it met the criteria established in Tennessee state law, that is, need, economic feasibility, and orderly development of health care. Once a legitimate reason for the challenged action has been shown, as here, plaintiffs must then show that the proffered reason is simply a pretext for discrimination. Plaintiffs can provide sufficient evidence of a pretext for unlawful discrimination by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A. B. Dick Co*., 231 F.3d 1016, 1021 (6th Cir. 2000)). The test is not a rigid one but is rather a commonsense inquiry. *Blizzard v. Marion Tech. Coll*., 699 F.3d 275, 285 (6th Cir. 2012).

### i.     Basis in Fact

Plaintiffs argue that they "provided sufficient, indeed overwhelming evidence, of satisfying the" requirements for a CON; provided statistical evidence of a significant number of overdose deaths in the Johnson City area; provided evidence that hundreds of residents were

driving daily from Johnson City to North Carolina for standard of care methadone treatment; provided evidence that TCH was financially sound with sufficient assets to build and operate the clinic; showed that there was no MMT within 50 miles of Johnson City; and established that "TCH's CON application fell within the range of 'reasonable difference of opinion' as to whether it met the CON criteria." In short, plaintiffs claim they should have been granted a CON.[24] The state defendants clearly dispute that plaintiffs have provided sufficient, much less overwhelming, evidence of need, economic feasibility, and orderly development. That, however, is an inquiry better suited for an administrative appeal of the CON denial, which TCH has foregone, and the Court's inquiry here is not whether the above facts are disputed, but whether state defendants proffered reason for the denial of the CON has **any** basis in fact.

The record includes very substantial evidence to support the denial of the CON and there is no genuine issue of fact in this record over whether the denial had a basis in fact. First of all, plaintiffs' admission that their CON application fell within the range of "reasonable difference of opinion" as to whether they met the CON criteria means that the opposite also falls within the range of reasonable difference of opinion. Second, TDMHSAS conducted its statutorily required review and analysis of TCH's CON application[25] and concluded that "[n]eed has not been clearly

---

[24]  This is the subject of Count 17 of plaintiffs' complaint which seeks review of the HSDA's decision pursuant to the state Administrative Procedures Act. Count 13 was previously dismissed by the Court. [*See* Doc. 163 at 14-15].

[25]  The TDMHSAS analysis set out in detail the criteria for a CON for a non-residential methadone facility from the Guidelines for Growth:

> . . . these and other specific criteria are listed in the Guidelines for Growth:  1) A non-residential methadone facility should provide adequate medical, counseling, vocational, educational, mental health assessment, and social services to patients enrolled in the program with the goal of the individual becoming free of opioid dependency; 2) need  should be based on information prepared by the Applicant which acknowledges the importance of considering the demand for services along with need as well as addressing and analyzing service problems; 3) the need assessment should also cover the proposed service area and include the utilization of existing service providers, scope of services provided, patient origin, and patient mix; 4) the Applicant should show that the geographic service area is reasonable and based on an optimal balance between population density

established," "[e]conomic [f]easibility has possibly been established," and "[t]he project does not contribute to the orderly development of health care." [Doc. 214-4 at 6-7]. According to TDMHSAS, TCH took national projections and improperly applied them to the Johnson City area, resulting "in a misrepresentation of need." [*Id*. at 9]. TDMHSAS concluded that "[m]any of the conclusions and inferences drawn by the Applicant from cited references are not scientifically based and national studies and statistics are mis-applied to the Upper Northeast, Tennessee area." [*Id*]. The TDMHSAS analysis committed several pages of detailed analysis to support its conclusion. As for economic feasibility, TDMHSAS found that "[t]he overall cost of the proposed project appears to be reasonable" and that the project could "be completed in a timely manner." [*Id*. at 7]. The analysis noted, however, that it was of concern that, while documentation had been provided that the managing member had sufficient personal brokerage account balances to implement the project, staff of TDMHSAS could not find requested documentation from "a banking institution, Certified Public Accountant, etc. that demonstrates financial resources and/or reserves to implement the proposed project." [*Id*. at 13]. Finally, when assessing the project's contribution to the orderly development of health care, TDMHSAS noted that TCH had been organized solely for the purpose of operating the Johnson City facility and "has no prior experience in the operation of this type of facility or program other than the leadership and experience of it Manager who has 'successfully opened nine (9) such facilities in four (4) states in five (5) years.'" [*Id*. at 17].

---

and service proximity and show that the project is sensitive and responsible to the special needs of the service area in terms of accessibility to consumers, particularly women, racial and ethnic minorities, and low-income groups; and 5) the Applicant should show the project's relationship to policy as formulated in local and national plans, including need methodologies.

[Doc. 214-4 at 5]. Plaintiffs refer to these criteria as "vague and subjective." The Court disagrees.

The report noted that there were no agreements or affiliations with any emergency hospitals in the area, nor with the East Tennessee State University James H. Quillen College of Medicine in Johnson City which, according to its Dean of Medicine, did not have any participation in the development of the proposal and did not support the clinic's opening. [*Id.*] No medical director had been identified[26] and the staffing chart did not contain enough information to determine if staffing requirements would be met or if staff would have the appropriate certification. [*Id.* at 18]. The report also noted that TCH had requested zoning variances to accommodate the project but that the proposal did not appear to meet the zoning criteria.[27]

Finally, the record of the CON hearing itself contains ample evidence to defeat any attempt by plaintiff to show that the denial of the CON had no basis in fact. A number of people, both in support and in opposition, appeared at the hearing. Among them was Stephen Loyd, a board-certified internal medicine physician, associate professor of medicine at the Quillen College of Medicine, associate chief of staff for education at the Mountain Home VA Medical Center, and a practicing hospitalist. Loyd is a national speaker on proper prescribing practices, a member of the subcommittee appointed by the State Health Related Boards charged with writing guidelines for pain clinics in Tennessee, and a speaker for the task force of the health related boards on providing education about the opiate narcotic epidemic in Tennessee, [Doc. 45-10 at 61-63].

---

[26] During the HSDA hearing on the CON application, one of the members stated that she would have preferred for the medical director of such a proposed facility to appear before HSDA in support of the application. [Doc. 45-10 at 192].

[27] At the beginning of the HSDA hearing on the CON application, HSDA's general counsel noted that the zoning issue was the subject of a federal court action and urged members "that the decision not be based on zoning . . . because it hasn't been definitively determined . . ." [Doc. 45-10 at 9]. Plaintiffs point to nothing in the record to suggest that TCH's lack of zoning approval played any part in the denial of the CON, thus completely undercutting their argument of a "Catch-22" with regard to zoning and CON approval.

While acknowledging the medical benefits of methadone treatment, Loyd stated opposition to the CON application on the basis of the application itself, which proposed a clinic with a part-time physician to see 1046 patients. [*Id*.]. Loyd cited the testimony of the manager, Mr. Kester, before this Court in TCH's initial lawsuit against Johnson City, No. 2:13-CV-108, that the clinic would utilize a contract physician nine to twelve hours per week, an average of 41 seconds with each patient, or if seen monthly, an average of two and one-half minutes per patient. [*Id*. at 66-67].[28] Loyd criticized TCH's business model as not meeting CON standards which require "adequate medical services with a goal of the individual becoming free of opiate dependency." [*Id*. at 66-67].[29] Loyd recounted what some of his own patients had said about their prior experience with another of the MMTs operated by Mr. Kester, TCH's managing partner: no, or very limited, contact with a doctor; denial of medication to patients unable to pay;[30] dosing impaired people and then allowing them to drive (largely because of lack of proper evaluations); limited time with counselors; and no drug screens or drug screens positive for benzodiazepines[31] without counselling about the risk of overdose. [*Id*. at 68-69]. Deficiency reports from Kester's other clinics indicated that counselors were not properly trained and charts had no individual treatment plan. [*Id*. at 70]. Loyd characterized the CON application as one for a "pill mill." [*Id*. at 71]. ]

---

[28] Kester confirmed that TCH's business model contemplated 12 hours a week of physician or physician assistant time, four hours a day for three days a week. [Doc. 45-10 at 107].

[29] Loyd also noted a concern that the proposed clinic refused to participate in TennCare, Tennessee's Medicaid program, even though 20-25 percent of the patient population at the proposed clinic would receive buprenorphine, a service covered by TennCare. [Doc. 45-10 at 51-52]. Kester confirmed that TCH's proposed clinic would not accept TennCare but said the same was true at the other 12 facilities in Tennessee and patients would be provided a receipt so they could seek reimbursement from TennCare. [*Id*. at 89].

[30] In "Tennessee's Health Guidelines for Growth" a non-residential methadone treatment facility "should provide adequate medical, counseling, vocational, educational, mental health assessment and social services to patients enrolled in the opioid treatment program with the goal of the individual becoming free of opioid dependency." [Doc. 41-9 at 34].

[31] According to Loyd, "if you look at drug-overdose deaths in the State of Tennessee, the number-one things found in the toxicology reports are methadone and benzodiazepines." [Doc. 45-10 at 69].

Dr. Bomar Herrin, a Johnson City board certified addiction care specialist, with 35 years in practice, also appeared in opposition to the CON. He echoed many of the same things stated by Loyd, but specifically addressed the standard of care for addiction treatment. [*Id*. at 72-73]. Dr. Herrin took issue with TCH's claim that methadone maintenance treatment was the standard of care for addicts. He noted that the Tennessee Medical Foundation had for 30 years stressed "abstinence-based recovery" and opined that methadone, a Schedule II drug, is "not the best drug" for treatment and "[t]here is a better chance of overdose with methadone." [*Id*. at 73]. According to Herrin, he had just recently returned from a meeting of the American Board of Addiction Medicine and "didn't hear anybody say that methadone was superior to buprenorphine," a Schedule C drug "less likely to create an overdose than methadone." [*Id*. at 73-74]. Johnson City has one buprenorphine-certified doctor for every 1,200 people, a much lower ratio than is found in Tennessee's capitol, Nashville, where the ratio is one certified physician for every 18,000 people. [*Id*. at 47].

Although these facts are contradicted by documents and testimony offered by TCH in support of its application, that is of little import here. These facts are far more than sufficient to refute any suggestion or argument by TCH that the CON denial "had no basis in fact" and there is no genuine issue of material fact on this factor.

### ii.     Did Not Actually Motivate the Denial of the CON

With regard to the second factor, the question is whether a genuine issue of material fact exists as to whether the denial of the CON was actually motivated by the record before HSDA, or if it was because of disability discrimination. Since plaintiffs did not specifically address this factor, it is difficult to discern their argument that a genuine issue of material fact exists. Plaintiffs do complain about HSDA's "facially invalid" statutory procedures, but they offer no

evidence to show that the notice requirements of Tennessee Code Annotated § 68-11-1607(c)(3) had any connection to the denial of the TCH CON application, as noted by this Court in its prior order and the Sixth Circuit in its opinion. [Doc. 172 at 12]. The only effort made by the plaintiffs that can be construed as an effort to do so is the argument by plaintiffs that "HSDA panel members admitted that local opposition weighed significantly on their thinking," citing the comments referenced earlier in this memorandum by members Southwick and Mills. These comments, however, do not create a genuine issue of material fact.

Plaintiffs also argue that the CON criteria "is [ ] vague, subjective, and subject to discriminatory abuse," and that TCH's application "clearly fell within the 'subjective range' of satisfying HSDA's vague and subjective CON criteria." [Doc. 223 at 22-23]. Even if the reasons were subjective, however, that does not raise an inference of disability discrimination. *See Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 269 (6th Cir. 2010) (citing *Geiger v. Tower Automotive*, 579 F.3d 614, 625 (6th Cir. 2009); *Browning v. Dept. of the Army*, 436 F.3d 692, 697 (6th Cir. 2006); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). Nor can the plaintiffs reasonably rely on an argument that somehow the CON criteria are flawed. Even if HSDA made an unwise decision or the criteria are faulty, that would likewise not support an inference of discrimination. *See Id.* (citing *Coleman v. Quaker Oats*, 232 F.3d 1271, 1285 (9th Cir. 2000)). Accordingly, since there is no evidence in the record that HSDA members had any discriminatory animus toward plaintiffs or others with drug addiction[32] or that anything other than the actual record before HSDA was the cause of the denial, there is no genuine dispute as to

---

[32] Indeed, the record shows the opposite. HSDA had approved an earlier application for a MMT in Johnson City, [Doc. 45-10 at 13], and had, as the Sixth Circuit stated, "issued CON's [sic] for 12 other methadone clinics in Tennessee, so this staff recommendation cannot simply be attributed to local opposition or lack of zoning approval, much less bias against opiate-addicted individuals." [Doc. 172 at 11].

a material fact as to whether HSDA's reasons for the denial were not the actual motivation for the denial of the CON application.

### iii. Insufficient To Warrant Denial

Finally, as to the third factor, the Court concludes, largely for the reasons set forth in subsection b.i. above, that no reasonable trier of fact could conclude that plaintiffs have established that the facts and testimony before the HSDA panel were insufficient to justify its denial of TCH's CON application.

In sum, the Court finds that plaintiffs have not created a genuine issue of material fact that defendants' reason for denial of the CON is mere pretext. Accordingly, defendants are entitled to summary judgment on Count 10 of plaintiffs' complaint and the Court will enter judgment in favor of defendant and against plaintiffs on Count 10 of the second amended complaint.

### d. Count 12-Failure of HSDA to Make a Reasonable Accommodation

In Count 12, plaintiffs state their cause of action as follows: "HSDA violated Title II of the Americans with Disabilities Act by failing to provide TCH a reasonable accommodation to allow it to locate its proposed OTP clinic in Johnson City, Tennessee." [Doc. 136 at ¶ 337]. According to the factual allegations of the complaint, plaintiffs made requests for accommodation (1) on or about June 17, 2003, when TCH requested by letter that HSDA provide TCH with a reasonable modification "to allow the granting of TCH's CON application;" [*id*. at ¶ 192]; (2) at the CON hearing, TCH requested that HSDA provide a reasonable modification "to allow the granting of TCH's CON application," [*id*. at ¶ 193]; and (3) on or about June 28, 2013, TCH requested by letter that HSDA provide a reasonable modification "to allow the granting of TCH's CON application." [*Id*. at ¶ 194]. Plaintiffs allege that "HSDA

could easily, without undue burden, modify one or all of the criteria related to need, economic feasibility, and orderly development (and for that matter any and all other rules, if any, presently stopping the CON from being issued) and allow the CON application to be approved." [*Id.* at ¶ 200].

Plaintiffs do not specify which of the criteria for a CON they refer to or how it could have been modified, nor do they specify what rules could be modified. They simply seek modification of any "criteria" or "rules" which are "stopping the CON from being issued." [*Id.*]. Plaintiffs' 25 page brief in support of their motion for summary judgment contains only one paragraph of conclusory argument on this issue. [Doc. 213 at 28]. In their brief of opposition to the motion of the state defendants, plaintiffs identify what they call "a very reasonable modification . . . [f]or the State Defendants . . . to adopt the findings of the three HSDA Panel members" who voted "yes." [Doc. 223 at 9]. No matter how characterized, the essence of plaintiffs' rejected modification was "to allow the granting of TCH's CON application." [*Id.* at 15]. Plaintiffs made the same vague and conclusory allegations in *TCH III* and the Court has thoroughly considered, and rejected, them in its memorandum opinion in that case, which is now on appeal to the Sixth Circuit. For the same reasons their reasonable accommodation claims filed against the other state defendants failed in *TCH III*, they fail here as well.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). The statute defines "discriminate" to include "not making reasonable accommodation . . ." *Id.* at § 12112(b)(5)(A). Three inquiries are made with respect to a requested accommodation: (1) Whether the modification requested was reasonable, (2) whether it was necessary for the disabled individual, and (3) whether it would fundamentally alter the nature of the program or activity. *PGA Tour,*

*Inc. v. Martin*, 532 U.S. 661, 682-83 (2001). An ADA plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys. and Forum Health*, 335 F.3d 445, 457 (6th Cir. 2004)).

"[A]n accommodation is reasonable unless it requires 'a fundamental alteration in the nature of a program' or imposes 'undue financial and administrative burdens.'" *Smith & Lee Assoc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir) (quoting *Southeastern Cmty. College v. Davis*, 442 U.S. 397, 410, 412 (1979)). The Supreme Court has indicated that, "in most cases," determining whether an accommodation is "reasonable" will require the district court "to conduct an individualized inquiry and make appropriate findings of fact." *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 (1987). "In cases involving waiver of applicable rules and regulations, the overall focus should be on 'whether waiver of the rule in the particular case would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Jones v. City of Monroe*, 341 F.3d 474, 480 (6th Cir. 2003) (quoting *Dadian v. Village of Wilmette*, 269 F.3d 831, 838-39 (7th Cir. 2001)). The burden of proving that an accommodation is not reasonable lies with the public entity. *Id.*

The purpose of the CON requirement in Tennessee is set out at Tennessee Code Annotated § 68-11-1603 where it is declared "to be the public policy of this state that the establishment and modification of health care institutions, facilities and services shall be accomplished in a manner that is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the health care of the people of Tennessee." The Court agrees with the state defendants that the "modification" requested by the plaintiffs is objectively unreasonable and would result in a fundamental alteration of the

Tennessee CON program. Plaintiffs' demand for a "blanket exception" from the requirements of the Tennessee program "would be so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Jones*, 341 F.3d at 480. In fact, plaintiffs have offered no legal authority or case law support for their very broad theory of this case, which seems to go something like this: "I am disabled or seek to provide a covered health service to the disabled; therefore, I should be automatically exempt from all statutory and regulatory criteria, i.e., need, economic feasibility, and orderly development, for the issuance of a CON." Such an approach would not only undermine the purposes of the Tennessee Health Services and Planning Act, it would destroy it altogether. Under plaintiffs' theory, any hospital, nursing home, surgical center, and like facility that provides health services to any disabled person would become automatically approved for a CON and, in effect, be totally exempt from the requirements of the Health Services and Planning Act. The ADA does not require such a result.

### e.  *Olmstead v. L.C. ex rel Zimring*

In one paragraph of their response to the motion of the state defendants for summary judgment, plaintiffs make the following claim: "HSDA's contention of no discriminatory intent is betrayed by Johnson City's spectacular *Olmstead* violation by officially opposing TCH's CON application, even bringing in a paid lobbyist and accompanied mass public opposition." [Doc. 223 at 16]. The claim is followed by one paragraph:

> Federal courts find that an ADA Title II violator may attempt to "conceal discriminatory intent by claiming that they relied upon objective, neutral criteria" when deciding to leave the requirement intact. But the animus described above reveals that any purported justifications are mere pretext. Johnson City spectacularly violated the Olmstead [sic] integration mandate when the Mayor opposed, in his official capacity, and a paid lobbyist "lead [sic] the opposition" against TCH's CON application. The official opposition was accompanied by a mass opposition and dozens of

letters of opposition from virtually every state and federal official
from Johnson City.

[*Id.*].

The state defendants reply to this "new" argument, raised "for the first time," in plaintiffs' response by correctly noting that neither *Olmstead* nor "integration mandate" are mentioned in any of plaintiffs' complaints filed in the case. The state defendants also correctly argue that, even if plaintiffs can now assert such a claim, it fails as a matter of law.

In *Olmstead*, the Supreme Court recognized that "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." *Olmstead*, 257 U.S. at 596. Following the *Olmstead* decision, the "DOJ announced its view that the disability discrimination claim recognized in Olmstead is not limited to individuals already subject to unjustified isolation, but also 'extend[s] to persons at serious risk of institutionalization or segregation.'" U. S. Dep't of Justice, Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans With Disabilities Act and *Olmstead v. L.C.*, Q.6 (updated June 22, 2011), available at www.ada.gov/Olmstead/q&a_Olmstead.htm) (last visited 8/24/17). *See also Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016).

In order to state a claim under *Olmstead's* integration mandate, a plaintiff must establish a sufficient risk of institutionalization by showing that "a public entity's failure to provide community services . . . will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Davis*, 821 F.3d at 262-63 (emphasis in original). Plaintiffs have simply failed to plead sufficient facts here which would make out a claim under *Olmstead* or the integration mandate.

**V. Conclusion**

For the reasons set forth herein, the motions for summary judgment filed by Johnson City and the State Defendants, [Docs. 215, 218] will be GRANTED and plaintiffs' motion for summary judgment, [Doc. 212], will be DENIED and plaintiffs' second amended complaint will be DISMISSED WITH PREJUDICE.

A separate judgment will enter.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
